IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| ANDY DURIS, | : | No. 11-cr-573 |
| | : | |
| JAMES SWAN, | : | No. 11-cr-580 |
| | : | |
| MICHAEL PATTERSON, and | : | No. 11-cr-582 |
| | : | |
| VICTOR PHILLIP. | : | No. 11-cr-583 |

MEMORANDUM OPINION

TIMOTHY R. RICE                                                                                          August 1, 2012
U.S. MAGISTRATE JUDGE

As described by its own director of security, the Boeing Company's Ridley Park facility

was a mess five years ago.  Some work areas were openly littered with drug paraphernalia.

Special Agent Raymond Carr of the Federal Bureau of Investigation ("FBI") described

prescription drug abuse among Boeing workers as an "epidemic."  To make matters worse,

Boeing apparently was unable to negotiate a collective bargaining agreement with the United

Auto Workers Union ("UAW") that would have allowed it to randomly test employees for

prescription drug abuse on the job.[1]

All of this transpired while the United States was fighting a war on two fronts -- our

nation's most expansive military initiative since World War II.  As U.S. soldiers sacrificed their

lives in battle, Boeing workers -- some of whom were trafficking in, and abusing, prescription

drugs on the job -- were manufacturing some of the most sophisticated helicopter weaponry in

---

[1]This year, however, after the arrests made as a result of Agent Carr's investigation, the
local chapter of the UAW agreed to an expanded drug policy that includes testing for prescription
painkillers.

the world: the V-22 Osprey and the CH-47 Chinook.

Following a joint investigation by the FBI and the Drug Enforcement Administration, dozens of Boeing employees have been charged with, and many convicted of, either distributing or attempting to illegally possess prescription drugs at Boeing's Ridley Park facility between 2007 and 2011.  As sentencing approaches for those convicted of attempted possession of illegal prescription drugs, defendants William Wallace Wilson, Andy Duris, Michael Homer, Jeffrey Lynn Forbes, Thomas Alfred Lees, Vincent Joseph Demsky, George Anthony Torres, III, James Swan, John Francis Shalkowski, Michael Patterson, Victor Phillip, and William Brian Summers seek special pre-judgment probation under 18 U.S.C. § 3607(a).[2]  This unique statute allows first-time, misdemeanor drug offenders to obtain dismissal of the proceedings upon successful completion of a probationary term lasting up to one year.

The government has filed a blanket opposition to all § 3607 requests and urges me to exercise my broad discretion to deny special probation to all Boeing defendants for a variety of reasons, primarily the critical role the company and its employees play in our national defense. During a two-day hearing on the pending motions, the government offered testimony by eight witnesses, including Agent Carr, Boeing employees, and cooperating defendants who used and sold prescription drugs at the Ridley Park facility.  Counsel agree that the requests of Duris, Swan, Patterson, and Phillip are now ripe for consideration.[3]  For the reasons that follow, I will grant the requests of Duris and Phillip, but deny the requests of Swan and Patterson.

---

[2]Although Shalkowski has not filed a written motion invoking § 3607 yet, his counsel announced at recent change-of-plea hearings that he intends to do so.

[3]I will dispose of the remaining defendants' requests at sentencing, after hearing additional evidence specific to each of them.

Our nation has long struggled to reconcile its war-time patriotism and quest for national security with its need to safeguard individual liberty, due process, and a sense of fairness.  See Boumediene v. Bush, 553 U.S. 723 (2008) (ruling Military Commission Act unconstitutional and granting Guantanamo Bay detainees habeas corpus privileges); Korematsu v. United States, 323 U.S. 214 (1944) (upholding order requiring Japanese-Americans in "military areas" on the west coast to evacuate their homes and submit to military control); Schenck v. United States, 249 U.S. 47, 52 (1919) (finding the right to free speech to be limited during World War I, reasoning "[w]hen a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured").  As explained further below, a blanket denial of special probation to a class of defendants working in the defense industry is inconsistent with the principle of individualized sentencing.  See 18 U.S.C. § 3553(a).  This is especially critical here, because the government has offered little evidence that any individual offenders jeopardized national security by producing defective weaponry, or were cited for poor work performance at Boeing.  The critical role of Boeing's work in our national defense is only one factor in the § 3607 determination; it cannot serve as a talisman that overrides the intent of Congress to afford first-time, misdemeanor drug offenders a rare opportunity for redemption.

I must consider the individual circumstances of each defendant in the larger context of drug abuse at Boeing.  For example, some defendants became unwittingly addicted to pain medication following surgery or serious injury, have led otherwise crime-free lives, and performed years of unblemished service at Boeing.  Their cases fall squarely within the heartland of what Congress envisioned when it enacted § 3607.  Others, however, merit denial because they abused leadership positions at Boeing, sold drugs for profit, continued to offend after

receiving an opportunity for redemption through a state or local first-time-offenders program, or

refused to confront the serious nature of their crimes.

## FACTUAL BACKGROUND[4]

Like most companies, Boeing has a policy prohibiting the use, possession, and sale of

controlled substances and drug paraphernalia on its property.  Employees are subject to drug

testing based on "reasonable suspicion" and after involvement in serious accidents.[5]  Boeing does

not fire an employee after a positive drug test.  Rather, the worker receives a Compliance

Notification Memorandum placing conditions on his continued employment, which remain in

effect for three years and include drug treatment pursuant to a Substance Abuse Recovery Plan.[6]

Similarly, an employee facing termination based on attendance or work quality problems is

permitted to keep his job with Boeing if he voluntarily admits the problems stem from substance

abuse and successfully completes drug treatment.  In these instances, the company is aware of,

and monitors, the employee's treatment.

Boeing's drug policy also includes a generous Employee Assistance Program ("EAP"),

which permits workers to voluntarily, confidentially, and at the company's expense, seek

treatment for substance abuse issues.  An employee who avails himself of drug treatment through

---

[4]My factual recitation is based on the testimony of the government's witnesses at the evidentiary hearing held on Defendants' § 3607 motions on July 11 and 23, 2012.

[5]David Bouse, the Human Resources Director at the Ridley Park facility, testified about the drug policy.  He also explained that, before March 2012, the policy did not permit Boeing to test for prescription painkillers.  When asked why the company did not seek to negotiate with the UAW to amend the policy sooner and allow such testing, Bouse offered no satisfactory explanation.

[6]None of the four defendants whose § 3607 motions are ripe for disposition now were subject to Compliance Notification Memoranda at the time of their arrests.

EAP retains his job and may collect disability benefits -- also at the company's expense -- if he seeks them.  Neither Boeing nor any future employers are made aware of the employee's problem or treatment.  There is no limit on the number of times an employee may utilize EAP services.  Signs and posters designed to remind employees of the EAP and its purpose were included on both Boeing and UAW billboards throughout the Ridley Park facility.

Robert Fasold, a former police detective, has been the director of corporate security at Boeing's Ridley Park facility since 2003.  By 2005, based on tips from employees, a number of on-the-job assaults and accidents, a scrap-metal theft problem, and drug paraphernalia he recovered in work areas, Fasold suspected there was wide-spread drug abuse among workers at the facility.[7]  In 2006, he asked UAW leadership for help addressing the problem.  When drug abuse at Boeing persisted, Fasold sought assistance from the Delaware County District Attorney's Office and, eventually, from the FBI.

Agent Carr, an experienced drug investigator, began investigating the use and sale of illegal drugs at the Boeing Ridley Park facility in 2007.  After interviewing workers, developing confidential informants, and setting up undercover purchases, Agent Carr identified approximately two dozen individuals who were illegally selling oxycodone and fentanyl at the facility.  Some of those individuals agreed to cooperate with the investigation.  They were asked to wear audio and video recording devices and sell placebos drugs so that Agent Carr could

---

[7]The government presented photographs of paraphernalia Fasold recovered at the Ridley Park facility, including a crack pipe, a bag of cocaine, prescription pill bottles, and wrappers and sticks from fentanyl lollipops.

identify individuals who bought and used the illegal painkillers on the job.[8]  Despite the

"epidemic" nature of the drug problem at the Ridley Park facility, Agent Carr testified he could

not recall anyone at Boeing complaining of increased quality control problems or citing such

concerns as a reason for initiating the investigation, and those issues were never the focus of his

investigation.

Three sellers of illegal drugs who were identified, arrested, and charged as a result of

Agent Carr's investigation described the atmosphere at the Ridley Park facility during the years

leading up to their arrests.  Stephen Ellis testified that, after two years working at the facility, he

began getting painkillers from his friends so that he could sell them at work, because he

recognized there was "a market" for illegal prescription drugs among his Boeing coworkers.  He

sold to a total of about thirty customers, making between fifteen and twenty sales -- a total of

thirty-to-sixty pills -- each week.  According to Ellis, he observed visible, physical signs of on-

the-job drug use among his coworkers on a nearly daily basis.

Jonathan Sullivan testified he became addicted to prescription painkillers after having

dental surgery and experiencing a knee injury.  He recognized signs of the drug problem at

Boeing within his first week of training there in 2009.  When he began illegally using painkillers,

he had little trouble discovering which coworkers used and sold them.  Over time, he went from

taking five-milligram pills once a day, to taking larger doses every four hours.  Although

prescription pain pills were the most commonly abused drug among his coworkers, he testified

he used cocaine at work once, and he knew other employees occasionally used marijuana,

---

[8]The twelve defendants seeking § 3607 probation were identified during this "reverse
buy" phase of the investigation.

cocaine, and nitrous oxide.  Some employees also illegally used and sold suboxone.  He

estimated twenty-five percent of the employees assigned to his work area during his shifts used

illegal drugs at work.

Sullivan sold pain pills to support his own habit, and also sometimes traded work for pills

-- i.e., he agreed to do another worker's tasks in addition to his own.  According to Sullivan, he

was "Superman" when he was taking pills.  He claimed he worked harder and faster, had more

energy, and had difficulty performing his duties only when he stopped taking pills and

experienced withdrawal.  Sullivan had "not one iota" of concern about the quality of the work he

performed while using painkillers.  In July 2011, however, Sullivan realized he had a drug

problem and took advantage of Boeing's EAP program.  He testified he has been drug-free ever

since.

Charles Haux became addicted to prescription painkillers after taking them to treat a

broken thumb in 2006.  Haux testified he bought, used, and sold illegal prescription drugs at the

Ridley Park facility.  He used the drugs about three times each day in order to avoid suffering

painful withdrawal symptoms, and also made between five and ten sales each day.  His

customers included Duris, Swan, Patterson, and Phillip.  After he was identified as a seller by

Agent Carr, Haux agreed to cooperate with the investigation.  During the course of his

cooperation, he sold placebo pills or lollipops to each of the four defendants at least once,

capturing each transaction on videotape.  Haux testified he was an "excellent" employee, even

while using drugs on the job.  When asked whether any of his supervisors ever expressed concern

about the quality of his work, Haux responded: "They loved me."

Dr. George Downs, a professor and Dean Emeritus of Philadelphia College of Pharmacy

at the University of the Sciences, testified as an expert in pharmacy with a specialty in substance

abuse issues.  According to Dr. Downs, abuse of opiates causes more deaths per year in the

United States than car accidents.  See also Timothy W. Martin, Bill Aims to Deter Painkiller

Abuse, Wall St. J., July 19, 2012, at A6 ("[T]he nation's growing addiction to prescription

painkillers . . . killed more people in 2011 than heroin and cocaine combined.").  Dr. Downs

opined that prescription drug abuse would not result in increased energy, strength, or efficiency.

Even a person taking such drugs pursuant to a valid prescription would be required to restrict

activities like driving and use of heavy equipment, because the drugs, like alcohol, alter

perception.  Dr. Downs was "not sure" whether a person under the influence of such drugs could

function "normally" without a doctor to regulate dosage.

Finally, Obie Jones, the Director of Operations at three Boeing facilities, including Ridley

Park, testified the employees who were arrested as a result of Agent Carr's investigation missed

more work, were involved in more accidents, and received more corrective action memoranda

from supervisors than similarly situated UAW workers in general.  According to Jones, absences,

accidents, and rule-breaking behavior reduce productivity.  He admitted, however, he could not

identify any specific production defect that was tied to the performance of any individual

defendant.  Like Bouse, Jones could not explain why Boeing was unable to negotiate a

prescription drug testing policy with the UAW before 2012.

SPECIAL PROBATION STATUTE

Section 3607, also known as the Federal First Offender Act ("FFOA"), provides:

> If a person found guilty of an offense described in section 404 of the Controlled
> Substances Act (21 U.S.C. 844)--

8

> (1)     has not, prior to the commission of such offense, been convicted of violating a Federal or State law relating to controlled substances; and
>
> (2)     has not previously been the subject of a disposition under this section;
>
> the court may, with the consent of such person, place him on probation for a term of not more than one year without entering a judgment of conviction.  At any time before the expiration of the term of probation, if the person has not violated a condition of his probation, the court may, without entering a judgment of conviction, dismiss the proceedings against the person and discharge him from probation.  At the expiration of the term of probation, if the person has not violated a condition of his probation, the court shall, without entering a judgment of conviction, dismiss the proceedings against the person and discharge him from probation.

§ 3607(a).  The FFOA permits first-time, misdemeanor drug offenders to avoid the harsh consequences of a federal criminal conviction.  Its legislative history provides no insight into Congress' intent in enacting the statute, nor does it supply any guidelines for its application.  See Gov't's Mem. Opp'n Defs.' Mots. Special Probation at 5, United States v. Wilson, No. 11-571 (E.D. Pa. July 10, 2012) [hereinafter Gov't's Br.] (quoting a Senate Report which essentially paraphrases the statute itself).  Likewise, there is little relevant caselaw interpreting § 3607.[9]  The parties have identified -- and my own research has revealed -- only one case in which a sentencing court conducted a written analysis of § 3607 under circumstances relevant here.  In that case, the defendant sold more than 100 oxycodone pills to a government informant to raise money to pay for her grandmother's medical care.  United States v. Castro, No. 10-711, 2012 WL 1174677, at *2 (S.D.N.Y. Apr. 9, 2012).  The defendant had no criminal history, was employed

---

[9]A majority of the cases that discuss the statute do so in the context of immigration proceedings.  See, e.g., Nunez-Reyes v. Holder, 646 F.3d 684 (9th Cir. 2011) (comparing effect of conviction later expunged under state first-time offender law with effect of expungement pursuant to FFOA for purposes of removal proceedings).

and pursuing education, engaged in no acts of violence, sold no drugs to civilians who would

have been harmed by them, and voluntarily ceased her criminal behavior.  Id. at *3.  She pleaded

guilty to possessing a controlled substance -- a misdemeanor -- and sought special probation

pursuant to § 3607.  Id. at *1.  The sentencing court considered the factors identified in 18 U.S.C.

§ 3553(a), and imposed nine months of special probation pursuant to § 3607.  Id. at *2-3.

GENERAL SENTENCING FACTORS

A sentencing court has broad discretion to fashion an appropriate sentence.  See United

States v. Voelker, 489 F.3d 139, 155 (3d Cir. 2007).  That discretion, however, must be guided

by the factors enumerated in 18 U.S.C. § 3553(a):

| | | |
|---|---|---|
| (1) | the nature and circumstances of the offense and the history and characteristics of the defendant; | |
| (2) | the need for the sentence imposed-- | |
| | (A) | to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; |
| | (B) | to afford adequate deterrence to criminal conduct; |
| | (C) | to protect the public from further crimes of the defendant; and |
| | (D) | to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; |
| (3) | the kinds of sentences available; | |
| (4) | the kinds of sentence and the sentencing range established [by the relevant sentencing guidelines] . . . ; | |
| (5) | any pertinent policy statement [by the Sentencing Commission] . . .; | |
| (6) | the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and | |
| (7) | the need to provide restitution to any victims of the offense. | |

§ 3553(a); see also Castro, 2012 WL 1174677, at *1-3.

In addition to these enumerated factors -- or perhaps as a component of the first factor,

"characteristics of the defendant" -- I also will consider performance on pretrial supervision.

Each defendant has been supervised for ten months, and their compliance with the terms of their

supervision -- or lack thereof -- is probative of their amenability to probation in general, and

special probation under § 3607 in particular.

ANALYSIS

The parties agree Duris, Swan, Patterson, and Phillips are eligible for § 3607 relief: all

have been found guilty of misdemeanor drug offenses; none have been convicted previously of a

drug offense under federal or state law; and none have received probation pursuant to § 3607

before.  The parties also agree I am not bound to grant special probation to any defendant simply

because he meets these eligibility requirements.  Instead, I must consider the same factors that are

relevant to any sentencing determination to assess whether § 3607 probation is appropriate for

each individual defendant.  See United States v. Gonzalez, 365 F.3d 796 (9th Cir. 2004) (where

defendant met statutory criteria, sentencing court properly applied preponderance-of-the-

evidence standard to find defendant intended to sell the drugs he possessed, and denial of § 3607

probation was not an abuse of discretion).

I.      Duris

Duris worked for Boeing as a composite fabricator for nearly thirty years.  He was a union

committeeman and shop steward.  The government suggests I should deny his request for § 3607

probation because he was temporarily terminated from his position in 1983 for falsifying

company time records, and because he received a one-day suspension without pay in 2007 for

"leaving a full piece of backing in a lay-up."  See Gov't's Br. at 19-20.[10]  I disagree.

Duris is an ideal candidate for special probation.  Haux testified Duris bought "a couple"

---

[10]The government does not explain what the terms "backing" or "lay-up" mean, and the record before me contains no further description of Duris' 2007 infraction.

pills from him about once a week, for less than one year.  Duris was arrested after he was

recorded once buying placebo pain pills from Haux.  The transaction itself was unremarkable,

aside from the fact it took place on Boeing property.  There is no evidence Duris used the pills at

work -- either in connection with the recorded transaction, or on any other occasion.  Similarly,

there is no evidence he ever sought or used other controlled substances.  Although Duris had a

24% absence rate,[11] he received no write-ups for attendance or other infractions, and incurred no

recordable injuries during the course of the investigation.  He also has satisfied all conditions of

his pretrial supervision, reporting as required and consistently testing negative for controlled

substances.  Accordingly, I will grant Duris' motion pursuant to § 3607.

II.      Swan

Swan was hired by Boeing in 2009 as a composite fabricator.  The government has

offered several specific reasons why special probation is not an appropriate disposition for Swan,

and I will exercise my discretion to deny his request pursuant to § 3607 for the following reasons.

In 2009, Swan received the benefit of a state diversion program for first-time offenders

following his arrest for driving under the influence and causing an accident.  Although his

participation in that program does not statutorily disqualify him for § 3607 probation, the spirit of

the FFOA is not served by allowing an individual to escape the consequences of a criminal

conviction for a second time.

---

[11]The average absence rate for all union workers at the Ridley Park facility was 17.4%.
However, the government's evidence of the defendants' absenteeism is of limited value.  The
data used to calculate the rates included as "absences" all of the following: unexcused absences,
approved vacation or sick days, late arrivals, and other partial-day absences.  Jones, who
compiled the data, admitted he did not account for many relevant factors, including the amount
of vacation time an individual had accrued based on seniority, the reason for the absence, and the
amount of time missed on any given day.

Moreover, the evidence reveals Swan purchased placebo pills from Haux three times in a single day.  Haux also testified Swan previously sold him steroids at the Ridley Park facility. Swan was written up twice in the past two years -- once for attendance problems, and once for breaking a rule and causing a work delay.[12]  He also logged a recordable injury in April 2010.[13]

Finally, although Swan has reported as required during his pretrial supervision, he has tested positive for opiates numerous times, including once after he completed inpatient drug treatment.  Based on his prior diversion opportunity, the extent of his drug activity at Boeing, and his continued use of drugs while on pretrial supervision, I will deny Swan's motion for § 3607 probation.

III.     Patterson

Patterson began working at Boeing in 1985.  During the years of the investigation, Patterson was an inspector in operational support, and also served as the UAW president at the facility from March 2010 to January 2011.  His abuse of illegal drugs while holding leadership positions at Boeing is one of several factors justifying denial of Patterson's request for special probation.

In 1992, Patterson benefitted from a first-time-offender diversion program in New Jersey state court after being arrested for marijuana possession.  As discussed above with respect to Swan, this fact removes Patterson from the intended reach of the FFOA.

Haux testified Patterson was his customer for two years, buying prescription painkillers,

---

[12]Swan's absence rate during the relevant time period was 31%.

[13]This fact alone, however, would not merit denial of Swan's motion.  Some defendants began using illegal painkillers after work-related injuries, so it is unclear whether a defendant's recordable injury caused, or was caused by, prescription drug abuse.

marijuana, and suboxone.  Patterson was videotaped buying pain pills and fentanyl lollipops from Haux three times in September 2011, and in one videotape, he is shown consuming a fentanyl lollipop at work immediately after purchasing it.  Haux testified he used drugs with Patterson on other occasions both on and off work property, and he characterized Patterson's addiction as "getting bad" in 2011.  In one of his recorded transactions with Haux, Patterson discussed purchasing cocaine, mentioned two sources from whom he sometimes obtained it, and offered to provide Haux with "a taste" next time he bought some.  These facts reveal the extent of Patterson's criminal activity and the depth of his addiction while working at Boeing.[14]

Patterson's performance on pretrial supervision generally has been satisfactory.  He tested positive for marijuana after his arrest, but has completed a short inpatient detox program and attended outpatient drug treatment.  All subsequent drug tests have been negative.  Patterson also has submitted fourteen character letters from family, friends, and coworkers, all of whom cite positive contributions Patterson has made to their lives.

These mitigating factors, while noteworthy, do not outweigh Patterson's abuse of his leadership positions, the extent of his criminal activity, and his prior opportunity to avoid a criminal conviction for a drug-related offense.  As such, I will deny his motion for § 3607 probation.

IV.    Phillip

Phillip, an Army veteran, worked as a composite fabricator at Boeing for twenty-five years.  During that time, he received numerous awards and commendations for his positive

---

[14]Additionally, Patterson possessed oxycodone, which was obtained pursuant to a legal prescription, at the time of his arrest.  His ability to obtain painkillers legally makes his decision to buy and use pain pills and other drugs illegally even more troublesome.

contributions to the company.  The government has cited no specific, individualized reasons to deny Phillip's request for special probation.  Like Duris, Phillip is a good candidate for disposition pursuant to § 3607.

Haux testified he sold illegal prescription drugs to Phillip for five years, and that the two men sometimes used the drugs together while at work.  During the investigation, Phillip twice bought placebo painkillers from Haux in transactions that were captured on video.[15]  Although Haux testified Phillip also bought marijuana on occasion, there is no evidence he ever used it on Boeing property.  Likewise, there is no evidence Phillip ever sold or distributed any drug.

Phillip's criminal behavior is mitigated by his service in the military and at Boeing, as well as his active involvement in charitable causes.  See Def.'s Mem. Supp. Req. Pre-Judgment Probation at 4 (describing Phillip's efforts to raise money for a Delaware County charity in memory of his grandson, who died in 2008).  Further, he has performed well on pretrial supervision, seeking voluntary treatment and submitting only negative drug tests.  Accordingly, I will grant Phillips' request for special probation.

V.      Conditions of Special Probation

My discretion to place conditions on a defendant's term of special probation is as broad as my discretion to grant a request for such probation.  Based on all of the facts and considerations discussed above, I conclude Duris' and Phillip's terms of special probation shall last one year, and shall be subject to the following conditions: 1) intensive, random drug testing; 2) drug treatment and counseling, as needed based on the assessment of the Probation Office; and

---

[15]Phillip had a recordable injury to his wrist in March 2011, and his absence rate was 38%.  For the reasons stated above, I have afforded little weight to these factors.  See notes 11, 13, supra.

3) 200 hours of community service in a program that assists military veterans or the families of active-duty servicemen and women.  The community service condition is important to ensure the defendants recognize the critical role they played, as Boeing employees, in supporting those men and women who have so nobly served our nation in wartime.

If Duris and Phillip do not violate these conditions, I will dismiss the proceedings against them without entering judgments of conviction, and discharge them from probation at the expiration of the one-year term.

An appropriate order follows.