IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-571 |
| | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | July 11, 2012 |
| WILLIAM WALLACE WILSON | : | 9:51 o'clock a.m. |

. . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-573 |
| | : | |
| v. | : | |
| | : | |
| ANDY DURIS | : | |

. . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-574 |
| | : | |
| v. | : | |
| | : | |
| MICHAEL HOMER | : | |

. . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-580 |
| | : | |
| v. | : | |
| | : | |
| JAMES SWAN | : | |

. . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-582 |
| | : | |
| v. | : | |
| | : | |
| MICHAEL PATTERSON | : | |

. . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-583 |
| | : | |
| v. | : | |
| | : | |
| VICTOR PHILLIP | : | |

. . . . . . . . . . . . . . . . . . .

CONSOLIDATED HEARING ON MOTION FOR PRE-JUDGMENT PROBATION
BEFORE THE HONORABLE TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

APPEARANCES:

| | |
|---|---|
| For the Government: | ASHLEY K. LUNKENHEIMER, ESQUIRE<br>FAITHE MOORE TAYLOR, ESQUIRE<br>U.S. Attorney's Office<br>615 Chestnut Street, Suite 1250<br>Philadelphia, PA   19106 |
| For the Defendant<br>William W. Wilson: | PAUL M. MESSING, ESQUIRE<br>Kairys Rudovsky Messing & Feinberg<br>The Cast Iron Building, Suite 501S<br>718 Arch Street<br>Philadelphia, PA   19106 |
| For the Defendant<br>Andy Duris: | STEPHEN D. MOLINEUX, ESQUIRE<br>225 MacDade Boulevard<br>Collingdale, PA   19023 |
| For the Defendant<br>Michael Homer: | DAVID LAIGAIE, ESQUIRE<br>Dilworth Paxson LLP<br>1500 Market Street, 3500E<br>Philadelphia, PA   19102 |
| For the Defendant<br>James Swan: | KAI N. SCOTT, ESQUIRE<br>Federal Community Defender Office<br>Curtis Center, Suite 540 West<br>601 Walnut Street<br>Philadelphia, PA   19106 |
| For the Defendant<br>Michael Patterson: | THOMAS A. DREYER, ESQUIRE<br>6 Dickinson Drive<br>Building 100, Suite 106<br>Chadds Ford, PA   19317 |
| For the Defendant<br>Victor Phillip: | PETER J. SCUDERI, ESQUIRE<br>419 Avenue of the States, Suite 405<br>Chester, PA   19013 |

- - -

| | |
|---|---|
| Audio Operator: | Sharon A. Hall |
| Transcribed by: | Tracey J. Williams, CET<br>Grace Williams, CET |

(Proceedings recorded by For the Record Gold digital sound recording; transcript produced by AAERT-certified transcriber.)

1        (The following hearing occurred in open court at

2    9:51 o'clock a.m.:)

3        THE COURT:  Have a seat everyone.

4        All right.  I've been getting all sorts of telephone

5    reports about what we're doing today.  So who wants to start?

6    Mr. Scuderi, go ahead.

7        MR. SCUDERI:  Good morning, your Honor.

8        Your Honor, yesterday I received this brief, the

9    Government's brief, at 4:17 p.m.  I then received an e-mail

10   at 7:49 p.m., I received Jencks material at 10:26 p.m., then

11   I received something else at 10:37 p.m.  I've had -- most of

12   these documents were given to me today, I have not been able

13   to prepare a response.  A lot of the documents are employee

14   manuals concerning what Boeing does with employees who have

15   drug problems.  If you read their brief, you'll see on Page

16   14 that they talk about their program, which is confidential.

17   In the last page of their brief they say that we should not

18   have 3607 consideration because future employers should know

19   that these people have drug problems or they may have drug

20   problems.

21       So their brief is internally inconsistent.  I don't

22   know what Boeing's program is, but if it is confidential, I

23   assume it is not disseminated to anybody, maybe not even the

24   Air Force, or to future employers.  So I need that date, I'd

25   like to subpoena Boeing's records to find out what they do

1    with other employees in situations where there's not a

2    Government indictment.

3            They also make allegations that these people may be

4    responsible for accidents all over the world with Chinooks.

5    It's a broad, overreaching argument about many, many things.

6    They also -- I'd like to respond in writing to their brief

7    how they analyze U.S. v. Castro and I'd just like to read

8    everything before I proceed and cross-examine anybody.  I've

9    had no opportunity to go through these documents.

10           THE COURT:  Okay.  Ms. Taylor or Ms. Lunkenheimer?

11           MS. TAYLOR:  Could we hear every -- I'm sorry, your

12   Honor.  I don't understand what Mr. Scuderi means,

13   confidential means the program that Boeing runs is

14   confidential to the employee, not confidential to the world.

15   That's one.  As to his responding to our response, I have no

16   comment on that.  It is their motion, we oppose the motion.

17   We've told Counsel that long ago.  We filed our response

18   yesterday to their motion.  The documents we're giving them,

19   in our opinion, is all rebuttal, much of which they already

20   have, some of which we recently got, like the Boeing manual.

21   The employees get this manual, the employees know about this.

22   We haven't given them anything that their clients did not

23   have or could not have.  We gave them the Boeing manual on

24   the employee-assistance program, we gave them their clients'

25   employee records that we subpoenaed, we gave them...

transcripts to tapes they already had received in discovery,
we gave them Jencks before our witnesses testified when they
didn't have to get it until after our witnesses testified.

What I can agree with Mr. Scuderi on is this: We
gave them a lot of stuff that they also had access to and we
gave it to them yesterday, there is no denying that. The
question we had was, this is their motion, we're opposing
their motion. We're bringing in general witnesses, as well
as specific witnesses. We gave everything before we
presented those witnesses when we could have given it to them
right after the witnesses testified; we did not do that, we
gave it to them in advance. Is it enough time for Mr.
Scuderi to review? I don't know the answer to that. He says
it's not enough time; if it's not enough time, it's not
enough time. But they have to first put on evidence for
their motion, then the burden shifts to the Government to
rebut or respond to that motion. The Government is prepared
to do that generally and that's to four of the Defendants,
not Mr. Wilson, because Mr. Messing wants to preserve that,
we're prepared to respond to them specifically. Their motion
alleged seven things, we're entitled because we're not this,
we're not this, we're not this, we're not this, we responded
to those seven things. This is part of a sentencing hearing,
so we also gave them information on 3553 factors that
typically we wouldn't have until sentencing or would be in a

PSR but, because that's relevant to the question of 3607

eligibility, we subpoenaed those things and gave them to them

also in advance. They should know their client's employment

history better than we do, they should know if their client

had disciplinary actions long before we did, they should know

their client's criminal history long before we did. What

they would not know in detail is every page of that Boeing

employee-assistance manual, but their client does. In fact,

Mr. Scuderi references that program in his argument as to why

his client should get 3607.

So I agree with Mr. Scuderi, we gave them a lot of

materials last night, I don't agree that that was improper; I

believe in many instances it was premature, but we gave it to

them because otherwise we'd have to give him to afterwards,

take time to review it, cross-examine the witness. I don't

disagree with what anyone wants to do. If they're ready, we

are ready. Our witnesses are here, we're ready to proceed.

I don't want to put them in an unfair position, but I don't

think we have.

THE COURT: Okay.

MR. SCUDERI: Your Honor, could I respond to that?

THE COURT: Yeah, sure.

MR. SCUDERI: And I was --

THE COURT: Or wait -- Mr. Messing, do you want to

say something because you have to leave, is that it?

1          MR. MESSING:  Yes, and I apologize.

2          THE COURT:  Okay.

3          MR. MESSING:  Ms. Taylor and I had discussed this

4    and agreed that we can defer consideration of the 3607 issue

5    until the time of sentencing for Mr. Wilson, which is October

6    4th.

7          THE COURT:  Now, how about the testimony that

8    they're contemplating presenting today, do you --

9          MR. MESSING:  We would simply incorporate that,

10   that's not an issue.

11         THE COURT:  Do you want to have a right to cross-

12   examine anyone?

13         MR. MESSING:  I believe that that will be adequately

14   covered, I don't think --

15         THE COURT:  I'm sorry?

16         MR. MESSING:  I believe that will be adequately

17   covered, Ms. Taylor and I could --

18         THE COURT:  By the other lawyers?

19         MR. MESSING:  -- work out stipulations if it becomes

20   necessary, I don't think it will be an issue.

21         THE COURT:  Is your client here?

22         MR. MESSING:  He is.

23         THE COURT:  Mr. Wilson?  Is that --

24         MR. MESSING:  Yes, that's Mr. Wilson.

25         THE COURT:  Where is he?  Oh.  Do you agree with

1    that, sir?

2              THE DEFENDANT WILSON:  Yes.

3              THE COURT:  So we're going to -- unless Mr.

4    Scuderi's motion is granted, we're going to be presenting

5    testimony today about factors relating to this 3607 --

6              MR. MESSING:  Not about Mr. Wilson.

7              THE COURT:  Not about Mr. Wilson personally --

8              MR. MESSING:  That's correct.

9              THE COURT:  -- but about the Boeing operation

10   generally.

11             MR. MESSING:  Yes, that is fine.

12             THE COURT:  And you're agreeable with your lawyer

13   that you're going to waive that?

14             THE DEFENDANT WILSON:  Yes, sir.

15             THE COURT:  Any objection from the Government?

16             MS. TAYLOR:  No, sir.

17             THE COURT:  All right.  So what are we going to do?

18   With respect to Mr. Wilson's specific issues, we're going to

19   deal with those before sentencing?

20             MS. TAYLOR:  Yes, your Honor.

21             THE COURT:  Is that agreeable, Mr. Messing?

22             MR. MESSING:  Yes, it is, sir.

23             THE COURT:  All right.  So you can be excused -- is

24   that what you want?

25             MR. MESSING:  Mr. Wilson as well?

1           THE COURT:  Is that your request?  Yes.  Mr. Wilson,

2    thank you for coming and thanks for participating.

3           MR. MESSING:  Thank you.

4           THE COURT:  All right.

5           Now, Mr. Scuderi, back to your request.

6           MR. SCUDERI:  Your Honor, this case was indicted in

7    2011, many, many months ago the Government knew that we were

8    going to apply for 3607 relief.  I have never been told why

9    they were opposing the motion, I was never given one reason.

10   I filed my brief preemptively trying to guess what their

11   reason was, they filed the brief last night.  Last night, I

12   was never told -- correct me if I'm wrong.  Was I wrong?

13          MS. TAYLOR:  I'm not talking to you, Counsel --

14          THE COURT:  Well, why don't you guys --

15          MS. TAYLOR:  -- you're talking to the Court.

16          THE COURT:  -- why don't you guys talk to me one at

17   a time rather than --

18          MS. TAYLOR:  Yeah, I wasn't talking to him or you,

19   your Honor.

20          MR. SCUDERI:  Okay.  Well, last night I received an

21   e-mail at 7:49 which provides a list of five witnesses and

22   it's the first time I received this e-mail, I wasn't aware of

23   these people.  One of the witnesses is an expert, I received

24   his resume this morning.  I think I need time to prepare to

25   cross-examine that witness.  It is an integral part of their

1　brief.  I didn't know they were going to say that, I didn't

2　know they were going to reference this manual to the extent

3　that they did.

4　　　　　THE COURT:  But your client had the manual, right?

5　　　　　MR. SCUDERI:  He had the manual.  And I looked at

6　the manual, but I would have to re-read it to see where the

7　information -- they raise an issue about confidentiality.

8　　　　　THE COURT:  But I don't understand.  If your client

9　had the manual, you had the manual, why is there any

10　prejudice today about talking about the manual that everybody

11　has known about except me.

12　　　　　MR. SCUDERI:  Well --

13　　　　　THE COURT:  I'm the only one who doesn't know

14　anything about the manual.

15　　　　　MR. SCUDERI:  Do I have a right to subpoena records

16　about other people, other employees who accessed that program

17　and whether their information was disseminated to either

18　other potential employers or to the Government?  That is

19　exculpatory --

20　　　　　THE COURT:  Say that again?  Just run it by me

21　again, I didn't hear you.

22　　　　　MR. SCUDERI:  Okay.  On Page -- in the last page of

23　their brief, which I'm sure your Honor has, it talks about

24　Victor Phillip, the section relating to Victor Phillip.

25　　　　　THE COURT:  Okay.

1    MR. SCUDERI:  And basically what it says is that

2    this should be denied with Victor Phillip, there's no other

3    reason other than to notify future employers that he was a

4    drug user, it's on Page 21.  There are no specific arguments

5    against Victor Phillip as there are against the other

6    employees.

7         THE COURT:  Okay.

8         MR. SCUDERI:  And it says future employers of those

9    employees other than Boeing Company --

10        THE COURT:  What line are you on?  I'm sorry.  Where

11   are you?

12        MR. SCUDERI:  I'm halfway down the page.

13        THE COURT:  Okay, I got you.

14        MR. SCUDERI:  It says it prevents future employers

15   of these employees other than the Boeing Company from having

16   any notice that these Defendants participated in the use and

17   abuse of prescription drugs.  I would like to know whether

18   anybody who avails himself of this program, whether Boeing

19   disseminates their names if they retire and go to work for

20   somebody else, I think it's critical to understand that.

21        THE COURT:  No, she's talking about special

22   probation, not the Boeing policy.

23        MR. SCUDERI:  I understand that.  But what I'm

24   saying is that if Boeing disseminates it all -- I think it's

25   important what Boeing does.  Boeing has a policy where if

1   somebody has an alcohol or a drug problem that they put them

2   in a program, they're not fired, they're not charged with a

3   crime, as far as I know.

4           THE COURT:  The employee-assistance program?

5           MR. SCUDERI:  The employee-assistance program --

6           THE COURT:  Okay.

7           MR. SCUDERI:  -- that's what they're saying.  What

8   the Government is saying here is that it's essential that

9   there's a record of this, that they're not admitted into 3607

10  so future employers know about this.  I want to know if

11  somebody who voluntarily goes into Boeing and is caught on

12  the premises using or abusing drugs have the same issue,

13  whether Boeing will tell some future employer, whether they

14  view it as a risk, I think that's important.

15          THE COURT:  Okay.  Well, we can ask the witness when

16  they testify.

17          MR. SCUDERI:  I have no way of corroborating that.

18  We can ask -- we can -- I have no way of cross-examining him.

19  They may do it with a thousand people, I have no way of

20  knowing that.

21          THE COURT:  Well --

22          MR. SCUDERI:  I was going to subpoena the records.

23  If your Honor --

24          THE COURT:  Well, you can't -- all right.

25          MR. SCUDERI:  I can't subpoena the records?

```
1          THE COURT:  Well --

2          MR. SCUDERI:  They've blacked out all the

3   information on the 302s, I don't need their names.

4          THE COURT:  No, I don't think you would be within

5   your rights to subpoena records of other employees'

6   confidential requests for drug assistance.

7          MR. SCUDERI:  I don't need their names, I need

8   dispositions.  I'm sure they have disposition tables as to

9   what they do, I'm sure --

10          THE COURT:  All right.  Well, we can --

11          MR. SCUDERI:  -- there are people that --

12          THE COURT:  -- we can talk about that.  I don't

13   think that's a reason to delay the hearing.

14          MR. SCUDERI:  Okay.

15          THE COURT:  But what other prejudice would be -- I

16   mean, the problem is we sent out notice of the hearing, what,

17   a month ago?  That we're having this hearing.  All these

18   people are here, prepared to testify, and I'm trying to

19   figure out what prejudice there is from going forward with

20   the witnesses who are here based on what we know right now.

21   I mean, everyone has known we were doing this for a month.

22          MR. SCUDERI:  Right.

23          THE COURT:  So I don't understand why there's all

24   these big surprises.  Your client knew what the policy was at

25   Boeing, you know their position that this is a defense plant
```

1   and therefore it's special, I mean, I don't think that's been

2   kept a secret.

3          MR. SCUDERI:  I don't have the data on that.  I

4   didn't know what they were going to put on, I didn't know

5   what their response was going to be.  I mean, we had over a

6   month for this hearing, they filed a brief last night, we got

7   information this morning.

8          THE COURT:  They filed a response to your motion.

9          MR. SCUDERI:  Correct.

10         THE COURT:  So they were responding to your motion.

11  You asked for special -- what's it called, special probation?

12         MR. SCUDERI:  Yes.

13         THE COURT:  Special probation.  They filed a

14  response saying, we don't think it should happen for these

15  reasons and we're prepared to put on testimony.  Everyone

16  knew we were going to have witnesses here today and nobody

17  said --

18         MR. SCUDERI:  I didn't know that.

19         THE COURT:  -- I need more time.

20         MR. SCUDERI:  I didn't know that.

21         THE COURT:  I scheduled the hearing a month ago.

22         MR. SCUDERI:  There was nothing there about

23  witnesses, I was never given any notice of any witnesses.

24         THE COURT:  Isn't that what a hearing is?  It wasn't

25  scheduled for oral argument, it was scheduled for a hearing.

1    I don't have the Court notice, but --

2              MR. SCUDERI:  Okay.

3              THE COURT:  -- does anybody have it?

4              What do the other Counsel -- Ms. Scott?

5              MS. SCOTT:  Your Honor, I have an issue separate and

6    apart from the other Counsel, my client is not here.  I

7    represent James Swan.  I had called Mr. Swan this morning

8    about 20 after 9:00 to see how close he was to the courtroom,

9    thinking he was right out on Market Street, and when I spoke

10   to him he indicated that he thought the hearing started at

11   1:30, which is in fact the time that the previously scheduled

12   sentencing hearing started.  And apparently he was looking at

13   that notice and believed that this hearing also started at

14   1:30.  I knew two days ago when I spoke with him that he was

15   going to be here today, I did not confirm at that time the

16   time because I assumed that we were all on the same page.

17             I have spoken to Mr. Swan, he did indicate to me

18   that he was getting dressed immediately and was going to be

19   here, and that it was going to take probably about an hour

20   for him to arrive.  I am going to await his presence until he

21   gets here and move forward with the hearing and, when he gets

22   here, obviously he gets here.

23             THE COURT:  All right.  Well, we can just arrange

24   not to present any testimony unique to Mr. Swan until he gets

25   here.  Is that agreeable, Ms. Taylor?

1          MS. TAYLOR:  Yes, your Honor.

2          THE COURT:  All right.

3          MS. SCOTT:  Thank you, your Honor.

4          THE COURT:  All right.  Who else wants to be heard?

5     Mr. Laigaie?

6          MR. LAIGAIE:  Good morning, your Honor, nice to see

7     you again.

8          THE COURT:  Nice to see you again also.

9          MR. LAIGAIE:  As you know, I'm a latecomer to the

10    picnic.  It seems to me there's a different set of

11    considerations which adhere to the attempt by the Government

12    to put expert opinion into the record.  I think under Rule 16

13    there are requirements for those of us who had asked for

14    discovery that adhere to experts; we should have had a

15    report, we should have a good idea of what the expert is

16    going to say.  I can tell you, I am befuddled as to how I can

17    cross-examine this fellow Mr. Downs or Dr. Downs, because I

18    don't know what he's going to say and, even if I did, even if

19    at 10:00 o'clock last night I learned, I wouldn't know what

20    the hell to ask him anyway because I'm not a pharmacologist.

21         So I would ask that the expert testimony be stricken

22    today for failure to produce discovery beforehand.

23         MR. SCUDERI:  I join that, your Honor.

24         MR. MOLINEUX:  Good morning, Stephen Molineux on

25    behalf of Andy Duris.

1            THE COURT:  Mr. Molineux, how are you?

2            MR. MOLINEUX:  Very good, sir, thank you.

3            I would join in both my co-counsels' arguments

4    regarding a continuance request.  I have -- just for

5    housekeeping purposes, I have brought Mr. Duris and George

6    Torres and I listed George Torres.  I realized that I had not

7    filed a motion for this consideration, I nonetheless brought

8    him down today.  And my understanding from speaking with Ms.

9    Taylor is that they're not going to oppose my subsequent

10   filing for Mr. Duris -- or for Mr. Torres' consideration for

11   this program.  Again, I would join in both the requests from

12   Mr. Scuderi and my co-counsel for --

13           THE COURT:  So what prejudice will you suffer today?

14           MR. MOLINEUX:  Again, I --

15           THE COURT:  Let's put the expert issue aside.

16           MR. MOLINEUX:  I didn't get an e-mail last night.  I

17   came into my office this morning back from vacation and there

18   was one e-mail and it was a transcript.  I received all of

19   this information this morning, I have not even had an

20   opportunity to review it with Mr. Duris or Mr. Torres, not to

21   mention the expert.  I don't have any idea what he's going to

22   testify to and I would like an opportunity to perhaps consult

23   with somebody who would be able to rebut whatever he's going

24   to say.  And, again, it's only anticipatory.

25           Mr. Scuderi filed a motion, a memorandum in support

1    of his position.  Again, I didn't -- I was going to wait

2    until afterwards because, as he indicated, it was preemptory,

3    he was anticipating what they were going to say today.

4           THE COURT:  Well, there's not going to be a ruling

5    today.  You can always file a response, you know, we can set

6    a briefing schedule if somebody wants to file a response

7    after that.

8           But what's your position, Ms. Taylor, on a

9    continuance?

10          MS. TAYLOR:  Your Honor, again, I do agree with one

11   thing Mr. Molineux said, we will not oppose a filing for Mr.

12   Torres.

13          THE COURT:  The filing of a motion for special

14   probation?

15          MS. TAYLOR:  The filing of a motion to proceed for

16   Mr. Torres.  The misconception here is that this is the

17   Government's burden to do anything.  This is their motion, so

18   nothing we filed is preemptory.  We responded to the people

19   that filed and to the people we thought were going to file,

20   that's all we did.  What Mr. Molineux has mostly is that same

21   employee manual, which we got yesterday and we turned over to

22   Counsel.

23          Again, there is no prejudice when I'm giving them

24   what their client has and which they already have access to.

25   I believe we should go forward today on the general portion.

1    As to Dr. Downs, there is no Rule 16 requirement in a hearing

2    that I give notice of my rebuttal witness to their motion.

3    There's no Rule 16 requirement, so we didn't, but we gave

4    them the summary of what he said.  Quite frankly, your Honor,

5    we weren't offering him as an expert in the sense that he can

6    do anything other than explain the treatment of opiate

7    addiction and substance abuse.  This is not an expert who is

8    going to offer an opinion to anything other than quite

9    frankly for this Court.  We brought Dr. Downs here to talk

10   about the science of opiate abuse, that is not.  He is not

11   going to testify about Mr. Phillip, Mr. Wilson or Mr.

12   anything else, he's simply testifying about opiates, the

13   addiction and how you treat it and what affect it has on the

14   abuser from the scientific perspective.

15           THE COURT:  Why is that relevant and why isn't

16   that --

17           MS. TAYLOR:  It's relevant.

18           THE COURT:  -- uncontested, on another point?

19           MS. TAYLOR:  I don't know why it's not uncontested.

20   It's relevant, your Honor, because the Government's argument

21   is here is twofold, but the first part of that argument is

22   the type of work these employees do is of a sensitive nature

23   that poses a risk to the end-user, which are the military

24   servicemen and women of this nation who use the V-22 and the

25   Chinook for transport.  So, if a worker is abusing this drug,

1   we anticipated that they would say there is no effect, that's

2   why my client is entitled to this.  But the science is

3   different and we believe the Court should know what the

4   science of opiate addiction is, because if the science is is

5   that an addict doesn't perform the way he would if he were

6   non-addicted then that is relevant to the Government's

7   argument that their addictive nature, behavior at work was

8   detrimental to the Boeing plant.

9         THE COURT:  But their argument is how can they

10  cross-examine your expert when they don't know the basis for

11  his opinion or they can't challenge the soundness of his

12  hypotheses.

13        MS. TAYLOR:  Then I would ask that we do this --

14        THE COURT:  Okay.

15        MS. TAYLOR:  -- maybe we could split the baby in the

16  middle.  We will present the direct of Dr. Downs today,

17  Counsel will then hear what Dr. Downs has to say.  Counsel

18  can then -- I guess I could bring Dr. Downs back to their

19  sentencing hearings or whatever other hearing.  Or I cannot

20  present Dr. Downs today and we can bifurcate this proceeding.

21  But Dr. Downs' testimony simply is the science of opiate

22  addiction, I don't understand why it would be controverted.

23        THE COURT:  Well, I understand, but he could be

24  wrong and they could -- they could do research and look into

25  his findings and find out that what he's saying is unsound or

1  illogic.  So I have to give them that opportunity to do that.

2  MS. TAYLOR:  I have no objection to doing it

3  whatever way the Court wants to do it.  If you want us to

4  present Dr. Downs' direct today, we can do that; if you wish

5  for us to present him completely at another day, I can check

6  his availability and we will do that.  Whatever you instruct

7  us to do is what we will do.

8  THE COURT:  Well, all right.  I haven't heard from

9  Mr. Dreyer.

10  MR. DREYER:  Your Honor, we are ready to proceed.  I

11  represent Mr. Patterson and we're ready to proceed today.

12  THE COURT:  Well, that's an interesting perspective.

13  (Laughter.)

14  THE COURT:  All right, thank you.

15  Well, I don't think we can go forward with Dr.

16  Downs.

17  MS. TAYLOR:  Very well.

18  THE COURT:  I think we're going to have to do that

19  at another session.  I mean, I can do that -- how much time

20  do you need, Mr. Scuderi and Mr. Molineux?

21  MR. SCUDERI:  Your Honor, just for the record, just

22  to clarify the record, we received two charts, Government

23  Exhibit 1 and 2, which I assume are relevant to Dr. Downs, I

24  just got his CV, I know the information.  So what co-counsel

25  is saying, I don't --

1          THE COURT:  I've already agreed --

2          MR. SCUDERI:  -- I'm not sure why we have this.

3          THE COURT:  Well, I've agreed with you.

4          MR. SCUDERI:  I understand.

5          THE COURT:  So what are you asking me?

6          MR. SCUDERI:  We also received 302s, I have not even

7    gone over the 302s with my client.

8          THE COURT:  Well, under statute --

9          MS. TAYLOR:  Your Honor --

10          THE COURT:  -- you're technically not even entitled

11   to them until after the witness testifies.

12          MR. SCUDERI:  I understand, I understand.

13          THE COURT:  So, I mean, they're entitled to offer

14   witnesses to rebut your argument.  This isn't like the

15   standard procedure in a criminal trial where the Government

16   has the burden and they're calling witnesses to prove

17   something against your client, they're putting rebuttal

18   evidence on in response to your request.  So they've given

19   you the 302s.

20          MR. SCUDERI:  All right.  My only burden is to show,

21   and I can proffer this, that my client has never been

22   convicted of a Federal or state offense and has never been

23   admitted into this program before.  I don't know if there's

24   any other burden.

25          THE COURT:  No, I don't think that's your burden, is

1   it?  I think your burden is to show that your client is
2   entitled to the benefits of the statute and it's a
3   discretionary call; it's not automatic if you haven't been
4   convicted.
5            MR. SCUDERI:  No, I'm just saying what my burden is.
6            THE COURT:  Right.
7            MR. SCUDERI:  To make my client eligible for this
8   provision, I have to show that he has not prior to the
9   commission of such offense been convicted of violating a
10  Federal or state law relating to controlled substances; and,
11  two, has not previously been the subject of a disposition
12  under this subsection.
13           THE COURT:  Don't you have to show by a
14  preponderance of the evidence that the statute should be
15  triggered?
16           MR. SCUDERI:  I don't see that in the --
17           THE COURT:  What's the legal standard?  What --
18           MR. SCUDERI:  The legal standard is has not prior to
19  the commission -- he's never been convicted of anything
20  before of this -- of a drug violation.
21           THE COURT:  Oh, so you're saying then the burden
22  shifts to the Government, is that what you're arguing?  That
23  once you show that he's never been convicted then the burden
24  shifts to the Government?
25           MR. SCUDERI:  Yes.

1          THE COURT:  All right.  Well, I think we're going to

2     have to reconvene to do Dr. Downs.  How much time do you

3     need, Mr. Scuderi?  Today is the 11th, I propose we do it on

4     July 23rd.  And we're never going to get a date that

5     everybody agrees to.  So unless we do it today, you know, I

6     can't do it based on the schedule of 14 or 20 people.

7          MS. TAYLOR:  Your Honor, July 23rd is acceptable to

8     the Government.

9          THE COURT:  July 23rd at 9:30 --

10         MR. SCUDERI:  That's fine, your Honor.

11         THE COURT:  -- we'll do Dr. Downs.

12         MR. LAIGAIE:  That's fine with me, your Honor.  I

13    just wanted to make sure we're on the same page in the sense

14    that there will be an expert report from the Government.

15         THE COURT:  I don't know.  Do you have a report?

16         MS. TAYLOR:  Your Honor, Rule 16 does not require us

17    to give a report --

18         THE COURT:  I understand you're not required to --

19         MS. TAYLOR:  -- in a sentencing hearing and we do

20    not have a report.

21         THE COURT:  Did he prepare a report?

22         MS. TAYLOR:  No, sir.  He prepared the charts.

23         THE COURT:  Well, why don't --

24         MR. LAIGAIE:  Your Honor, I would -- and I'm sorry

25    to overspeak --

1          THE COURT:  It seems like it would facilitate things

2    if --

3          MS. TAYLOR:  Your Honor, I will provide them within

4    the next week a summary.

5          THE COURT:  A summary of how he reached his

6    conclusions --

7          MS. TAYLOR:  Yes, sir.

8          THE COURT:  -- what that's based on, what his --

9          MS. TAYLOR:  Yes, sir.

10          THE COURT:  -- you know, the Daubert factors --

11          MS. TAYLOR:  Yes.

12          THE COURT:  -- what his methodology was, why is it

13    reliable, those types of things.  Okay?  Why don't you get

14    that -- today is the 12th, why don't you get that within

15    seven days --

16          MS. TAYLOR:  Yes, sir.

17          THE COURT:  -- to Counsel?  All right.

18          So we're going to postpone Dr. Downs.  Any other

19    issues from the defense?

20          MS. SCOTT:  No, your Honor.

21          MR. SCUDERI:  No, your Honor.

22          THE COURT:  Mr. Molineux?

23          MS. SCOTT:  No, your Honor.

24          THE COURT:  All right.  So otherwise I'm going to

25    deny the request for a continuance with the exception of Dr.

1   Downs and I'll grant that based on the fact that I think

2   Counsel needs additional time to study his methodology and

3   the reliability of his analysis.  So we'll reconvene on July

4   23rd at 9:30.  Can we get this courtroom, Sharon, do you

5   think?  Why don't we just tentatively schedule it for 16B

6   unless we tell you otherwise.

7           MS. TAYLOR:  And that is solely for Dr. Downs'

8   testimony, your Honor?

9           THE COURT:  Yes.  Is there anything else, anything

10  else we can do?

11          MS. TAYLOR:  Would the Court want to entertain doing

12  any of the witness-specific testimony that we are not

13  covering today?

14          THE COURT:  Yes.  Since Mr. Laigaie is going to be

15  here, could we do the witnesses' specific information on your

16  client?

17          MR. LAIGAIE:  Yes, your Honor, and we can --

18          MS. TAYLOR:  On the 23rd?

19          MR. LAIGAIE:  -- I can get that information that

20  I'll need for Mike Homer from you guys right after this

21  hearing.  That will be fine then, your Honor.

22          MS. TAYLOR:  You'll get it, not immediately after

23  this hearing, but you'll get it --

24          MR. LAIGAIE:  Well, not right after, but after.

25          MS. TAYLOR:  So we'll do Homer on the 23rd as well?

1          THE COURT:  We'll do Mr. Homer.  And any other --

2   anybody else?  How about Mr. Messing's client?

3          MS. TAYLOR:  We'll see if we can do Mr. Wilson that

4   day.

5          THE COURT:  Check with Mr. Messing if he's

6   available.

7          MS. TAYLOR:  Okay.  And Mr. Torres?

8          (Discussion held off the record.)

9          MS. TAYLOR:  Okay.

10          THE COURT:  Torres we're going to do?

11          MS. TAYLOR:  No, sir.

12          THE COURT:  No, okay.

13          MS. SCOTT:  Your Honor, depending on what time my

14   client gets here and how far along we get, it may be

15   beneficial to do Mr. Swan's on the 23rd as well.

16          THE COURT:  Well, it sounds like he's on his way,

17   right?

18          MS. SCOTT:  I'm hoping.  I ordered him to come, so I

19   believe he'll be here shortly.

20          THE COURT:  Okay.  I've never known anyone to defy

21   one of your orders, Ms. Scott.

22          All right, so we'll do Mr. Homer and possibly Mr.

23   Wilson.  Anybody else?

24          MS. TAYLOR:  Your Honor, if we could, there are

25   several defense attorneys not here?

1          THE COURT:  How about Mr. Lees?

2          MS. TAYLOR:  I was -- if we could do Mr. Lees?  If

3     we could notice those people for that day as well to see if

4     Counsel is available?

5          THE COURT:  Okay.

6          MS. TAYLOR:  And there are a few we have not heard

7     from formally.

8          THE COURT:  Okay.

9          MS. TAYLOR:  So we would reach out to those counsel

10    as well for their availability for the 23rd.

11         THE COURT:  Okay.  All right, great.

12         MS. TAYLOR:  Your Honor, so prior to -- your Honor,

13    I'm sorry.

14         THE COURT:  Yes.

15         MS. TAYLOR:  Prior to beginning, I think we need a

16    ruling on clarification of exactly what needs to happen.

17    What Counsel, Mr. Scuderi, has indicated to the Court is he

18    simply has to proffer or present evidence by some other

19    fashion that his client is not expressly excluded from

20    consideration under 3607 and then that triggers a shifting of

21    the burden to the Government.  The Government does not agree

22    with that assessment of how this proceeding should occur.

23    The difficulty is that there is very little guidance anywhere

24    on proceeding under 3607, but it is certainly a sentencing

25    consideration.  And so the moving party in a sentencing

1   consideration must prove its eligibility, not excludeability,
2   by a preponderance of the evidence.  So it's the Government's
3   position, which is why we prepared a rebuttal, that Counsel
4   cannot simply stand up and say, my guy has never had this
5   disposition under the Federal system and he has not been
6   convicted of a Federal or state narcotics violation;
7   consequently, the Court may then just automatically move him
8   into the program, now, Government, say why not.  They have to
9   show by a preponderance of the evidence their client's
10  eligibility for this program.  Their motions don't allege --
11  well, I take that back -- Mr. Scuderi's motion is very
12  detailed and he argues eligibility, the other motions simply
13  argue the base, we are not excluded.  And we would ask for a
14  ruling from the Court as to what -- whether, if this is a
15  sentencing hearing, must they prove it by a preponderance.
16  And then, respectfully, they have to put up something --

17          THE COURT:  Well, they have to put -- as I read the
18  statute -- I understand your argument, I don't think it's
19  something we need to wrestle with --

20          MS. TAYLOR:  Okay.

21          THE COURT:  -- because I don't think it's going to
22  matter at the end of the day.

23          MS. TAYLOR:  Okay.

24          THE COURT:  Because, as I read the statute, they
25  have to show that their client has not prior to the

1   commission of this offense has been convicted of violating a

2   Federal or state law relating to controlled substances and

3   has not previously been subject to disposition under this

4   subsection, then I have the discretion to give them special

5   probation. That's the way I read the statute. So, I think

6   the issue now is, what are all the relevant factors that

7   anybody wants to offer pro or con.

8           MS. TAYLOR: Right, then --

9           THE COURT: So I don't think the burden of proof

10   matters.

11           MS. TAYLOR: Okay, fair enough.

12           THE COURT: Is that fair?

13           MS. TAYLOR: That's fine.

14           THE COURT: Does everybody agree with that?

15           ALL COUNSEL: Yes, your Honor.

16           MS. TAYLOR: Then if we're going to proceed that

17   way, then we will not object to the proffer that then will

18   satisfy the first prong and we would of course not object

19   that their client would consent, which is also a requirement

20   under the statute. So if each Counsel then puts that on the

21   record, then --

22           THE COURT: Well, they filed a motion, right?

23   Everybody has filed a motion saying, my client will consent,

24   we want special probation. Has everybody done that? Except

25   Mr. Laigaie, who has done it now.

1          MS. TAYLOR:  He's --

2          MR. LAIGAIE:  I will do it, your Honor.

3          THE COURT:  Okay, very well.

4          Is there anybody who's here who you believe does not

5    statutorily qualify to seek special probation?  Mr.

6    Molineux's client, Mr. Scuderi's client, Ms. Scott, Mr.

7    Dreyer?

8          MS. TAYLOR:  We're not certain about Mr. Homer

9    because we don't have his stuff with us.  As to Mr. Swan, we

10   believe he is eligible.

11         THE COURT:  Okay.

12         MS. TAYLOR:  As to Mr. Duris, we believe he is

13   eligible.  As to Mr. Phillip, we believe he is eligible.

14   And...

15         THE COURT:  Mr. Patterson?

16         MS. TAYLOR:  Yes, as to Mr. Patterson, we believe he

17   is eligible --

18         THE COURT:  Okay.

19         MS. TAYLOR:  -- as to those four.

20         THE COURT:  So they're eligible, I have discretion

21   to do it if I want.  Why don't -- does any of the Defendants

22   want to put on any evidence?  If not, I know the Government

23   has witnesses.

24         MR. SCUDERI:  Your Honor, I filed a memorandum, as

25   you know, and this is a de facto sentencing hearing, a lot of

1   these facts would be in the PSR.  I don't know if there's any
2   dispute about anything that I put in there; if there is, they
3   can put on evidence about it.

4        THE COURT:  Okay.  All right.  Because I know the
5   Government has witnesses, I didn't know if anybody else had
6   witnesses.

7        Before we go to that, there's been a motion for a
8   protective order?

9        MS. TAYLOR:  Yes, just as to the Jencks, your Honor,
10  that we provided to Counsel.

11       THE COURT:  Did the defense get a copy of that?
12  Because I just got it this morning.

13       MS. LUNKENHEIMER:  Your Honor, we did e-mail them
14  and I do have copies available, I've given some to some
15  Counsel.  If they need copies, I have them.

16       THE COURT:  Does anybody want to be heard on that?
17  The Government wants a protective order precluding you from
18  disclosing, it appears, to your clients and to anyone else
19  any of the Jencks material.

20       MS. TAYLOR:  They can't give it to their clients --
21       THE COURT:  Right.
22       MS. TAYLOR:  -- they can't disseminate it, but they
23  can --
24       THE COURT:  They can talk about it, but they can't
25  disseminate it.

1          MS. TAYLOR:  Yes, sir.

2          MS. SCOTT:  I have no objection, your Honor.

3          THE COURT:  Mr. Scuderi?

4          MR. SCUDERI:  I have no objection.

5          THE COURT:  Okay.  Anybody else have an objection?

6          Now, the order you gave me only has the caption of

7     Victor Phillip.

8          MS. TAYLOR:  There were -- I think she filed --

9          THE COURT:  There's multiple orders?

10          MS. LUNKENHEIMER:  Your Honor, I --

11          MS. TAYLOR:  Yes.

12          MS. LUNKENHEIMER:  -- that's strange to me.  The

13     copy I have has all five -- it actually has all six --

14          THE COURT:  All right.  We'll go back on the docket

15     and print them out.

16          MS. LUNKENHEIMER:  Okay.  I have a copy --

17          THE COURT:  I'll grant it as unopposed.

18          MS. LUNKENHEIMER:  I have copies here, if you'd

19     like.  And it includes Mr. Laigaie too, because I did provide

20     him copies of the Jencks.

21          THE COURT:  Okay.  All right, I'll grant it as

22     unopposed.

23          Mr. Laigaie, do you have any opposition?

24          MR. LAIGAIE:  No opposition, your Honor.

25          THE COURT:  Okay.

1          (Pause.)

2          THE COURT:  All right.  I guess we're prepared to

3   hear some witnesses, Ms. Taylor?

4          MS. TAYLOR:  Yes, sir, your Honor.  The Government

5   would call Robert Fasold.

6          THE COURT:  All right, sir.  Just remain standing

7   and we'll swear you in.

8          THE AUDIO OPERATOR:  Please raise your right hand

9   and state your full name for the record.

10         THE WITNESS:  Robert E. Fasold, F-a-s-o-l-d.

11         ROBERT E. FASOLD, Government's Witness, Sworn.

12         THE COURT:  You can be seated, sir.

13         All right.  Ms. Taylor, you may proceed.

14         MS. TAYLOR:  Your Honor, may I move the podium over

15  there?

16         THE COURT:  Of course, you can go anywhere you want.

17         If that screen is in your way, sir, you can push it

18  aside.

19         MS. TAYLOR:  I believe that screen is not working,

20  so we'll use paper exhibits with the witnesses and electronic

21  for everyone else.

22         THE COURT:  Okay.

23                    <u>DIRECT EXAMINATION</u>

24  BY MS. TAYLOR:

25  Q   Good morning, Mr. Fasold.

1   A   Good morning.

2   Q   Will you tell the Court your full name, sir?

3   A   Robert E. Fasold.

4   Q   And who employs you?

5   A   The Boeing Company.

6   Q   And what is your title at the Boeing Company?

7   A   I'm a corporate investigator.

8   Q   And how long have you held the title of corporate

9   investigator at Boeing?

10  A   Nine years.

11  Q   And --

12          THE COURT:  Can I just interrupt you a second?

13          MS. TAYLOR:  Yes.

14          THE COURT:  Mr. Dreyer, do you want to move up?

15          MR. DREYER:  I'm fine, your Honor.

16          THE COURT:  Are you sure?  Because we have room

17  here.

18          MR. DREYER:  Okay.

19          THE COURT:  Matt, could you just switch seats with

20  him?  Thanks.

21          MR. DREYER:  Thank you, sir.

22          THE COURT:  I'm sorry, go ahead.

23  BY MS. TAYLOR:

24  Q   What are your duties and responsibilities as a corporate

25  investigator for Boeing?

1  A    I investigate violations of company policies and

2  procedures, that includes investigations of thefts, employee

3  misconduct such as misuse of company time, misuse of company

4  assets, misuse of the corporate credit card, drugs, to name

5  but a few -- oh, and threat management and assaults.

6  Q    Prior to being employed by Boeing as a corporate

7  investigator, did you have previous law enforcement

8  experience?

9  A    I did.

10  Q    And can you share that with the Court?

11  A    I was 13 years with the Springfield Township Police in

12  Montgomery County, most of the time I spent as a Detective,

13  and 15 years with Montgomery County CID as a Detective

14  assigned to Homicide, Narcotics, Special Victims Unit and

15  Major Crimes.

16  Q    At some point during your period of employment as

17  Boeing's corporate investigator did you begin to suspect that

18  there was a drug problem in the Boeing plant?

19  A    Yes, I did.

20  Q    Can you tell the Court approximately when those

21  suspicions began to arise?

22  A    I began my employment in June of 2003 and within two to

23  three years -- within two years I realized that we had an

24  issue.

25  Q    And what were some of the red flags that you observed

1   that caused you to have these suspicions?

2   A   By that time I had established a rather good rapport with

3   many of the employees at the site and I was receiving phone

4   calls, information from employees identifying other employees

5   that were involved with the use and distribution of drugs.

6   In addition, we had a number of threat management and

7   assaults that were higher at our site than at other sites.

8   We had a number of accidents that I was concerned with.

9   Q   Can you give the Court just a couple examples of the

10  accidents?

11  A   We had an employee that ran a forklift truck into a fence

12  one time, we had another employee that was coming into work

13  and drove his car into the security booth that the security

14  officer mans.

15  Q   Were there incidents of theft that caused you to be

16  suspicious about drug use?

17  A   There were.  We were having -- we experienced what I

18  consider a large volume of theft involving scrap metal,

19  particularly copper.  In one building that they were

20  refurbishing, the workers were in there stripping the walls

21  and the ceiling.  The following day they came back and all

22  the pipe or copper pipes that were in the ceiling had been

23  removed.

24  Q   Did you have occasion to recover any paraphernalia that

25  would arise your suspicious of drug use at the plant?

1  A   I did.

2  Q   And what did you recover?

3  A   Actiq or fentanyl wrappers, sticks that went with them,

4  bags of -- small bags of cocaine -- or white powder that

5  field tested to be a cocaine, crack pipes.

6  Q   Did you take a photograph of some of that material that

7  you recovered?

8  A   I did.

9       MS. TAYLOR:  May we show -- your Honor, may I

10 approach the witness?

11       THE COURT:  Of course.

12       MS. TAYLOR:  Can you bring up Fasold 1 for -- not to

13 be published for --

14       MS. LUNKENHEIMER:  It will only be published, that's

15 the problem.

16 BY MS. TAYLOR:

17 Q   Mr. Fasold, I've given you an exhibit that's been marked

18 as Fasold 1; do you see Fasold 1?

19 A   I do.

20 Q   And is that a photograph of some of the items you

21 recovered that led to your suspicions that there was drug use

22 at the Boeing plant?

23 A   It is.

24 Q   And did you take that photograph?

25 A   I did.

1  Q    And does it truly and accurately represent the items that

2  it depicts?

3  A    Correct, it does.  The --

4  Q    No --

5  A    Okay.

6  Q    -- I just need you to answer that question.

7  A    Yes.  I'm sorry, yes.

8  Q    Okay.

9          MS. TAYLOR:  May we publish Fasold 1?

10         THE COURT:  Any objection to the admission of that?

11         MR. SCUDERI:  No, your Honor.

12         MR. LAIGAIE:  None.

13         MS. SCOTT:  None, your Honor.

14         THE COURT:  All right, I'll admit it.

15         (Government's Exhibit Fasold 1 received in

16  evidence.)

17         THE COURT:  You can publish it.

18         (Pause.)

19         THE COURT:  I just noted Mr. McGovern came in.  Do

20  you want to participate in the hearing, Mr. McGovern?

21         MR. McGOVERN:  No, your Honor.  I just -- I

22  apologize for my late arrival because my -- I'll just audit

23  the proceedings and I'll order a transcript.

24         THE COURT:  Okay.

25         MR. McGOVERN:  Thanks for the --

1          THE COURT:  But if you want to participate or ask

2     any questions, feel free to do so.  We'll get you a seat.

3          MR. McGOVERN:  Thanks, Judge Rice, I appreciate it

4     very much.

5          THE COURT:  All right, sure.

6          MR. McGOVERN:  Pardon the interruption.

7          THE COURT:  That's no problem.

8          MS. TAYLOR:  Your Honor, may I proceed?

9          THE COURT:  Yes.

10    BY MS. TAYLOR:

11    Q   Mr. Fasold, now Fasold 1 has been published for the Court

12    and for the parties to see, what I want you to do is to just

13    come down from there --

14          MS. TAYLOR:  -- with the Court's permission?

15          THE COURT:  Sure.

16    BY MS. TAYLOR:

17    Q   -- and approach the larger monitor there.

18          (Pause.)

19          THE COURT:  Why don't you stand on the other side,

20    sir, so I can see the picture?

21          THE WITNESS:  I'm sorry.

22          THE COURT:  That's all right.

23    BY MS. TAYLOR:

24    Q   Mr. Fasold, if you could, we're going to need you to

25    speak as close as you can to that microphone.

1          You've indicated that Fasold 1 is a photograph that

2    you took of items that were recovered that led you to suspect

3    there was a drug problem at the Boeing plant, is that

4    correct?

5    A    Yes, it is.

6    Q    Can you show us -- describe for the Court what those

7    items are?  And if you specifically recall the areas they

8    were recovered from, could you share that as well?

9    A    This here is a crack pipe that was found in parts wreck

10   in the V-22 shop, Building 325.  This is a razor blade and

11   small bag of white powder that field tested positive for

12   cocaine.  This was in a desk drawer in Building 331 of an

13   abandoned office that appeared that employees had been using.

14   These items here were taken from a -- during an inventory

15   search of an employee's locker who died of an overdose.  He's

16   one of three employees that died of overdoses during this

17   investigation.  And this is a wrapper that I was referring to

18   before, Actiq or fentanyl with a stick, and that was found --

19   typical of what we were finding on the factory floor.

20   Q    And the two items with the spoons, what are they?

21   A    Those are spoons and syringes that were found in the

22   decedent's locker.

23   Q    Okay.  You can return to your seat.

24          MS. TAYLOR:  You can take down Fasold 1.

25          (Pause.)

1   BY MS. TAYLOR:

2   Q   Mr. Fasold, as part of your duties, did you have

3   employees with -- encounters with employees that also led you

4   to believe there was a drug problem at Boeing?

5   A   I did.  There was one employee -- excuse me --

6            MR. DREYER:  Your Honor, I would object at this

7   point.  I think a foundation to the fact that there was a

8   drug problem at the Boeing plant has been established, I

9   think we can move on from here.  This has nothing to do with

10  any of the people who are in front of your Court, he's

11  established there's a drug problem.  I think we can proceed

12  to some other topic.

13           MS. TAYLOR:  If I may, your Honor, the Government's

14  first objection to the applicability of 3607 to anyone is the

15  nature of the Boeing plant and the culture and the drug

16  culture at that facility.  This witness' testimony directly

17  goes into how that problem existed and the steps that were

18  taken that bring us here today.

19           THE COURT:  All right.  Well, I'll give you a little

20  more leeway.

21           MS. TAYLOR:  Thank you, your Honor.

22           THE COURT:  I'll deny the motion.

23  BY MS. TAYLOR:

24  Q   If you could continue, sir?

25  A   I was given a name of an employee who was suspected of

1  being involved with the distribution of prescription

2  medicine.  This employee owns, that I was aware of, two

3  Jaguars, and I knew that personally because I saw him drive

4  the Jaguars to work.  He's a factory worker.  One day, he

5  drove into the parking lot and I followed him -- I don't know

6  how he didn't see me, but I followed him right into the

7  factory floor where he approached his locker.  And I was

8  standing right behind him when he opened his locker and he

9  took out a bottle containing 120 Oxycontin, then in his

10  locker he had another bottle of 90 Percocets.  Both of these

11  medicines had been issued by prescription by the same doctor

12  within a two-week period.  In addition, he had $500 in cash

13  in his pockets.

14  Q   Did you after these things occurred take efforts to

15  address the drug problem that you perceived as ongoing at

16  Boeing?

17  A   I did.

18  Q   What did you do?

19  A   It was really too much -- it was too big a scope for me

20  to handle myself.  There was an arbitration hearing that I

21  attended that the union was present, the union leadership was

22  present.  And I approached the union president and the shop

23  chairman at that time, and I met with them separately during

24  an adjournment of the hearing, at the hearing, and I pleaded

25  with them that they -- we have a major problem, I felt, in

1  the factories and I pleaded with the union to take some steps

2  to help me with this issue.

3          THE COURT:  When was this?

4          THE WITNESS:  This would have been I believe in the

5  summer of 2006.

6  BY MS. TAYLOR:

7  Q   Now, at the Boeing plant there are occasions when

8  management based on certain observations can require

9  employees to be tested, is that correct?

10 A   Yes, ma'am.

11 Q   Were there occasions when management sent employees --

12         THE COURT:  Hold on.  Can I just ask a question

13 about the --

14         MS. TAYLOR:  Sure.

15         THE COURT:  -- 2006 meeting?  What did the union

16 leadership say to you?

17         THE WITNESS:  They acted surprised, but they said

18 that they would try to do what they could.

19         THE COURT:  Okay, thanks.

20         Go ahead.

21 BY MS. TAYLOR:

22 Q   Were there occasions when employees who exhibited signs

23 of being under the influence of drugs were pulled off the

24 floor by management and tested?

25 A   Yes.

1  Q   Do you receive information about the results of those

2  tests?

3  A   Yes.

4  Q   Would the employees -- strike that.

5        Were there occasions when employees exhibited these

6  signs and were tested, but the tests came back negative?

7  A   Yes.

8  Q   During that time period, up until very recently, was the

9  Boeing plant testing for prescription pills at all?

10 A   No, they were not.

11 Q   What would happen if an employee who had exhibited signs

12 of being high went to the medical office and was tested and

13 the test came back negative?

14 A   He would come back to work with back pay for the amount

15 of time he was suspended from work.

16 Q   And would that occur despite the observations that

17 management had made?

18 A   Yes, ma'am.

19 Q   Would Boeing, after the panel that it came back -- well,

20 let me say that more clearly.

21        Did Boeing have a right at that time to subject that

22 employee to testing for prescription pills?

23 A   No, they did not.

24 Q   From the time of your investigation up until the time of

25 the arrest in these cases did the Boeing plant test for

1  prescription pill use?

2  A    No, they did not.

3            THE COURT:  So what period is that, what years?

4            MS. TAYLOR:  That's from 2006 until 2011, your

5  Honor.

6  BY MS. TAYLOR:

7  Q    Did you seek assistance from local law enforcement?

8  A    I did, through the --

9            THE COURT:  Hold on.  Can I just ask you a question?

10           THE WITNESS:  Sure.

11           THE COURT:  Is that because it was a collective

12  bargaining issue?

13           THE WITNESS:  Yes.

14           THE COURT:  That you couldn't test?

15           THE WITNESS:  Correct.

16           THE COURT:  Okay.  Go ahead, sorry.

17  BY MS. TAYLOR:

18  Q    Did you seek assistance from local law enforcement?

19  A    From the local District -- Delaware County District

20  Attorney's Office, yes.

21  Q    And was the Delaware County District Attorney's Office

22  able to assist you in investigating the narcotics abuse at

23  Boeing?

24  A    They got involved initially, but it was a short period of

25  time and they realized it was too big of a scope, they didn't

1    have the manpower nor the facilities to help us out.

2    Q    At some point was this matter referred to Federal law

3    enforcement?

4    A    Yes, in the summer of 2000 -- I'm not -- it was in 2007,

5    I forget the date.

6    Q    And have you cooperated with this investigation from the

7    summer of 2007 until the present time?

8    A    Yes, I have.

9    Q    Did the union and/or Boeing post signs throughout the

10   different buildings in the plant relating to drug abuse and

11   available treatment?

12   A    Yes, they did.

13   Q    Did Boeing post signs around the plant about the

14   unacceptability of drug abuse?

15   A    Yes, they did.

16   Q    Did you take -- strike that.

17          Were those signs placed in areas where they were

18   accessible to all of the employees?

19   A    Yes, ma'am.

20   Q    And were there also kiosks at Boeing where employees

21   could electronically access information should they need

22   assistance with drug abuse or other issues?

23   A    That is correct.

24   Q    Did you take photographs of some of the signs and

25   pictures that were posted around the plant?

1  A    I did.

2         MS. TAYLOR:  Your Honor, may I approach the witness

3  again?

4         THE COURT:  Of course, you don't have to ask.

5         MS. TAYLOR:  Okay.

6         (Pause.)

7         THE COURT:  Excuse me one second.

8         (Pause.)

9         THE COURT:  Sorry, go ahead.

10        MS. TAYLOR:  Your Honor, may I just let Counsel know

11 what I'm about to show the witness?

12        THE COURT:  Sure.

13        (Discussion held off the record.)

14        MS. TAYLOR:  May I proceed, your Honor?

15        THE COURT:  Of course.

16 BY MS. TAYLOR:

17 Q    Mr. Fasold, I've placed in front of you what's been

18 marked as Government's Exhibits 3, 4, 5, 6, 7, 8, 9, 10 and

19 11; have you had a chance to review those exhibits?

20 A    I have.

21 Q    And are those exhibits photographs that you took at the

22 Boeing plant either in the union compartment or in the open

23 area about drug use and abuse?

24 A    They are.

25 Q    Are they true and accurate photographs of those posters?

1  A   Yes, they are.

2  Q   If I may, Mr. Fasold, I want to show you Government's

3  Exhibits 12, 13 and 14.  Are these also the actual sizes of

4  some of the posters and notices that were in different

5  buildings in the plant?

6  A   They are.

7        MS. TAYLOR:  Any objection from Counsel of showing

8  these to the Court?

9        MR. SCUDERI:  No objection.

10        MS. TAYLOR:  Your Honor, the Government moves to

11 publish Government's Exhibits 3 through 14.

12        THE COURT:  Okay.

13 BY MS. TAYLOR:

14 Q   And if I could, Mr. Fasold, could you go down to the

15 monitor?

16 A   Sure.

17        (Pause.)

18 Q   Mr. Fasold, do you see Government's Exhibit 3?

19 A   I do.

20 Q   And is that a poster dealing with drug abuse and other

21 issues and the assistance you can receive at the Boeing

22 plant?

23 A   Yes, it is.

24 Q   What building was that posted in?

25 A   Can I get my -- 307.

1  Q   Do you need your glasses?

2  A   Please.

3          (Pause.)

4          MS. TAYLOR:  Can we have Fasold Number 4, please?

5  BY MS. TAYLOR:

6  Q   What building is that in?

7  A   Building 312.  And if I may add?

8  Q   Yes.

9  A   This is a poster that's produced by the UAW, it's in

10 their glass cabinet that's posted that all union members can

11 see.

12         MS. TAYLOR:  Fasold 5, please?

13 BY MS. TAYLOR:

14 Q   Is that an example of the UAW's locked cabinet that you

15 were just describing?

16 A   Yes, ma'am.

17 Q   And does that poster in fact appear inside of that

18 cabinet?

19 A   It does.

20 Q   What building is that?

21 A   That's Building 325.

22         MS. TAYLOR:  Fasold 6, please?

23 BY MS. TAYLOR:

24 Q   What building is that posted in?

25 A   That's 325 as well.

1  Q   What does it say at the bottom of the left-hand side of

2  the poster?  Do you see it?

3  A   "Alcohol and drugs don't work here."

4  Q   Is that posted by Boeing or was that posted by you?

5  A   That's Boeing.

6          MS. TAYLOR:  Fasold 7, please?

7  BY MS. TAYLOR:

8  Q   Is that a similar-type poster posted by Boeing?

9  A   Yes, it is.

10  Q   What building is that?

11  A   That is in Building 331.

12          MS. TAYLOR:  Fasold 8, please?

13  BY MS. TAYLOR:

14  Q   Is that a Boeing communication center where different

15  posters are placed in there?

16  A   That is correct.

17  Q   And do we see some of the same posters about alcohol use

18  and treatment options inside of that container?

19  A   Yes, ma'am.

20  Q   What building is that?

21  A   That's Building 331.

22          MS. TAYLOR:  Fasold 9, please?

23  BY MS. TAYLOR:

24  Q   Similar photographs?

25  A   Yes, ma'am.

1  Q   Also in Building 331?

2  A   Yes, and this is the union -- again, that's a union --

3           MS. TAYLOR:  Go back to 9, please?  I'm sorry.

4           THE WITNESS:  Once again, that's the union bulletin

5  board.

6  BY MS. TAYLOR:

7  Q   So Boeing were placed up in their areas and then the

8  union had designated areas where they could also place

9  notices or other information for their members, is that

10 correct?

11 A   It is.  The only thing that differentiated between the

12 two bulletin boards is the union kept theirs locked.

13          MS. TAYLOR:  Fasold 10, please?

14 BY MS. TAYLOR:

15 Q   Similar?

16 A   Yes, ma'am.

17 Q   What building?

18 A   That was in the cafeteria at 360.

19          MS. TAYLOR:  Fasold 11, please?

20 BY MS. TAYLOR:

21 Q   Is that a Boeing enclosure or a union enclosure?

22 A   That is a union enclosure.

23 Q   What building is that?

24 A   361.

25 Q   You can return to your seat, sir.

1          (Pause.)

2   Q    Mr. Fasold, you previously authenticated Government's

3   Exhibits Fasold 12, 13 and 14.  Fasold 14 is posted in what

4   building?

5   A    328.

6   Q    This is similar to -- this is -- what's the title of

7   that?

8   A    "Expected Conduct Standards for All Boeing Employees."

9   Q    And is this the poster that we saw in almost every one of

10  the photographs displayed either by the union or the plant?

11  A    Yes, ma'am.

12  Q    And under Paragraph 6, "Adhere to company agreements,

13  policies and procedures," if you could, I'd like you to start

14  six lines down and read the sentence that begins,

15  "Possession..."

16  A    "Possession, sale or consumption of alcohol or drugs,"

17  slash, "paraphernalia on company premises; soliciting

18  contributions or sales without authorization; circulating or"

19  -- well --

20  Q    No, I only wanted that one sentence.

21          In this expected code of conduct is a reminder that

22  you just read about the use of drugs at the Boeing facility,

23  is that correct?

24  A    Yes, ma'am.

25  Q    On this poster, Fasold 12, "Knowing where to turn is the

1    first step," can you read for Judge Rice this writing here?

2    A    Yes, ma'am.  "Boeing understands the importance of a

3    drug-and-alcohol-free workplace.  We put procedures and

4    training tools in place to ensure that our employees work in

5    an environment free from the dangerous and destructive

6    effects of alcohol and drugs.  If you want to know more about

7    our program, visit our web site at dfw.web.boeing.com."

8    Q    And Fasold Exhibit 13, which again is the part I had you

9    read for the record, "Alcohol and drugs don't work here,"

10   this is a similar poster that's posted in different locations

11   throughout the plant, correct?

12   A    Correct.

13   Q    And what is the notice given to the employees after

14   "Alcohol and drugs don't work here"?

15   A    "Should you have a problem with alcohol or drug abuse,

16   you are encouraged to seek help through the Employee

17   Assistance Programs."  And below that it lists a listing of

18   phone numbers for various sites including Philadelphia.

19   Q    Now, Mr. Fasold, more recently did Boeing have to clean

20   out one of the areas of one of its buildings?

21   A    They did so at my request, yes.

22   Q    And when was that?

23   A    May 7th, 8th and 9th of this year, I believe it was.

24   Q    And can you describe for the Court the area of the

25   building that was cleaned out?

1   A   The designated area is 3-B-3, it's a paint shop area and

2   the area was about 28,000 square feet, it consisted of I

3   believe five or six paint booths.

4   Q   And what specific location within that area did you have

5   cleaned out?

6   A   They cleaned out the entire area, the 28,000 square feet

7   of that area.

8   Q   Was there a specific location in that area where drug

9   paraphernalia was recovered?

10  A   Yes, ma'am.

11  Q   And what specific location was that?

12  A   On the tops of the paint booths.

13  Q   I want to show you what's been marked Government's

14  Exhibit Fasold 2.  And is Government's Exhibit Fasold 2 a

15  photograph that you took?

16  A   Yes, it is.

17  Q   And is that photograph -- what is that a photograph of?

18  A   It's a photograph of prescription bottles --

19  Q   No, is it a photograph of items recovered from that area?

20  A   I'm sorry, I'm sorry.  Yes, it was -- those are all the

21  items that were recovered from that 3-B-3 area, yes, ma'am.

22  Q   And is that a true and accurate photograph of the items

23  that were recovered after the cleaning company cleaned that

24  specific area?

25  A   Yes, it is.

1    MS. TAYLOR:  May I approach Counsel, your Honor?

2    THE COURT:  Sure, you don't have to ask.

3    (Discussion held off the record.)

4    MS. TAYLOR:  Your Honor, without objection, the

5    Government moves for the admission of Fasold 2 and asks that

6    it be published.

7    THE COURT:  Of course.

8    (Pause.)

9    BY MS. TAYLOR:

10   Q   Mr. Fasold, do you see what's been marked as Government's

11   Exhibit Fasold 2?

12   A   Yes, ma'am.

13   Q   Okay.  I'm going to ask you to come down again and go to

14   the large monitor.

15   (Pause.)

16   Q   Government's Exhibit Fasold 2 is a photograph you took of

17   the items recovered from that paint shop area, is that

18   correct?

19   A   That is correct.

20   Q   Can you show -- first, what are these things in this

21   corner, the right corner?

22   A   These are 40-some -- I'm sorry, I believe 35 wrappers for

23   Actiq or fentanyl sticks.

24   Q   And what's next to it?

25   A   Next to them there's 40-some sticks that were at one time

1    associated with the wrappers.

2    Q    And next to that?

3    A    Empty pill bottles, prescription pill bottles.

4    Q    As to the fentanyl wrappers, did some of them have

5    expiration dates that you could read?

6    A    Yes, ma'am.

7    Q    Did they expire in 2008?

8    A    That's correct.

9    Q    The sticks do not have expiration dates, is that correct?

10   A    Not to my knowledge.

11   Q    You can go back to your seat, sir.

12        (Pause.)

13   Q    Mr. Fasold, as Boeing corporate security you were made

14   aware when the Federal Government arrested a number of Boeing

15   employees, is that correct?

16   A    Yes, ma'am.

17   Q    And after those employees were arrested did Boeing

18   authorize a search of the lockers of those employees?

19   A    Yes, they did.

20   Q    I want to specifically talk to you today only about

21   Michael Patterson.  Were you present when the locker of

22   Michael Patterson was searched?

23   A    Yes, ma'am.

24        (Pause.)

25   Q    Mr. Fasold, I'm showing you what's been marked as

1  Patterson 5 -- actually, Patterson 4, 5 and 6.  Were you

2  present when these items were taken from the locker of

3  Michael Patterson?

4  A   Yes, I was.

5  Q   And --

6          MR. DREYER:  Your Honor, I would object to the

7  introduction of this evidence at this point.  My client has

8  informed me that these were medications prescribed by a

9  doctor, legally prescribed, and that's why they were in his

10 locker.  I don't understand the relevancy to an illegal

11 prescription drug prosecution of the fact that my client had

12 legally prescribed, doctor-prescribed medications in his

13 locker.

14         MS. TAYLOR:  Your Honor, if I may?  The Government's

15 position as to Michael Patterson is that upon his arrest he

16 was found with three pills of oxycodone that were not in a

17 prescription bottle that were separate and apart from these

18 prescriptions and in an analysis as to whether or not he's

19 entitled to 3607 relief.  If he could get the pills legally,

20 then he shouldn't have been getting them illegally and we

21 think that's relevant for the Court to know about his

22 conduct.  We are not introducing this for any reason other

23 than his eligibility for 3607.

24         THE COURT:  Any response to that?

25         MR. DREYER:  It's irrelevant, your Honor, it's

1   irrelevant.

2          THE COURT:  Well, she's saying it shows that if he

3   really needed medication he could go to the doctor and get it

4   and why was he --

5          MR. DREYER:  You can take judicial notice of that

6   fact then.

7          THE COURT:  Well, will you all agree --

8          MR. DREYER:  That's fine.

9          THE COURT:  -- that he had the ability to get

10  lawfully prescribed drugs if he wanted it?

11         MS. TAYLOR:  That he had --

12         THE COURT:  He had.

13         MS. TAYLOR:  -- prescriptions for lawfully

14  prescribed drugs for pain medication --

15         MR. DREYER:  Stipulated.

16         THE COURT:  All right, they'll stipulate to it.

17         MS. TAYLOR:  Works for me, your Honor.

18         THE COURT:  Okay.

19         MS. TAYLOR:  I have nothing further.

20         THE COURT:  All right.  Who wants to start?  Mr.

21  Scuderi?

22         MR. SCUDERI:  Sure.

23         THE COURT:  We'll just go down the table, if that's

24  all right?

25         MR. SCUDERI:  Pardon?

1    THE COURT:  We'll just move down the table.  We'll

2  start with you, Mr. Scuderi.

3    MR. SCUDERI:  Just briefly.

4                    CROSS-EXAMINATION

5  BY MR. SCUDERI:

6  Q   So you said that Boeing did not test for prescription

7  drugs?

8  A   That's correct, yes.

9  Q   What did they test for?

10    MS. TAYLOR:  Excuse me, Counsel.

11    (Discussion held off the record.)

12  BY MR. SCUDERI:

13  Q   I'm sorry about that.  What did they test for?

14  A   Your Honor, I'm not confident in -- I knew --

15    THE COURT:  If you don't know, say you don't know.

16    THE WITNESS:  I knew they didn't test for

17  prescription medicine.

18    THE COURT:  All right.  Well, hold on, hold on.

19  Just answer his question.  If you don't know the answer to

20  his question, say you don't know.

21  BY MR. SCUDERI:

22  Q   Well, you said on direct that Boeing does not test for

23  prescription drugs, is that correct?

24  A   Yes, sir.

25  Q   What is the basis of that statement?

1   A   Direct knowledge.

2   Q   Okay.  Did somebody tell you that?  Did you read a

3   manual?  Do you have any documents with you showing that?

4   A   I was told by Medical, I was told by documentation.

5   Q   Do you have any of that documentation with you?

6   A   I do not.

7   Q   Okay.  You said it was part of the collective bargaining

8   agreement they could not test for prescription drugs?

9   A   That was my understanding.

10  Q   Have you ever read that agreement?

11  A   I was shown that agreement, yes.

12  Q   Okay.  I'm going to show you a document entitled, "PRO-

13  388," which is Government Exhibit --

14          MR. SCUDERI:  -- HR-5?

15          MS. TAYLOR:  HR-5.

16  BY MR. SCUDERI:

17  Q   -- HR-5.  Could you look at that document and read that

18  document?

19  A   It's the Drug-and-Alcohol-Free Workplace Program.

20          THE COURT:  You can read it to yourself first.

21          (Pause.)

22          THE WITNESS:  Okay.

23  BY MR. SCUDERI:

24  Q   Have you ever seen that document before?

25          (Pause.)

1    A    I don't believe so.

2    Q    Do you recognize it as a Boeing document?

3    A    Yes.

4    Q    Do you recognize it as a Boeing drug-related document or

5    drug-testing document?

6    A    Yes, I do.

7    Q    Is there anything in there which says that Boeing may

8    unilaterally change the rules for drug testing?

9    A    Yes.

10   Q    Separate and apart from the general rules for drugs and

11   alcohol?

12   A    Yes.

13   Q    Okay.  And I'm going to show you what has been marked as

14   HR-3.

15            THE COURT:  Just go over that again, Mr. Scuderi.

16   So that document states what about Boeing's ability to drug

17   test?

18            MR. SCUDERI:  Okay.

19   BY MR. SCUDERI:

20   Q    What does the document --

21   A    Are you asking me?  I'm sorry.

22            THE COURT:  Yeah.  What does it say?  I don't have

23   the document in front of me.

24            MR. SCUDERI:  I don't have a copy, your Honor.

25            THE COURT:  That's all right.  No, I'm not

1  criticizing you, I just want to know what it says.

2          I believe the question was that Boeing can

3  unilaterally change their drug-testing policy and you said

4  yes?

5          THE WITNESS:  "This procedure does not constitute a

6  contract or contractual obligation and the company reserves

7  the right in its sole discretion to amend, modify or

8  discontinue its use without prior notice, notwithstanding any

9  person's acts, omissions or statements to the contrary."

10  BY MR. SCUDERI:

11  Q   Okay.  And does it cite --

12          (Discussion held off the record.)

13  BY MR. SCUDERI:

14  Q   Okay.  I'm going to show you a document labeled

15  Government Exhibit HR-4.

16          (Pause.)

17  Q   Do you recognize that document?

18  A   I do.

19  Q   Could you tell the Court what that document is?

20  A   It's the compliance notification memo.

21  Q   And what does that memo consist of, what's it about?

22          (Pause.)

23          MR. SCUDERI:  Your Honor --

24          MS. TAYLOR:  Your Honor, I have to object unless

25  this -- these are human resource documents --

1           THE COURT:  Okay.  Well, if he doesn't know --

2           MS. TAYLOR:  -- I'm going to --

3           THE COURT:  -- what they are, he can --

4           MR. SCUDERI:  He testified about --

5           THE COURT:  -- say that.

6           MR. SCUDERI:  -- human resources, he testified --

7           THE COURT:  Hold on, hold on.

8           MR. SCUDERI:  Okay.

9           THE COURT:  If he doesn't know, you know, he's a

10    very experienced law enforcement officer, he can say he

11    doesn't know.  If he doesn't know what it is, that's fine; if

12    he knows what it is, he can talk about it.

13           THE WITNESS:  Your Honor, I'm not comfortable in

14    discussing -- talking about HR documents.

15           THE COURT:  That's not what he asked you.

16           What was the question?

17    BY MR. SCUDERI:

18    Q   Is there anything -- have you read that document before?

19           THE COURT:  He can certainly answer that.

20           MS. TAYLOR:  Yes.

21    BY MR. SCUDERI:

22    Q   Is there --

23    A   I don't recall reading this document.

24           THE COURT:  Okay, he hasn't read it.

25           MR. SCUDERI:  Okay, okay.

1  BY MR. SCUDERI:

2  Q   I'm going to show you what is marked as HR-6.

3          (Pause.)

4  Q   If you can read that -- look at that document, see if you

5  can identify it, and read the title of that document, the

6  heading.

7  A   The heading is, "Letter of Understanding Number 3, Drug-

8  and-Alcohol Free Workplace."

9  Q   Okay.

10         THE COURT:  Have you ever seen that before?

11         THE WITNESS:  No, I have not.

12 BY MR. SCUDERI:

13 Q   Is there any reference in that document to PRO-388?

14         MS. TAYLOR:  Objection.

15         THE COURT:  Well, he's never seen the document --

16         MR. SCUDERI:  Okay.

17         THE COURT:  -- so I don't know if he can talk about

18 it.

19         MR. SCUDERI:  Okay.

20         THE COURT:  Sustained.

21         MR. SCUDERI:  No further questions, your Honor.

22         THE COURT:  All right.  Mr. Molineux?

23         MR. MOLINEUX:  I have no questions, your Honor.

24         THE COURT:  Ms. Scott?

25         MS. SCOTT:  I have no questions, your Honor.

1          THE COURT:  Mr. Dreyer?

2          MR. DREYER:  No questions.

3          THE COURT:  Mr. Laigaie?

4          MR. LAIGAIE:  Yes, just a few questions, your Honor.

5          THE COURT:  Okay.

6                    CROSS-EXAMINATION

7     BY MR. LAIGAIE:

8     Q    Good morning, Mr. Fasold.

9     A    Good morning.

10    Q    I'm Dave Laigaie and I represent Mike Homer.

11    A    Okay.

12    Q    I just have a few questions for you.

13              Is it fair to say that Boeing aggressively

14    investigates inappropriate drug use in its workplace?

15    A    Yes.

16    Q    Is it fair to say that since 2003 when you became a

17    corporate investigator part of your job has been to

18    aggressively investigate inappropriate drug abuse in the

19    workplace?

20    A    Yes, sir.

21    Q    And is it fair to say if an employee is found to be using

22    drugs inappropriately in the workplace they are disciplined

23    in some fashion?

24    A    If it can be proven, yes.

25    Q    In addition to you as a corporate investigator, are you

1  familiar with persons called Drug-Free Workplace Focals?

2  A   Vaguely, somewhat.

3  Q   Okay.  Well, you're one up on me.  I saw the term in one

4  of the Government's Exhibits.  Is that someone in the

5  workplace whose -- one of their responsibilities is to be on

6  the lookout for inappropriate drug use?

7  A   I believe what it's referring to is the people with the

8  EAP, Employee Assistance Program, these are focals who the

9  employees can turn to for assistance.

10  Q   Okay, I see.  Focals are people that employees can turn

11  to for existence -- assistance?

12  A   I believe that's the terminology used in this particular

13  -- I mean --

14  Q   Okay.

15  A   -- focals can mean anything.

16  Q   No, I know.  That's kind of an unusual term in my

17  experience, but I just wanted to see if you knew what it was.

18          In addition to yourself as an investigator and

19  perhaps the focals, supervisors are also trained to be on the

20  lookout for inappropriate drug use in the workplace, correct?

21  A   I'm told they are trained, but I don't know to what

22  extent.

23  Q   Okay, fair enough.

24          Now, let's make sure we're -- I just want to make

25  sure of one thing about the drug-free workplace policies.

1   Drug-free workplace policies do not prohibit the therapeutic
2   use of prescription medications pursuant to a doctor's order,
3   do they?
4   A    I'm not comfortable in answering that question.
5   Q    Okay, so you don't know.  For instance, if I'm a diabetic
6   and I use Glycogen or something like that, is it your
7   understanding that it would be inappropriate for me to be
8   using that drug on Boeing premises?
9   A    There is a procedure in place that the employee has to go
10  through through Medical when they are under a prescription,
11  what all that entails I do not know.
12  Q    Okay, fair enough.
13        The Employee Assistance Program that you spoke
14  briefly about, one or two questions about that, that's a
15  program where employees who feel as if they have a drug
16  problem can go for assistance, correct?
17  A    Yes.
18  Q    And Boeing would encourage employees who believe they
19  have a drug problem to avail themselves of the EAP, correct?
20  A    That's why they put the signage up, yes, sir.
21  Q    And the EAP protects employees who avail themselves of
22  that program?
23  A    I don't understand your meaning of protect.
24  Q    Well, you don't get fired.  If I call EAP and say I think
25  I have a drug problem, I don't then get fired for having come

1  forward with that?

2  A   Again, you're getting into issues I'm not familiar with.

3  Q   Fair enough, then I'll keep from doing that.

4        Is it your understanding that an employee, once

5  again, who is using pharmaceuticals therapeutically, is that

6  an employee that should avail him or herself of the EAP?

7  A   I don't believe that's for me to decide.

8  Q   Is that I don't know or --

9  A   I mean, again, that has to be worked out with Medical.

10  It's my understanding there's a threshold that they -- I

11  mean, obviously a person cannot -- cannot a drive, for

12  example, under medication.  So --

13  Q   Under certain medications perhaps?

14  A   Exactly, exactly.

15  Q   Okay.  Well --

16  A   And the same would hold true in the workplace.  So, you

17  know, what that person's capabilities are under a medication

18  has to be worked out through Medical and their doctor, the

19  Boeing doctor that's on site, not from me.

20  Q   Do you happen to -- can you point me to or direct me to

21  this policy that you're discussing about working with Medical

22  about the use of therapeutic pharmaceuticals?

23  A   I'm not -- I'm not aware of the specific policy, sir.

24  Q   Okay.  Well, maybe another witness this morning will be.

25  A   I don't know.

1          MR. LAIGAIE:  I have no further questions.

2          THE WITNESS:  Thank you.

3          THE COURT:  Anything else, Ms. Taylor?

4          MS. TAYLOR:  No, sir.

5          THE COURT:  I just have one question.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  You were asked about HR-5 and I got a

8     little confused on the drug-testing policy, because I thought

9     from your direct that Boeing between 2006 and 2007 could not

10    under the collective bargaining agreement test for

11    prescription drugs?

12         THE WITNESS:  They could not -- they could not --

13    they were not -- Boeing could not test for prescription

14    medicine up until about two months ago.

15         THE COURT:  Okay.  So what were you referring to in

16    this HR-5 about the drug-testing policy could be changed?  I

17    didn't understand that.

18         THE WITNESS:  I wasn't -- that's why I wasn't -- I'm

19    a little confused with that myself, sir.

20         THE COURT:  Okay.  All right.

21         Anything further?

22         MR. SCUDERI:  No, your Honor.

23         MS. TAYLOR:  No, sir.

24         THE COURT:  Mr. McGovern, you're fine observing?

25         MR. McGOVERN:  Yes.  Thank you, Judge.

1          THE COURT:  Okay.  All right.  You can step down,

2     sir.

3          THE WITNESS:  Thank you, your Honor.

4          THE COURT:  Thank you.

5          (Witness excused.)

6          THE COURT:  Next witness?

7          MS. LUNKENHEIMER:  Your Honor, the Government would

8     call Steven Ellis.

9          THE COURT:  Just for housekeeping purposes, what's

10    the lineup like and how long is this hearing -- do you

11    anticipate taking?

12         MS. LUNKENHEIMER:  Your Honor --

13         THE COURT:  Because we're going to have to take a

14    break at some point.

15         (Discussion held off the record.)

16         MS. LUNKENHEIMER:  Your Honor, we have three

17    civilian witnesses coming up that we anticipate two of them

18    will be much shorter than the third, but the third should

19    still not be very long... what, a half hour, 45 minutes?

20         MS. TAYLOR:  Yeah, at the most.

21         MS. LUNKENHEIMER:  For the direct.  So the first two

22    witnesses should be ten to 15 minutes -- the next two

23    witnesses should be ten, 15 minutes, after that our witness,

24    he should be about half hour, I would imagine that defense

25    counsel will have particular questions for that witness.

1          THE COURT:  All right.  So we'll plan on breaking
2    for lunch like 12:00 to 1:00 or something?
3          MS. LUNKENHEIMER:  Whatever the Court's preference.
4          MR. SCUDERI:  I don't think it's going to take very
5    long.
6          THE COURT:  It's not going to take long?
7          MR. SCUDERI:  No.
8          THE COURT:  Oh, okay.
9          MS. LUNKENHEIMER:  Should I proceed then, your
10   Honor?
11         THE COURT:  We've got to swear you first, sorry.
12         THE AUDIO OPERATOR:  Please raise your right hand.
13   State your full name for the record.
14         THE WITNESS:  Steven Ellis, E-l-l-i-s.
15         STEVEN ELLIS, Government's Witness, Sworn.
16                    DIRECT EXAMINATION
17   BY MS. LUNKENHEIMER:
18   Q    Good morning, Mr. Ellis.
19   A    Good morning.
20   Q    Can you please tell the Court your age?
21   A    I'm 42.
22   Q    Can you please give the Court a brief history of your
23   employment?
24   A    At Boeing or before that?
25   Q    Before that, starting with perhaps when you first gained

1  substantive employment.

2  A   When I first got out of high school, I went into Delaware

3  County College, got some credits there, then I went into

4  mortuary school, worked for a funeral home for many years.

5  Then I moved on from that, starting working at a transmission

6  shop and then for a friend's fence company, and then I got an

7  opportunity to be hired at Boeing.

8  Q   When was that?

9  A   September of 2008.

10 Q   And are you still currently employed by Boeing?

11 A   Suspended, I believe.

12 Q   When you began at Boeing, what position did you take?

13 A   I was a sheet metal assembler.

14 Q   Can you please describe to the Court what that means?

15 A   In my area, we put an inner skin into the V-22, it's made

16 out of composite, it's in the main cabin of the V-22.

17 Q   And would you work in a particular building if you were

18 working on the V-22?

19 A   Yes.

20 Q   What building is that?

21 A   325.

22 Q   Now, did your employment over -- you were there then --

23 I'm sorry, you said that you started what date?

24 A   September 26th of 2008.

25 Q   So from September, 2008 until present, until you were

1  suspended --

2  A   Yes.

3  Q   -- did you remain a sheet metal assembler?

4  A   Yes, I did.

5  Q   Did anything change about your position?

6  A   No.

7  Q   Now, when you came to Boeing, were you made aware of any

8  policies that Boeing had regarding drug use/abuse?

9  A   Yes, it was not to be tolerated.

10 Q   And what was your understanding of what that meant?

11 A   No drug use, period.

12 Q   And would that also mean anything regarding sales?

13 A   Yes.

14 Q   What was your understanding of that?

15 A   Uh, you shouldn't be selling any kind of drugs.

16 Q   And where did --

17          THE COURT:  Excuse me, can I interrupt for a second?

18          MS. LUNKENHEIMER:  Absolutely.

19          THE COURT:  It looks like Mr. Swan is here?

20          MS. SCOTT:  He is, your Honor.

21          THE COURT:  All right.  You can come right up by

22 your lawyer, Mr. Swan.

23          I'm sorry, Ms. Lunkenheimer.

24          MS. LUNKENHEIMER:  Thank you, your Honor.

25          Your Honor, may I approach?

1    THE COURT:  Yeah, I don't know if that mike is

2  working.

3    THE WITNESS:  Oh, I'm sorry.  Do you want me to

4  move?

5    (Pause.)

6  BY MS. LUNKENHEIMER:

7  Q    And if you could just speak up a little bit?

8  A    Okay, all right.  Sorry.

9  Q    Thank you.  Where did gain your understanding, your

10  general understanding of the no-tolerance policy for drug use

11  and sales in the workplace?

12  A    Through the posters and things like that around the shop.

13  Q    And you mentioned that you were suspended; do you

14  remember when that was?

15  A    The 29th of September.

16  Q    And was that the day you were arrested?

17  A    Yes.

18  Q    Can you just tell the Court -- but your case is not

19  before this Judge, is it?  If you know?  No, okay.

20  A    Uh, no.

21  Q    If you don't know --

22  A    No.

23  Q    Can you please tell the Judge what you were arrested for?

24  A    Yes, selling of Percocets, Oxycontin.

25  Q    Was that at the Boeing facility or somewhere else?

1   A    At the Boeing facility.

2   Q    When did you begin selling Percocets and other drugs at

3   the Boeing facility?

4   A    I would say about two years into my employment, so I'd

5   say around 2010.

6   Q    Were you a user of Percocets or other drugs?

7   A    No.

8   Q    So how did it come about that you began to sell those

9   drugs at Boeing?

10  A    I had friends outside the plant that would get

11  prescriptions and stuff like that and, once I knew that there

12  was a market down at Boeing, I would just buy them off of

13  them and then sell them to the guys at the shop.

14  Q    Can you tell the Court what you mean by that there was a

15  market at Boeing?

16  A    Uh, there was -- there was -- when I first got there, you

17  know, just talking to the other guys and stuff like that, I

18  started to notice some odd behavior from a few of the

19  employees and I would wonder, you know, what's going on with

20  them.  And they told me, because they were there longer than

21  me, that, you know, the guys was on pill, Percocets.

22  Q    Was this something that you noticed -- was it a common

23  thing that you noticed or was it infrequent?

24  A    Common, I would say common, weekly, maybe sometimes even

25  on a daily basis.

1  Q   And so then please continue.  You noticed that people

2  were using at the plant?

3  A   Yes, I did.

4  Q   What else did you learn as you began your employment

5  there?

6  A   That I could make money selling these pills to many of

7  these people, because just by word of mouth I knew that there

8  was a lot of guys that were doing it and that I could provide

9  them the Percocet and I could make money at it.

10 Q   And so did you ultimately decide to do that?

11 A   Yes, I did.

12 Q   And when you did that, you said -- you mentioned that you

13 obtained pills from someone outside of the plant?

14 A   Outside of the plant, also other coworkers I would also

15 get them off of.

16 Q   You would buy them in order to sell them or would you buy

17 them to use them?

18 A   No, I would buy them to sell them.  Sometimes I would --

19 there was one particular case, a coworker was out with

20 leukemia and he was struggling, and I worked with him for

21 three years and he approached me and asked me to provide some

22 pills to a certain gentleman, and I did that for him.

23 Q   So at this point then you mentioned that you were selling

24 -- you began selling pills yourself, is that correct?

25 A   Yes, I --

1  Q   About when did you do that?

2  A   When did I start selling?

3  Q   Yes.

4  A   I would say right around 2010, September, October of

5  2010.

6  Q   And so if you were arrested in September 29th, 2011, you

7  were selling for about a year?

8  A   About a year, yes.

9  Q   When you began selling, what did you sell?

10  A   I started with the Percocets, any kind of milligram that

11  I could get my hands on, Perc 5s, 10s, and then gradually,

12  you know, if I -- somebody had Perc 20s, I sold them.  The

13  gentleman I was talking about, my coworker, he was getting

14  higher prescriptions because he was really sick.

15  Q   And were you able to develop a customer base for your

16  sales?

17  A   Yes, sir -- yes, ma'am, I'm sorry.

18  Q   That's all right.  How big was your customer base?

19  A   I would say upwards of 15 people directly, but then by

20  talking to them, it branched out after that.  So I would say

21  probably around 30 to 40 people.

22  Q   Okay.  And I'm going to go into that in a minute, but

23  when you first began selling, how did you start?

24  A   I just came in and let a few guys I knew that were on

25  them that I had them and it just took off from there.

1  Q   And can you just -- you say it just took off from there,

2  can you just describe exactly how you developed a customer

3  base that you think reached about 30 to 40 different people

4  at the Boeing plant?

5  A   I would say just by word of mouth.  People were looking

6  for them, I would come in, not be in the door maybe a half an

7  hour before my phone rang and asked me, you know, if I had

8  anything on me.

9  Q   And so, just in a typical day or week, how many people

10 would -- different people would approach you about purchasing

11 from you?

12 A   I would say anywhere from 15 to 20 people.

13 Q   And then you indicated that you understood that other

14 people may be receiving the pills that you were supplying to

15 those people; can you please explain that to the Court?

16 A   Well, guys would come up -- you know, obviously you ain't

17 making the kind of money to buy 20, 30 of these pills at a

18 time just yourself, so they would -- they would come up to me

19 and say, you know, I need 15 of these, but they're for other

20 guys that I'm working with in my area.  I didn't ask names, I

21 just said fine.

22 Q   So you understood that some of your customers were then

23 in turn sharing them or selling them to other people?

24 A   Yes.

25 Q   And did other people approach you about purchasing pills

1  that you ended up not selling to?

2  A    I don't understand.

3  Q    Did everybody who asked you for pills, did you sell to

4  them?

5  A    Yes, mostly.  Unless I didn't know them, then I would ask

6  around and see if he was okay, you know, if he was going to,

7  you know, tell the boss on me or something like that, but

8  mostly I would -- you know, I knew them, it was recurrent

9  customers that I knew.

10  Q    Was this something that you were able to do out in the

11  open at the plant?

12  A    Somewhat.  I mean, we'd meet out in the parking lot at

13  break time, maybe get in my car, you know, in the bathroom,

14  you know.  We knew that there was cameras all throughout the

15  plant, so we would either go in the men's room or outside in

16  the parking lot.

17  Q    And so just to walk the Court through, what quantities

18  were you selling then on a weekly basis?

19  A    Uh, on a weekly basis, anywhere from 30 to 60 pills, I

20  would say.

21  Q    And those would be any range, whatever you mentioned that

22  you could get --

23  A    Yes, any milligrams, yes.

24  Q    -- in terms of milligrams?

25          And 30 to 60 pills and you said about, what, ten to

1  15 customers a week?

2  A    Yes, mm-hmm.

3  Q    And what were you just -- what were you selling them for?

4  A    The number of milligrams usually, like Perc 5s would go

5  for $5, the tens and so on.  But as you got up into the

6  higher end like the Oxycontins, which are 40 milligrams, they

7  went for $20 a pill.

8  Q    And what were you then making off of let's say a Perc 5

9  if it was $5?

10  A    I would maybe get a bunch of them for like maybe $2, like

11  a hundred of them for $200, and sell them for $5, make about

12  $300.

13  Q    And so you mentioned I believe, and correct me if I'm

14  wrong, you had about ten to 15 regular customers, is that

15  correct?

16  A    Yes, mm-hmm.

17  Q    You understood your reach in sales was further than that?

18  A    Correct.

19  Q    Those ten to 15 customers, how much generally were they

20  getting from you on a weekly basis?

21  A    Uh, they were probably getting anywhere from ten to 15

22  pills per week off me.

23  Q    Were any of those people that were buying from you some

24  of the people that you had heard were using at the plant?

25  A    Yes.

1  Q   And did you have observations of those individuals that
2  indicated to you that they were using the pills that you were
3  supplying?
4  A   Yes.
5  Q   Can you please describe that to the Court?
6  A   Just on different occasions guys being very, you know,
7  like nodding out, like their eyes going -- rolling in the
8  back of their head, a couple guys would sweat really bad, you
9  know, and it wasn't -- it's a temperature-controlled
10 building, and things like that.  They were just -- they were
11 off, you could tell.
12 Q   And were there any concerns that you were aware of about
13 management finding those people in those conditions?
14 A   Yes.
15 Q   What were those concerns?
16 A   They would get caught and get in trouble.  I mean, you
17 know, I knew these guys, I worked with them, you know, so I
18 didn't want to see anybody lose their job.
19 Q   And so would you take any steps to try to prevent that
20 from happening?
21 A   On occasion, yes, I would --
22 Q   What would you do?
23 A   I would try to warn them, you know, that the boss was
24 coming or, you know, to move to a different area, maybe go to
25 the bathroom, splash some water on your face.

1  Q   Was that something that you personally did?

2  A   Uh, maybe a couple times; not all the time, you know, I

3  just sort of shied away from it because I was the one

4  supplying.

5  Q   Did you notice other people doing that to help other

6  people who were impaired?

7  A   Yes, mm-hmm.  Everybody looked out for everybody down

8  there it seemed.

9  Q   And just to understand it, when you first began selling,

10 how many customers did you initially start with?

11 A   Just a couple, just a few, and then by word of mouth it

12 grew.

13 Q   How quickly did it grow?

14 A   Uh, within a week or two.  I mean, it got out pretty

15 quick.

16 Q   Got out pretty quick what?

17 A   Within the -- you know, within the first couple guys that

18 I dealt with, within that week, it doubled and tripled in

19 guys.

20 Q   So when you had something to sell, did you need to tell

21 anybody that you had it?

22 A   Uh, no, they would contact me about what I had.

23 Q   Okay.  And they, again, meaning your --

24 A   Yes, the guys that I was dealing with.

25         MS. LUNKENHEIMER:  I have no further questions.

1          THE COURT:  All right.

2          MR. SCUDERI:  No questions, your Honor.

3          THE COURT:  Any questions?

4          MR. LAIGAIE:  No questions, your Honor.

5          MS. SCOTT:  I have no questions, your Honor.

6          MR. DREYER:  No, your Honor.

7          MR. MOLINEUX:  No questions from me, your Honor.

8          THE COURT:  All right.  You can step down, sir.

9          THE WITNESS:  Thank you.

10          (Witness excused.)

11          MS. TAYLOR:  Excuse me, your Honor, I just want to

12    make sure the witness is here.

13          THE COURT:  Okay.

14          MS. TAYLOR:  The Government calls Jonathan Sullivan.

15          THE AUDIO OPERATOR:  Please stand and raise your

16    right hand.  State and spell your last name for the record.

17          THE WITNESS:  Jonathan David Sullivan,

18    S-u-l-l-i-v-a-n.

19          JONATHAN SULLIVAN, Government's Witness, Sworn.

20          THE AUDIO OPERATOR:  Thank you.

21          MS. TAYLOR:  May I proceed, your Honor?

22          THE COURT:  Of course.

23                    DIRECT EXAMINATION

24    BY MS. TAYLOR:

25    Q   Good morning, Mr. Sullivan.

1    A    Good morning.

2    Q    How old are you?

3    A    I am 36.

4            (Discussion held off the record.)

5    BY MS. TAYLOR:

6    Q    Were you employed at the Boeing plant?

7    A    Yes, I was.

8    Q    Were you arrested for selling drugs there?

9    A    Yes, I was.

10   Q    What did you sell?

11   A    Oxycontin.

12   Q    And as a result of being arrest, did you agree to

13   cooperate with the Government?

14   A    Yes, I have.

15   Q    And in exchange for your cooperation you hope to get

16   consideration from your sentencing judge, is that right?

17   A    I do, yes.

18   Q    And that is not Judge Rice?

19   A    No, it is not.

20   Q    Now, when did you start working at Boeing?

21   A    January 9th, 2009.

22   Q    And when you started there, what was your position?

23   A    Sheet Metal Assembler B.

24   Q    Did you ultimately become Sheet Metal Assembler A as

25   well?

1   A    I did.

2   Q    As Sheet Metal Assembler B or A, what were your duties

3   and responsibilities?

4   A    Reading blueprints, drilling holes, fastening rivets.  I

5   was in the splice area and I would attach the cockpit to the

6   cabin.

7   Q    And what aircraft were you working on?

8   A    The V-22 Osprey.

9   Q    And did you work on the V-22 Osprey throughout the time

10  that you were a Sheet Metal Assembler B and A?

11  A    I did.

12  Q    What buildings did you work in?

13  A    Building 3-25.

14  Q    When you came to Boeing, were you addicted to any kind of

15  pills?

16  A    I was not.

17  Q    After being at Boeing for a short while, did you become

18  addicted to pills?

19  A    I did.

20  Q    Within how many months of your employment at Boeing did

21  you become addicted to pills?

22  A    I'd say within six months, give or take.

23  Q    How did your addiction begin?

24  A    It started with tooth pain and I had -- you know, I had

25  never taken, you know, Percocet or Oxys before that.  And

1    then I went on to hurt my right knee at Boeing while I was

2    working there and I was out for about ten days, I believe,

3    and during that ten days I was prescribed any number of

4    different kinds of pain pills and it pretty much took off

5    from there.

6    Q    Did you -- did those pain pills include Oxys?

7    A    Yes.

8    Q    Did they include Percocets?

9    A    They did.

10   Q    At some point during the treatment for that knee injury

11   did you become addicted to Oxys and Percocets?

12   A    I did.

13   Q    And after becoming addicted -- well, strike that.

14          When you first came to Boeing, were you aware that

15   people there were taking prescription pills?

16   A    When I first came?

17   Q    Yes.

18   A    I found --

19          THE COURT:  You mean legally or illegally?

20          MS. TAYLOR:  Illegally, I'm sorry.

21   BY MS. TAYLOR:

22   Q    That people were taking -- illegally taking prescription

23   pills?

24   A    I became aware of it within my first week while I was in

25   my training class, yes.

1  Q   Tell the Judge about that.

2  A   When entering into Boeing, you put in a training class

3  for a couple of weeks.  I don't know, I wasn't there the

4  whole time, I taken out.  Within my first four days or so,

5  another new-hired employee came to me and wanted to know if I

6  wanted to buy some pills, and I saw him giving them out like

7  they were candy.

8  Q   After your initial training period --

9          THE COURT:  What kind of pills were they?

10         THE WITNESS:  I don't know at that point.  He told

11 me they were Percocets, but at that point I couldn't visually

12 see them and tell you what they were.

13 BY MS. TAYLOR:

14 Q   And you did not buy them?

15 A   I did not at that point, no.

16 Q   After that, did you begin to meet other employees at

17 Boeing?

18 A   Yes.

19 Q   And was there a conversation about the availability of

20 pills at the plant?

21 A   You never really had a conversation, like you didn't say,

22 hey, these are so easy to get, it was -- it's kind of amazing

23 how when you go down that road how fast it is, you know, that

24 you find out people sell, how easy it is to find out who's

25 the one that sells, who you stay away from.  But, yeah, you

1   do have conversations, but they're not, you know, that drawn

2   out.  It's just, hey, if you want to get this, this is where

3   you go for right now.

4   Q   And when you say when you go down that road, do you mean

5   the road of addiction?

6   A   Yes, I do.

7   Q   So after you became addicted to pills, you were able to

8   determine or to discover who was selling the pills and who

9   you could get them from?

10  A   Very easily, yes.

11  Q   And did you buy pills at the Boeing plant?

12  A   I did.

13  Q   And did you buy them from Boeing employees?

14  A   I did.

15  Q   Did you use those pills at the Boeing plant?

16  A   I did.

17  Q   What were you buying?

18  A   Percocets, Oxycontins.  Those were the basics, the

19  oxycodone.

20  Q   Do you remember what milligrams you were buying?

21  A   I started out with five milligrams, ten, and as my

22  addiction got worse, you know, as it got worse, so did my

23  need for higher milligrams.  I went up to 20, 40, 60, you

24  know, it kept going up.

25  Q   How often during any given day would you have to take

1   pills in order to make it through the day?

2   A    In order to make it through the day, at least once, but,

3   you know, at times it was once every four hours.

4   Q    And when you were taking these pills -- well, let's take

5   a typical shift, an average day.  When you began your shift,

6   would you have to take the pills?

7   A    Yes.

8   Q    And then four hours later you would take more pills?

9   A    Yes, if -- that was all possible, yes.

10  Q    And then if it were possible, four hours after that --

11  A    Absolutely.

12  Q    -- were you taking more pills?

13  A    Yes.

14  Q    When you were addicted to these pills, when you were

15  using these pills, are you taking a prescription at this

16  point or are you released from the doctor?

17  A    When I had gotten up higher in the amount of milligrams I

18  was taking, I was off of the doctor and --

19  Q    So all of the pills you were taking at this point were

20  illegally obtained by you?

21  A    Yes, they were.

22           THE COURT:  At what point?

23  BY MS. TAYLOR:

24  Q    Once you were done the doctor's treatment --

25           THE COURT:  When was that?

1  BY MS. TAYLOR:

2  Q   -- approximately when was that?

3  A   Just before December of 2009.

4  Q   So from December of 2009 until the point of your arrest,

5  the pills that you were taking you illegally obtained at

6  Boeing?

7  A   I did.

8  Q   Did you obtain all of those pills from different Boeing

9  employees?

10 A   Two or three guys, but, yes, there was just a couple of

11 different guys.  And every now and then they weren't in or

12 they didn't have them and you had to talk to someone else to

13 find someone else to obtain them, but it was very easily

14 obtained.

15 Q   Would you sometimes trade work instead of money for

16 pills?

17 A   I would.

18 Q   Describe that to the Court.

19 A   When I didn't have cash to buy a pill, I would talk to

20 someone and I would do their day's work for them for said

21 pill.  It was an easy way to not have money trade hands and

22 obtain the pills that you needed, yeah, and not have to pay

23 for it.

24         THE COURT:  What do you mean, you would show up and

25 work their shift?

1    THE WITNESS:  No, I would do -- like every day you
2 have -- you're there for eight hours and you have eight hours
3 of scheduled work that you have to get done, you have to
4 drill a certain plate, put a wheel on or something like that.
5 I would do eight hours of scheduled work for that employee in
6 -- you know, in exchange for a pill.
7 BY MS. TAYLOR:
8 Q   Who was doing your eight hours of work?
9 A   Me.
10 Q   So you were doing your work and his work?
11 A   When I was on pills, I was Superman, I could do 16.
12    THE COURT:  So you would stay 16 hours or would you
13 do two --
14    THE WITNESS:  No, I would stay for --
15    THE COURT:  -- jobs within eight hours?
16    THE WITNESS:  I would stay for eight hours or maybe
17 ten and I would get done two eight-hour jobs in that period
18 of time.
19 BY MS. TAYLOR:
20 Q   And that's when you were taking the pills?
21 A   That's when I was taking the pills, yes.
22 Q   Now, were you the only person that you saw at Boeing, the
23 only employee you saw using pills?
24 A   No.
25 Q   If I asked you to estimate, just based on the people you

1  saw, how many of those employees were using pills, could you

2  do that?

3  A    I could give you a rough estimate, yes.

4  Q    Based on what you saw and what you know?

5  A    On what I saw and what I know, yes.

6  Q    What's that?

7  A    I would say one of every four, one --

8  Q    Was taking pills?

9  A    Yes, on the shifts and on the aircrafts that I was on,

10 yes.

11 Q    Did you ever -- did you ever experience withdrawal while

12 you were at work?

13 A    I had, yes.

14 Q    And when you experienced withdrawal, would that be

15 because you did not have access to the pills you needed?

16 A    Yes.

17 Q    And what symptoms would you suffer when you were

18 experiencing withdrawal?

19 A    Leg cramps were the start of it, stomach cramps,

20 vomiting, diarrhea.  That was the start of it.  Usually the

21 cramps were so bad that once they got going -- that was kind

22 of the start of it -- once the cramps got going, you really

23 couldn't stay.  You were in the men's room or you went home,

24 you know.

25 Q    Did you see other employees also experiencing or

1  demonstrating symptoms of withdrawal?

2  A    Yes.

3  Q    Tell the Judge what you saw?

4  A    I would -- you would see someone with the sweats, someone

5  that you knew was like on pills, you'd see them with the

6  sweats, the vomiting, the throwing up, the diarrhea, just

7  your basic symptoms, yes.

8  Q    And on occasion did you have to leave work because of

9  your withdrawal symptoms?

10 A    I had, yes.

11 Q    Do you know of others who also left work because of their

12 withdrawal symptoms?

13 A    I do.

14 Q    Now, did employees at Boeing -- strike that.

15      You're a member of the union, is that right?

16 A    I am.

17 Q    Was it the culture at Boeing that the union brothers

18 would look out for each other?

19 A    It was an unspoken, we all worked with one another.

20 You're there for eight hours per day at least, you know, you

21 see them more than you see your own wife and kids.  So, yes,

22 you look out for one another.

23 Q    And if people were experiencing symptoms of drug use,

24 what would you do or what did you see others do?

25 A    Grab them by the side -- you know, take them and tell

1  them that they are -- you know, that they look bad, that you

2  need to get home, because if the boss sees you like this

3  they're going to test you.  Just looked out for one another,

4  but basically you'd tell them to go home.

5  Q   What typical areas were you and other employees using

6  drugs at Boeing?

7  A   In areas?

8  Q   Yeah.

9  A   I'm sorry.

10 Q   Did you use it in your work area, did you use it in

11 restrooms --

12 A   Usually in your work area --

13 Q   -- where?

14 A   -- or in the men's room.  I mean, it was just a pill.

15 Q   So you just popped it wherever you were?

16 A   Absolutely.

17 Q   Were you -- well, let me ask this question first.  Did

18 you ever use any drugs at Boeing other than prescription

19 pills?

20 A   I have.

21 Q   And what did you use?

22 A   I used cocaine one time there.

23 Q   You used cocaine on the plant?

24 A   Yes.

25 Q   Did you get that cocaine from a Boeing employee?

1   A   I did.

2   Q   Did you use it with the employee at the plant?

3   A   I did.

4   Q   Did you ever know of other people using other drugs in

5   addition to the pills at Boeing?

6   A   Yes.

7   Q   What?  What drugs?

8   A   Marijuana, cocaine, there was even nitrous oxide, but

9   pills were the main.

10  Q   Was there ever an occasion -- strike that.

11          Because you were in -- or you were down that road,

12  as you described it --

13  A   Yes.

14  Q   -- did you interact on a daily basis with other people

15  who were down that road of pill usage?

16  A   Absolutely.

17  Q   How often during any day would you -- would people be

18  looking for pills?

19  A   At least once.  Right when you got in, I would get in at

20  6:00 a.m. and by 6:30 at least one or two guys would come up

21  and say, hey, do you know where I can get a pill today?  And

22  that was the start of it.  I mean, you went to the bathroom,

23  you were bound to hit someone else too who needed a pill.

24  Q   And did people trade pills?  Like if you had pills and I

25  needed pills, would you give me pills to hold me over?

1    A    That, yes, had been known to happen, sure.

2    Q    Did people also use Suboxone?

3    A    Absolutely.

4    Q    Did you use Suboxone?

5    A    I did.

6    Q    What did you use Suboxone for?

7    A    Suboxone was prescribed to me to help me conquer my need

8    for Oxycontins and Percocets.

9    Q    And so how would you use it?

10   A    Well, it's in a pill form, but it melts under your

11   tongue.

12   Q    I'm sorry, that's my mistake --

13   A    I'm sorry.

14   Q    -- I asked the wrong question.

15   A    Okay.

16   Q    Why would you use it during the work day?

17   A    To help me get through.  Once I became addicted to

18   opiates, the need was so overpowering, it overpowered

19   everything else; you could not function without them.  So I

20   used Suboxone to -- as a replacement for my opiates.

21   Q    Did it bridge you between opiate doses?

22   A    Yes.

23           THE COURT:  And was the Suboxone prescribed?

24           THE WITNESS:  Yes, it was.

25   BY MS. TAYLOR:

1  Q   Were people at Boeing also selling Suboxone illegally?

2  A   They were.

3  Q   And was it your impression that other employees were

4  using Suboxone in the same way you were, meaning as a bridge

5  between opiate doses?

6  A   Yes.

7  Q   Now, was there ever a time at Boeing when you couldn't

8  get pills?

9  A   Yes, there was.

10 Q   And what happened then?

11 A   Usually -- it didn't happen much, once or twice.  There

12 would, you know, be a dry spell, I guess you'd call it, I

13 don't know what the terminology is.  Usually you would go

14 home, you know.  If you came back in the next day, they were

15 bound to be back.

16 Q   Okay.  So if you couldn't get the pills that would permit

17 you to get through the day, you simply went home?

18 A   Yes.

19 Q   What was the longest drought you experienced at Boeing

20 where people didn't have pills?

21 A   Oh, two or three days tops.

22         MS. TAYLOR:  I have nothing further of Mr. Sullivan.

23         THE COURT:  Did you participate in any Employee

24 Assistance Programs that Boeing offered?

25         THE WITNESS:  I did.  In July 16th of 2011, I

1  entered Mirmont treatment facility, I stayed there for 20

2  days, and next week I will have been clean for one year

3  because of that problem.

4          THE COURT:  Was that before or after the arrest?

5          THE WITNESS:  That was before the arrest by almost

6  60 days.

7          THE COURT:  So you were arrested while you were in

8  treatment?

9          THE WITNESS:  No, I was arrested after I got back

10  from treatment, yes, sir.

11          THE COURT:  Why didn't you go to Employee Assistance

12  earlier?

13          THE WITNESS:  Uh, I didn't have a problem, I could

14  handle this, is what I told myself.

15          THE COURT:  Any follow-up to that?

16          MS. TAYLOR:  No, sir.

17          THE COURT:  Okay.  Mr. Scuderi?

18          MR. SCUDERI:  Thank you, your Honor.

19          THE COURT:  Thank you.

20                          CROSS-EXAMINATION

21  BY MR. SCUDERI:

22  Q   Sir, you're okay right now?

23  A   I am.

24  Q   And the period when you were addicted to drugs, did you

25  think about that as a time when you were sick?

1  A   Like did I refer to myself as being sick?

2  Q   Or now, when you look back, was it a time when you were

3  sick?

4  A   I guess you could say that.

5  Q   All right.

6  A   I mean, I don't use that particular word --

7  Q   Okay.

8  A   -- but yes.

9  Q   But you feel better now?

10 A   Absolutely.

11 Q   And it's a battle which you constantly --

12 A   Every single day.

13 Q   Every single day?

14 A   Absolutely.

15 Q   When you went to the EAP, what did they tell you?

16 A   It was a phone call, you know, I didn't show up somewhere

17 and there was papers to sign or anything like that.  I made a

18 phone call and because of my sickness, my illness, they made

19 a phone call for me and got me into Mirmont within the -- I

20 think it was within six hours I went from making the phone

21 call to showing up there at the treatment center.

22 Q   Was it your understanding that the information which you

23 gave them or what you told them was confidential?

24 A   Yes.

25 Q   And was that used against you?  Did you go back to work

1  at Boeing before you were arrested?

2  A    Yes, I went back to work.

3  Q    Okay.  And when you went back, you were straight and you

4  were okay at that point?

5  A    Yes.

6  Q    And you're still okay?

7  A    I am.

8  Q    Now, you said you first started taking pills when you had

9  a tooth problem?

10  A    Yes, it started that way, I believe.

11  Q    Okay.  And that was for pain?

12  A    Yes.

13  Q    And did it make the pain in your mouth go away or did it

14  help to some degree?

15  A    It helped to some degree, yes.

16  Q    And you said you had a knee problem?

17  A    Yes.

18  Q    Was that work-related?

19  A    It was.

20  Q    Okay.  And were there other people with work-related

21  injuries at Boeing?

22  A    Absolutely, yes.

23  Q    Was it a very -- would you describe it as a very physical

24  type job?

25  A    It is, yes.

1  Q   And you said you riveted things or you -- did it require

2  a lot of lifting or --

3  A   Absolutely.

4  Q   Okay.  Is your knee better now?

5  A   It is.

6  Q   Okay.  Did you take your pills too long for your knee or

7  for your tooth?

8  A   You know what, I can't tell you if I did or not, I'm not

9  entirely sure.

10  Q   Okay.  When you took the pills for your knee, did it make

11  you high?

12  A   I can't tell you if it did at first, but I know, yes, it

13  did as I kept taking them, yes.

14  Q   Okay.  Did you go back to work at some point when your

15  knee was still hurting you?

16  A   Yes.

17  Q   Did it accelerate your return to work because you could?

18  A   Yes.

19  Q   Did the people at Boeing know that you were taking the

20  pills?

21  A   I'm not aware that they did, I don't know.

22  Q   Well, those pills were --

23            THE COURT:  You mean when they were prescribed?

24            MR. SCUDERI:  When they were prescribed.

25            THE WITNESS:  Yeah, I don't know.

1  BY MR. SCUDERI:

2  Q   Okay.  Did you have a work-related claim or workmen's

3  comp claim?

4  A   I did.

5  Q   Okay.  And did they send you to a doctor or did you go to

6  your own doctor?

7  A   I went to -- they went and talked to the doctor that I

8  had gone to.  Boeing sent me to a knee specialist and I think

9  they talked to the knee specialist, I'm not entirely sure.

10 Q   Do you know if Boeing ever saw your medical records in

11 connection with the knee problem?

12 A   Yes.

13 Q   Okay.  Is the answer they did see your medical records?

14 A   Yes, I believe they did, yes.

15 Q   Okay.  And do you recall telling them that you were on

16 medication?

17 A   I believe I told them -- you know what, I'm not entirely

18 sure that I did.

19 Q   Did you have any surgical procedure on your knee?

20 A   No.

21 Q   Is your knee better now or does it still hurt you?

22 A   It's absolutely fine now, yes.

23 Q   Okay.  How did the -- how did your ingestion of these

24 pills affect your work performance?

25 A   Uh, I can't say that it did.  I know I worked harder and

1    faster when I had them.

2    Q    Okay.  On your direct testimony you referred to yourself

3    that when you were on these pills you were like Superman?

4    A    Yes.

5    Q    Could you tell the Court what you mean by that?

6    A    As just a turn of a phrase, but, you know, no aches, no

7    pains, you felt like you had a little bit more energy, in

8    that way is how I meant it.

9    Q    Okay.  And you said you would trade off pills for work,

10   were you able to do two people's work in an eight-hour period

11   because you felt so good?

12   A    Sometimes, yeah.

13   Q    Okay.  I assume that you were not nodding out when you

14   were working this hard?

15   A    No, not me, no.

16   Q    And your eyes were not rolling back in your head?

17   A    No, not me.

18   Q    And basically your problem with performance is when you

19   were withdrawing from drugs, is that correct?

20   A    Uh, for me that was the case, yes.

21   Q    And at that point you would either go to the bathroom or

22   you would go home?

23   A    Yes.

24   Q    Okay.  Now, you said you were prescribed Suboxone, is

25   that correct?

1  A   I was.

2  Q   And obviously Suboxone is a legal substance which is used

3  to get people off of Oxycontin?

4  A   That's, yes, what I believe.

5  Q   All right.  When you went to Mirmont, were you prescribed

6  any drugs?

7  A   When I went to Mirmont, while I was in detox I was given

8  doses of Suboxone for four days, I believe --

9  Q   Okay.

10 A   -- and it got progressively lower.

11 Q   Okay.

12 A   And that's all I was given while there, I was there -- I

13 mean, besides an aspirin.

14 Q   Okay.  Did it help you to detox?

15 A   It did.

16 Q   Did you still have the cramps and the sickness?

17 A   You know what, I'm sure I did, it's kind of -- when I was

18 there, it was all happening so fast, you know, I got put in a

19 treatment facility with like -- I'm sure it did, but I don't

20 recall.

21 Q   All right.  Sir, you testified what your job was on

22 direct and I'd like to ask you again.  You said you --

23 A   Sheet metal assembly.

24 Q   Okay.  And that was for what kind of aircraft?

25 A   The V-22 Osprey.

1   Q   Okay.  Do you have any question that any of the job, any

2   of the jobs you performed while at Boeing were done

3   negligently or --

4   A   Not one iota, no.

5   Q   Not one iota?

6   A   No.

7   Q   Okay.  Were you ever written up for poor job performance?

8   A   No, I was not.

9   Q   Did you consider yourself an exemplary employee?

10  A   Employee?  No.

11  Q   How about worker?

12  A   Yes.

13  Q   Were you proud of your work?

14  A   I was.

15          MR. SCUDERI:  I have no further questions, your

16  Honor.  Good luck.

17          THE COURT:  Okay.

18          MR. MOLINEUX:  No questions, sir.

19          MS. SCOTT:  Just a couple of questions, your Honor.

20                      CROSS-EXAMINATION

21  BY MS. SCOTT:

22  Q   Good morning, sir.

23  A   Good morning.

24  Q   Mr. Sullivan, you said that you went into Mirmont back in

25  July of 2011, is that right?

1  A   Yes, July 16th.

2  Q   Were you aware prior to that time whether there was a

3  Government investigation related to drug use or abuse at

4  Boeing?

5  A   I was not aware of that, no.

6  Q   When did you first become aware of that?

7  A   The day I was arrested.

8  Q   In September of 2011?

9  A   In September of 2011, yes.

10          THE COURT:  That he was aware of what?

11          MS. SCOTT:  The Government's investigation at

12  Boeing.

13          THE COURT:  Okay.

14  BY MS. SCOTT:

15  Q   You indicated that everyone sort of covered for each

16  other, is that right?

17  A   Yes.

18  Q   All the employees would go to one another and say, look,

19  you know, you're sweating, go home or clean yourself up, that

20  sort of thing?

21  A   Yes, that would happen.

22  Q   And that includes managers as well, is that right?

23  A   No.

24  Q   Just the workers themselves?

25  A   Just the workers is what I saw, yes, firsthand.

1  Q   And you worked in which building, sir?

2  A   The 3-25.

3  Q   You indicated that you took pills so that you could make

4  it through the day, right?

5  A   It had gotten to that point, yes.

6  Q   And you would continue to take pills so that you could

7  continue to work, is that right?

8  A   Absolutely.

9  Q   And it's fair to say that the reason why you took the

10  pills is because you didn't want to miss days, otherwise you

11  would get paid, is that right?

12  A   It's fair to say; it's not the only reason why, but yes.

13  Q   When you went to the Employee -- or went through EAP to

14  Mirmont, were you getting paid during that time?

15  A   No.

16          MS. SCOTT:  I have no further questions.

17          MR. DREYER:  No questions, your Honor.

18          MR. LAIGAIE:  No questions, your Honor.

19          THE COURT:  Anything further, Ms. Taylor?

20          MS. TAYLOR:  No, sir.

21          THE COURT:  All right.  Congratulations on your

22  anniversary.

23          THE WITNESS:  Thank you very much, I appreciate

24  that.

25          THE COURT:  All right.  Good luck to you.

1     (Witness excused.)

2     THE COURT:  How many witnesses do we have left?

3     MS. TAYLOR:  Three?  Three.

4     THE COURT:  How long do you think that will take?

5     MS. TAYLOR:  This is the longer witness of the

6  civilians.

7     THE COURT:  All right.  Why don't we break for an

8  hour?

9     MS. TAYLOR:  Very well.

10     THE COURT:  Is that convenient for everyone?

11     MS. SCOTT:  Your Honor, I have a hearing before

12  Judge Diamond at 1:30, which I think will take about 45

13  minutes or so.

14     THE COURT:  All right.  Well, let's just take a

15  brief break then for -- how about if we break until 12:10?

16     MS. SCOTT:  Okay.

17     MS. TAYLOR:  Very well, your Honor.

18     THE COURT:  All right?  Thank you.

19     (Court in recess; 11:46 to 12:11 o'clock p.m.)

20     THE COURT:  Welcome back, everyone.  Please be

21  seated.

22     It sounds like we're all okay with 1:30 for the

23  23rd, except for the golfer in our midst?

24     MR. SCUDERI:  We have no choice.

25     (Laughter.)

1          THE COURT:  At least there's one golfer who is -- he

2    has a previous engagement.  I won't disclose who that is.

3          I'm not sure we're going to be able to finish

4    everything today, because I have to stop at 2:45.  It doesn't

5    sound like we're going to be able to get everything done.  So

6    can we -- if we don't finish, can we do that person with the

7    doctor on the 23rd?

8          MS. TAYLOR:  Yes, we could.  We have three witnesses

9    left, I'm certain we'll get through the first one and

10   probably the second one.  It may be --

11         THE COURT:  Are any of those going to implicate Ms.

12   Scott's client?

13         MS. TAYLOR:  Yes.

14         THE COURT:  So why don't we --

15         MS. TAYLOR:  We're trying to get her --

16         THE COURT:  -- do that first?

17         MS. TAYLOR:  Yes, sir.

18         THE COURT:  Okay.

19         MS. LUNKENHEIMER:  Yes, your Honor.

20         MR. SCUDERI:  I think we're going to finish, your

21   Honor.

22         THE COURT:  Okay, I hope we do.

23         MS. LUNKENHEIMER:  I think we could.

24         MS. TAYLOR:  We're going to make our best efforts,

25   your Honor.

1          THE COURT:  Okay, very well.

2          COUNSEL:  We'll stipulate to everything, your Honor.

3          (Laughter.)

4          THE COURT:  There you go.

5          MS. TAYLOR:  In a different world.

6          Your Honor, we would call Charles Haux.

7          THE AUDIO OPERATOR:  Please raise your right hand.

8    State and spell your last name for the record, please.

9          THE WITNESS:  Charles Francis Haux, H-a-u-x.

10          CHARLES F. HAUX, Government's Witness, Sworn.

11          THE AUDIO OPERATOR:  Thank you.

12                     DIRECT EXAMINATION

13   BY MS. TAYLOR:

14   Q    Mr. Haux, if you could have a seat and if you could try

15   to keep your voice up, okay?

16   A    Okay.

17   Q    Tell the Judge your full name, sir.

18   A    Charles Francis Haux.

19   Q    And how old are you?

20   A    50.

21   Q    And were you employed at the Boeing plant?

22   A    Yes, I was.

23   Q    And you were employed there from what years?

24   A    '79 until September 29th, 2011.

25   Q    So you were employed until the date of your arrest, is

1    that correct?

2    A    Correct.

3    Q    When you -- can you tell the Judge briefly the jobs you

4    performed at the Boeing plant?

5    A    I got hired as a Pattern Maker B and then in -- in '79,

6    and in '85 I became an A Man --

7    Q    Okay, hold on one second, because we're not familiar with

8    what that really means.  Were you a Pattern Maker B Mechanic?

9    A    Yes.

10   Q    And then you became a Pattern Maker A Mechanic?

11   A    A Mechanic, yes.

12   Q    Is that what you refer to as an A Man?

13   A    Yes.

14   Q    What were your duties and responsibilities as a Pattern

15   Maker either A or B Mechanic?

16   A    We fabricated tools for production to use, made tools.

17   Q    And what does it mean to fabricate tools?

18   A    To build the tool, worked with fiberglass and plaster and

19   all, you could drop hammer dies and all sorts of other parts

20   -- tools to make the parts or trim the parts or whatever.

21   Q    Would you -- did you make the tools that then the

22   mechanics used to make the parts?

23   A    Yes.

24   Q    And did you make the tools that mechanics used for the

25   V-22?

1    A    Yes, the V-22.

2    Q    Did you also make the tools for the Chinook?

3    A    Yes, I did.

4    Q    And was that your job for the entire time you were a

5    Pattern Maker A or B Mechanic?

6    A    Yes.

7    Q    Would that have been from approximately 1979 to 1995?

8    A    Correct.

9    Q    In 1995, did you get a different position?

10   A    Yes.

11   Q    What did you become?

12   A    I became a Breakdown Fabrication Man.

13   Q    What were your duties as a Breakdown Fabrication Man?

14   A    We would --

15           MR. DREYER:  Objection, your Honor --

16           THE WITNESS:  -- order prints --

17           MR. DREYER:  -- as to the relevance of --

18           THE COURT:  Hold on, hold on, hold on, sir, I'm

19   sorry.  What's your objection?

20           MR. DREYER:  The relevancy of this information.

21           MS. TAYLOR:  Your Honor, if I may, the jobs he

22   performed put him in a position to create -- commit the

23   crimes he committed, we would ask for two minutes' leeway to

24   simply have him tell you what he did.

25           THE COURT:  All right, I'll allow it.

1   BY MS. TAYLOR:

2   Q    I'm sorry, what was your job, what did you do as a

3   Breakdown Fabrication Man?

4   A    As a Breakdown guy, I had to order the prints, and then

5   from there I looked at the prints and then I ordered any

6   material that was needed for the job.

7   Q    What buildings did you work in?

8   A    I started in 356, 307, 331 and 306.

9   Q    And did you work in those buildings throughout the time

10  of your employment at Boeing?

11  A    Yes.

12  Q    In 2006, did you become addicted to drugs?

13  A    Yes, I did.

14  Q    What did you become addicted to?

15  A    Percocets.

16  Q    And what happened that caused you to become addicted to

17  Percocets?

18  A    I broke my thumb skiing and needed surgery and then the

19  doctor prescribed Percocets to me.

20  Q    And the Percocets were prescribed to you for the pain?

21  A    Correct.

22  Q    And at some point were you released from the doctor's

23  care for your thumb accident or injury?

24  A    Yes.

25  Q    When you were released from the doctor's care, were you

1  addicted to Percocets at that time?

2  A   Yes.

3  Q   Could you lawfully obtain Percocets after the doctor

4  released you from his care?

5  A   Yes, I could.

6  Q   And where did you get Percocets from?

7  A   I got them from work or outside of work.

8  Q   Okay.  Let me ask it again, I think I might have confused

9  you.  Could you legally get Percocets after the doctor

10 released you?

11 A   No, I couldn't legally get them, no.

12 Q   Nonetheless, were you still addicted to Percocets?

13 A   Yes.

14 Q   Were you able to get Percocets illegally?

15 A   Yes, I was.

16 Q   And how were you -- where and how were you able to get

17 them?

18 A   I was able to get them at work and also outside of work.

19 Q   Let's talk about where you got and how you got them at

20 work.

21 A   Okay.

22 Q   How is it that you were able to get Percocets at Boeing?

23 A   I bought people's scripts, people had a script for

24 Percocets or whatever, and I started buying the scripts.

25 Q   So you would approach the employees who had scripts?

1   A   Right.

2   Q   And these are prescriptions from their doctors or a

3   doctor?

4   A   Correct.

5   Q   And when you say you would buy their prescription, would

6   you buy the prescription and you fill it or would they fill

7   the prescription and then give you the pills?

8   A   They would fill it and then give me the pills.

9   Q   So when you refer to buying scripts, you're actually

10  buying the pills --

11  A   Correct.

12  Q   -- after that prescription has been filled?

13  A   Yes.

14  Q   Approximately how many pills would you buy on a script at

15  a time?

16  A   A hundred, 120 at a time.

17  Q   And would that be just Percocets?

18  A   Yes.  It started out Percocets and then it went to Oxys.

19  Q   When you were selling -- strike that.

20          At some point were you not only using --

21  A   Yes, I was.

22  Q   -- the pain medication, but you began to sell it as well?

23  A   Yes, I sold it.

24  Q   How soon after you began -- strike that.

25          How soon after you became addicted to Percocets did

1    you begin to also sell Percocets and other pills?

2    A    Right away, pretty much right away.

3    Q    Right away.  So when you were getting the scripts that

4    you were buying from employees, were you using some of those

5    pills yourself?

6    A    Yes.

7    Q    Were you selling the rest?

8    A    Yes.

9    Q    When you were selling those pills -- and you said

10   Percocets and Oxycontins in different milligrams -- how much

11   were you charging, an example, for the Percocets?

12   A    For the tens, $10.  And for Oxy, 40s, $20, and then later

13   on the 30s came out and --

14   Q    And how much --

15   A    -- and they were --

16   Q    -- were you selling --

17   A    -- $20.

18   Q    -- them for?  I'm sorry, I talked over you, I apologize.

19   How much were you selling the 30s for?

20   A    $20.

21   Q    Did you ever sell the fentanyl lollipops?

22   A    Yes, I did.

23   Q    And how much were you selling them for?

24   A    That was a while back, I think it was like five apiece,

25   something like that.

1  Q    Now, Mr. Haux, you were -- you indicated to the Court you

2  were arrested in September of 2011, is that correct?

3  A    Correct.

4  Q    And you were charged with 12 counts of selling Percocets

5  or oxycodones, is that correct?

6  A    Correct.

7  Q    And you've already pled guilty to that indictment, is

8  that right?

9  A    Yes, I did.

10 Q    And as part of your plea agreement you agreed to

11 cooperate and testify, is that correct?

12 A    Yes.

13 Q    And you expect that you will get consideration from your

14 sentencing judge as a result of your cooperation, is that

15 right?

16 A    Yes.

17 Q    And your sentencing judge is not Judge Rice, is that also

18 correct?

19 A    Yes.

20 Q    Now, when you -- let's do it this way.  When you were

21 using Percocets, were you also using Oxycontins?

22 A    Yes.  Not in the beginning, in the beginning I just used

23 Percocets and then I graduated to Oxys.

24 Q    How -- in an average day, how often would you use drugs?

25 A    Average day?  Probably three times.

1    Q    And is that in the morning?

2    A    Morning, and at lunch time and probably after dinner.

3    Q    Was there an average hourly interval that you would go

4    between uses?

5    A    Four or five hours, yes.

6    Q    Four or five hours.  Would you use drugs just on your

7    work days or were you using drugs seven days a week?

8    A    Seven days a week.

9    Q    And was this four-to-five-hour time span between uses

10   basically the same whether you were at work or you were not

11   at work?

12   A    Yes.

13   Q    Were there occasions when you would experience withdrawal

14   symptoms?

15   A    Yes.

16   Q    Can you tell the Court what symptoms you would experience

17   when you were going through withdrawal?

18   A    My whole body would ache and my legs would really ache

19   and I just couldn't sleep.  So I started doing Suboxone, I

20   found out about Suboxones, so...

21   Q    Okay.  Did you ever experience constipation or any other

22   physical effects?

23   A    Uh, constipation, yes.

24   Q    When you -- strike that.

25            You indicated that you then started getting

1   Suboxone, is that right?

2   A    Yes.

3   Q    Now, did you have a prescription for Suboxone?

4   A    No, no.

5   Q    How were you able to obtain Suboxone?

6   A    I traded them or -- traded pills for them or I bought

7   them off of them.

8   Q    So you would either trade Percocets or Oxycontin for

9   Suboxone?

10  A    Correct.

11  Q    And who would you be trading that with?

12  A    Whoever had the Suboxones.

13  Q    Would that be Boeing employees or employees outside --

14  A    Yes, Boeing employees mostly.

15  Q    Okay.  And when you were buying the Suboxone, who were

16  you buying it for?

17  A    For me.

18  Q    I'm sorry, who were you buying it from?

19  A    Who was I buying it from?

20  Q    Correct.  Was it Boeing employees or other people?

21  A    Yes, Boeing employees.

22  Q    How did you know where you could get these pills at

23  Boeing?

24  A    It was just a circle of people who just used that you

25  know.

1  Q   And was there a circle of people who sold?

2  A   Yes.

3  Q   And were you -- well, you're part of the circle of users?

4  A   Yes.

5  Q   And you're part of the circle of sellers?

6  A   Yes.

7  Q   On an average day, how many customers, how many Boeing

8  employees would you sell pills to?

9  A   Between five and ten.

10 Q   And on an average purchase, how many pills were people

11 buying from you?

12 A   Some people would buy two or three, others ten, some

13 people 20.

14 Q   When you sold these pills to these employees, were there

15 occasions when they would use the pills in your presence

16 after they had purchased it from you?

17 A   Yes.

18 Q   On the days when you were working, were you also using

19 your pills at work to get through your day?

20 A   Yes, I was.

21 Q   Do you know Andy Duris?

22 A   Yes, I do.

23 Q   How do you know Andy Duris?

24 A   I know him from work.

25 Q   And did you and Andy Duris -- do you know what job Andy

1  Duris performed?

2  A   He was a Composite Fabricator when I first met him.

3  Q   Do you know whether or not he held any position in the

4  union?

5  A   Yes, he did.

6  Q   And what position in the union did he hold?

7  A   He was a shop steward for a while and then a

8  committeeman.

9  Q   And were you a member of the union?

10  A   Yes, I was.

11  Q   Do you know what type of duties a Composite Fabricator

12  would perform?

13  A   They pretty much build the parts on the tools that we

14  made, fabricate the parts.

15  Q   Have you ever sold Andy Duris pills?

16  A   Yes, I have.

17  Q   Did you sell Andy Duris -- strike that.

18        When you were arrested by the Federal Government,

19  was Andy Duris already an existing customer of yours?

20  A   Yes.

21  Q   How long had you sold Andy Duris pills, how many years or

22  months or days?

23  A   I would say less than a year.

24  Q   And that's less than a year prior to the time of your

25  arrest?

1   A   Correct.

2   Q   And what were you selling him?

3   A   He would usually just get a couple pills here and there.

4   Q   No, I mean was it Percocet, Oxys --

5   A   Percocets or Oxys --

6   Q   -- or something else?

7   A   -- whatever I had, yes --

8   Q   So it was either --

9   A   -- two or three.

10  Q   Okay, I have to slow down because I'm talking over you.

11          Was it Percocets and Oxys?

12  A   Yes.

13  Q   And approximately how many of them would you sell him?

14  A   Two or three.

15  Q   And, on average, how often during the week?

16  A   Maybe once a week, something like that.

17  Q   Was Andy Duris an individual who you observed used the

18  pills on the Boeing property after you had sold them to him?

19  A   Uh, yes.

20  Q   Did you ever sell pills to Andy Duris off of Boeing

21  property?

22  A   No.

23  Q   So all your sales to Mr. Duris were on Boeing property?

24  A   Yes.

25  Q   Did you ever -- did he ever come to Boeing to buy pills

1    from you when he wasn't scheduled to work?

2    A    No.

3    Q    So you sold to him during his work shift?

4    A    Yes.

5    Q    Do you -- and I think you told us this, but the only

6    thing you sold him were Percocets and Oxys, is that correct?

7    A    Correct.

8    Q    Do you know Victor Phillip?

9    A    Yes, I do.

10   Q    Do you know Victor Phillip from Boeing?

11   A    Yes.

12   Q    What job did you know Mr. Phillip to hold?

13   A    When I first met Vic he was a Pattern Maker and then he

14   became a Composite Fabricator.

15   Q    And the Pattern Maker would be the duties you talked

16   about?

17   A    Correct.

18   Q    And the Composite Fabricator would be the duties you

19   described Mr. Duris as having performed --

20   A    Correct.

21   Q    -- correct?

22        At the time of your arrest, was Victor Phillip an

23   existing customer of yours?

24   A    Yes.

25   Q    And how long had you been selling Victor Phillip pills?

1  A    Uh, over five years.

2  Q    And what pills were you selling him?

3  A    Uh, Percocets and Oxys too.

4  Q    And on an average of how often in any given week would

5  you sell him Percs or Oxys?

6  A    Two or three times.

7  Q    Now, is Mr. Phillip an individual who you observed use

8  the pills after you sold them to him?

9  A    Yes.

10  Q    Did you use pills with Mr. Phillip?

11  A    Yes, I did.

12  Q    Did Mr. Phillip buy pills from you during his work shift

13  or did he come to the Boeing property when he was not

14  working?

15  A    It would be his work shift.

16  Q    So you sold to him during his work shift as well?

17  A    Correct.

18  Q    And when you and he used together it was on his work

19  shift and your work shift?

20  A    Yes.

21  Q    Now, did you ever sell anything to Mr. Phillip in

22  addition to Oxys or Percocets?

23  A    Yes.

24  Q    And what did you sell to him?

25  A    I sold marijuana and maybe once in a while maybe a Xany

1   or a Valium.

2   Q   Was marijuana or Xanies drugs that you were also using?

3   A   Uh, yes.

4   Q   Do you know a gentleman by the name of Richard Summers?

5   A   Richard?

6   Q   Or Rick -- Rich -- yeah, Richard Summers.

7   A   Yes.

8   Q   And was Richard Summers someone who supplied you with

9   pills?

10  A   Yes, he did.

11  Q   How did you meet Richard Summers?

12  A   I met Rich through Vic more or less.

13  Q   And why did Vic introduce you to Richard Summers?

14  A   Because Richie had prescriptions that he wanted to sell

15  and get rid of pills.

16  Q   And did you buy those prescriptions?

17  A   And then I bought them off of -- I started buying them

18  off of Richie.

19  Q   Do you know James Swan?

20  A   Yes.

21  Q   Did you meet James Swan also while working at Boeing?

22  A   Yes, I did.

23  Q   What was James Swan's job?

24  A   He was a Composite Fabricator.

25  Q   Did you sell pills to James Swan?

1  A   Yes, I did.

2  Q   What did you sell to him?

3  A   Percocets and Oxys.

4  Q   And how often, prior to your arrest, was James Swan a

5  customer of yours?

6  A   Uh, probably six months, if that.

7  Q   So six months prior to your arrest is the period of time

8  you sold to Mr. Swan?

9  A   Correct.

10 Q   And how often, it is in a week or over that period of

11 time did you sell to him?

12 A   Yes, just a few times I dealt with him.

13 Q   Was it -- what's a few?  Give me a range of numbers.

14 What does that mean?

15 A   Uh, a few times, I'm going to say between five and ten

16 maybe.

17 Q   Did you -- did Mr. Swan purchase pills from you on Boeing

18 property?

19 A   Yes.

20 Q   During his work shift?

21 A   Yes.

22 Q   Did he ever use the pills in your presence?

23 A   Yes.

24 Q   Did he ever sell you anything?

25 A   Yes, he did.

1  Q   What did he sell you?

2  A   I bought a thing of steroids off of him.

3  Q   You bought steroids from him?

4  A   Yes.

5  Q   And did you buy those from him -- well, where did you buy

6  those from him?

7  A   From work, in Boeing.

8  Q   At Boeing?

9  A   Yes.

10 Q   Do you know Michael Patterson?

11 A   Yes.

12 Q   And how do you know Michael Patterson?

13 A   Uh, I know him as a -- he's a -- he used to be a Template

14 Maker and then he became our union president and vice

15 president, and a Tooling Inspector too.

16 Q   Do you know what the job is, job duties are of a Template

17 Maker?

18 A   They made templates for the different parts and stuff

19 like that or whatever.

20 Q   What's a template?

21 A   It's a metal plate like.

22 Q   Okay.  And what's the job of a Tooling Inspector?

23 A   They inspect mostly all our jobs from Tooling that we

24 built.

25 Q   And they inspect it for quality?

1    A    Yes, everything.

2    Q    And he was also, you said, a union official?

3    A    Yes.

4    Q    And what positions did you know him to hold in the union?

5    A    Vice president, president, committeeman.

6    Q    At the time of your arrest, was Michael Patterson an

7    existing pill customer of yours?

8    A    Yes, he was.

9    Q    And what did you sell him?

10   A    Percocets, Oxys, marijuana.

11   Q    And how often did you sell Percs and Oxys to him?

12   A    Uh, a couple times a week.

13   Q    Over what period of time did you sell to him?

14   A    Two years, I'd say.

15   Q    Did you ever use pills with Michael Patterson?

16   A    Uh, yes.

17   Q    Did you use them on or off of Boeing property?

18   A    Both.

19   Q    Both on and off Boeing property?

20   A    Yes.

21   Q    Did you ever see Michael Patterson use the pills that you

22   had sold him?

23   A    Yes, I did.

24   Q    Was that on or off Boeing property?

25   A    Usually on.

1  Q   Did you sell Michael Patterson anything in addition to, I

2  think you said, marijuana, Oxys and Percs?

3  A   I sold cocaine before.

4  Q   Were you a person who used cocaine?

5  A   I've used it, yes.

6  Q   When you sold him cocaine, did you sell him cocaine on

7  the Boeing property or off of it?

8  A   On.

9  Q   And did you ever use cocaine at Boeing property?

10 A   Yes, I did.

11 Q   Did Michael Patterson ever use cocaine at Boeing property

12 in your presence?

13 A   I never seen him, no.

14 Q   Okay.

15        (Pause.)

16 Q   You indicated that you both sold to and used drugs with

17 Michael Patterson on and off of Boeing property, is that

18 correct?

19 A   Yes.

20 Q   You were an addict, is that correct?

21 A   Correct.

22 Q   Could you describe for Judge Rice your opinion of what

23 Michael Patterson was?

24 A   He was -- he was getting bad towards the end.

25 Q   And what does --

1       THE COURT:  He was getting what?

2       THE WITNESS:  He was getting bad towards the end.

3  BY MS. TAYLOR:

4  Q   And what does he's getting --

5       MR. DREYER:  Objection, your Honor.  This guy is

6  obviously not a medical doctor, I don't know what good and

7  bad means, but I would ask --

8       MS. TAYLOR:  That's what I was getting ready to ask

9  him.

10       THE COURT:  All right, I'll have her follow up and

11  have him explain it.

12       MR. DREYER:  He can testify to the number of pills

13  maybe, but --

14       THE COURT:  Well, he can offer a lay --

15       MR. DREYER:  -- not any medical analysis.

16       THE COURT:  -- he can offer a lay opinion under 701

17  as long as you lay the foundation.

18  BY MS. TAYLOR:

19  Q   Mr. Haux, you indicated to the Court that in your opinion

20  Michael Patterson was getting bad; what did you see that led

21  yo to that conclusion?

22  A   He was using a lot more, buying a lot more pills all the

23  time.

24  Q   What does that mean?

25  A   That means he was coming like three times a week, getting

1    20 at a time.

2    Q    He was coming three times a week, getting 20 at a time?

3    A    Yes.

4    Q    And what pills was he getting 20 at a time?

5    A    Percocets or whatever I had.

6    Q    And did you see him exhibit any physical symptoms or

7    anything that caused you to say he was getting bad?

8    A    Yes.  I remember one night he -- he said he missed a day

9    because he couldn't -- he couldn't get out of bed because he

10   was withdrawing, and I turned him to Suboxones.

11   Q    And did you sell him Suboxone?

12   A    Yes, I did.

13   Q    And were you using Suboxone?

14   A    Yes, I was.

15   Q    Were you prescribed that Suboxone?

16   A    No.

17   Q    What were you using the Suboxone for?

18   A    Uh, for withdrawals.

19   Q    And what did you sell Suboxone to Mr. Patterson for?

20   A    For withdrawals.

21   Q    Did -- during the time that you were selling pills at

22   Boeing, and that's approximately 2006 to 2011, was there ever

23   an occasion where you did not have customers for your pills?

24   A    No.

25   Q    Was there ever an occasion when the need or the -- I

1   don't want to say the need -- the market for the pills you

2   were selling dried up?

3   A    No.

4   Q    Did you use pills the entire time from 2006 to 2011 that

5   you were working at Boeing?

6   A    Yes, I did.

7   Q    Nothing further, Mr. Haux.

8          THE COURT:  How about your performance at work?  How

9   would you characterize your performance on the job while you

10  were --

11         THE WITNESS:  I was an --

12         THE COURT:  -- using pills?

13         THE WITNESS:  -- excellent employee.

14         THE COURT:  Pardon me?

15         THE WITNESS:  I was an excellent employee.

16         THE COURT:  No, but how was the work quality?

17         THE WITNESS:  Great.  They used to loan me in the

18  shop all the time and everything, so -- to do certain jobs.

19         THE COURT:  Okay.

20         THE WITNESS:  I've always had a good record at work.

21         MR. SCUDERI:  Your Honor, you took my questions

22  again.

23         THE COURT:  I'm trying my best.

24         MR. SCUDERI:  That's really --

25         THE COURT:  You know, I get very frustrated up here,

1    I can't ask many questions.

2              (Laughter.)

3              MR. SCUDERI:  Okay.

4                        CROSS-EXAMINATION

5    BY MR. SCUDERI:

6    Q    Sir, just a few questions.

7              When did you start working at Boeing?

8    A    In '79.

9    Q    Okay.  And in 2006 you started -- you were addicted to

10   drugs again?

11   A    Yes.

12   Q    And for the 12 years before that you had been clean and

13   sober?

14   A    Yes, I was.

15   Q    Because you had a problem before that?

16   A    Yes, I did.

17   Q    Was it a bad problem?

18   A    Uh, a drinking problem, yes.

19   Q    Okay.  Did you get help for that at Boeing?

20   A    Uh, yes.  I went away to Livengrin.

21   Q    Okay.  So did you report to Boeing about your severe

22   drinking problem and they helped you?

23   A    Yes, I put myself away.

24   Q    And then obviously you overcame the drinking problem --

25   A    Yes.

1  Q   -- and you went back to work?

2  A   Yes.

3  Q   And were you a good employee when you went back to work?

4  A   Yes.

5  Q   And you were an excellent employee when you were taking

6  the pills in 2006?

7  A   I was always an excellent employee.

8  Q   Always an excellent employee?  And would you say -- were

9  you part of the Last Chance Program?

10 A   No, I was not.

11 Q   Okay.  It was just where you reported to them you had a

12 problem, they helped you, you got through it and then you

13 went back to work at Boeing, is that correct?

14 A   Yes.

15 Q   Okay.

16          MR. SCUDERI:  That's all I have, your Honor.

17          THE COURT:  Did you take advantage of the EAP

18 program when you were addicted to pills?

19          THE WITNESS:  I didn't know what that was, I just --

20 I just went away to the rehab and --

21          THE COURT:  Did Boeing set that up for you?

22          THE WITNESS:  No, my father did.

23          THE COURT:  Okay.  But Boeing helped you with your

24 alcohol abuse?

25          THE WITNESS:  Uh, they notified -- I guess once I

1  went to Livengrin, I guess they notified Boeing after my

2  insurance and all that.

3          THE COURT:  Oh, you did that on your own?

4          THE WITNESS:  I did it on my own, yes.

5          THE COURT:  Okay.  Did you know about the Employee

6  Assistance Program at Boeing?

7          THE WITNESS:  Not really, no.

8          THE COURT:  Okay.

9          MR. SCUDERI:  Can I just follow up on that?

10         THE COURT:  Yeah, sure.

11 BY MR. SCUDERI:

12 Q   Sir, you didn't see those posters all around about how

13 they help employees?

14 A   I didn't really see them, I don't remember seeing them.

15 Q   Okay.  Thank you.

16         MR. SCUDERI:  No further questions.

17         MR. MOLINEUX:  No questions, sir.

18         MS. SCOTT:  I have a few questions, your Honor.

19                    CROSS-EXAMINATION

20 BY MS. SCOTT:

21 Q   Sir, you indicated that you began to use Percocet again

22 in 2006 after a thumb injury?

23 A   Yes.

24 Q   And at the time that you began to use the Percocet, were

25 you also using the Oxycontin in 2006?

1  A    No, I started out just doing Percs for a couple years.

2  Q    And then it progressed into Oxycontin?

3  A    Yes, mm-hmm.

4  Q    So then by the time 2009 came, were you using Oxycontin

5  at that time?

6  A    Probably, yes.

7  Q    My client started work -- my client is James Swan, by the

8  way -- he began working at Boeing in 2009.  When he began

9  working there, you were by that time using Percocet, right?

10 A    Okay.

11 Q    Right?

12 A    Yes.

13 Q    Oxycontin --

14 A    Mm-hmm.

15 Q    -- right?  You also testified that you were using

16 marijuana --

17 A    Mm-hmm.

18 Q    -- is that right?  You were using that in 2009 --

19 A    Mm-hmm.

20 Q    -- between 2009 and 2011, right?

21 A    Yes.

22 Q    Cocaine?

23 A    Mm-hmm.

24 Q    You were using that also between 2009 and 2011?

25 A    Yes.

1  Q  Alcohol --

2  A  Yes.

3  Q  -- were you using that between 2009 and 2011?

4  A  Yes.

5  Q  Were you using heroin?

6  A  No.

7  Q  But you also said you were using steroids, is that right?

8  A  I tried it one time, that was it.

9  Q  Okay.  You testified that you sold to Mr. Swan a few

10 times, is that right?

11 A  Correct.

12 Q  Between -- in the year -- in just the six months actually

13 prior to the time that you were arrested?

14 A  Yes.

15 Q  And when you testified -- or, excuse me, when you sold to

16 him, you said you sold him one or two pills on those

17 occasions, is that right?

18 A  Correct.

19 Q  It's fair to say that using the five or six different

20 drugs that I just named that your memory is not exactly

21 accurate, is that right?

22 A  Yeah, it's pretty accurate.

23 Q  Although you were using cocaine, alcohol --

24 A  Yeah.

25 Q  -- marijuana, Percocet and Oxycontin?

1  A   I've got a good memory.

2  Q   Okay.  You didn't work in the same building that Mr. Swan

3  worked in, is that right?

4  A   No, I did not.

5  Q   So he would normally come to you, buy his pill and leave,

6  is that right?

7  A   Uh, yes.

8  Q   So you don't know what he was using or when he was using?

9  A   No.  Like I said, I just sold to him a few times.

10  Q   All right.

11          MS. SCOTT:  I have no further questions.

12          MR. DREYER:  No questions, your Honor.

13          MR. LAIGAIE:  No questions, your Honor.

14          THE COURT:  All right.  You just -- Ms. Scott just

15  went through marijuana, cocaine, Oxycontin, alcohol, and that

16  didn't affect your work performance at all, in your view?

17          THE WITNESS:  No, I wasn't using it all the time at

18  work.

19          THE COURT:  No, but you --

20          THE WITNESS:  I mean, I was using pills every day,

21  yeah, but I wasn't smoking it or nothing like that that much.

22          THE COURT:  But you were abusing all those

23  substances while you were working at Boeing?

24          THE WITNESS:  I was using, yes.  I started drinking

25  in 2009.

1        THE COURT:  And you don't believe that affected your

2   work performance one bit?

3        THE WITNESS:  No, I always did my job, I always did

4   my job.

5        THE COURT:  Okay.  Anything further?

6        MR. SCUDERI:  No, your Honor.

7        MS. TAYLOR:  No, sir.

8        THE COURT:  Anything further?

9        MS. TAYLOR:  No, sir.

10        THE COURT:  Okay.  You can step down.  Thank you.

11        THE WITNESS:  Okay.

12        (Witness excused.)

13        MS. LUNKENHEIMER:  Your Honor, I believe we have

14   some last-minute stipulations that may make the next witness'

15   testimony go a little faster.

16        THE COURT:  Okay, sure.

17        MS. LUNKENHEIMER:  I just want to clarify what they

18   are.

19        (Discussion held off the record.)

20        MS. LUNKENHEIMER:  The Government would call Special

21   Agent Raymond Carr of the Federal Bureau of Investigation.

22        THE COURT:  Agent, good afternoon.

23        THE WITNESS:  Good afternoon, your Honor.

24        THE AUDIO OPERATOR:  Please raise your right hand.

25   State and spell your last name for the record, please.

1          THE WITNESS:  Raymond J. Carr, C-a-r-r.

2          RAYMOND CARR, Government's Witness, Sworn.

3                    DIRECT EXAMINATION

4    BY MS. LUNKENHEIMER:

5    Q    Good afternoon, Agent Carr.  Could you please introduce

6    yourself to the Court, letting the Court know where you work

7    and what your duties are?

8    A    My name is Raymond J. Carr.  I'm a Special Agent with the

9    Federal Bureau of Investigation in the Philadelphia Division.

10   Q    How long have you been with the FBI?

11   A    Almost 24 years.

12   Q    And during the course of your employment with the FBI do

13   you investigate narcotics?

14   A    I do.

15   Q    Can you just briefly describe to the Court what types of

16   narcotics you've investigated in your 24 years?

17   A    In the last 13 years I've dismantled two drug

18   organizations in the City of Chester and then the Boeing

19   investigation along with assisting other agents in their drug

20   investigation.

21   Q    And the illegal drug -- the illegal drug activity that

22   you've investigated, what kind of drugs have you

23   investigated?

24   A    The range anywhere from cocaine to crack, heroin and

25   prescription medications.

1  Q   Did there come a time that you were asked to investigate

2  the Boeing Company's Ridley Park, Pennsylvania facility?

3  A   Yes.

4  Q   Can you please describe to the Court briefly how that

5  came about?

6  A   In October of 2007 myself and the DEA were approached

7  about a drug problem located inside the Boeing facility.

8  Q   And was that, the nature of that problem described to

9  you?

10  A   It was.

11  Q   What was the description given to you at the time?

12  A   Said there was a abuse of employees using prescription

13  medications, painkillers, and there were numerous individuals

14  selling those same prescription medications.

15  Q   And was the information given to you limited to

16  prescription medications?

17  A   No, they also mentioned marijuana, cocaine and heroin as

18  well.

19  Q   Was there any sense of what employees at the Boeing

20  facility were using or -- sorry.  Was it use and sales or

21  what were people doing at the plant, were they selling, were

22  they using?

23  A   They were doing both.  There was employees that were

24  using the prescription medications and there were employees

25  that were selling prescription medications as well as using

1    other illicit drugs, marijuana, cocaine and heroin.

2    Q   Was it your understanding that some of that use actually

3    occurred during the work hours at Boeing?

4    A   Yes.

5    Q   And then what employees were doing that, the Boeing

6    Company has a very large facility at Ridley Park, is that

7    correct?

8    A   Yes.

9    Q   Are you familiar with that facility?

10   A   I'm very familiar with it.

11   Q   Have you spent a lot of time there during your

12   investigation?

13   A   I have.

14   Q   And so did you end up targeting a particular aspect of

15   the functions of that facility when you did your

16   investigation?

17   A   We initially targeted the Chinook side of the plant and

18   once we became familiar and gathered intelligence we saw that

19   it was widespread throughout the plant, that also encompassed

20   the B-22 side of the plant as well as other employees that

21   were office employees.

22   Q   And when you say that it was widespread, you mean the use

23   and sale of prescription medications as well as other drugs?

24   A   Yes.

25   Q   Now you mentioned that you gathered information.  Can you

1   just briefly describe how you developed information about

2   what was going on in this facility after you had been told

3   that these problems were existing?

4   A    We developed some source information inside the facility

5   and then we interviewed numerous Boeing employees.

6   Q    And after you developed that information did it

7   corroborate what you had initially been told about the

8   widespread use and sale of prescription medications and other

9   drugs at the facility?

10  A    Yes.

11  Q    Did you end up then using some of the sources that you

12  developed to take an active role in your investigation?

13  A    We did.

14  Q    What did you do?

15  A    These individuals made undercover purchases from

16  individuals that were selling these prescription medications

17  inside the Boeing facility.

18  Q    Were there particular prescription medicines that they

19  were purchasing?

20  A    They were purchasing Percocet and Oxycontin along with

21  Actiq, A-c-t-i-q, fentanyl lollipops.

22  Q    And when you made those undercover purchases did you

23  record and videotape the purchases?

24  A    We did.

25  Q    And then did you end up approaching some of the people

1  that your undercovers had purchased -- the seller -- sorry,

2  you were targeting sellers at this point in time?

3  A    That is correct.

4  Q    And then did you end up using the people that you

5  purchased from to develop additional sources?

6  A    Yes.

7  Q    So approximately how many sellers at the plant did you

8  end up purchasing from?

9  A    Approximately two dozen.

10  Q    And after you, as you purchased them did you end up

11  getting additional people to cooperate with you?

12  A    We did.

13  Q    And did there come a time where you decided to take a

14  different approach to your investigation and investigate the

15  users at the plant?

16  A    Yes.

17  Q    How did you do that?

18  A    We decided to sell placebos.  We contacted two drug

19  companies, Purdue Pharma and Cephalon and they made batches

20  of Oxycontin tablets that included 40 milligram and 80

21  milligram tablets.  Cephalon provided us with Actiq lollipops

22  that were placebos.  We used some of our cooperators then to,

23  after being afforded with the wiring, wiring equipment, to go

24  out into the plant, go about their regular business and sell

25  to the customer base that they had.

1  Q   Before you sent them out to sell to their customer base
2  did you debrief those cooperators?
3  A   Yes.
4  Q   And what were you, what type of information were you
5  seeking from them?
6  A   Wanted to know who their customer base was, who they were
7  selling to, who they were obtaining their prescription
8  medications from, how much they were obtaining, what they
9  were selling the medications for, the different types of
10 medications that were available to the employees and the
11 different types of drugs that were available to the employees
12 inside the Boeing facility.
13 A   And did you develop an understanding of how widespread
14 the use of prescription medications was at the plant?
15 A   Yes.
16 Q   What was your understanding, based on your debriefing of
17 all the cooperators?
18 A   It was pretty bad.  It was -- it was, in my estimation,
19 to epidemic proportions.
20 Q   And so then did you work with those cooperators you
21 already indicated to sell to the customers that they already
22 had?
23 A   Yes.
24 Q   And you mentioned that you wired them up?
25 A   That is correct.

1   Q   And then you would put wiring and audio video devices

2   placed on them?

3   A   That is correct.

4   Q   And then what would you do in terms of, would you send

5   them out into the plant?

6   A   Yeah, they would go about their normal business and

7   approach their customer base or their customers would

8   approach them.

9   Q   And is that what ended up happening in many occasions?

10  A   Yes.

11  Q   And did that happen with respect to Andy Duris?

12  A   It did.

13  Q   Michael Patterson?

14  A   It did.

15  Q   Victor Phillip?

16  A   Yes.

17  Q   And James Swan?

18  A   Yes.

19  Q   And who was the individual that you used to sell to those

20  four individuals?

21  A   Charles Haux.

22  Q   And had Mr. Haux indicated to you whether they were

23  customers of his before you sent him in to sell your

24  placebos?

25  A   He did.

1  Q   And did you end up successfully videotaping and

2  audiotaping his sales to those individuals?

3  A   Yes.

4  Q   And did you end up reviewing all those video and

5  audiotapes?

6  A   I did.

7  Q   Can each of those four individuals be seen on the video

8  or audiotape purchasing from Charles Haux?

9  A   They can.

10  Q   And when you reviewed the tapes did you also prepare

11  transcripts of the conversations that those individuals had

12  with Charles Haux as they made their purchases?

13  A   Yes.

14       MS. LUNKENHEIMER:  And, your Honor, it's my

15  understanding that we have a stipulation regarding the-- and

16  I want to make sure the transcript --

17       MR. SCUDERI:  Yes, I'll stipulate to everything.

18       MS. LUNKENHEIMER:  As well as the videotapes.

19       THE COURT:  Okay.

20       MS. LUNKENHEIMER:  So at this point in time I was

21  going to put the -- I think he's laid the foundation for

22  them.  I would ask, based on that stipulation, to be able to

23  play the videotapes of the sales by Charles Haux of placebos

24  to the four individuals --

25       THE COURT:  Okay.

1          MS. LUNKENHEIMER:  -- that I mentioned.

2          THE COURT:  Any objection?

3          MS. SCOTT:  No objection, your Honor.

4          MR. DREYER:  I thought the base of the stipulation

5    was to avoid having to play the tapes and read just the

6    transcripts.

7          MR. SCUDERI:  Your Honor, I have no problem with

8    your Honor viewing them, we've already seen them.  It's up to

9    your Honor.  It's the question of time.

10          THE COURT:  I'll --

11          MS. LUNKENHEIMER:  Your Honor, there is -- there is

12    content and material in those tapes that is the subject of

13    our motion.

14          THE COURT:  All right, play them.

15          MS. LUNKENHEIMER:  It would be important to us to

16    enter them on the record as well as --

17          THE COURT:  I'll overrule it, play it.

18          MS. LUNKENHEIMER:  They're not very long clips, I'm

19    not talking about --

20          THE COURT:  Okay.

21          MS. LUNKENHEIMER:  Okay.  Yes, Investigator Davis,

22    can you please play what has been marked as Andy Duris 1?

23          (Videotape played at this time.)

24          (Discussion off the record.)

25    BY MS. LUNKENHEIMER:

1  Q   Agent Carr, just because this is the first transcript I

2  just wanted to identify, there are letters on the left, it

3  says AD and CS.  Can you just indicate to the Court who those

4  people are?

5  A   AD refers to Andrew Duris, CS refers to confidential

6  source.

7  Q   At times during the course of the transcript were there

8  portions that you weren't able to make out?

9  A   Yes.

10 Q   And did you indicate those portions by the letters UI or

11 unintelligible?

12 A   That is correct.

13 Q   Now for each of the, just so that we can run straight

14 through them, if AD is Andy Duris, when we get to Michael

15 Patterson would MP be Michael Patterson?

16 A   It would be.

17 Q   And VP be Victor Phillip?

18 A   Correct.

19 Q   And then JS would be James Swan?

20 A   Yes.

21 Q   Thank you, okay.

22         MS. LUNKENHEIMER:  And just to be clear, your Honor,

23 for the record, this is the video and the transcript that's

24 been synchronized with the video of the sale by Charles Haux

25 to Andy Duris on September 23rd, 2011.

1    (Videotape played at this time.)

2  BY MS. LUNKENHEIMER:

3  Q    Now just very briefly, Agent Carr, there was a reference

4  to good ones.  Was there something about the placebo pills

5  that you sold that might make them different in your

6  knowledge and experience of prescription drug use and abuse

7  from other prescription medications?

8  A    They did not include the active ingredients of the

9  painkiller itself.

10  Q    When you obtained the placebos was it your understanding

11  that the pharmaceutical companies had developed new, new type

12  of active pills that were more difficult to abuse than old

13  ones?

14  A    Yes, they were tamper resistant.

15  Q    When you obtained placebos were they placebos of the new

16  tamper resistant pills or were they placebos of the previous

17  version of the pills which was not tamper resistant?

18  A    The previous pills.

19  Q    And in reviewing all of the transcripts in this case and

20  in speaking with the cooperators was it your understanding

21  that the old pills that were not tamper resistant or the new

22  pills that were tamper resistant were more attractive to the

23  users?

24  A    The older pills that were not tamper resistant.

25  Q    Thank you.

1       MS. LUNKENHEIMER:  Your Honor, at this time then we

2   would play the September 9th sale by Charles Haux to Michael

3   Patterson.

4       (Videotape played at this time.)

5   BY MS. LUNKENHEIMER:

6   Q   Agent Carr, I don't know if you're able to see that but

7   there was discussion about old ones and breaking it off, what

8   was that in reference to if you have an understanding of

9   that?

10  A   They were talking about the Actiq lollipop and the fact

11  that breaking it off and actually chewing it and getting the

12  lollipop itself to digest it.

13  Q   Thank you.

14      (Videotape played at this time.)

15  BY MS. LUNKENHEIMER:

16  Q   And there you saw the reference that you'd written in the

17  transcript: "So we sat, so these are the old ones you can

18  snort."  What does that mean to you?

19  A   Means that the old pill they can crush it up and then

20  snort it, thereby getting a quicker high from the tablet

21  rather than letting it have the time lapse to it.

22  Q   And when we say the old ones, is that what you were

23  referring to when you said the non-tamper resistant pills,

24  you were selling placebos of the pre-tamper resistant pills?

25  A   That is correct.

1   Q    Thank you.

2              MS. LUNKENHEIMER:   Please continue.

3              (Videotape played at this time.)

4   BY MS. LUNKENHEIMER:

5   Q    Now have they changed their discussion a little bit?

6   A    Yeah, they're talking about the Actiq lollipops now.

7   Q    Thank you.

8              (Videotape played at this time.)

9   BY MS. LUNKENHEIMER:

10  Q    Now what does the conversation turn to at that point in

11  time when you say "Are you still getting the coke there"?

12  A    He's -- he's inquiring whether Mr. Patterson can obtain

13  cocaine from an individual.

14  Q    Had you debriefed Mr. Haux about any cocaine relationship

15  he had with Mr. Patterson prior to sending him in to sell to

16  Mr. Patterson?

17  A    Yes.

18  Q    And was it -- what was your understanding of that

19  relationship?

20  A    That Mr. Haux had sold him, sold Mr. Patterson cocaine in

21  the past and that he said he could probably purchase cocaine

22  off him as well.

23  Q    Thank you.

24             MS. LUNKENHEIMER:   Please continue.

25             (Videotape played at this time.)

1       MS. LUNKENHEIMER:  And, your Honor, I don't know if

2  I did this before but the first transcript relating to Andy

3  Duris is marked Andy Duris 1.  The second one is marked-- I'm

4  sorry, AD-1.  The next one is MP-1.  I'm going to turn to the

5  second sale by Charles Haux that was recorded to Michael

6  Patterson that took place on September 23rd and the

7  transcript has been marked MP-2.

8       (Videotape played at this time.)

9  BY MS. LUNKENHEIMER:

10 Q   Agent Carr, it says there "Yeah, I got 500, I can buy up

11 to 500," and Charles Haux then says -- I think there's a

12 mislabeling there.  The person who says "I got 500, I can buy

13 up to 500," it says CS but is that intended to be MP?

14 A   That is correct.

15 Q   And then CS meaning Charles Haux, which CS stands for

16 cooperating source, says "I don't have 500, just give me

17 160."  Had you instructed Charles Haux about limiting the

18 amount that he sold to his customers?

19 A   Yes.

20 Q   What had -- what was the limitations you placed and why?

21 A   We said no more than three lollipops or Actiq lollipops

22 and no more than five pills to any individual.

23 Q   In your experience investigating narcotics transactions

24 are there quantities that as you get higher and higher might

25 indicate that an individual might go on to sell those?

1  A    Yes, that is correct.

2  Q    And did you have concerns about that with the placebos

3  that you were using in this operation?

4  A    We did.

5  Q    What were those concerns?

6  A    We were concerned that they were going to, in order to

7  support their habit, that they would in turn go around and

8  start selling the product that we were providing to them.

9  Q    And just a little earlier, we don't need to go back but

10  there's a dialogue between Charles Haux and Michael Patterson

11  where he says five OC's and Michael Patterson says "Okay,

12  what are they, the original?"  Are we again referring to the

13  fact that these were the old pills?

14  A    That is correct.

15  Q    Okay.  Thank you.

16            MS. LUNKENHEIMER:  Please continue.

17            (Videotape played at this time.)

18  BY MS. LUNKENHEIMER:

19  Q    Michael Patterson indicates "I'm going to do a pop now,

20  all right?  Right."  And then Charles Haux says "I guess,

21  yeah, I haven't been doing anything.  I'm on the Suboxone,

22  brother" what is your understanding in your 24 years of

23  narcotics investigation that that conversation relates to?

24  A    Mr. Patterson is about to ingest a Actiq lollipop and he

25  asked Charlie if he's going to have one and Charlie says "I'm

1  on Suboxone which means that he's trying to get off the

2  medication at this point."

3           (Videotape played at this time.)

4  BY MS. LUNKENHEIMER:

5  Q   The 80's, what is that referring to?

6  A   80 milligram of Oxycontin.

7  Q   Was he selling the 40 milligram placebos at the time?

8  A   He was.

9  Q   But he was indicating that he might have the 80's

10 available?

11 A   That is correct.

12 Q   Thank you.

13          (Videotape played at this time.)

14 BY MS. LUNKENHEIMER:

15 Q   Do you see, Agent Carr, have you reviewed this tape, sir?

16 A   I have.

17 Q   And spoken with Mr. Haux about it, correct?

18 A   Yes.

19 Q   What is Mr. Patterson doing as he's --

20 A   He's sitting in the golf cart with a Actiq lollipop in

21 his mouth.

22          (Videotape played at this time.)

23          MS. LUNKENHEIMER:  We're going to stop the tape

24 there because it does go into just the end of the

25 conversation but it's not particularly relevant.

1      I'd like to turn now to the transcript of Charles

2 Haux sale of placebos to Michael Patterson on September 26th

3 and the transcript has been marked MP-3.

4           (Videotape played at this time.)

5 BY MS. LUNKENHEIMER:

6 Q   Agent Carr, 20, 40, 60, 80, what is your understanding of

7 those numbers?

8 A   He's counting out money.  Each Oxycontin tablet costs

9 $20.

10           MS. LUNKENHEIMER:  Thank you.  Please continue.

11           (Videotape played at this time.)

12 BY MS. LUNKENHEIMER:

13 Q   Just a second ago Michael Patterson asked a question

14 about whether you can start them, again referring to the old

15 pills?

16 A   That is correct.

17 Q   Former pills.  And then the Xanies, what does the

18 question about the Xanax relate to?

19 A   Relates to Xanax, it's a medication.

20 Q   So Michael Patterson says "How about the Xanies, are you

21 going to give me any of those," it's your understanding that

22 he was trying to purchase what?

23 A   Xanax tablets.

24 Q   Thank you.

25           (Videotape played at this time.)

1          MS. LUNKENHEIMER:  I'm next going to turn to the

2    transaction between Victor Phillip where Charles Haux sells

3    him placebos on September 9th, 2011.  And for the record the

4    transcript has been marked VP-1.

5          MS. SCOTT:  Your Honor, if I may, I would ask the

6    Court and the Government if we could take Mr. Swan out of

7    turn.

8          MS. LUNKENHEIMER:  Sure.

9          MS. SCOTT:  Just because I do have a hearing and I

10   don't --

11         MS. LUNKENHEIMER:  That makes sense.  Let's change

12   that back.  I'm going to turn to the transcript of Charles

13   Haux sale of placebos, the first sale to James Swan on

14   September 22nd, 2011, and that transcript has been marked

15   JS-1.

16         (Videotape played at this time.)

17         MS. LUNKENHEIMER:  Sorry, that was actually not what

18   I had marked as James Swan 1.  So please correct it.  That

19   was the first sale, that was the first sale on September 22nd

20   but it's actually been marked, the transcript, as JS-2.

21         (Discussion off the record.)

22         MS. LUNKENHEIMER:  Your Honor, I think we're there

23   now because we're talking about the...

24         (Videotape played at this time.)

25   BY MS. LUNKENHEIMER:

1   Q   Agent Carr, I know your investigation didn't -- you

2   didn't indicate that it involved Clonapin but are you

3   familiar with Clonapin?

4   A   I am not.

5              (Videotape played at this time.)

6              (Discussion off the record.)

7              MS. LUNKENHEIMER:  Your Honor, I think we're about

8   to play the September 22nd, the second sale from Charles Haux

9   to James Swan.  It's been marked, the transcript's been

10  marked JS-3.

11             THE COURT:  Three?

12             MS. LUNKENHEIMER:  I think that's what the

13  transcript's marked but I may be correcting that in one

14  moment.

15             (Videotape played at this time.)

16             MS. LUNKENHEIMER:  Okay.  And then I'm going to play

17  the September 22nd third -- 2011 third sale from Charles Haux

18  to James Swan which the transcript is mistakenly marked JS-1.

19             (Videotape played at this time.)

20  BY MS. LUNKENHEIMER:

21  Q   George Torres, is George Torres an individual who ended

22  up being involved in this investigation?

23  A   Yes.

24  Q   Was he someone that you arrested for purchasing drugs?

25  A   Yes.

1   Q   Placebo drugs?

2   A   Yes.

3   Q   And that's who they're referring to.  Is Big George is

4   whom then?

5   A   That's his father.

6           MS. LUNKENHEIMER:  Thank you.  Please continue.

7           (Videotape played at this time.)

8   BY MS. LUNKENHEIMER:

9   Q   When they're talking about last chance, what's your

10  understanding of that?

11  A   That's Boeing's Last Chance Program.

12  Q   And they indicate that George Torres is on it.  At the

13  time that you conducted your operation with George Torres was

14  he, what was his status at the Boeing plant?

15  A   He was -- he was not working, he was temporarily

16  suspended from Boeing.

17          (Videotape played at this time.)

18  BY MS. LUNKENHEIMER:

19  Q   And then now I'm going to just turn to the two Victor

20  Phillip, sales of placebos from Charles Haux to Victor

21  Phillip.  The first one --

22          THE COURT:  Do you want to give Ms. -- do you have

23  any questions of the agent?

24          MS. SCOTT:  No, your Honor.

25          THE COURT:  Okay.

1          MS. LUNKENHEIMER:  I'm sorry.

2          MS. SCOTT:  Your Honor, if I may just interrupt for

3    one more moment, I don't know if your Honor intends to take a

4    break before the next witness or before the HR person comes

5    on and after the FBI Agent.

6          MR. SCUDERI:  Your Honor, can I make a suggestion?

7          THE COURT:  Sure.

8          MR. SCUDERI:  After the next tape if we could break

9    for the day and do the rest on the 23rd?  The HR person might

10   be lengthy.

11         THE COURT:  That's what I was going to propose.

12         MR. SCUDERI:  The information which I requested

13   earlier is in the packets which were given me this morning so

14   I don't have to subpoena anybody.

15         THE COURT:  All right.  So why don't we, after we

16   finish with Agent Carr we'll break and we'll resume on the

17   23rd at 1:30.

18         COUNSEL:  Yes, your Honor.

19         MS. SCOTT:  That's fine, your Honor.

20         THE COURT:  It should be easier for you so then you

21   don't have to run back and forth.

22         MS. SCOTT:  That's right, thank you, your Honor.

23         MS. LUNKENHEIMER:  And, your Honor, we only have two

24   more transcripts and then a brief stipulation relating to Mr.

25   Patterson.

1          THE COURT:  Okay.

2          MS. LUNKENHEIMER:  Okay, so I'm going to try then to

3    go with the transcript of, the sale from Charles Haux to

4    Victor Phillip on September 9th, 2011 and the transcript's

5    been marked VP-1.

6          (Videotape played at this time.)

7    BY MS. LUNKENHEIMER:

8    Q   On the transcript you've indicated that UN stands for

9    unknown individual, was there another person present during

10   the conversation?

11   A   Yes.

12   Q   And did you not, were you unable to identify that person?

13   A   That is correct.

14         (Videotape played at this time.)

15         MS. LUNKENHEIMER:  Okay, and then the last

16   transcript and video relates to the September 22nd, 2011 sale

17   of placebos from Charles Haux to Victor Phillip and the

18   transcript's been marked VP-2.

19         (Videotape played at this time.)

20   BY MS. LUNKENHEIMER:

21   Q   Is now Victor Phillip talking about the real ones,

22   meaning the pre-tamper resistant pills?

23   A   That is correct.

24   Q   Thank you.

25         (Videotape played at this time.)

1      MS. LUNKENHEIMER:  And, your Honor, I think that

2  completes -- well, we do have a stipulation.  I can put it on

3  now.  I was going to put it on through Agent Carr but I can

4  wait until afterwards, cross-examination.  It will take one

5  minute to put the stipulation on.

6      THE COURT:  Sure, go ahead.

7      MS. LUNKENHEIMER:  Agent Carr was going to testify

8  but we've now stipulated with Mr. Dreyer that on September

9  29, 2011 when Michael Patterson was arrested at the Boeing

10 plant in Ridley Park in Pennsylvania he had on him three

11 oxycodone pills.  They were marked 80 on one side and OP on

12 the other and they were found, all three pills were found to

13 contain the active ingredient oxycodone.

14      At this point in time I don't have any additional

15 questions of Agent Carr.

16      THE COURT:  All right, why don't we start with Ms.

17 Scott.  Do you have any questions of Agent Carr?

18      MS. SCOTT:  I have no questions, your Honor.

19      THE COURT:  All right, anyone have any questions?

20      MR. SCUDERI:  No questions, your Honor.

21      THE COURT:  Mr. Dreyer?

22      MR. DREYER:  I just have a question.

23      THE COURT:  Yes.

24                    CROSS-EXAMINATION

25 BY MR. DREYER:

1  Q    Agent, my name is Tom Dreyer.  I represent Michael

2  Patterson in this matter.  Good afternoon.

3  A    How are you, Mr. Dreyer?

4  Q    Swell, thanks.  How are you, sir?

5  A    Very good.

6  Q    In the tape we just saw concerning Mr. Patterson and Mr.

7  Haux dated September 9, 2011, Mr. Patterson talks about

8  giving Mr. Haux a taste.  What does a taste refer to, sir?

9  A    Wanted to know if he wanted to take a lick of the

10  lollipop.

11  Q    I think this is in the reference to when they're talking

12  about half an ounce of cocaine or cocaine, not the lollipop.

13  Doesn't that mean that he's going to let Mr. Haux have a

14  little taste of the cocaine?

15         MS. LUNKENHEIMER:  Your Honor, it might assist, it

16  may of assistance to Agent Carr to actually see the

17  transcript in the proper context.

18         MR. DREYER:  I'm sorry, I thought you had.

19         MS. LUNKENHEIMER:  Which one are you referring to,

20  MP-2, is that the one?

21  BY MR. DREYER:

22  Q    This is Page 4, I apologize.

23  A    That's all right.

24  Q    You've read through that transcript, that portion of the

25  transcript?

1  A   Yes, I did.

2  Q   And in reference to cocaine he says "Next time I'll get

3  something, I'll, if you want to taste it, I'll probably get

4  some next week," right?  Now what does that mean to you?

5  A   It means that if he wants to try some he'll let him try

6  some.

7  Q   Okay.  It doesn't mean he's going to sell him some, does

8  it?  Is there any indication in his transcript that Mr.

9  Patterson is agreeing to sell Mr. Haux cocaine?

10  A   Well, in my estimation when they're talking about

11  quantities and how much the quantities are and how much this

12  guy sells they are talking about selling cocaine.

13  Q   There's no reference to pricing, quantity that Mr. Haux

14  might be interested in purchasing, they don't even use the

15  word "purchase," do they?

16  A   No, he says "No other guy sells eightballs" but it's

17  intermittent.  He talks about the, his contact and what he

18  sells.  And in my opinion what they're talking about here is

19  the fact that he's looking to purchase cocaine from Mr.

20  Patterson.

21  Q   Thank you.

22          THE COURT:  Any followup?

23          MS. LUNKENHEIMER:  Is he the last one?  Then no

24  followup, your Honor, thanks.

25          THE COURT:  Do potential purchasers ever ask to

1    sample a product before they buy it?

2             THE WITNESS:  No, that's kind of taboo with these

3    individuals, you either buy or not.

4             THE COURT:  So what's the taste reference to?

5             THE WITNESS:  The taste is referring to cocaine.

6             THE COURT:  That's what I mean, potential purchasers

7    of cocaine who want to sample it.

8             THE WITNESS:  You know, there -- there is a point in

9    time where some people will taste the cocaine like on the tip

10   of their tongue to see if it's pure or to check for its

11   purity.

12            THE COURT:  All right.  Anything further?

13            COUNSEL:  No, your Honor.

14            THE COURT:  All right, thank you, Agent.  Oh, I have

15   one question for you.  In your investigation did you uncover

16   any evidence of quality control or product quality problems

17   involving any of these locations where the defendants worked

18   or the sellers worked?

19            THE WITNESS:  My investigation did not relate to the

20   quality control of what Boeing's producing at the plant.  I

21   was more focusing --

22            THE COURT:  Did anyone at Boeing complain to you

23   about that, that one of the reasons why they called you was

24   because they were having quality control issues as a result

25   of drug abuse?

1          THE WITNESS:  Not that I can recollect, your Honor.

2          MS. LUNKENHEIMER:  No further questions.

3          THE COURT:  Anything further?

4          COUNSEL:  Nothing further, your Honor.

5          THE COURT:  Okay.  Thank you, Agent.

6          THE WITNESS:  Thank you, your Honor.

7          (Witness excused.)

8          THE COURT:  All right, so what are we going to do on

9     the 23rd, before Ms. Scott leaves?

10          MS. TAYLOR:  Your Honor, we will have Dr. Downs, we

11    will provide her summary next week.

12          THE COURT:  Okay.

13          MS. TAYLOR:  We may have one additional witness from

14    Boeing.  We will provide a summary of that testimony next

15    week, as well.  Other than that we will have nothing -- oh,

16    we have HR already, yes.

17          THE COURT:  Fine.  All right.

18          MS. LUNKENHEIMER:  In addition, she's saying that we

19    may end up, we may have 30--

20          THE COURT:  Three witnesses, okay.

21          MS. TAYLOR:  HR, Mr. Downs and maybe another Boeing

22    witness, we're not certain yet but we will provide within the

23    same time period for Dr. Downs' statement a statement of any

24    additional witness, should we have one.

25          THE COURT:  Okay.

1     MS. LUNKENHEIMER:  Your Honor, it also seems to me

2  that the Government might at this point in time, there are

3  all these people who sort of have been hanging out there,

4  indicating they might file 3607 motion.  I assume the Court

5  would entertain a motion from the Government to say if you're

6  going to do it, do it before that hearing, if possible?

7     THE COURT:  Well, as I read the statute you can't

8  file it until you've actually pled guilty.

9     MS. LUNKENHEIMER:  Well, this is true.  But some of

10  those people, Mr. Lees has pled guilty.

11     THE COURT:  Yeah, Mr. Lees advised me, well, Mr.

12  McGovern is here.  He advised me yesterday he's going to

13  plead.

14     MR. McGOVERN:  I will be filing that this week.

15     MS. LUNKENHEIMER:  Okay.  Okay.  And then --

16     THE COURT:  And Mr. Laigaie made an oral motion

17  which I granted.

18     MS. LUNKENHEIMER:  I have Mr. Homer, I have Mr.

19  Wilson as being the specific subjects of the hearing.  I

20  didn't have Mr. Lees down and then if in conversations with

21  defendants' counsel there appears to be anybody else, we do

22  have Mr. Summers who indicated he's going to waive, appear in

23  front of you, plead guilty and seek 3607.  I don't know if

24  all of that can be accomplished by the 23rd but I'll talk to

25  counsel in that matter.

1          THE COURT:  I mean I can, it takes a half hour to do
2     a guilty plea so we can squeeze it in before the 23rd at some
3     time, I'm sure.
4          One question I have with respect to Mr. Patterson,
5     my notes showed we did a sentencing on July 17th.
6          MR. DREYER:  Yes, we do, your Honor.
7          THE COURT:  So we're going to have to continue that,
8     I would think.
9          MR. DREYER:  I was just going to ask the Court about
10    that.
11         THE COURT:  Yes.  All right, well, why don't both of
12    you coordinate with Ms. Settles and get a new date sometime
13    after the 23rd because we want to finish the testimony before
14    we do that.
15         MR. DREYER:  So there's no need for Mr. Patterson or
16    I to be here on the 17th then?
17         THE COURT:  Unless you want to.  They're going to
18    provide at least two witnesses --
19         MS. LUNKENHEIMER:  That's not on the 17th, the 23rd.
20         THE COURT:  Oh, 17th, no.  17th you're free.
21         MR. DREYER:  Thank you, sir.
22         THE COURT:  So we'll cancel it.  I apologize.
23         All right, do we have to do anything else today?
24         MS. LUNKENHEIMER:  No, sir.
25         THE COURT:  All right, thanks, everyone, for your

1  patience.  It's good to see all of you.

2          COUNSEL:  Thank you, your Honor.  Have a good day.

3          THE COURT:  Have a good day.

4          (Hearing concluded at 1:31 o'clock p.m.)

5                          * * *

6

I N D E X

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Robert E. Fasold | | | | |
|   By Ms. Taylor | 34 | | | |
|   By Mr. Scuderi | | 60 | | |
|   By Mr. Laigaie | | 66 | | |
| Steven Ellis | | | | |
|   By Ms. Lunkenheimer | 72 | | | |
| Jonathan Sullivan | | | | |
|   By Ms. Taylor | 84 | | | |
|   By Mr. Scuderi | | 99 | | |
|   By Ms. Scott | | 106 | | |
| Charles F. Haux | | | | |
|   By Ms. Taylor | 111 | | | |
|   By Mr. Scuderi | | 134 | | |
|   By Ms. Scott | | 136 | | |
| Raymond J. Carr | | | | |
|   By Ms. Lunkenheimer | 141 | | | |
|   By Mr. Dreyer | | 163 | | |

| GOVERNMENT'S EXHIBITS | RECEIVED IN EVIDENCE |
|---|---|
| Fasold 1 | 39 |

- - -

CERTIFICATION


        I hereby certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter.


S:/Geraldine C. Laws, CET          Date 8/1/12
Laws Transcription Service