IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-571 |
| | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | July 23, 2012 |
| WILLIAM WALLACE WILSON | : | 1:37 o'clock p.m. |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-573 |
| | : | |
| v. | : | |
| | : | |
| ANDY DURIS | : | |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-574 |
| | : | |
| v. | : | |
| | : | |
| MICHAEL HOMER | : | |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-580 |
| | : | |
| v. | : | |
| | : | |
| JAMES SWAN | : | |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-582 |
| | : | |
| v. | : | |
| | : | |
| MICHAEL PATTERSON | : | |

. . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 11-583 |
| | : | |
| v. | : | |
| | : | |
| VICTOR PHILLIP | : | |

. . . . . . . . . . . . . . . .


CONSOLIDATED HEARING ON MOTION FOR PRE-JUDGMENT PROBATION
BEFORE THE HONORABLE TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

- - -

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

APPEARANCES:

For the Government:      ASHLEY K. LUNKENHEIMER, ESQUIRE
                         FAITHE MOORE TAYLOR, ESQUIRE
                         U.S. Attorney's Office
                         615 Chestnut Street, Suite 1250
                         Philadelphia, PA   19106

For the Defendant        PAUL M. MESSING, ESQUIRE
William W. Wilson:       Kairys Rudovsky Messing & Feinberg
                         The Cast Iron Building, Suite 501S
                         718 Arch Street
                         Philadelphia, PA   19106

For the Defendant        STEPHEN D. MOLINEUX, ESQUIRE
Andy Duris:              225 MacDade Boulevard
                         Collingdale, PA   19023

For the Defendant        DAVID LAIGAIE, ESQUIRE
Michael Homer:           Dilworth Paxson LLP
                         1500 Market Street, 3500E
                         Philadelphia, PA   19102

For the Defendant        KAI N. SCOTT, ESQUIRE
James Swan:              Federal Community Defender Office
                         Curtis Center, Suite 540 West
                         601 Walnut Street
                         Philadelphia, PA   19106

For the Defendant        THOMAS A. DREYER, ESQUIRE
Michael Patterson:       6 Dickinson Drive
                         Building 100, Suite 106
                         Chadds Ford, PA   19317

For the Defendant        PETER J. SCUDERI, ESQUIRE
Victor Phillip:          419 Avenue of the States, Suite 405
                         Chester, PA   19013

                         - - -

Audio Operator:          Christian Henry

Transcribed by:          Jo-Anne L. Hutt

(Proceedings recorded by For the Record Gold digital sound
recording; transcript produced by transcription service.)

                         - - -

1          (The following occurred in open court at 1:37

2     o'clock p.m.:)

3          THE COURT:  Good afternoon, everyone.  Please be

4     seated.

5          ALL COUNSEL:  Good afternoon, your Honor.

6          THE COURT:  All right.  Why doesn't everybody

7     introduce themselves so we have it all clear for the court

8     reporter.  Our court reporter is Christian, so we're lucky to

9     have him.

10         Ms. Taylor?

11         MS. TAYLOR:  Good afternoon, your Honor.

12         Faithe Moore Taylor on behalf of the Government.

13         MS. LUNKENHEIMER:  Ashley Lunkenheimer.  And with me

14    at counsel table is Division Investigator Scott Davis from

15    the D.E.A.

16         MR. DAVIS:  Your Honor.

17         THE COURT:  Agent.

18         MR. SCUDERI:  Good afternoon, your Honor.

19         Peter Scuderi.  I'm here for Victor Phillip.  I'm

20    also sitting here for Steve Molineux who will arrive late,

21    and the people he represents --

22         MS. TAYLOR:  Andy Duris and George Torres.

23         MR. SCUDERI:  Right, okay.

24         MS. SCOTT:  Good afternoon, your Honor.

25         Kai Scott for --

```
1            THE COURT:  Ms. Scott.
2            MS. SCOTT:  -- Mr. Swan.
3            THE COURT:  Good afternoon.
4            MR. DREYER:  Good afternoon, your Honor.
5            Tom Dreyer for Michael Patterson.
6            THE COURT:  Mr. Dreyer.
7            MR. LAIGAIE:  Good afternoon, your Honor.
8            Dave Laigaie, and I'm here for my Mike Homer who's
9     present in the courtroom today.
10           THE COURT:  Good to see you again --
11           MR. O'MEARA:  Good afternoon --
12           MR. LAIGAIE:  Good afternoon.
13           THE COURT:  -- Mr. Laigaie.
14           MR. O'MEARA:  I'm sorry.  Good afternoon, your
15    Honor.
16           Steven O'Meara on behalf of (indiscernible).
17           THE COURT:  Thanks for coming on such short notice.
18           All right.  We were going to continue the hearing.
19           Where are we going next?
20           MS. LUNKENHEIMER:  Your Honor, I just have a brief
21    matter before, and otherwise we can go straight into the
22    continuing --
23           THE COURT:  Okay.
24           MS. LUNKENHEIMER:  -- testimony.
25           We have provided counsel with an exhibit marked, I
```

1    believe, Jones 1, and it is an exhibit that contains charts

2    that relate to the individuals who are here today as well as

3    other individuals listed by name who are charged in this

4    case, and it talks about their absence records, and

5    corrective actions taken, and reportable injuries that --

6    that may have happened that related to them.

7              And at this point in time, the Government, we just

8    received this exhibit this morning, so we have not had a

9    chance to file a protective order, but we would ask that

10   because it lists not only information specific to these

11   individuals, and their work history, and their personal

12   histories, that we ask that it be placed under seal, but it

13   also names other defendants who aren't present today.

14             So we will be moving for a protective order, and for

15   the purposes of this hearing, we ask that the document,

16   although it will be publicly displayed, be ultimately placed

17   under seal and that the counsel abide by the other -- the

18   terms of the protective order.

19             THE COURT:  How are we going to do that if it's

20   going to be publicly displayed in the courtroom?

21             COUNSEL:  It's just electronically under seal, so...

22             MS. LUNKENHEIMER:  Normally under seal means it's

23   never shown to anybody.  We would have the -- ultimately

24   we'll provide the Court with a copy of all the exhibits.  We

25   will certainly keep them for the record as well, and if --

1    and, so, we would ask that those not be able to be

2    disseminated, other than the brief moments that they're

3    displayed here in court.

4              THE COURT:  Well, but once it's displayed in court,

5    it's in the public domain, and don't I have to balance the

6    public right of access to judicial proceedings with whatever

7    overriding interest you have in keeping it sealed?

8              MS. TAYLOR:  May I?  I'm sorry, your Honor.

9              THE COURT:  No, sure.  It's up to Ms. Lunkenheimer.

10             MS. LUNKENHEIMER:  No, I want to see --

11             MS. TAYLOR:  Ms. Lunkenheimer's the first --

12             MS. LUNKENHEIMER:  -- what she wants to say, and I

13   will always defer to Ms. Taylor.

14             MS. TAYLOR:  Well --

15             MS. LUNKENHEIMER:  Oh, okay.

16             MS. TAYLOR:  -- that's dangerous.

17             Your Honor, what the Government is requesting is

18   that the electronic record of those documents be sealed

19   outside the parameters of this courtroom.

20             Typically, this would be provided as it has been in

21   discovery, so in that instance, it's public to counsel, it's

22   public to us, and when discovery is shown in the courtroom,

23   it's -- during the hearing it's obviously public to those in

24   the courtroom.

25             What we are asking is that the electronic record be

sealed, so that others not affiliated with this matter,

cannot access the personal information of people who are on

that -- on those charts.

THE COURT:  What does it have, social security

numbers or --

MS. TAYLOR:  It has their attendance records, it has

their employment information, information that we believe

should not be readily accessible outside of the confines of

this hearing.

THE COURT:  Why not?

MS. TAYLOR:  Because it's private as to those

defendants, and they are not here.  This is unusual --

THE COURT:  But they've all filed motions and you're

responding to their motions.

MS. TAYLOR:  No, sir.  12 of the misdemeanor

defendants -- 13 -- have filed their motions or will file

their motions.  Their information is included.

But for the purposes of this chart, it includes all

arrested defendants at Boeing, which will include 22-some-odd

felony defendants who have not sought this relief.  So they

have not put those issues into question, and it is their

information, as well as the defendants who are not here

today, who we seek to seal.

But in doing so, we would just seal the whole thing

electronically.  The felony defendants have not sought this.

1      THE COURT:  Yes, but why are we getting into them
2  then?
3      MS. TAYLOR:  Because we're dealing with -- our
4  argument is the general impact of the use at Boeing, whether
5  you were a seller, or whether you were a user.
6      What we have asked Boeing to do is to go back and
7  look at the individuals we arrested during this
8  investigation, and make certain comparisons to like union
9  employees.  That includes not just the 13 who will be before
10 you, but also the additional 20-some-odd felony defendants
11 who will not be before you.  So the chart is inclusive of the
12 universe of people we arrested.
13     THE COURT:  Well, my view is anything introduced in
14 court is public record.  I mean I don't know if anybody --
15 does anybody else want to be heard on this?  Any of the
16 defense?
17     MR. LAIGAIE:  No, your Honor.
18     MR. DREYER:  No, your Honor.
19     MR. SCUDERI:  No, your Honor.
20     THE COURT:  And I have to balance the public right
21 of access.  There's a presumptive right of access to judicial
22 proceedings, there's a presumptive right of access to the
23 evidence, and I have to balance that with the need for
24 secrecy and sealing, and I don't think the reasons you stated
25 override that.

1          MS. TAYLOR:  We may be overly-cautious about this.

2          THE COURT:  I understand.

3          MS. TAYLOR:  I concede that to the Court.

4          THE COURT:  Okay.

5          MS. TAYLOR:  So we accept the Court's ruling.

6          THE COURT:  Okay.  All right.  So I'm not going to

7    seal it.

8          All right.  Where do you want to go next, Ms.

9    Lunkenheimer?

10         MS. LUNKENHEIMER:  Then I was going to present a

11   witness if you're ready to --

12         THE COURT:  Sure, I'm ready.

13         MS. LUNKENHEIMER:  -- proceed with additional

14   testimony.

15         The Government would call David Bouse.

16         THE COURT:  Christian, do you want to swear him in

17   when he gets up here?

18         THE CLERK:  Yes.

19         THE COURT:  Mr. Bouse, how are you?

20         MS. BOUSE:  Good.

21         DAVID W.  BOUSE, after having first been duly sworn

22   as a witness, was examined and testified as follows:

23         THE COURT:  All right, Ms. Lunkenheimer.

24         MS. LUNKENHEIMER:  Thank you, your Honor.

25                         DIRECT EXAMINATION

1   BY MS. LUNKENHEIMER:

2   Q   Mr. Bouse, can you please tell the Court by whom you are

3   employed?

4   A   I'm employed by the Boeing Company.

5   Q   And what is your title?

6   A   I'm the Director of Human Resources for the Philadelphia

7   site.

8   Q   Generally, can you describe your duties as director?

9   A   As the Director of Human Resources, I oversee all the HR

10  activities that ongo -- that go on at the Philadelphia site,

11  including policy, interpretation, wage and benefits, parts of

12  the labor relations contract, administration, general

13  questions on discipline, the whole gamut of HR activities.

14  Q   And would that include all the policies and procedures

15  that relate to employees who work for the -- the facility?

16  A   That is correct.

17  Q   How long have you been in that capacity?

18  A   I've been in Philadelphia since March of 2010.

19  Q   Just to go back a little bit into your background, do you

20  have a longer HR background than the last two-and-a-half

21  years?

22  A   Yes, approximately 35 years.

23  Q   And how many of those years have been with the Boeing

24  Company?

25  A   So I've been with the Boeing Company back to 1980.

1   Q    And is that actually when you went -- worked for a

2   subsidiary called the McDonnell Douglas Corporation?

3   A    That is correct.

4   Q    And then when was that acquired by Boeing?

5   A    The acquisition was in '96, and the merger was finalized,

6   I believe, in the '98 time frame.

7   Q    Now, just briefly moving through your jobs at -- at the

8   Boeing Company, they were always in the human resources area?

9   A    Yes, that's correct.

10  Q    And can you just describe the positions you had as you

11  moved through, ending with your current position?

12  A    So previous to being in Philadelphia, I was the Director

13  of Human Resources for the Maintenance and Mod and Upgrades

14  business within Global Services, and that was based on San

15  Antonio, Texas, so I had HR responsibilities in multiple

16  states across the United States, where our business was

17  predominantly aircraft maintenance, overhaul, and repair.

18  And in that vein, I administered policies, monitored wage

19  progressions, administered benefits plans, resolved employee

20  differences, administered discipline, once again, typical HR

21  activities.

22  Q    Okay.  And just focusing in on your time in San Antonio,

23  does Boeing have national policies and procedures or are they

24  local in nature?

25  A    The vast majority of the Boeing Company policies are

1    national in nature.  There are some differences that may be

2    incorporated into those national policies that are specific

3    to a region or to a specific state.

4    Q   So would it be fair to say then, in your time in San

5    Antonio, which was, I believe, for -- for spanning

6    approximately a decade; is that correct?

7    A   That's correct.

8    Q   And that was right before you came to Philadelphia?

9    A   That's correct.

10   Q   Would you have been overseeing -- acknowledging that

11   there will be minor regional differences -- would you have

12   been overseeing HR policies and practices that are similar to

13   those in Philadelphia or even exactly the same?

14   A   That is correct.

15   Q   Okay.  Now, can you briefly describe to the Court what is

16   manufactured at the Boeing Company's Ridley Park,

17   Pennsylvania, facility?

18   A   So in Ridley Park we actually manufacture the Chinook

19   Helicopter, so we do the design, the support, post-production

20   support, and the manufacture of the air frame.  We deliver

21   the final product to the customer from Ridley Park.

22           In addition to that, we build the fuselage for the

23   V-22 Osprey, and we do what's known as stuff that cockpit,

24   meaning we put the wires and the hydraulic lines in, and we

25   transport that fuselage down to Amarillo, Texas, with our

1    partner company, Bell, who does the final assembly, flight

2    test, and sell-off of the product to the customer.

3    Q    So for the Chinook, is it fair to say that from suit to

4    nuts the entire production process is done at the Ridley

5    Park, Pennsylvania, facility?

6    A    That's correct.

7    Q    And that for the V-22 Osprey, you don't put in the

8    engine, the wings, certain things, but the main cabin and all

9    of the pieces of that, except as they relate to those -- the

10   engines and things, are made in Ridley Park?

11   A    That is correct.

12   Q    And have you reviewed the positions held by the 35 Boeing

13   employees that were charged by the Federal Government in

14   these related cases?

15   A    Yes, I have.

16   Q    And did everyone work directly on or facilitate the

17   production of either the Chinook, the Osprey, or both?

18   A    Yes.

19   Q    Now, have you, as part of your responsibilities as

20   Director of HR, did you assist in the preparation materials

21   to give an overview of what is done at the Ridley Park plant,

22   including the manufacturing and the human resources related

23   policies?

24   A    Yes, I did.

25              MS. LUNKENHEIMER:  Your Honor, am I free to approach

1  --

2          THE COURT:  Oh, you can.

3          MS. LUNKENHEIMER:  -- as appropriate?

4          THE COURT:  Yes, you don't have to ask.

5          (Pause.)

6  BY MS. LUNKENHEIMER:

7  Q   Okay.  Mr. Bouse, can you review what I've just handed to

8  you?

9  A   Yes, it's a document called Wi-Mobility (ph).  This was a

10 document that I asked the HR team to put together to help

11 them in recruiting of people both inside the company and

12 external to the company to encourage them to join the Boeing

13 Company in Philadelphia.

14         MS. LUNKENHEIMER:  Can you all hear when he's

15 talking?  It's not going to the microphone.

16         Can you move -- either speak up or just move a

17 little bit towards the microphone?

18         Thank you.

19 BY MS. LUNKENHEIMER:

20 Q   And, so, this is a pamphlet that was put together at your

21 direction?

22 A   Yes.

23 Q   And just briefly, Wi-Mobility, can you explain to the

24 Court what that means?

25 A   Over the last three years or so, we've had several

1  different reorganizations within Boeing Defense and Space,

2  specifically within the Boeing Military Aircraft Company, and

3  when I first got to the Philadelphia site in 2010, we were

4  really referred to as the Rotor Craft Division.  And in

5  October of 2010, that was reorganized into a competency-based

6  divisions, so the Rotor Craft Division, as it had formerly

7  been known, disappeared, and a Mobility Division took its

8  place.  And within Mobility, we included the Chinook, the V-

9  22, C-17, and the KC-46 tanker programs.

10 Q   And just for the layperson, is that because those

11 aircraft have some relationship to mobility?

12 A   Yes, exactly.  They're principally used to move equipment

13 and troops around the world, work on humanitarian missions,

14 things of that nature.

15          MS. LUNKENHEIMER:  Your Honor, may I please publish

16 HR-15, the exhibit I presented to Mr. Bouse?

17          THE COURT:  Any objection?

18          MR. SCUDERI:  No objection.

19          MR. LAIGAIE:  No objection.

20          THE COURT:  Sure.

21          MS. LUNKENHEIMER:  Okay.  Just put up the first

22 page.

23          (Discussion held off the record.)

24          MS. LUNKENHEIMER:  That's why I started with the

25 first page.

1          (Discussion held off the record.)

2          THE COURT:  You have very nice sound effects.

3          MS. LUNKENHEIMER:  Yes, I do.

4          (Laughter.)

5          (Discussion held off the record.)

6          THE COURT:  Do you have any insight on this,

7    Christian?  Any insight on how to get this working?

8          MS. LUNKENHEIMER:  There we go.

9          THE COURT:  There we go.

10          SPEAKER:  We got it.

11          THE COURT:  Good job, Christian.

12          MS. LUNKENHEIMER:  It was the computer and not our

13    operator, I am sure.

14    BY MS. LUNKENHEIMER:

15    Q    All right.  And this is the pamphlet we were talking

16    about?

17    A    That is correct.

18    Q    Okay.  And, so, you mentioned -- and it does give an

19    overview of the plant -- the helicopters that are

20    manufactured.

21    A    Yes.

22          So I'll turn to your attention to Page 10.

23          (Discussion held off the record.)

24          THE CLERK:  Can you see it, your Honor?

25          THE COURT:  Yes, I just had to move the monitor.

1          (Pause.)

2     BY MS. LUNKENHEIMER:

3     Q    And on that page it says the H-47 Chinook.

4          Can you just tell the Court what that -- the next

5     two pages will indicate to the Court about the plane?

6     A    It basically gives the outline and the history of the

7     Chinook helicopter, the number of countries we're delivering

8     to, some of the capabilities of the helicopter, and what our

9     current models are when they first went into service, and

10    approximately how many are still in service around the world.

11    Q    And, so, on Page 11, for example, on the second to the

12    last paragraph, does this describe all of the countries and

13    military units that are -- or many of the countries and

14    military units -- that are currently using the Chinook?

15    A    Yes, it does.

16    Q    Okay.  And then the next page, Page 12, does that do a

17    similar thing for the Osprey?

18    A    Yes, it basically takes you through the history of the

19    Osprey as it was developed and fielded.

20    Q    Okay.  Now, going beyond that, I asked you whether or not

21    this -- this brochure indicates some of the HR policies and

22    practices.

23         If we turn further into that, specifically focusing

24    on Page 18, can you describe to the Court what is represented

25    there?

1  A   So on Page 18, we wanted to make sure that we gave an

2  overall prospective of the benefits that the Boeing Company

3  provides to new employees.  So we talked about our Boeing

4  Well-Being Programs, both on physical, financial, emotional

5  health, things of that nature, that are delivered through our

6  EAP services.

7  Q   And just for the record, EAP stands for Employee

8  Assistance Program?

9  A   That is correct.

10 Q   And then just lastly on Page 19, the last section there,

11 medical coverage, can you please read to the Court or tell

12 the Court about what is covered under medical coverage?

13 A   The coverage for certain preventative care services such

14 as annual physicals, well baby, generally at little or no

15 cost to the employee, coverage for doctor visit, surgery, and

16 hospital care, vision, coverage for routine eye exams,

17 glasses, contacts covered, prescription drug, including

18 retail mail order options, also coverage for mental health

19 and substance abuse services are all covered within our

20 health care plans.

21 Q   And, so, who exactly is this brochure distributed to

22 again, just to be clear?

23 A   This -- this brochure is distributed to people that we

24 extend an offer to that are external to the company.  In some

25 cases we give this out internally to people that are

1    transferring in from different parts of the company.  And
2    it's to help familiarize them with the Philadelphia site and
3    everything that is available for them, as well as what we
4    actually build and produce at the site.
5    Q   Okay.  Now, are you, as a result of your duties as
6    director, are you also familiar with all the different jobs
7    that you hire employees into?
8    A   Yes.
9           MS. LUNKENHEIMER:  And I'm going to just show him
10   the ...
11          (Pause.)
12   BY MS. LUNKENHEIMER:
13   Q   I'm showing you what's been marked as HR Exhibit 8.
14          Can you please review that and tell the Court what
15   that is?
16   A   (Witness complies.)
17          Yes, this exhibit is the consolidation of several
18   different job classifications that have existed for a number
19   of years that were combined during contract negotiations into
20   a new classification called composite fabricator.  And in
21   combining those job descriptions, essentially what takes
22   place is all of the different previous jobs are pulled
23   together, and all of the duties and responsibilities included
24   in each of those, are now part of the new job classification.
25   Q   Okay.  So just to be clear.

1          You did mention negotiations.  Is that with a union?

2   A    Yes.

3   Q    Which union is that?

4   A    The UAW.

5   Q    Are a large number of the employees who work on the

6   manufacturing of the Chinook and Osprey members of the UAW?

7   A    That is correct.

8   Q    And are almost all, but not all of the defendants who are

9   charged by the Government, also members of the UAW?

10  A    That is correct.

11  Q    Okay.  And, so, if any -- this one is titled "Composite

12  Fabricator" -- so if any of the individuals charged were

13  composite fabricators, would this be their official job

14  description for that -- that job?

15  A    This would be the official job description for the job,

16  because it combines all of the previous jobs that were

17  previously broken down in other contracts and brought

18  together under a single title to allow greater flexibility

19  and growth and development of the work force.

20  Q    And, so, in principle, should anybody who is a composite

21  fabricator be able to do some, if not all, of the different

22  jobs specified in this packet?

23  A    That's correct.

24  Q    Okay.

25          (Pause.)

1     MS. LUNKENHEIMER:  For the record, I'm showing Mr.

2  Bouse what's been marked as Exhibit HR-9.

3     THE COURT:  Any objection to 8 and 9?

4     MR. DREYER:  No, your Honor.

5     MS. SCOTT:  No, your Honor.

6     MS. LUNKENHEIMER:  Okay.  Sorry.  We went straight

7  to publishing it.  I'm sorry.

8  BY MS. LUNKENHEIMER:

9  Q   Can you please then describe what this packet relates to?

10 A   This particular packet is a consolidation of jobs that

11 were combined to create a new title called "Inspector

12 Operational Support," and these combined in 2009, from a

13 variety of inspector positions that existed in different

14 parts of the factory, most -- most of which were in support

15 areas.

16 Q   So, again, if an individual's title is inspector of

17 operational support, they would be expected to be able to

18 perform some, if not all, of the jobs listed and -- and

19 described in this packet?

20 A   That is correct.

21 Q   Okay.  Now, turning back to the union, approximately how

22 -- how much of the Ridley Park, Pennsylvania, work force is a

23 member of the UAW?

24 A   Today there are roughly 1900 out of 6100 people at the

25 site.

1    Q    And the UAW workers, do they have -- are they entirely

2    working on production of the manu -- of the helicopters?

3    A    Either production or support activities that support

4    production activities.

5    Q    Would those be -- well, for just -- briefly examples of

6    what that would mean?

7    A    So there are other support functions that maintain

8    equipment, maintain the facilities that are also part of the

9    bargaining unit.

10   Q    And, so, when I asked you before whether or not all of

11   the defendants who were charged by the Government were in a

12   position where they either worked on the helicopters or they

13   supported the production of those helicopters, is that what

14   you were referring to --

15   A    Yes.

16   Q    -- generally?

17        Okay.  And, now, the union, does it have special

18   positions that, therefore, bring upon -- change the job

19   responsibilities of an individual while they hold those

20   positions?

21   A    Yes.

22   Q    Can you describe to the Court what -- is one of those

23   positions a committee man?

24   A    Yes, to some degree the committee men, while they may be

25   classified in a specific classification, the vast majority of

1   their time is spent pursuing contractual issues between the

2   company and the union, resolving grievances, attending to

3   union-type of business.

4   Q   So can anybody who's a member of the UAW become a

5   committee man?

6   A   If you get elected.

7   Q   And they have to get elected by the member -- the other

8   members of the union?

9   A   Yes.

10  Q   And if they're elected to that position then, they have

11  additional responsibilities besides just their normal job

12  performance?

13  A   Yes.

14  Q   And, so, as a result, do you in HR, do you track the

15  attendance of your employees?

16  A   Yes.

17  Q   Do you track any injuries reported or associated with

18  your employees?

19  A   Yes.

20  Q   And that tracking system, is it altered when someone is

21  elected to be a committee man?

22  A   Not really.

23  Q   Is it as easy to -- to -- does the individual who becomes

24  a committee man, are they following the same sort of schedule

25  that a normal UAW employee would for you?

1  A    The vast majority of them are charging to indirect

2  activities, a number of them modify their schedules so they

3  can cross across both first and second shifters, or third and

4  first shift, they spend time traveling between the plant and

5  the union offices, which are off the company's premises.

6  Generally speaking, they do these activities without

7  consulting their management or their other supervisors.

8  Q    Okay.  So do they have more flexibility than in their

9  schedule and their ability to -- to work certain hours and

10  different times --

11  A    Yes --

12  Q    -- of the day?

13  A    -- their schedule is a lot more flexible than the average

14  person who's doing production work.

15  Q    All right.  So is it possible to track the attendance

16  schedules -- the attendance record of an individual who's a

17  committee man the same way you would somebody who is not?

18  A    It would be significantly more difficult.

19  Q    And is it done, generally?

20  A    Not to the extent that the production employees there who

21  we know exactly what time they're coming, we know if they

22  have to leave work to make a doctor's appointment, something

23  like that.  With a committee man, we don't have that kind of

24  visibility.

25  Q    And does a committee man spend the same amount of time

1   working on the actual production of the helicopters as an

2   individual who's not an elected committee man?

3   A    No.

4   Q    Okay.  Now, turning to unions.

5         Does the union also have a vice president and a

6   president?

7   A    Yes.

8   Q    And starting with the vice president, how -- what is --

9   what is generally -- can you describe how that position

10  interacts with -- with the -- your -- your policies and

11  procedures relating to absences and other things?

12  A    Generally speaking, the vice president, in a lot of

13  instances, is also -- kind of functions as a committee man.

14  They are not -- they're still on our payroll, so we pay both

15  the committee man and the vice president of the union.  They

16  still have a lot of flexibility in setting their schedule,

17  because predominantly their function is to monitor the

18  contract, and resolve grievances associated with that

19  contract.

20  Q    Now, what about the union president?  Is that a different

21  type of position?

22  A    Yes, so the union president is paid by the union.  Their

23  benefits are a continuation of their normal benefits and they

24  pay the company in their normal contributions towards those

25  benefits.  But their day-to-day activities are directly

1   related to the union and they go on a leave of absence from
2   the corporation when they take the job as the union
3   president.
4   Q   So, in that case, would their absences or injuries not be
5   recorded as the same way that the committee man or just a
6   normal worker?
7   A   We track none of their absences as a president.  We don't
8   -- they don't record time in our system.  For all intents and
9   purposes, they are an employee of the United Auto Workers.
10  Q   Now, I want to turn to the -- you mentioned that Boeing
11  has national policies, and I want to focus on the drug and
12  alcohol policies.
13          Is there a national drug and alcohol policy for all
14  of the -- the Boeing plants that manufacture aircraft?
15  A   Yes, there is.
16  Q   Okay.
17          MS. LUNKENHEIMER:  Can you show him HR-5?
18          (Discussion held off the record.)
19          MS. LUNKENHEIMER:  Your Honor, can we publish that?
20          THE COURT:  That's fine.
21          MS. LUNKENHEIMER:  Okay.  If there's any objection,
22  I won't.
23          THE COURT:  Nobody's objecting.  That's fine.
24          Any objection to 5?
25          MR. SCUDERI:  No, your Honor.

1          MR. DREYER:  No.

2          MS. SCOTT:  No, your Honor.

3    BY MS. LUNKENHEIMER:

4    Q   I'm just showing you, Mr. Bouse, what's been marked as

5    HR-5.

6          Can you please describe what that is?

7    A   Yes, this was the Drug and Alcohol-Free Work Place

8    Program dated March 29th, 2011.

9    Q   Okay.  And what does it cover generally?

10   A   This covers the drug and alcohol program at the Boeing

11   Company, including what we test for, the responsibilities of

12   the various organizations in administering the program.

13   Q   Now, you mentioned that there are sometimes local nuances

14   to policies.

15         Is there a local, meaning a Philadelphia area nuance

16   to the drug and alcohol national policy of the Boeing

17   Company?

18   A   Yes, the drug and alcohol policy, the national program is

19   the documents written around the non-represented work force.

20   Any -- any group that is represented, we have an obligation

21   to negotiate terms and conditions with.  So there may be some

22   nuances on the drug and alcohol policy by location or by

23   bargaining unit across the Boeing Company.

24   Q   Okay.  And, I'm sorry, so in this case was -- did the

25   Philadelphia UAW actually bargain for a specific change to

1  this national policy?

2  A    Yes, there are -- there are a couple of small minor

3  changes throughout here.

4  Q    And I want to turn your attention to Page 26 of the

5  document.

6  A    (Witness complies.)

7  Q    Can you describe what that is to the Court?

8  A    These were the changes to the policy to specific

9  paragraphs as negotiated between the Boeing Company and the

10 UAW.  The most significant difference in this falls under

11 reasonable suspicion, and when we can test for reasonable

12 suspicion.

13         In the -- in the policy for non-represented

14 employees, we can test solely on the basis of the odor of

15 alcohol or drugs, or whether the eyes appear to be red,

16 watery, inflamed or dilated.  In our agreement with the UAW,

17 we cannot test solely on the basis of odor, nor can we test

18 solely on the basis of the appearance of the eyes.  There has

19 to be another combining factor in order for us to request a

20 reasonable suspicion test.

21 Q    So, basically -- and we'll get into a little bit more

22 about reasonable suspicion in a moment -- but basically in

23 order to test the employee who may appear to be intoxicated

24 in some form, nationally you only need one specific factor,

25 and in Philadelphia you need more than one?

1    A    Yes.

2    Q    Okay.  And is that unique to Philadelphia?

3    A    Yes.

4    Q    Okay.  Now --

5              THE COURT:  Do you have a hard copy?  Are you going

6    to give me any hard copies of that?

7              MS. LUNKENHEIMER:  I was, and I can give them all to

8    you --

9              THE COURT:  I just wanted you to give a copy to my

10   law clerk.  Can you --

11             MS. LUNKENHEIMER:  I was going to do that at the

12   end.  Would you like one now, though --

13             THE COURT:  Yes --

14             MS. LUNKENHEIMER:  -- to be able to reference?

15             THE COURT:  -- just the page.

16             COUNSEL:  You can have my copy.

17             MS. TAYLOR:  No, I'll just give him -- may I

18   approach, your Honor?

19             THE COURT:  Oh, sure, because Amy can't see the

20   screen behind her, I just wanted her to have a copy.

21             MS. TAYLOR:  Oh, okay.

22             THE COURT:  Thanks.

23             MS. TAYLOR:  They're not in any particular order.

24             (Discussion held off the record.)

25   BY MS. LUNKENHEIMER:

1    Q   All right.  And, so, you were here during testimony that

2    was taken at the first part of this hearing, correct?

3    A   Yes.

4    Q   And did you hear discussions about the five-panel testing

5    versus a ten-panel testing?

6    A   Yes.

7    Q   Okay.  I want to turn your attention to Page 9 and 10 of

8    this document.

9    A   (Witness complies.)

10        Okay.

11   Q   Okay.  And there does it list the drug testing that is --

12   when -- we're going to go into this later, but just briefly

13   can you tell the Court when individuals are drug tested at --

14   at the Boeing plant?

15   A   So we do pre-employment drug testing for all new

16   employees of the corporation.  Absent that, and absent

17   requirements for FAA drug testing, or DOT direct testing, we

18   do drug and alcohol testing on the basis of reasonable

19   suspicion and post-accident testing.

20   Q   And, so, here on Page 9, going into Page 10, does it list

21   what was being tested for, at least in March 29th of 2011?

22   A   Yes, it does.

23   Q   And is that typically called the five-panel?

24   A   That's what we, within our drug-free work place

25   organization refer to as a five-panel test, yes.

1    Q    Okay.  Was that modified recently?

2    A    Yes.

3    Q    And can you describe how that came about?

4    A    So after the arrest of the 30-odd employees in September

5    of 2011, we had ongoing discussions with the UAW leadership

6    about the need to enhance our drug testing in response to --

7    to the arrests and the abuse of what we're referring to as

8    artificial opiates.

9    Q    Okay.  And, so, in order to accomplish that, what needed

10   to happen?

11   A    So a couple of things needed to happen to accomplish

12   that.

13        First, the -- the union had to agree to expand the

14   testing.  They also had to get their membership to agree to

15   open the contract in the middle of the term, specifically so

16   that they could negotiate with us for an enhanced drug

17   testing policy, which we wound up referring to it as the

18   expanded ten-panel test.

19        Then we --

20        MR. SCUDERI:  Your Honor, I object to this

21   testimony.  I don't know how it's relevant about post-arrest

22   change in Boeing --

23        MS. LUNKENHEIMER:  Your Honor --

24        MR. SCUDERI:  -- contract talks.  I don't -- I'm

25   sorry.

1          MS. LUNKENHEIMER:  Your Honor, it has a couple

2     different relevancies.

3          One, the other witness, Robert Fasold was questioned

4     about whether or not tests would show positive for oxycodone

5     and other drugs, and this is responsive to this.  This

6     witness is indicating that they wouldn't have in the past,

7     but they will now in the future.

8          And, second of all, we are going to go into some of

9     the different ways in which Boeing HR provided services, and

10    also identified drug abuse by individuals, and the fact that

11    these drugs were not included in -- in some of the earlier

12    methods, does have an impact on whether they were able to

13    detect and provide assistance some -- to some of the

14    defendants in this -- this case.

15         THE COURT:  All right.  I'll allow it.

16         MS. LUNKENHEIMER:  Okay.  I'm going to show just

17    briefly HR-16.

18         (Pause.)

19         THE COURT:  Can I just ask him a question --

20         MS. LUNKENHEIMER:  Yes.

21         THE COURT:  -- on that ten-panel thing?

22         Why didn't Boeing, if you knew since '07 or '08,

23    that there was a drug abuse problem, why didn't Boeing

24    negotiate this or take steps to negotiate this stricter

25    drug-testing sooner?

1        THE WITNESS:  So because we do our -- our policies

2   on a national basis, any kind of change that we do into the

3   drug and alcohol policy would have to be negotiated with

4   every one of the unions that in our --

5        THE COURT:  Yes, I understand.

6        THE WITNESS:  -- in our sphere of employees.

7        THE COURT:  Why did you wait four years?

8        THE WITNESS:  So we were basically following the

9   accepted drug testing policies that were out there, and that

10  the vast majority of the companies that do drug testing test

11  to.  Our tests conform to FAA drug testing policies.

12       THE COURT:  That's not what I asked you.

13       THE WITNESS:  Okay.

14       THE COURT:  Mr. Fasold and Agent Carr both testified

15  to all these problems that were there since when, '07, '08 --

16       THE WITNESS:  Yes.

17       THE COURT:  -- somewhere in that range?

18       THE WITNESS:  The investigation began in '07.

19       THE COURT:  Why wait until 2011, to enhance the drug

20  testing policy?

21       THE WITNESS:  So at the time of that investigation,

22  I was not aware that investigation was ongoing.

23       THE COURT:  Okay.  Go ahead.

24  BY MS. LUNKENHEIMER:

25  Q    I'll turn your attention to just Page 28 of the exhibit I

1   just handed you, HR-16.

2          (Discussion held off the record.)

3          MS. LUNKENHEIMER:  Okay.  It's not going to come up

4   on the big screen, your Honor, but just for the record.

5   BY MS. LUNKENHEIMER:

6   Q   What is contained on Page 28 of that exhibit?

7   A   It's a listing of the original five drugs that we test

8   for plus an additional nine other artificial opiates.

9   Q   Okay.  And would that be, even though it doesn't actually

10  list ten, does it list more drugs than ten?

11  A   Yes.

12  Q   Okay.  But is that what we call -- what everybody -- what

13  you're referring to as the expanded ten-panel?

14  A   Yes.

15  Q   And, so, that is the current testing process in place?

16  A   That is now the current policy in place, yes.

17  Q   Thank you.

18         MS. LUNKENHEIMER:  Can we go back to HR-5?

19         THE COURT:  And what drugs do they test for now?

20         MS. LUNKENHEIMER:  I'm sorry.

21  BY MS. LUNKENHEIMER:

22  Q   Can you please read those drugs?

23  A   You would ask me to do that.

24  Q   Okay.

25  A   So we started with barbiturates, benzopines, methadone,

1    methaqualone, propozylene (ph), I guess, oxycodone,

2    hydromorphone, hydrocodeine, oxymorphone.

3    Q   Okay.  And you started with barbiturates because that was

4    the addition.

5          So the original five were the amphetamines, the

6    cocaine, marijuana, opiates, and PCP?

7    A   Yes.

8    Q   Okay.  Turning back to HR-5, the policy that was actually

9    in place in 2011, on March 2011, I just want to focus your

10   attention on the first page, the fourth paragraph, "This

11   procedure does not constitute a contract."

12         Were you present when Mr. Fasold was questioned

13   about whether or not the Boeing Company had the opportunity,

14   under this paragraph, to unilaterally amend or modify or

15   discontinue its drug policies at the Boeing facility in

16   Ridley Park?

17   A   Yes.

18   Q   And can you explain -- can you answer the question, which

19   was:  Does it have that ability?

20   A   So we can modify the policy for the non-represented work

21   force at any juncture or any point in time.  Any modification

22   of the policy that would then effect a bargaining unit would

23   have to be negotiated individually with each one of those

24   bargaining units.

25   Q   And turning to the next paragraph, does that relate to

1  what you're describing now?

2  A   Yes, it does.

3  Q   And what does that basically say?

4  A   It basically says that the previous statement has no

5  effect, and that the terms of the applicable collective

6  bargaining agreement have precedence over the policy.

7  Q   Okay.  Now, are you -- is this policy something that's

8  generally distributed to all the UAW members, itself?  The

9  policy itself?

10  A   No.

11  Q   Is there a format that it is distributed to them at least

12  by reference given to them?

13  A   Two different formats.  All of Boeing's policies and

14  procedures are on a web-based system, accessible by any

15  employee in the corporation.

16       Secondly, the drug and alcohol program, pro 388

17  specifically is called out in an addendum to the contract and

18  it's in the contract book that all employees receive.

19       (Discussion held off the record.)

20  BY MS. LUNKENHEIMER:

21  Q   Mr. Bouse, I just placed in front of you exhibit that's

22  been marked on the front HR-7.

23       What is that?

24  A   It's the contract that was negotiated in 2009, with an

25  effective date of October 2nd, 2009, between the Boeing

1    Company and the United Auto Workers and Local 1069.

2    Q   And so that contract would -- would have been in place

3    during what period?

4    A   2009 to present.

5    Q   Okay.  And I just want to turn your attention to what's

6    been marked within that book as HR-6.

7          Can you please describe what that is?

8    A   It's a letter of understanding on the Drug and

9    Alcohol-Free Work Place Policy, specifically talking to the

10   exceptions to pro 388, that are contained in pro 320 -- 388

11   as the exceptions for the Philadelphia UAW contract.

12   Q   Now, we weren't calling HR-5 pro 388, but was that pro

13   388?

14   A   Yes.

15   Q   And, so, when you said that one of the ways that all of

16   the United Auto Worker members were informed of the drug

17   policy through the collective bargaining contract that they

18   received, is that what you were talking about?

19   A   Yes, it is.

20   Q   Okay.  Now, how would you generally describe Boeing's

21   policy toward drug and alcohol abuse at the work place?

22   A   Our policy is geared towards more rehabilitative in

23   nature.  So when we find an instance of drug abuse, either

24   through reasonable suspicion, testing, or post-accident

25   testing, we encourage the employees to seek, if they want to

1    continue their employment, to seek appropriate treatment

2    through Value Options, a third-party provider of ours, that

3    helps administer, the Drug and Alcohol Rehabilitation

4    Program.  People go into that program, they have to sign a

5    conformance notification --

6    Q   Well, we'll get into that specifically.  I just wanted to

7    get the general philosophy.

8            Is that something -- and you're saying it's a

9    rehabilitative-related --

10   A   Yes.

11   Q   -- the general philosophy is one of focus on

12   rehabilitation.

13           Is that philosophy and the drug and alcohol abuse

14   practice is something that individuals are notified from the

15   moment they begin employment at Boeing?

16   A   Yes.

17   Q   Is it something that they're aware -- made aware of

18   before they begin employment at Boeing?

19   A   Yes.

20   Q   Let's just briefly describe how they first become aware

21   of the drug and alcohol policies at the Boeing Company.

22   A   So if we have an opening in the Boeing Company, and

23   somebody's external to us, we post our openings on the Boeing

24   webpage, and people enter into the portal, and can apply for

25   jobs.

1          In the process of applying for a job, if there's a

2    mutual interest in an applicant, we ask the applicant to

3    complete an application, and on the back side of the

4    application on the very last page is a notation that notifies

5    all prospective employees of the potential for drug and

6    alcohol testing.

7    Q    I'm going to show you...

8          (Pause.)

9          Mr. Bouse, I've just placed in front of you what's

10   been marked HR-11.

11         Can you describe what that is to the Court?

12   A    Yeah, HR-11 is a synopsis of the entire employee

13   application and offer process.  It also includes the

14   employment application, which on the very last page of the

15   employment application, is the acknowledgement, "If required,

16   I agree to submit for tests for illegal drugs and alcohol."

17         There's a copy of an offer letter also within that

18   package that calls out that drug testing is required.  It

19   also points out that we have an ethics acknowledgement form,

20   code of conduct is -- is included also.  There are electronic

21   links for employees that are -- who are connected

22   electronically to view these documents --

23         THE COURT:  I don't know, Ms. Lunkenheimer, if any

24   of this is contested.  Maybe...

25         MS. LUNKENHEIMER:  No, your Honor.  I just want to

1   make sure, first of all, that it's in the record, and then

2   briefly to have him just describe a couple things that have

3   been put at issue with the general arguments that the

4   Government is making and the defense is making, and that is,

5   is that obviously that drug -- drug and alcohol illegal use

6   and abuse is not tolerated at the Boeing facility.  And then

7   moving from that, if there -- and the employees are aware of

8   that from the moment they even begin the application process

9   through their employment.

10          So that's where I'm headed with that.

11          THE COURT:  I would suspect --

12          COUNSEL:  I'd stipulate to that, your Honor.

13          THE COURT:  -- you can get a stipulation on that.

14          MS. LUNKENHEIMER:  That's fine, your Honor.

15          And then we'll move this a little bit faster.  Then

16  the next thing I want to -- and I did anticipate you might at

17  some point ask for that.

18          THE COURT:  I --

19          MS. LUNKENHEIMER:  I just want to make sure that the

20  record is clear.

21          Then the other thing that we want to go into is the

22  resources available, some of which I would like to be a

23  little bit more specific about.

24          THE COURT:  You can probably lead on that, because I

25  don't think that's going to be contested either.

1           MS. LUNKENHEIMER:  Okay.  Thank you, your Honor.

2           THE COURT:  Sure.

3  BY MS. LUNKENHEIMER:

4  Q   Okay.  So, Mr. Bouse, just to be clear, there's a code of

5  conduct.

6           Does that indicate to the employees that -- that

7  drug and alcohol use and abuse on the premises is not

8  tolerated?

9  A   Yes.

10 Q   And is that something that employees will receive notice

11 of -- you mentioned in the application process -- but when

12 did that -- when did that code of conduct first become

13 written and something that employees were aware of?

14 A   So we have a code of conduct certification process on an

15 annual basis that began in 2005, and is an annual requirement

16 as a condition of employment that all employees sign a code

17 of conduct on an annual basis.  New employees sign on their

18 first day of employment.

19 Q   Okay.  And I just want to show you HR-1 and 2, just for

20 the record.

21           (Pause.)

22           Can you tell the Court what those are, please?

23 A   Yeah, HR-1 is the Boeing Code of Conduct, and HR-2 is

24 another different version with questions and answers for

25 management and supervision while doing the annual code of

1    conduct authorization process.

2    Q    And those indicate in there that you're not allowed to

3    break the law on the -- on the Boeing Company, the plant,

4    right?

5    A    That's correct.

6    Q    And has that been true -- for how long has that been true

7    that that -- the code of conduct contain that?

8    A    This code of conduct is -- has always had that.  Prior to

9    this code of conduct we had standards of behavior and those

10   all contained similar wording about illegal, unethical

11   conduct.

12   Q    And when did drugs and alcohol-free environment become

13   more of a specific part of the Boeing policies and practices?

14   A    I would say in the late '90s -- late '80s, rather, when

15   we first began pre-employment drug testing.

16   Q    And were you present when Mr. Fasold presented to the

17   Court some photographs and some hard copies of different

18   signage related to the drug and alcohol policies and

19   practices at the Boeing Company?

20   A    Yes, I was.

21   Q    And are those one way that these policies are made known

22   to employees?

23   A    Yes, it is.

24   Q    Are there other ways that they're made known to

25   employees?

1   A   Yes, during new employee orientation, we cover drug and

2   alcohol policies with all new employees.  They're given

3   copies of the Boeing Code of Conduct.  They are given

4   extensive explanations of our total access system, which is

5   the employee portal, which gets them into all the policies

6   and procedures, which have direct links to the Employee

7   Assistance Program.

8           Employees who first start employment with us on the

9   first day are given a pamphlet about the Employee Assistance

10  Program, and the various services to include drug and alcohol

11  abuse and counseling that are available to all employees.

12  Q   Okay.  And, so, we've focused on the policies and

13  practices and the prohibitions against drug and alcohol use

14  and abuse on the facility, and you mentioned, though, that

15  the general philosophy is one of rehabilitation.

16  A   That is correct.

17  Q   Can you please describe to the Court briefly some of the

18  ways that employees may gain access to assistance if they'd

19  like to rehabilitate themselves from any drug or alcohol

20  abuse issues that they have?

21  A   So they're basically two entry points into our drug and

22  alcohol rehabilitation program.

23          The first is driven through either reasonable

24  suspicion, post-accidents, or a discharge and abeyance, which

25  all relate to performance problems on the job that we have

1    discovered, or they have been -- they have taken a drug test

2    post-accident or reasonable suspicion, and they got a

3    positive result indicating that there were traces of illegal

4    narcotics in their system.

5           In discharge and abeyance, generally speaking, we

6    have a performance issue with an employee, and during the

7    discharge discussion, the employee advises the company that

8    -- that their performance is directly related to a drug or

9    alcohol problem, and that then triggers a discharge and

10   abeyance where we do not discharge until we confirm that the

11   person does, indeed, have a problem related to drug or

12   alcohol.  They have an opportunity to get into a

13   rehabilitation program.

14          So we don't proceed with the discharge.  We place

15   them on a conformance notification memo.  They receive

16   appropriate counseling and treatment, either inpatient,

17   outpatient, through Value Options arranging with the

18   appropriate providers, and in concert with our various health

19   care plans, so that the employee gets the maximum advantage

20   of the health care plan in their treatment.

21          At a point in time when Value Options determines

22   that we can return the employee back to the work place, we

23   are notified that the employee's ready to return to work.  As

24   part of that compliance notification process, the employee's

25   required to pass a -- a drug test prior to coming back into

1    the work place, and then they are subjected to random testing
2    for the next three years.  If at any point in time during
3    that three-year period there's a positive drug test result,
4    the employment is terminated with the employee.
5    Q    You mentioned a third way?
6    A    The --
7    Q    Is that post -- you had mentioned before post-accident?
8    A    Post-accident.  So post-accident -- so if we have a
9    serious accident on site, or a mishap involving an aircraft -
10   - and I'll give you an example -- somebody's towing an
11   airplane and we tow the airplane in and it hits the hangar,
12   the people engaged in that activity -- and that's everything
13   from the tug driver to the wing walkers to the brake rider
14   would all be subjected to a post-accident test to make a
15   determination if drug or alcohol contributed to that
16   incident.
17   Q    Okay.  So just to -- to summarize.  There's a reasonable
18   suspicion testing when someone thinks, under certain
19   appropriate circumstances that someone may be impaired?
20   A    Correct.
21   Q    Then there's the discharge and abeyance where, if I
22   understand it correctly, someone is about to be terminated
23   for work performance related issues, they raise their hand
24   and say, I have an addiction problem, and then they go into
25   sort of an opportunity for three years to get themselves --

1   so that they're not discharged, but can continue employment,

2   and that involves drug treatment, drug or alcohol abuse

3   treatment?

4   A   Right.

5   Q   And then the third is if there's an accident, and I

6   assume if they tested positive, they'll be placed into a

7   similar thing?

8   A   Yes, anybody that tests positive in either reasonable

9   suspicion or post-accident are offered the opportunity to go

10  into the conformance notification process, which is the

11  three-year process, and that includes the rehabilitation

12  period and --

13              THE COURT:  Is that what they call the Last Chance

14  thing?  Is that what they've been talking about?

15  BY MS. LUNKENHEIMER:

16  Q   Do they call it that?  It's not what you call it, but is

17  --

18  A   It's not what we call it.  Some people call it the Last

19  Chance.

20              THE COURT:  That's what the employees refer to it

21  as?

22              THE WITNESS:  Yes.

23              THE COURT:  Okay.

24  BY MS. LUNKENHEIMER:

25  Q   And, so, it's under those three circumstances it's --

1   it's relatively the same as the -- they sign the conformance

2   notification memo --

3          MS. LUNKENHEIMER:  And I'm just going to -- if the

4   Court would like to see that?  It's HR-4.

5          (Pause.)

6   BY MS. LUNKENHEIMER:

7   Q   Can you identify HR-4 for the Court?

8   A   Yeah, HR-4 is a compliance notification form that the

9   employee has to acknowledge if they want to continue their

10  employment.

11  Q   Okay.  And, so, during the conformance notification

12  process, is the company aware of whether or not an

13  individual's testing positive for illegal -- for substances

14  that they're not permitted to have?

15  A   Yes.

16  Q   And is that process generally -- the company is

17  monitoring every stage of that rehabilitation process for the

18  individual?

19  A   So during their rehabilitation phase, Value Options, our

20  third-party provider is -- is the one that comes back to us

21  and tells us that the employee has received the appropriate

22  level of care, and that they are ready to return to the work

23  place.

24         Once they're returned to the work place, they are

25  then subjected to random testing no less than six times a

1    year for three years.

2    Q   Okay.  Now, you referred to Value Options.

3            Is Value Options a provider that works with your

4    employee -- under your Employee Assistance Program?

5    A   Yes.

6    Q   Okay.

7            MS. LUNKENHEIMER:  Let me show him HR-15?

8            (Pause.)

9            Actually, before I return to HR-15.

10   BY MS. LUNKENHEIMER:

11   Q   All of these things that you've described, the discharge

12   and abeyance, the reasonable suspicion, are they all outlined

13   -- and post-accident testing -- are they all laid out in the

14   National Policy, HR-5, that we reviewed earlier?

15   A   Yes, they are.

16   Q   Okay.  And, so, now I want to turn to HR-13 --

17           I'm sorry.  Which -- what are the two numbers that I

18   just put in front of you?

19   A   HR-13 --

20           SPEAKER:  13 and 14.

21           THE WITNESS:  -- employee assistance brochure.

22   BY MS. LUNKENHEIMER:

23   Q   Mm-hmm.  And the other document?

24   A   HR-14 is a -- excerpts of the Employee Assistance

25   Program, and the types of services that are provided from our

1  weblink.

2  Q   Okay.  And, so, is there a voluntary and confidential way

3  that employees can get assistance with drug and alcohol abuse

4  issues?

5  A   Yes.

6  Q   What is that?

7  A   The brochure, which is HR-13, specifically states that

8  you can call the Employee Assistance Program for confidential

9  counseling and assistance at any time to an 800 number, where

10 the on-site person is not necessarily engaged, and you'll be

11 contacted with a professional that will do the same types of

12 things with you to help you through your substance or alcohol

13 problem, including directing you to appropriate levels of

14 treatment that are covered under your insurance plans.

15 Q   Now, you mentioned that are -- there are on-site people.

16 Can you -- I don't think we have described that to the Court

17 -- separate from the ability to call a 1-800 number to

18 receive confidential assistance, what -- what are you

19 referring to when you refer to on-site people?

20 A   So Value Options has an on-site representative in

21 Philadelphia that works with us, and his name is Rich Buxton

22 (ph).  He's been at the Philadelphia site for 15 plus years

23 doing Employee Assistance Program work.

24 Q   And does the United Auto Workers also have a counselor

25 that can assist with individuals who have to help -- who need

1   help?

2   A    The UAW has -- has a person who's a recovering alcoholic

3   that -- that they use to help encourage people that have drug

4   or alcohol problems to seek help, and they use him as a

5   positive role model, because he has been clean for 25 plus

6   years.  So -- and he's very familiar with a lot of the

7   symptoms associated with drug and alcohol, and he encourages

8   people to seek help before they wind up in the conformance

9   notification process.

10  Q    So if an individual reaches out to either of the

11  counselors that are on site, or calls through the 1-800

12  number and asks for help, does Boeing know about it?

13  A    No.

14  Q    Okay.  And what happens if they end up needing help?

15       You mentioned that they might go to outpatient or

16  inpatient treatment.  Would Boeing be informed of that?

17  A    The only thing that Boeing receives is, is that an

18  employee has applied for a medical leave of absence, most

19  likely it's a non-occupational leave, and that they're being

20  placed on leave for a period of time, and that's the extent

21  of the communication that's given to us.

22  Q    And then at some point would they -- then would you be

23  notified that they are clear to return to work?

24  A    Yes.

25  Q    Okay.  But the content of that medical treatment that

1  they are seeking during their absence, would that be known to

2  you?

3  A   No.

4  Q   And you heard -- you were here present in court the other

5  day when Mr. Sullivan, John Sullivan testified?

6  A   Yes.

7  Q   Do you remember?

8          And do you remember him saying that he sought

9  voluntarily treatment help through the Employee Assistance

10 Program?

11 A   Yes.

12 Q   And do you remember that he indicated that he did not get

13 paid when he was in inpatient treatment while -- while under

14 that program?

15 A   Yes.

16 Q   Now, have -- since that testimony, have you gone and

17 reviewed the files of Mr. Sullivan that relate to that -- any

18 leave of absence he had?

19 A   Yes.

20 Q   And what did you -- what did you find?

21 A   I found two leave of absences for Mr. Sullivan.  I then

22 contacted our payroll office to determine whether the leave

23 of absence qualified under our short-term disability plan,

24 and if, indeed, the employee received a disability payment.

25          And in one instance of the leave, I was advised that

1    he was receiving disability payments, and I believe it was

2    for $375 a week, and in the other instance, the employee

3    declined to file for the disability leave, therefore, he was

4    in an unpaid status of his own choosing.

5    Q    Okay.  So when he testified that he -- was he -- are the

6    disability payments made by Boeing itself?

7    A    Back in this time frame, they were not.

8    Q    Okay.  So he was not receiving pay from Boeing, but he

9    was receiving compensation during his absences --

10   A    Yes.

11   Q    -- during the absence where he actually applied for

12   disability?

13   A    Yes.

14   Q    Now, in reviewing all those medical records, and other

15   records, did it indicate to you why Mr. Sullivan had been --

16   was on medical leave?

17   A    No.

18   Q    So other than him testifying in court that he was on

19   leave because he was receiving drug and alcohol treatment,

20   did you have any way of knowing that?

21   A    No.

22   Q    Okay.

23          THE COURT:  How is this confidential thing tying in

24   with that Last Chance agreement?  What exhibit was that, 11

25   or 12?

1      MS. LUNKENHEIMER:  No, I thought it was --

2      THE COURT:  The contract.

3      MS. LUNKENHEIMER:  -- 4.  HR-4.

4      COUNSEL:  4 was the notification memo.

5      MS. LUNKENHEIMER:  Yes, it's HR-4, your Honor.

6      THE WITNESS:  Yeah.

7      THE COURT:  How does that figure?

8      THE WITNESS:  This does not apply when somebody

9  seeks help on their own through the Employee Assistance

10  Program, because we have no notice, nor we do have any

11  positive test results that somebody has a drug or alcohol

12  problem, so they are not on the conformance notification

13  memo.

14  BY MS. LUNKENHEIMER:

15  Q   So just to be clear, if they are -- if they are asked to

16  -- to get testing, because of one of the three things; that's

17  the discharge and abeyance, that is they have an injury or

18  accident, and they have to be tested, or on -- there's

19  reasonable suspicion, then they go through the conformance

20  notification memo process?

21  A   That's correct.

22  Q   And at that point, during the whole process of their

23  treatments, and their rehabilitation, the company is made

24  aware of exactly the contours of whether they can return to

25  work, whether they're being successful?

1    A    That's correct.

2    Q    But if an individual voluntarily seeks out treatment, can

3    they do so in a way that is completely confidential to them?

4    In other words, the Boeing Company does not know what type of

5    medical treatment they are receiving?

6    A    That's -- that's what happened.  If you go to Value

7    Options, or call the 1-800 number, and enter the program, and

8    claim that you have a drug or alcohol addiction problem and

9    enter that program on your own, outside of intervention

10   directly by the company, we have no knowledge that you're in

11   the program.

12        So you'll go through the complete treatment, as

13   prescribed by Value Options, you'll get released to return to

14   work, and you'll return to work.  We will have no knowledge

15   of that unless that employee decided to start telling other

16   employees, or telling his manager.  Outside of that, we have

17   no knowledge.

18        THE COURT:  As many times as they want?

19        THE WITNESS:  Yes, unless -- now, it's possible that

20   somebody could have gone through the voluntary program, got

21   involved in an accident or --

22        THE COURT:  No, forget that.  I'm talking about a

23   strictly self-initiated call to EAP.  I could do that three

24   times a year if I want?

25        THE WITNESS:  Yes.

1  BY MS. LUNKENHEIMER:

2  Q   And during that time, would you be able to get paid

3  disability benefits, if you otherwise qualified for them?

4  A   Yes.

5        MS. LUNKENHEIMER:  I don't have any further

6  questions.

7        MR. SCUDERI:  May I, your Honor?

8        THE COURT:  Yes.

9                    CROSS-EXAMINATION

10  BY MR. SCUDERI:

11  Q   Sir, what's your academic background?

12  A   I have an Associate's Degree in Aerospace Technology and

13  a Bachelor's in Management with a minor in math.

14  Q   Okay.  Now, is this a union issue or an employee issue?

15        THE COURT:  Which issue?

16  BY MR. SCUDERI:

17  Q   Well, you're talking about drug testing, intervention,

18  the EAP Program.

19        Are those programs available just to union employees

20  or non-union employees?

21  A   They're available to all employees.

22  Q   So it doesn't really matter if I'm a designer or an

23  engineer versus a composite fabricator, whether I take

24  advantage of the EAP Program?

25  A   That is correct.

1  Q   So, in theory, I could be somebody who is designing the

2  Osprey, or a Chinook, or working on some kind of system for

3  those vehicles, I could be a heroin addict, and I can

4  voluntarily check myself into that program; is that correct?

5  A   That is correct.

6  Q   And Boeing will know nothing about it?

7  A   That is correct.

8  Q   And if the following week I apply to Ratheon for a job,

9  Ratheon will not know about it from Boeing?

10 A   That is correct.

11 Q   Now, these -- these crashes or problems with the Osprey

12 or the Chinook, has there ever been any suggestion that it

13 was related to a defect by a composite fabricator?

14 A   I am unaware of what crashes or whatever it is you're

15 asking me about here.

16 Q   Well, how many crashes have there been with the Osprey?

17 A   I have no clue.

18 Q   You know that there have been some crashes, don't you?

19 A   I knew that there was a crash very early on in the

20 program, and outside of that, that's about the extent of my

21 knowledge of an Osprey crash.

22 Q   How about Chinook?

23 A   I'm sure we have lost helicopters over the -- over the

24 years with --

25 Q   Well, you know you've lost --

1   A   -- nearly a thousand --

2   Q   -- helicopters; isn't that correct?

3   A   I'm sorry?

4   Q   You know that you have lost helicopters over the years;

5   is that correct?

6   A   I'm sure we have.  Yes, sir.

7   Q   Have you heard that there have been design defects?

8               MS. LUNKENHEIMER:  Your Honor, this is a --

9               THE WITNESS:  No.

10              THE COURT:  Hold on.

11              MS. LUNKENHEIMER:  Your Honor, I just would object.

12  This individual is here to speak about -- he's the Director

13  of Human Resources.  To the extent that he's indicated, he

14  does not have a personal familiarity or an employment

15  familiarity with some of the details of crashes and other

16  issues with the -- the helicopters.  I think that he's made

17  clear he just doesn't have personal knowledge of that.

18              THE COURT:  Well, I'm going to allow it, because you

19  in your response referenced at least one maybe two crashes

20  involving or military personnel killed, and I think it's a

21  fair question to ask if he knows whether that had --

22              MS. LUNKENHEIMER:  Okay.

23              THE COURT:  -- anything to do with any of these job

24  categories.

25              MS. LUNKENHEIMER:  Fine, your Honor.

1    BY MR. SCUDERI:

2    Q    Sir, in connection with your job, have you heard of any

3    crashes, have you heard of any crashes relating to defects in

4    composite fabrication?

5    A    I am unaware.

6    Q    Okay.  Have you heard of any crashes that were possibly

7    due to pilot error?

8    A    Once again, I have to say I'm unaware.

9    Q    Do you read the newspaper?  I'm talking about

10   allegations.

11   A    Yes.

12   Q    Have you ever heard those allegations?

13   A    Every -- virtually every time an airplane goes down, the

14   accusation of pilot error comes into play.

15   Q    So you've heard about that?

16   A    I've heard of --

17   Q    Have you heard about --

18   A    -- pilot --

19   Q    -- design error with dust storms, brown outs?  Have you

20   heard those terms before?

21   A    Sure.

22   Q    Okay.  So you have heard some terms?

23   A    Yes.

24   Q    Okay.  Have you ever heard any suggestion that the errors

25   of the crashes were caused by people who did their jobs?

1   A   No.

2   Q   Okay.  Now, were you the person responsible for

3   generating the paperwork related to these employees?

4   A   I don't know what paperwork that is.

5   Q   Okay.  I'm going to show you.

6           MR. SCUDERI:  Let me mark this Phillip 1.

7           MS. LUNKENHEIMER:  Okay.

8   BY MR. SCUDERI:

9   Q   Sir, can you identify these papers?

10          (Pause.)

11  A   This would be a -- a printout of an employee's work

12  history with the Boeing Company.

13  Q   What's the name of the employee?

14  A   Victor Phillip.

15  Q   Victor Phillip.

16          And do you recognize Victor Phillip as sitting right

17  here?

18  A   No, sir.

19  Q   Can you tell me how many pages there are in that

20  document?

21  A   Without counting them, no.

22  Q   About a hundred?  92?

23  A   Your guess is as good as mine.

24  Q   Do you know what a corrective action report is?

25  A   Yes.

1    Q    What is it?  Tell the Court.

2    A    A corrective action report is a written document that

3    talks about corrective action that was issued to a specific

4    employee.

5    Q    Does that mean that a specific employee did something

6    wrong?

7    A    That an employee was engaged in an activity that either

8    violated company policy intentionally, was involved in some

9    defective work, could be any number of things.

10   Q    Could be like a write-up; is that correct?

11   A    Sure, exactly.

12   Q    Now, from looking at that document, can you tell for how

13   long Victor Phillip has worked for Boeing?

14   A    Approximately 25 years.

15   Q    And from looking at that document, can you tell us if

16   there was one CAR in that report?

17   A    In these documents?

18   Q    Yes.

19   A    Probably not, because the corrective actions get pulled

20   from the system in terms -- under the terms of the collective

21   bargaining agreement after ten months.

22        So the likelihood that I would find a corrective

23   action in the employee's work history file are very remote.

24   Q    Well, don't you think that it's important that Boeing, as

25   an employer of all these employees, knows whether an employee

1    has done a good job in the last 25 years?

2    A    Sure.

3    Q    But you're saying that it's not in the collective

4    bargaining agreement?

5    A    I'm sorry.  I don't understand.

6    Q    You're saying under the collective bargaining agreement

7    that Boeing has to redact those comments?

8    A    That a corrective action memo is not part of an

9    employee's file after ten months is the terms that were

10   negotiated in the collective bargaining agreement.

11   Q    How about for non-union employees?

12   A    Non-union employees, we, depending upon the type of

13   corrective action, some corrective actions stay there

14   forever, if they're like any EEO violation.

15   Q    All right.  Now, I'm going to show you a series of

16   documents.

17            (Discussion held off the record.)

18            MS. TAYLOR:  Counsel, what are they, Phillip 2?

19            MR. SCUDERI:  Yes.

20            Your Honor, I'm going to hand the witness a series

21   of documents which are labeled Phillip 2, which I've shown

22   the Government.

23   BY MR. SCUDERI:

24   Q    And ask the witness, if you recognize those?  Can you

25   look at those documents and tell me what they are?

1  A    These are documents that attest to recognition that we

2  give to employees for doing good jobs.  So these are --

3  Q    And could you look at that last document and tell me what

4  it says?  Whose name is on that document?

5  A    The -- oh, you mean the -- the awarded?

6  Q    Yes, who was awarded that document?

7  A    Victor Phillip.

8  Q    And what was he awarded for?

9  A    The very last one?

10 Q    Yes.

11 A    In appreciation for the employee's observing a possible

12 catastrophic defect and the dedication and integrity and

13 working to correct it.

14 Q    Okay.  Now, is there -- is there anything on the front of

15 his employment file --

16        THE COURT:  When was that?

17        THE WITNESS:  This was dated May 22nd, 2002.

18 BY MR. SCUDERI:

19 Q    And they're also other awards, are there not?

20 A    Yes.

21 Q    But, in fact, every piece of paper there is an award for

22 something?

23 A    Yes.

24 Q    Is it something to do with -- could you give us the

25 general description?

1  A    Usually related to good performance, doing a good job,

2  stepping up, taking care of an issue.

3  Q    Now, is there anything in his employment file which

4  reflects those awards?

5            THE COURT:  You mean in Exhibit 1?

6            MR. SCUDERI:  Yes.

7            THE WITNESS:  I'm going to have to go back in here

8  and look.

9            (Pause.)

10           They are not typically items that are kept in the

11  employee file.

12  BY MR. SCUDERI:

13  Q    Okay.  Now, let me just ask you a few questions:

14           Under the collective bargaining agreement -- well,

15  let me strike that.

16           In 2007, you said that you did not move, or Boeing

17  as a company, did not move to amend its collective bargaining

18  agreement as you had in 2011, as far as the drugs tested; is

19  that correct?

20  A    In 2007?

21  Q    I think the Judge asked you a question, Why you didn't

22  move to change your drug policy as far as the kinds of drugs

23  tested until 2011; is that correct?

24  A    Yes.

25  Q    And I believe your answer was that you were not aware of

1  the investigation in 2007?

2  A    That's correct.

3  Q    Okay.  In 2007, were you aware that there was a drug

4  problem at Boeing?

5  A    The only, as far as my knowledge of drug issues on Boeing

6  property, would have been related towards illegal narcotics,

7  and in 2007, I was in San Antonio, Texas.

8          THE COURT:  So you weren't working in Philadelphia?

9          THE WITNESS:  No.

10          MR. SCUDERI:  All right.

11          THE COURT:  Or Ridley, I guess.

12          MR. SCUDERI:  Okay.

13          THE WITNESS:  Right.

14  BY MR. SCUDERI:

15  Q    About nation-wide, were you aware of a drug problem?

16  A    Nothing more than what you'd find in the normal work

17  place that's out there.

18  Q    Okay.  Because there -- can we say generally that the

19  normal work place has a drug problem --

20  A    I would --

21  Q    -- and these issues are not isolated to Boeing?

22  A    Yes.

23  Q    And you also know, based on your data, that this is not a

24  union worker versus a non-union worker problem; isn't that

25  correct?

1  A   Yes.

2  Q   Because you actually generate reports about who avails

3  themselves of the EAP services; isn't that correct?

4  A   The Employee Assistance Program, Value Options, generates

5  a series of reports that they provide to us that tell us the

6  nature of services that they're providing, so that we get a

7  broad understanding as to the types of issues that are out

8  there with the work force.

9  Q   Okay.  And you're not suggesting that only people -- that

10  the only people who are doing drugs at Boeing are the ones

11  who avail themselves of this program --

12  A   No.

13  Q   -- is that correct?

14  A   No.

15  Q   Because there are also people who voluntarily take care

16  of their problems by themselves, correct?

17  A   That's correct.

18  Q   And according to your information, which you disseminate

19  in the work place, you encourage other people who are

20  embarrassed to say they have a problem; isn't that correct?

21  A   I'm sorry.  Could you restate that?

22  Q   I think you were here for the earlier testimony, there

23  was discussion about literature, which was posted around the

24  plant --

25  A   Yes.

1  Q   -- about how, if you have a problem, you can call

2  confidentially?

3  A   Yes.

4  Q   You know that not every person calls confidentially;

5  isn't that correct?

6  A   That's true.

7  Q   And that some people have problems for years and they

8  don't call.  So the data which you have about the utilization

9  of the EAP is limited to quote, "only those people who

10  utilize the EAP" --

11  A   That is correct.

12  Q   -- isn't that correct?

13        And at the Boeing plant at Ridley, there are 6100

14  workers?

15  A   That's correct.

16  Q   And only 1900 are union?

17  A   That's correct.

18  Q   And yet the same percentage of non-union workers use the

19  EAP as union workers?

20  A   You've got --

21  Q   Roughly?

22  A   -- you have the statistical analysis --

23  Q   Right here?

24  A   Yeah.

25  Q   And a lot of those people are professionals; is that

1  correct?

2  A    Sure.

3  Q    And those professionals are the ones who are making

4  budget decisions and design decisions for Boeing?

5  A    Yes.

6  Q    And those decisions are affecting the military and

7  military helicopters; is that correct?

8  A    Sure.

9  Q    Okay.

10        MR. SCUDERI:  I have no further questions, your

11  Honor.

12        THE COURT:  All right.  We'll go down the row.

13        Go ahead, Ms. Scott.

14        MS. SCOTT:  Thank you, your Honor.

15        Mr. McGovern, I see you're here.  You don't want to

16  ask any questions today?

17        MR. McGOVERN:  No, I have no questions.  Thank you,

18  your Honor --

19        THE COURT:  All right.

20        MR. McGOVERN:  -- for the opportunity.

21        THE COURT:  Sure.

22        MR. McGOVERN:  It's nice to see you.

23        THE COURT:  You, too.

24                    CROSS-EXAMINATION

25  BY MS. SCOTT:

1    Q   Good afternoon, sir.

2            Sir, you just indicated that Value Options generates

3    a report that's given to Boeing indicating who's taking

4    advantage of the EAP; is that right?

5    A   Not -- not by name.  We get a -- a synopsis of types of

6    claims, and the reasons why people go to Value Options, and

7    it's more of a report card to -- to demonstrate the value

8    that they're creating for the Boeing Company, and that

9    they're trying to work with our work force on issues that are

10   important to them.

11   Q   So it gives you -- it itemizes at least the number of

12   people who is -- who are using EAP, right?

13   A   Yes.

14   Q   Does it differentiate between the various positions at

15   Boeing and how many in each position is using EAP?

16   A   No, it's much more at a higher level, so it -- it won't

17   get down to say three design engineers came in, or six

18   composite fabricators came in.  It doesn't get down to that.

19   Q   Okay.  In your capacity as the Human Resources Department

20   Director, you are familiar, though, with the various

21   individuals at Boeing, and who have had problems in terms of

22   drug or alcohol problems; is that fair to say?

23   A   When you say I'm familiar with --

24   Q   Do you, at some point, generally become aware?

25   A   I am aware if we have an issue that results in a

1    conformance notification memo, yes.

2    Q   Okay.  And would you be notified of each accident that

3    occurs at the plant?

4    A   A vast majority, not every accident that occurs on the

5    plant.  That's, you know, it depends upon how you want to

6    classify an accident.

7           Do you want to classify an accident as a recordable

8    accident?  Then, no.

9    Q   Well, what about -- what about an accident that results

10   in a drug test?

11   A   Those I'm generally made aware of, yes.

12   Q   You're also told of anyone whose drug test, that as a

13   result of reasonable suspicion by management; is that right?

14   A   Generally, probably only when there's a positive result

15   on those.

16   Q   Okay.  Would you also be told -- certainly you'd be told

17   of people who are being discharged from Boeing; is that

18   right?

19   A   Yes.

20   Q   And it's fair to say that my client, James Swan, was

21   never brought to your attention because he was, in fact,

22   involved in some sort of work-related accident; is that

23   right?

24   A   I would have to say so without looking at his record.

25   Q   Okay.  Well, would you like to look at his record?

1   Would that help you?

2   A    It might.

3   Q    Okay.

4          MS. SCOTT:  If I may, your Honor?

5          THE COURT:  Sure.

6          (Pause.)

7          May I approach, your Honor?

8          THE COURT:  Of course.  You don't have to ask.

9          (Pause.)

10  BY MS. SCOTT:

11  Q    Sir, I'm showing you what I will identify as Swan 1.

12  A    Okay.

13  Q    Did you prepare that?

14  A    No, I didn't.

15  Q    Compile those?  Okay.

16  A    I did not.

17  Q    Are you familiar with the documentation in that, what

18  I've identified as Swan 1?

19  A    I'm familiar with the work histories, the employment app.

20  This basically is the employment file and what they have

21  charged to over their --

22  Q    Okay.

23  A    -- period of time.

24  Q    So that's something that would be kept by your office, I

25  presume; is that right?

1  A   It's -- they're all electronic files.  We do not maintain

2  the employee files, per se.  They're maintained at --

3  Q   Okay.

4  A   -- a different location for everybody in the corporation.

5          So if you were to ask me if somebody had an

6  accident, from this file, the only way that I could determine

7  that would be is if under the action and comments on the work

8  history, there was a potential notation that they went out on

9  an occupational-related leave.

10 Q   Okay.

11 A   Now, that could be -- for an accident it could be for

12 carpal tunnel surgery.

13 Q   Okay.

14 A   The exact nature I wouldn't know.

15 Q   So, as far as you know, you're not aware of Mr. Swan

16 having any sort of accident-related drug or alcohol use at

17 the Boeing plant?

18 A   That's true.

19 Q   And you're also not aware of any times that he was --

20 that there was reasonable suspicion by management to actually

21 drug test him; is that fair to say?

22 A   That is fair to say.

23 Q   And, as far as you know, he also is not slated to be

24 discharged from Boeing prior to, of course, his arrest in

25 this matter?

1  A    That's correct.

2          THE COURT:  Have you reviewed the files of all the

3  employees who were seeking 3607 relief, special probation?

4          THE WITNESS:  This is the first time I'm seeing the

5  files in detail of --

6          THE COURT:  Well, has somebody at Boeing looked at

7  their files to determine if there was any drug or

8  alcohol-related accidents, or maybe they were disciplined, or

9  scheduled for discharge?  Any of the people that are seeking

10 this relief?  I think there's about 12 Ms. Lunkenheimer said.

11         MS. LUNKENHEIMER:  13, your Honor.

12         THE COURT:  13.

13         THE WITNESS:  So several of the -- those arrested

14 out of the original 35 were on conformance notification

15 memos, existing memos.  Two had been discharged for --

16         THE COURT:  Do you know who these people are?  Do

17 you have the names off the top of your head or can you reach

18 an agreement on that, Ms. Lunkenheimer?

19         MS. LUNKENHEIMER:  We can reach an agreement on some

20 of those.

21         (Discussion held off the record.)

22         MS. LUNKENHEIMER:  No, they're not going to be here.

23         COUNSEL:  They're not here.

24         THE COURT:  No, I know whether --

25         MS. LUNKENHEIMER:  The two that --

1           THE COURT:  -- they're not here or not, but are they

2    people who are seeking --

3           MS. LUNKENHEIMER:  I don't know that --

4           THE COURT:  -- this relief?

5           COUNSEL:  No.

6           MS. LUNKENHEIMER:  No, your Honor, and I --

7           (Discussion off the record.)

8           THE COURT:  Because there are some people who are

9    seeking 3607 relief that aren't here today, but they're going

10   to get a copy of this transcript, so I want to --

11          MS. LUNKENHEIMER:  I'm sorry, your Honor.  There is

12   one individual who is seeking relief.  I believe George

13   Torres was either discharged or certainly on a conformance

14   notification memo.

15          THE COURT:  For substance abuse?

16          MS. LUNKENHEIMER:  For substance abuse related --

17          COUNSEL:  Yes.

18          THE COURT:  Torres?

19          MS. LUNKENHEIMER:  Yes --

20          THE COURT:  Okay.

21          MS. LUNKENHEIMER:  -- Torres, and I don't know if --

22   I just don't know.  I don't know of positively that any of

23   the other individuals were, but I also can't completely rule

24   that out.

25          THE COURT:  Okay.

1          MS. LUNKENHEIMER:  We can make that determination,

2     your Honor.

3          THE COURT:  Okay.

4          MR. SCUDERI:  Your Honor, I'm here for Mr. Torres

5     today who's not here.  I agree that whatever they produce is

6     fine.

7          THE COURT:  Okay.  Great.  Thank you.

8          Sorry to interrupt you, Ms. Scott.

9          MS. SCOTT:  No problem, your Honor.

10    BY MS. SCOTT:

11    Q   Sir, you mentioned that Mr. Sullivan, who testified a

12    couple of weeks ago, had gone out on a medical -- medical

13    leave, right?

14    A   That's what he testified to, yes.

15    Q   And that --

16    A   I was verified that he was on a leave of absence.

17    Q   -- you actually went back and looked at his records and

18    determined that he had, in fact, received some short-term

19    disability?

20    A   Yes.

21    Q   Is short-term disability voluntary at Boeing or is that

22    something that's given to all employees as part of their

23    employee benefit package?

24    A   It's part of the employee benefit package.  Short-term

25    disability is a provided benefit to the United Auto Workers

1   as well as to the salaried work force.

2          Whether you use that benefit or not is an individual

3   decision as to your triggering that benefit through our

4   benefits provider.

5   Q   Okay.  So it is actually offered and paid for by Boeing

6   --

7   A   That's correct.

8   Q   -- is that right?

9          (Pause.)

10         MS. SCOTT:  I have no further questions.  Thank you,

11  sir.

12         THE COURT:  All right.

13         MS. SCOTT:  May I approach, your Honor --

14         THE COURT:  Oh, sure.

15         MS. SCOTT:  -- so I can take back the exhibit?

16         MR. DREYER:  No questions, your Honor.

17         THE COURT:  All right.  Mr. Laigaie?

18         MR. LAIGAIE:  Thank you, your Honor.

19                         CROSS-EXAMINATION

20  BY MR. LAIGAIE:

21  Q   Good afternoon, sir.

22  A   Good afternoon.

23  Q   I'll try not to tread over the same ground we've been

24  over.

25         Have you reviewed -- I represent Mike Homer who

1   worked at Boeing for 23 years.  He's present today in court.

2            Mike, stand up for a second?

3            (Mr. Homer stands.)

4            You don't know Mr. Homer, do you?

5   A   No, I do not.

6   Q   Did you review his employment record to prepare for

7   today's testimony?

8   A   No.

9   Q   Okay.  And have you prepared -- have you reviewed his

10  employment record at any time prior to today's proceeding?

11  A   Only to the extent when we were looking at some absence

12  data and recordable accidents, where we pulled data from

13  other sources, because our accident database is not part of

14  the HR database, it's part of our SHEA (ph) --

15  Q   I see.  And we were produced today by the Government an

16  analysis of accidents and vacation time, which I think you

17  might be speaking to.

18           Is this something that -- that you were assisting

19  Mr. Opey (ph) putting together a schedule?

20  A   We were providing him some data, so that he could put

21  together some charts for his testimony.

22  Q   Okay.  So the extent you were looking at some data

23  related to Mike Homer, you were also looking at the same data

24  as it related to all the other defendants, correct?

25  A   Correct.

1  Q   Okay.  Now, without belaboring the point too much, Boeing

2  disciplines employees that don't act correctly, right?

3  A   Yes.

4  Q   And it awards employees who do a good job, correct?

5  A   True, and the two aren't necessarily mutually exclusive.

6  Q   I understand.

7       Now, are you aware that in 23 years of service, Mr.

8  Homer has never received any form of written discipline?

9  A   I have no knowledge of that.

10  Q   And are you aware that in 23 years of service,

11  conversely, Mr. Homer has received, by my count, 13 different

12  types of meritorious service awards?

13  A   Once again, I don't have specific knowledge of that.

14       THE COURT:  Can you stipulate to that, Ms.

15  Lunkenheimer or are you going to contest that?

16       MS. TAYLOR:  We -- we -- I'm sorry, you didn't say

17  me.

18       THE COURT:  Sorry, Ms. Taylor.

19       (Discussion held off the record.)

20       MS. LUNKENHEIMER:  Yes, we haven't seen that.  It

21  may be true, but I'd be basing it only on Mr. Laigaie's

22  representation.

23       THE COURT:  Is it pretty easy to check based on the

24  file?

25       MR. LAIGAIE:  Well --

1          THE COURT:  Where did that come from?

2          MR. LAIGAIE:  -- your Honor, I have here the

3    certificate --

4          THE COURT:  Why don't you show them the --

5          MR. LAIGAIE:  -- which I have attached to the motion

6    which I filed with the Court --

7          THE COURT:  Right.

8          MR. LAIGAIE:  -- last week and provided a copy to

9    the Government.

10         I'll be glad to show them to this witness, although

11   I think he's going to say I've never seen them before.

12         MS. LUNKENHEIMER:  Your Honor, I mean we did not

13   prepare this specific testimony related to Mr. Homer today.

14   This is supposed to be the general testimony about the

15   policies and practices at Boeing that relate generally to all

16   of the defendants seeking this relief, so we're not prepared

17   to respond to that either.

18         THE COURT:  All right.

19         MS. LUNKENHEIMER:  I mean there is some specific

20   information about Mr. Homer that actually we would present to

21   respond to that type of information that this witness

22   actually might even be aware of, but we didn't prepare it

23   that way.  That would be -- it would be -- I would be

24   uncomfortable having a conversation that there's positive

25   information presented when we can't present the whole picture

1 | today on Mr. Homer.

2 | THE COURT: So when do you want to do that, the day

3 | of sentencing?

4 | MS. LUNKENHEIMER: I believe that we agreed to do

5 | that at the time of sentencing.

6 | THE COURT: Is that okay with you?

7 | MR. LAIGAIE: Yes, your Honor.

8 | THE COURT: While he's here, you can ask him what he

9 | knows, if you want to, just so we --

10 | MR. LAIGAIE: Right, that's what --

11 | THE COURT: -- don't have to recall him at

12 | sentencing.

13 | MR. LAIGAIE: -- that's what I was going to say.

14 | Since he's testified he hasn't reviewed the files,

15 | since he's not familiar with these awards or certificates, I

16 | think it would be wasting everybody's time to go through them

17 | one at a time here today.

18 | I did expect though, however, that we were going to

19 | go through Mr. Homer's specific testimony today, but Mr. Lunk

20 | -- I was made aware Friday afternoon in a call that that

21 | wasn't on the agenda for today.

22 | THE COURT: Okay.

23 | BY MR. LAIGAIE:

24 | Q   Now --

25 | THE COURT: I guess we'll do that the day of

1    sentencing, unless somebody wants to do it earlier.

2              MS. LUNKENHEIMER:  Your Honor, I mean that was our

3    understanding from the Court that --

4              THE COURT:  Yes.

5              MS. LUNKENHEIMER:  -- was our understanding at the

6    time of the change of plea and that was --

7              THE COURT:  Well, I was trying to --

8              MS. LUNKENHEIMER:  -- and --

9              THE COURT:  -- accommodate all the people who

10   couldn't come, and weren't ready, and --

11             MS. LUNKENHEIMER:  Right, I mean we were not going

12   to use this witness to present Mr. Homer-related specific

13   testimony.  If he wants to ask him if he knows anything about

14   Mr. Homer --

15             THE COURT:  Yes.

16             MS. LUNKENHEIMER:  -- he's welcome to do that.

17             THE COURT:  All right.  Go ahead.

18             MR. LAIGAIE:  Thank you, your Honor.

19   BY MR. LAIGAIE:

20   Q   Now, we talked about the -- you talked some about the

21   difference between a five-drug panel and a ten-drug panel.

22             Do you recall that testimony?

23   A   Yes.

24   Q   Irrespective of whether someone who's being tested under

25   a five-drug panel or a ten-drug panel, the fact of the matter

1   is, if someone acts suspiciously in the work force, and is

2   observed as such, they will be tested for drug use, correct?

3   A    Provided they meet the criteria for screening which, you

4   know, are they exhibiting certain behaviors, and the reason

5   beyond reasonable suspicion testing, first of all, is to get

6   somebody into medical, because there are a lot of reasons why

7   they could be acting that way that aren't related to drug

8   abuse.  They could need medical assistance, and that's one of

9   the reasons why we're bringing -- they get tested through the

10  medical department, so they can make an evaluation that if it

11  isn't potentially related to this, it could be related to a

12  diabetic situation, or any -- any other number of factors.

13  Q    Sure.  Well, I think we agree here, if someone acts in a

14  way that meets the criteria of reasonable suspicion under pro

15  388, they will be -- they will be assessed whether there's a

16  medical condition or whether they should be tested for drug

17  abuse, correct?

18  A    Correct.

19  Q    And are you aware that in 23 years of service, Mr. Homer

20  has never been referred for any drug testing under pro 388?

21  A    I have no knowledge of that.

22       (Pause.)

23  Q    And, oh, by the way, is that something you could look at

24  in an employment record and necessarily determine?

25  A    It would not be in any kind of employment record, as far

1    as the number of times that somebody may have gone in for

2    reasonable suspicion testing.

3    Q    Okay.

4    A    That is part of our drug-free work place organization and

5    they maintain those records, so they maintain

6    confidentiality.

7    Q    So referrals for reasonable suspicion testing wouldn't

8    necessarily reach an employee's permanent record.

9         What about positive test results?  Would that reach

10   the employee's records?

11   A    So positive test results result in their record through

12   the form of the conformance notification memo for a drug-free

13   work place focal who is an HR member.

14   Q    Okay.  And just -- just so I'm clear -- I'm less

15   familiar, obviously, with these policies than you are -- if I

16   test positive and there's a performance notification, that

17   then becomes a part of my permanent record?

18   A    It becomes part of your record, yes.

19   Q    And would be, presumably, in one of -- in Mr. Homer's

20   file?

21   A    I would believe so.

22   Q    Similarly, if he were tested because of post-accident, I

23   think is the phrase we're using, if he was tested

24   post-accident, and it came back verified or confirmed drug or

25   alcohol abuse, that's also something that would end up in his

1   permanent record, correct?

2   A   The only piece that would be part of the record would be

3   the conformance notification memo.  Any -- whatever the test

4   results were that's maintained by the drug-free work place

5   group, which is part of our medical group, that restricts

6   that information.

7   Q   Okay.  Well, I just want to make sure the record's clear.

8   If he tested positive post-accident, and there were a CNM, a

9   conformance notification memo -- I'm never going to get that

10  right, I apologize -- that would be in his record?

11  A   I believe so, yes.

12  Q   Okay.

13          (Discussion held off the record.)

14  BY MR. LAIGAIE:

15  Q   You don't know anything about Mr. Homer's medical

16  history, do you?

17  A   No.

18  Q   And you don't know anything about why he may or may not

19  have been using oxycodone in and around the time he was

20  arrested, do you?

21  A   I have no knowledge.

22          MR. LAIGAIE:  That's all the questions I have, your

23  Honor.

24          THE COURT:  All right.  Thank you.

25          Mr. O'Meara, anything?

1          MR. O'MEARA:  No, thank you, your Honor.  I have no

2    questions.

3          THE COURT:  All right.

4          Anything else, Ms. Lunkenheimer?

5          MS. LUNKENHEIMER:  No, your Honor.

6          THE COURT:  Thank you, sir.

7          THE WITNESS:  Thank you.

8          (Witness excused.)

9          MS. LUNKENHEIMER:  Your Honor, the Government would

10   call Special Agent Raymond Carr back to the stand.

11         RAYMOND CARR, after having been previously duly

12   sworn as a witness, was examined and testified further as

13   follows:

14         MS. LUNKENHEIMER:  Your Honor, if I may have a

15   moment?

16         THE COURT:  Sure.

17         (Discussion held off the record.)

18         MS. LUNKENHEIMER:  Your Honor, I'm trying to learn

19   from past practice, and I think that some of -- most of what

20   Mr. -- Special Agent Carr was going to put in today can be

21   done by stipulation.  Defense counsel appears to agree.  So

22   I'll just briefly describe that, so that the Court can

23   determine whether they're in agreement.

24         THE COURT:  All right.

25         MS. LUNKENHEIMER:  Agent Carr was going to testify

1    that he is familiar with the Osprey and the Chinook

2    manufacturing process, both by spending extensive amounts of

3    time at the manufacturing plant, as well as even observing a

4    test flight of one of those two helicopters.

5            And then he has done a search of the public record

6    for public documents and photographs and videos that would

7    show and describe the use of these two helicopters currently.

8    And, so, we were going to put some of those public records in

9    through him.  They are -- they have been marked, and I'd like

10   to just very quickly do that with no objection from defense

11   counsel.

12           THE COURT:  Sure.

13           MS. LUNKENHEIMER:  Okay.

14                    DIRECT EXAMINATION

15   BY MS. LUNKENHEIMER:

16   Q    I'm just going to hand you...

17   A    Thanks.

18   Q    Agent Carr, I've just handed you exhibits that have been

19   marked --

20           MS. LUNKENHEIMER:  Just a moment.

21           COUNSEL:  What, these?

22   BY MS. LUNKENHEIMER:

23   Q    Well, they've been marked as Carr 1 through 8, and then

24   Carr 10 through 13, I believe.

25   A    Okay.

1   Q   Are these documents that you're familiar with?

2   A   Yes.

3   Q   Are these documents that can be obtained that describe

4   the Chinook and Osprey Helicopters in the public domain?

5   A   Yes.

6   Q   In other words, are these documents that are available on

7   the internet?

8   A   They are.

9   Q   And Carr Exhibit 1, is that a document that describes the

10  V-22 Osprey?

11  A   It is.

12  Q   Documents 2 and 3 describe various models of the Chinook?

13  A   It is.

14  Q   And are you familiar with whether these are describing

15  the Chinooks and the Ospreys that are being manufactured at

16  the Boeing Ridley Park facility?

17  A   They are.

18  Q   Okay.  Then is there a selection here of photographs of

19  the Osprey and the Chinook in active use currently?

20  A   Yes.

21  Q   And, so, Carr 4, 5 -- sorry, I'll go a little slower --

22  4, 5, 6, 7 and 8, what are those photographs depicting?

23  A   Photographs of the V-22 Osprey model.

24  Q   In current use?

25  A   Yes.

1  Q   Some of those in use at -- are those photographs used by

2  the military?

3  A   Yes.

4  Q   Okay.

5          MS. LUNKENHEIMER:  And then, your Honor, we have a

6  brief video -- defense counsel has not had an opportunity to

7  see this -- of the Osprey in -- in action.

8          Would I be able to present this?  If you have any

9  objections, can you hold them until afterwards?

10          COUNSEL:  Certainly.

11          MS. LUNKENHEIMER:  Could you please play Carr

12  Exhibit 9?

13          (The video was played at this time.)

14  BY MS. LUNKENHEIMER:

15  Q   Agent Carr, is that video simply a depiction of some of

16  the active uses that the -- the Osprey is made to -- some of

17  the uses that the military would make of the Osprey

18  currently?

19  A   Yes, uses and capabilities of that machine.

20  Q   Again, I just want to turn to Carr Exhibit 10, 11, 12,

21  and 13.

22          What are those photos depicting?

23  A   Of the Chinook CH-47, manufactured at Boeing.

24  Q   And, again, are those depictions of the active use of the

25  Chinook manufactured at the Ridley Park facility?

1   A    Yes.

2   Q    And is there also a video that was selected that's marked

3   as Carr Exhibit 14 that depicts that helicopter in active

4   use?

5   A    There is.

6            MS. LUNKENHEIMER:  Can I briefly show that to the

7   Court?

8            (The video was played at this time.)

9   BY MS. LUNKENHEIMER:

10  Q    And in the video -- that video that's been marked Carr 14

11  when it's viewed on the internet, does it indicate the

12  country that those troops are acting in?

13  A    Yes.

14  Q    What is it in?

15  A    Afghanistan.

16  Q    Thank you.

17           Agent Carr, when you began this investigation, you

18  testified earlier about that beginning in 2007?

19  A    Correct.

20  Q    Was there a certain requests that you made of employees

21  at the Boeing company about the secrecy of -- the need for

22  secrecy of that investigation?

23  A    Yes.

24  Q    And can you, please, just briefly describe what you

25  instructed the -- was it -- sorry.

1    Did you inform only a limited number of Boeing

2  employees about the investigation as it was being conducted?

3  A   The only employee at the Philadelphia plant was Mr.

4  Fasold, other than a few people in Chicago.

5  Q   And was there investigation specific reasons that you

6  limited the knowledge of your investigation?

7  A   For the integrity of the investigation, yes.

8  Q   Okay.

9       MS. LUNKENHEIMER:  I have no further questions of

10  Agent Carr.

11       MR. SCUDERI:  May I, your Honor --

12       THE COURT:  Yes, sure.

13       MR. SCUDERI:  -- a few questions?

14                      CROSS-EXAMINATION

15  BY MR. SCUDERI:

16  Q   Agent, how long have you been an agent for the F.B.I.?

17  A   Close to 24 years.

18  Q   Okay.  And you've handled many, many drug investigations;

19  isn't that correct?

20  A   Yes.

21  Q   Have you ever been involved in the charging of

22  individuals with misdemeanor drug offenses before?

23  A   No.

24  Q   So this is the first time ever -- these people here --

25  first time ever misdemeanor drug offense; is that correct?

1  A   Correct.

2  Q   Okay.  Now, you said you started working on -- on the

3  case in 2007 or 2008?

4  A   October 2007, is when --

5  Q   Okay.

6  A   -- we sat down.

7  Q   Didn't Boeing conduct an internal investigation before

8  that?

9  A   You'd have to ask Boeing that.

10 Q   Okay.  How were you contacted to investigate Boeing at

11 Ridley Park?

12 A   The Department of Defense.

13 Q   Okay.  Now, we saw a lot of exhibits from you, and we saw

14 video from you.

15        Is there any connection between any problem with the

16 integrity of the V-22 Osprey or the Chinook and these

17 defendants?

18 A   I have no direct knowledge of any of that.

19 Q   Okay.  I believe that U.S. Attorney Zane Memeger said the

20 authorities were not aware of any accidents or problems

21 involving aircraft that he accused employees worked on at the

22 Ridley Park plant.

23        Do you know if that's true or not?

24 A   You'd have to ask Mr. Memeger about that.

25 Q   Okay.  Now, in doing your research on this case, I assume

1  you know that the Osprey has had at least four failures

2  during flight testing, one combat zone crash, and a number of

3  minor incidents; is that correct?

4  A    I don't have any direct knowledge as to the accidents

5  that have occurred, other than what's in the news.

6  Q    Okay.  But have you, in searching the archives, did you

7  see any reports about helicopter crashes?

8  A    I did not look specifically into helicopter crashes.

9  Q    Okay.  Did you investigate whether anything -- any

10  materials that these defendants worked on had anything to do

11  with any helicopter crashes?

12  A    That was not the focus of the investigation.

13           MR. SCUDERI:  Thank you very much.

14           MS. SCOTT:  I have no questions, your Honor.

15           MR. DREYER:  No questions.

16           MR. LAIGAIE:  I just want to clarify one point.

17                    CROSS-EXAMINATION

18  BY MR. LAIGAIE:

19  Q    I just want to clarify one point.

20           Your answer to Mr. Scuderi's question, when you said

21  you didn't have any direct knowledge of any connection

22  between any of these petitioners' actions, and a bad safety

23  record with the V-22 Osprey, I want to ask you a question

24  about that.

25           The V-22 Osprey doesn't have a bad safety record,

1  does it?

2  A   I'm un -- I'm unfamiliar with the safety record of the

3  V-22.

4  Q   Okay.  In fact, in Saturday's Wall Street Journal,

5  Hillary Clinton was quoted as saying the V-22 Osprey has an

6  excellent safety record, and that we believe basing it in

7  Okinawa will significantly strengthen our -- our ability in

8  providing for Japan's defenses.

9         Do you have any reason at all to disagree with the

10 Secretary of State?

11 A   No.

12        MR. LAIGAIE:  Thank you.

13        MR. O'MEARA:  No questions, your Honor.  Thank you.

14        MS. LUNKENHEIMER:  Your Honor, I just have one

15 follow-up.  Actually, it's going to take more than one

16 question, but --

17        THE COURT:  I just wondered if you're going to have

18 Hillary Clinton testify.

19        MS. LUNKENHEIMER:  Yes, your Honor.

20        (Laughter.)

21        Our subpoena power might cover her.

22                    REDIRECT EXAMINATION

23 BY MS. LUNKENHEIMER:

24 Q   Agent Carr, were you consulted with the U.S. Attorney's

25 Office about the charging decisions made in this

1  investigation?

2  A    I was not.

3  Q    Did you have any conversations with Government counsel;

4  myself and Ms. Taylor, about whether or not misdemeanor

5  defendants should be charged in this case?

6  A    I did not.

7  Q    Okay.  Let me... you didn't make the charging decisions

8  in this case, did you?

9  A    I did not.

10  Q    No, and you don't make the charging decisions in any

11  case, correct?

12  A    I do not.

13  Q    Okay.  But was an investigative decision made to conduct

14  reverse operations that would result in simple possession

15  cases?

16  A    Yes.

17  Q    Okay.  And were you involved in the decision to -- to run

18  those reverse operations?

19  A    Yes.

20  Q    And can you, please, tell the Court why you, as the lead

21  case agent from the F.B.I., decided to -- to take that -- I'm

22  sorry.

23       Is that an unusual investigative tactic, to run a

24  reverse operation of placebo pills?

25  A    Yes.

1    Q    And is it unusual that you would also be selling such a

2    small quantity of pills; in other words, pills that would be

3    charged as misdemeanors?

4    A    Yes.

5    Q    Okay.  Can you please tell the Court why, in your

6    investigation, you made the decision to run a reverse

7    operation in that manner?

8    A    Because where -- where the situation was taking place,

9    the facility it took place, the product that was being

10   produced, and the implications of the product on the

11   soldiers.

12   Q    Okay.  Thank you.

13             MS. LUNKENHEIMER:  I have no further questions.

14             MR. SCUDERI:  Just a few questions, your Honor.

15             THE COURT:  Yup.

16                      RECROSS-EXAMINATION

17   BY MR. SCUDERI:

18   Q    Agent, in connection with your investigation, you looked

19   at -- at the EAP access documents, the utilization records?

20   A    No.

21   Q    That's the early or the Employee Assistance Program.

22             Are you aware that a large percentage of

23   professional employees of Boeing, including engineers and

24   designers, were involved in the EAP?

25   A    No, I was not.

1  Q   Do you know that the EAP is for people with drug and
2  alcohol programs?
3  A   Yes, I'm aware of that.
4  Q   Problems.
5         THE COURT:  Well, it could be --
6  BY MR. SCUDERI:
7  Q   You're aware of that, right?
8         THE COURT:  -- it could be mental health.  It could
9  --
10        THE WITNESS:  It could be.
11 BY MR. SCUDERI:
12 Q   It could be mental health, but --
13        MR. SCUDERI:  Your Honor, we have data on that, too.
14        THE COURT:  Okay.
15 BY MR. SCUDERI:
16 Q   Are you aware of the large percentage of people in the
17 EAP Program are professionals, and are designers, and they
18 have drug and alcohol problems?
19 A   We're speaking about Boeing?
20 Q   Right, Boeing.
21        THE COURT:  He testified that he didn't look at the
22 EAP stuff --
23        THE WITNESS:  Right.
24        THE COURT:  -- so I don't know if he can answer
25 this.

1    BY MR. SCUDERI:

2    Q    Well, you said at some point you decided to do a reverse

3    sting at Boeing; is that correct?

4    A    Right.

5    Q    Because the employees were involved in manufacturing

6    defense hardware; is that correct?

7    A    Correct.

8    Q    Did you investigate the professionals also?

9    A    If they would have came across, or their names would have

10   came up within my investigation, yes, we would have.

11   Q    Okay.  But you -- they didn't; is that correct?

12   A    They did not.

13   Q    Okay.

14        MR. SCUDERI:  Thank you, your Honor.

15        THE COURT:  Thank you.

16        Anything further?

17        MR. LAIGAIE:  Nothing, your Honor.

18        COUNSEL:  Nothing, your Honor.

19        THE COURT:  Okay.  Thank you very much, Agent.

20        THE WITNESS:  You're welcome.

21        (Witness excused.)

22        MS. TAYLOR:  Your Honor, the Government would call

23   Dr. George Downs.

24        THE COURT:  All right, Doctor.

25        MR. SCUDERI:  Your Honor, I move for the admission

1  of my exhibits.  I don't know if I did that.

2          THE COURT:  All right.  Any objection to that?

3          MS. LUNKENHEIMER:  No, your Honor.  We'll be doing

4  the same at the conclusion today.

5          THE COURT:  All right.  All the exhibits are

6  admitted.

7          (HR Exhibit Nos. 1, 2, 4, 5, 6, 7, 8, 9, 11, 13, 14,

8  15 and 16 were admitted.)

9          (Jones Exhibit No. 1 was admitted.)

10          (Carr Exhibit Nos. 1 through 8 and 10 through 14

11  were admitted.)

12          (Pause.)

13          DR. GEORGE DOWNS, after having been first duly sworn

14  as a witness, was examined and testified as follows:

15          MS. TAYLOR:  May I proceed, your Honor?

16          THE COURT:  Of course.

17                    VOIR DIRE EXAMINATION

18  BY MS. TAYLOR:

19  Q    Good afternoon, Dr. Downs.

20  A    Good afternoon.

21  Q    If we can, Dr. Downs, can you tell the Court who you're

22  currently employed by?

23  A    Yes, I'm employed by the Philadelphia College of Pharmacy

24  at the University of the Sciences.

25  Q    And what is your current position?

1  A   I'm a Professor of Clinical Pharmacy and the Dean

2  Emeritus.

3  Q   And at my request, have you provided us with a copy of

4  your C.V. or your resume?

5  A   Yes, I have.

6  Q   Dr. Downs, I'm showing you what's been marked as

7  Government's Exhibit Downs 3.

8          Is that a copy of your resume?

9  A   Correct.

10  Q   Do you have a separate copy of your resume?

11  A   No, I don't.

12  Q   Hold onto that.

13          MS. TAYLOR:  Counsel, do you have any objection to

14  Government Exhibit Downs 3 --

15          COUNSEL:  No.

16          MS. TAYLOR:  -- which is his C.V.?

17          MS. SCOTT:  No.

18          COUNSEL:  No objection.

19          MS. TAYLOR:  Your Honor --

20          THE COURT:  Okay.

21          MS. TAYLOR:  -- I'd move for the admission of Downs

22  3, and ask that -- it doesn't have to be published.

23          THE COURT:  Okay.  I'll admit it.

24          (Exhibit No. Downs 3 was admitted.)

25  BY MS. TAYLOR:

1  Q    Dr. Downs, I'm going to have you now, referring to your

2  C.V., just briefly talk a little bit about your background.

3  A    Sure.

4  Q    First, can you tell the Court about your education and

5  training?

6  A    Sure, I'm a -- I got a Bachelor Degree in Pharmacy from

7  the University of New Mexico, and then a Doctor of Pharmacy

8  from the Philadelphia College of Pharmacy and Science.

9  Q    And when did you receive those degrees?

10  A    1962 for the Bachelor's Degree and 1972 for the Doctor of

11  Pharmacy.

12  Q    Did you have to serve a residency?

13  A    I have served two residencies.

14  Q    Can you tell the Court where you served your residencies?

15  A    My first was in the United States Public Health Service

16  in New Orleans, and then I was on the -- a staff pharmacist

17  at Staten Island at the U.S. Public Health Service as well.

18  Q    You indicated that you're a Professor of Clinical

19  Pharmacy; is that correct?

20  A    That's correct.

21  Q    Can you tell the Court what clinical pharmacy --

22  A    Sure.

23  Q    -- involves?

24  A    Yeah, the stereotype of a pharmacist is a pharmacist who

25  works in a community practice, and indeed what clinical

1  pharmacy has done is we basically round with physicians, we

2  basically make decisions as far as drug-dosing outpatients,

3  drug therapy, and work with the physicians to try to improve

4  medication health.

5  Q   So you're actually a part of the treating process a

6  clinical pharmacist?

7  A   Correct.

8  Q   Now, in your resume, you detail -- and now I'm looking at

9  Page 3 -- a series of professional affiliations.

10  A   Correct.

11  Q   I'm trying to just speed this up a little bit, because

12  you have a lot.

13          Approximately how many organizations are you

14  affiliated with?

15  A   I would say about a dozen.

16  Q   And do all of them involve your practice as a pharmacist?

17  A   Yes.

18  Q   Have you been affiliated with organizations throughout

19  the some-odd 30 years, I guess, of your practice?

20  A   Yes, I have.

21  Q   So you also --

22  A   It's more like 40.

23  Q   I'm sorry.

24  A   It's 40.

25  Q   You said 40?

1    A    I said 40.

2    Q    Okay.  I'm dating myself.  Your some-odd 40 years of

3    practice.

4          Can you tell the Court what SARPH is?

5    A    Yes, SARPH is called Secundum Artem Reaching Pharmacists

6    with Help.  It is the impaired pharmacist program at

7    Pennsylvania.  It's a voluntary organization that works very

8    closely with the State Board of Pharmacy to identify and

9    provide after-care contracts for pharmacists who have

10   substance abuse issues.

11   Q    And approximately how long, if you know, how SARPH been

12   in existence?

13   A    They started in about 1972.

14   Q    And is SARPH -- does SARPH continue to be in existence

15   today?

16   A    Yes, it is.

17   Q    Do you have an additional role presently with SARPH?

18   A    Yes, I'm also on their Board of Directors.

19   Q    Now, prior to being on the Board of Directors, what type

20   of activities did you do with SARPH?

21   A    Oh, I have been involved with SARPH since the mid-80s

22   when I started working with the students to try to intervene

23   on them to get them into substance abuse treatment.  SARPH

24   was the organization that we use in order to provide the

25   after-care for those students.  So there's a contractual

1   agreement that a student has to work with in SARPH.

2   Q   During your career, have you also served on university

3   committees?

4   A   Yes, I have.

5   Q   And I want to talk to you specifically, first,

6   approximately how many committees have you served on?

7   A   I would say 25, 30.

8   Q   And what I want to do is I want to specifically talk to

9   you about the Task Force on Drug and Alcohol Abuse.

10          Is that a committee you served on?

11  A   Yes, I did.

12  Q   Can you tell the Court about your role and duties on that

13  committee?

14  A   This is a task force that was established to try to

15  determine a policy for working with students at the

16  university that may have substance abuse problems.

17  Q   And was that -- how long did you serve on that task

18  force?

19  A   That was about five years.

20  Q   Throughout your career, have you received numerous

21  honors?

22  A   Yes, I have.

23  Q   Have you also published approximately 31 publications?

24  A   Yes.

25  Q   And on those publications, are you majorly the lead

1    contributor?

2    A    Yes.

3    Q    In one of your publications -- well, one of your

4    publications is entitled, "The Challenges of Assisting the

5    Chemically-Impaired Pharmacist."

6            Can you tell the Court just briefly what that goes

7    into?

8    A    That -- that basically looks at the issues that we have

9    to determine when we have a pharmacist who basically has a

10   substance abuse problem.  Remember that pharmacists have

11   access to drugs, so that they're at higher risk than normal

12   populations for substance abuse issues, and working with them

13   to make sure that we can get them into treatment programs,

14   get them into after-care programs, and let them continue

15   working.

16   Q    Have you also served as a reviewer for pharmacy or

17   pharmaceutical publications?

18   A    Yes, I have.

19   Q    And I'm sure the Court is aware what a reviewer does, but

20   in two sentences for us, just tell us.

21   A    You get publications and you go back and act as a

22   reviewer to determine whether that publication is worthy to

23   be published.

24   Q    And you've done that on approximately five different

25   types of publications --

1   A    Correct.

2   Q    -- is that correct?

3        You've also, over your career, done approximately 45

4   presentations?

5   A    Or more.

6   Q    Or more.

7        And those are primarily in the area of pharmacy and

8   pharmacy-related issues --

9   A    Correct.

10  Q    -- is that correct?

11       In addition, you've been part of eight research

12  grants?

13  A    Correct.

14  Q    Did one of those grants involve the SARPH Program that

15  you've already explained to the Court?

16  A    Yes, I did.

17  Q    Were you also involved in what's called SHAPE?

18  A    SHAPE.  SHAPE was another grant that we obtained in order

19  to look at heightening awareness for students on campus, so

20  that they would be willing to come forward and help other

21  students that may have a substance abuse issue, but they're

22  afraid to go forward and -- and getting some help.

23  Q    Now, you have testified that you have some experience

24  working with pharmacists on substance abuse issues --

25  A    Correct.

1    Q   -- pharmacy students with substance abuse issues.  You've

2    written on the subject, you've gotten grants on the subject.

3          Do you have any other experience in the area of

4    substance abuse treatment or monitoring that would enable the

5    Court to make a decision about your expertise in the area?

6    A   Over the -- since the mid-80s, I have probably intervened

7    on over 100 students that have had a risk of substance abuse,

8    have done interventions, evaluations, sent them to

9    professionals for absolute evaluation, and then if they have

10   been identified as having substance abuse issues, I serve as

11   the monitor on campus for them when they're in their

12   after-care contract.

13   Q   And you've indicated you've done it over how many years,

14   sir?

15   A   Well, about 25 years.

16   Q   About 25 years.

17          MS. TAYLOR:  Your Honor, at this time the Government

18   would offer Dr. George Downs as an expert in pharmacy with a

19   specialty in the treatment of substance abuse.

20          MR. SCUDERI:  No questions, your Honor.

21          MR. DREYER:  No questions, your Honor.

22          MS. SCOTT:  No questions.

23          MR. LAIGAIE:  No questions.

24          THE COURT:  Any objection to him being --

25          MR. LAIGAIE:  No, no, your Honor.

1          MR. DREYER:  No, your Honor.

2          MS. SCOTT:  No, your Honor.

3          MR. SCUDERI:  No, your Honor.

4          THE COURT:  All right.  I'll let him testify as an

5     expert in that area.

6          MS. TAYLOR:  Thank you, your Honor.

7                    DIRECT EXAMINATION

8     BY MS. TAYLOR:

9     Q    Dr. Downs, have you ever testified in a court before?

10    A    No, I haven't.

11    Q    And are you being compensated in any way for your

12    testimony today?

13    A    No.

14    Q    What I'd like to do, Dr. Downs, is to direct you very

15    specifically to the area of the science and substance abuse.

16          Can you tell the Court what percentage, in your

17    experience -- not only your experience -- I want you to rely

18    on your research, as well as any publications that you have

19    written, okay?  Can you tell the Court what percentage of the

20    U.S. population is at risk to become addicted to some

21    substance?

22    A    The -- the data seems to show that there's probably

23    between 10 and 15 percent of the population's at risk.

24    Q    And what effect is the substance user, not abuser, but

25    the substance user seeking?

1  A   In the case of opiates, what they're looking for pain

2  relief, because these drugs are prescribed for relief of

3  pain.

4  Q   Is that a positive effect or a negative effect?

5  A   That would be positive, obviously, if you have pain.

6  Q   What is a euphoric effect?

7  A   A euphoric effect is usually a secondary effect that is

8  part of the drug, but pain relief occurs through one

9  mechanism, euphoria occurs through another mechanism, the

10 pleasure center of the brain.  That is usually part of the

11 opiates, but in the case of people who start to abuse that,

12 it becomes the reason why they continue.

13 Q   What is a negative effect that -- that -- of opiate use

14 or abuse?

15 A   Well, the negative effect would be what we call

16 dysphoria, which is the opposite of euphoria, which would be

17 when you start to have discomfort from not having the drug,

18 if you become intolerant to it.

19 Q   Now, you prepared a chart dealing with the tolerance of

20 opiate abuse; is that correct?

21 A   Yes, that's correct.

22 Q   Before we pull up the chart, I want you to explain to the

23 Court what is an opiate?

24 A   An opiate is basically what we in laymen's terms call a

25 narcotic.  It's a drug which is basically utilized

1  predominantly for pain relief usually in patients who have

2  severe pain.

3  Q   Now, how is it that an opiate achieves the goal of

4  relieving pain?

5  A   It does that through usually making the brain sense that

6  the pain isn't there, and so it kind of blocks the sensation

7  that the -- the pain fibers going up to the brain.

8  Q   Is that normally called a central nervous system

9  depressant?

10 A   All -- all opiates have a central nervous system

11 depressant effect that you get sleepy, you can get drowsy

12 from them.

13 Q   And is that in order -- strike that.

14        And as a depressant -- strike that.

15        Because an opiate acts as a depressant, is that why

16 it can have the effect on the brain of sort of convincing it

17 that the pain is lesser than it is?

18 A   It is part of that process, yes, it's more complex than

19 that, but that certainly is a component of it.

20 Q   Okay.  Is fentanyl also an opiate?

21 A   Yes, it is.

22 Q   Are oxycodones opiates?

23 A   Yes, they are.

24 Q   Are Percocets opiates?

25 A   Yes.

1  Q   Can you compare for Judge Rice the relative potency as

2  opposed to a fentanyl, an oxycodone product, or oxycodone in

3  Percocet drugs?

4  A   Sure.  If you use morphine as kind of your baseline for

5  that, oxycodone is about two, two-and-a-half times more

6  potent than morphine.  Fentanyl is between 50 and 100 times

7  more potent.

8  Q   Than morphone -- than morphine?

9  A   That's right.

10         MS. TAYLOR:  Can we show Downs Exhibit 4, please?

11         (Discussion held off the record.)

12         MS. TAYLOR:  Any objection to 4?

13         COUNSEL:  No objection.

14         MS. SCOTT:  No objection.

15 BY MS. TAYLOR:

16 Q   Dr. Downs, you have -- well, you see before you, and on

17 the screen, what's been marked as Government's Exhibit Downs

18 4; is that correct, sir?

19 A   Correct.

20 Q   And is that entitled, "Tolerance to Opiates"?

21 A   Yes, it is.

22         MS. TAYLOR:  With the Court's permission, Dr. Downs,

23 could you come down from your seat, approach your chart, and

24 explain to Judge Rice what it is your chart shows?

25         (Witness leaves the stand.)

1           MS. TAYLOR:  Doctor -- I'm sorry -- you were
2    supposed to come down after --
3           THE COURT:  That's all right.  He's already there.
4           (Laughter.)
5           MS. TAYLOR:  Sorry, your Honor.
6           THE COURT:  He's working for free.  You've got to
7    give him some leeway.
8           THE WITNESS:  Yeah, right.
9           (Discussion held off the record.)
10          THE WITNESS:  Do I need a mic for this or not?
11          THE COURT:  Do you pick him up, Christian?
12          (Discussion held off the record.)
13          THE WITNESS:  What I tried to -- what I tried to
14   develop in this chart is kind of the positive and negative
15   effects of the use of -- of analgesics or opiates, and if you
16   look at the --
17          THE CLERK:  Dr. Downs, one second.  Come closer.
18          THE WITNESS:  You still can't get it?  What if I --
19   what if I stand here and talk?
20          THE COURT:  Yes, that would be great.
21          THE CLERK:  Yes, is that okay?
22          COUNSEL:  That's great.  We can hear you now.
23          THE WITNESS:  Okay.  And I'll just use this as my
24   chart.
25          If you look at the first triangle there, you'll see

1   what would happen if -- if you had pain, and you basically

2   took an oxycodone 5 milligrams for the pain, so --

3          MS. TAYLOR:  Your Honor, can I assist him and point

4   to what he's talking about, because he can't do both?

5          THE COURT:  Sure.

6          (Discussion held off the record.)

7          THE WITNESS:  So while my assistant is working on

8   this, that's -- right there, okay.

9          And you'll notice that the arrow just points at what

10  the dose is for that, as -- and you'll see that over a period

11  of time then you have to use another dose in order to get the

12  pain again, so it's a back and forth process.

13         So second again.  But then you'll notice that over a

14  period of time, you develop tolerance, and tolerance is that

15  you need a larger dose of the drug in order to get the same

16  effect.  So in order to get the same effect now, I have to

17  use a little larger dose of the drug, so you see it takes a

18  little bit further to get there --

19  BY MS. TAYLOR:

20  Q   Dr. Downs --

21  A   -- to get the same effect.

22  Q   -- Dr. Downs, explain what it means -- first of all, did

23  you create this chart?

24  A   Yes, I did.

25  Q   Okay.  Explain what it means when your line on a graph

1   goes down below which you've identified as the baseline?

2   A    That -- what that is is where you're going to start to

3   get the negative effects, or the dysphoria, or the withdraw

4   symptoms.  So you start to see where it starts, and you get a

5   larger dose in order to get the same effect, and then you

6   need more of a dose.  And this -- there's the time factor

7   here is not days or hours, this could be weeks or months,

8   okay, as it goes.

9        But you'll notice that in order to get to the same

10  effect, whether that be pain relief, or whether that be

11  euphoria, you need a larger dose of the drug.  That's

12  tolerance.  And, so, as the person takes more, you'll see

13  that the arrow gets larger, and so you need a larger dose of

14  the drug.

15       What happens over a period of time in addiction is

16  that in order to get -- the dose gets to be so large, and to

17  be so difficult, that in order just to get to be back to

18  baseline to be normal, you're going need that much drug, and

19  that's where you see in those last two triangles that you see

20  just getting back to baseline.

21       The biggest cause of death in opiates is respiratory

22  depression, and one of the big problems is that euphoria is

23  the one thing that starts to become tolerant, the fastest,

24  and then the thing that becomes tolerant next would be the GI

25  tract and the eyes.  And then if a person tries to take an

1   extra dose in order to get back up to the euphoria, they can

2   die from respiratory depression.

3           And, so, you see now that respiratory deaths from

4   opiates have exceeded deaths from automobile accidents in

5   this country, just because of the effect that you're getting

6   there.

7   Q   Dr. Downs, you can go back to your seat.  I can ask you

8   more questions about the chart up there.

9           (Witness retakes the stand.)

10  BY MS. TAYLOR:

11  Q   Now, Dr. Downs, I want to stay with the chart just for a

12  few more minutes.

13          On your chart you have what's called a baseline.

14  A   Correct.

15  Q   What does that mean?

16  A   A baseline would be what you and I would consider normal

17  before we have pain.

18  Q   So that's no pain --

19  A   Just --

20  Q   -- and also no drugs?

21  A   That's correct.

22  Q   So hopefully that's how you and I are here today.

23  A   Correct.

24  Q   When there is pain, the arrow on your chart goes up --

25  A   Correct.

1    Q    -- correct?

2          And that's the beginning of the use of the opiate

3    for the pain relief?

4    A    Correct.

5    Q    And that use can be prescribed or illegally obtained,

6    correct?

7    A    Yes.

8    Q    As your chart goes forward, left to right, we go further

9    into what you have marked as the negative effect; is that

10   correct?

11   A    Correct.

12   Q    Is that the area where now we have abuse or are we simply

13   building up tolerance?

14   A    What I'm showing here is building up tolerance.  Abuse is

15   part of that, because as you -- as you come more tolerant,

16   you have to use a higher dose.  People can't have severe pain

17   like people who have terminal cancer, and they can become

18   tolerant, but they may not be abusing the drug, so they --

19   Q    Basically more --

20   A    That's right.

21   Q    -- to get pain relief?

22   A    So there's -- there's a difference between tolerance,

23   dependence, and addiction.

24   Q    Okay.

25   A    So the addiction is when you start to get a craving that

1   you have to be able to get this drug in order to -- to

2   function.

3   Q   Now, Dr. Downs, did you prepare, at my request, a summary

4   of your testimony and the terms as you would view the terms?

5   A   Yes, I did.

6   Q   And do you have a copy of that summary with you, sir?

7   A   Yes, I do.

8   Q   And if you could, could you turn to that?

9   A   (Witness complies.)

10  Q   Now, this is not a marked exhibit, but I'm going to ask

11  you some questions, and I'm going to ask you to explain

12  certain terms to Judge Rice, okay?

13  A   Okay.

14  Q   You indicated that there's a difference between addiction

15  and dependency --

16  A   Correct.

17  Q   -- and you've explained to us what addiction is.

18          What is dependency?

19  A   Dependency is when you have a physical dependency, so

20  that you can get the withdraw syndrome.

21  Q   And how is that different from addiction?

22  A   Addiction is different in that addiction, there's five

23  characteristics of that, which there is chronic, that you've

24  lost control over your drug use, so the people using it,

25  there's compulsive use, they just have to use it, there's

1  continued despite of harm.  I know that this is not something

2  I should be doing, but I have to continue doing it anyway,

3  and then the last is craving.

4  Q   And craving simply means I have to have it?

5  A   Have to have it.

6  Q   Okay.  Now, you've talked about euphoria and you've

7  described it as the opposite of dysphoria.

8  A   Right.

9  Q   Explain what euphoria is and what dysphoria is.

10 A   Euphoria is a feeling of well being.  It's a very intense

11 feeling of well being.  Usually when a person is addicted,

12 they're looking for the rush, which is the rapid effect from

13 the drug, and then they have a state of euphoria.  And then

14 they just -- they can feel happy, they feel ecstatic, they --

15 they basically just feel great.

16 Q   They feel great.

17      And that is a condition brought on by the drug?

18 A   That's correct.  It's usually not achieved normally.

19 Q   And what is the difference between euphoria and

20 intoxication?

21 A   Intoxication would be when somebody takes so much of the

22 drug that they become comatose, and that those are the folks

23 that come to the hospital, and that we have to use Naloxone

24 on in order to -- to revive them.

25 Q   Now, on your chart, and in your experience, at some point

1  does the negative effects of drugs in the abuser become more

2  important than the positive effects?

3  A   What happens at a point when they're dosing to become so

4  high is that because of the withdraw they are tending to

5  avoid withdraw, and so that they're avoiding the negative

6  effects of the drug, trying to get back toward normal.

7           So the individual may take a dose in the morning in

8  order just to get up and get moving, in order to be able to

9  get to work.  And then as the day wears on, they may need

10 more in order to just function, and they're always looking to

11 try to get toward normal, but unfortunately what happens is,

12 they can't control up versus down.  It's just one of --

13 because they're not basically prescribed this thing.  They're

14 using every drug they can get their hands on.

15 Q   So they can't achieve normal?

16 A   They cannot.

17 Q   You've talked a little bit about withdraw symptoms, and

18 on your chart, I believe -- I can't read it --

19 A   Can I read it to you?

20 Q   -- you talked about what withdraw is.  You write it's a

21 wide range of symptoms that occur after stopping or

22 dramatically reducing opiate drugs after heavy and prolonged

23 use.

24          That's your definition, correct?

25 A   That's correct.

1   Q   Can you tell Judge Rice some of the symptoms individual

2   addicted to opiates will suffer when they are going through

3   withdraw?

4   A   Frequently withdraw is almost the opposite of euphoria,

5   so you're looking at agitation, you're looking at diarrhea,

6   because they get constipated when they have -- when they're

7   on opiates, they get chills, they get goose flex -- goose

8   flesh -- I'm sorry -- nausea, vomiting, muscle cramps,

9   involuntary movements, very, very uncomfortable.

10  Q   Have you heard withdraw symptoms also include an

11  inability to sleep?

12  A   Yes.

13  Q   Have you heard withdraw symptoms including increased

14  anxiety and apprehension?

15  A   Yes.

16  Q   What about crawling out of your skin?

17  A   That was a statement that one of my students described to

18  me as the sensation that he felt when he was going through

19  withdraw, and that's very similar to the goose flesh, or --

20  or the cold turkey effect that you're getting.

21  Q   Now, you were present a little over a week ago when we

22  presented the testimony of both Jonathan Sullivan -- Jonathan

23  Sullivan as well as Charles Haux; is that correct?

24  A   That's correct.

25  Q   And I want to direct your attention back to their

1   testimony when they talked about feeling an increased amount

2   of energy.  I believe Mr. Sullivan said he felt like

3   Superman.  And then when they talked about withdraw, they

4   talked about having to go home and the other withdraw

5   symptoms that we've testified.

6           Can you explain to the Court how it is an individual

7   who testifies is clearly addicted long term to use of opiates

8   can feel like Superman?

9   A   The -- the paradoxical effect, and it's really difficult

10  to try to describe that -- the paradoxical effect is the

11  euphoria that you feel is such that you can get, in a sense,

12  a numbing sensation so that nothing that -- nothing bothers

13  you around you, so you can focus really on the sensation that

14  you're looking for, okay.  That's the euphoria.

15          The withdraw on the opposite side of that is just

16  going to be this terrible sensation that you're trying very

17  hard to avoid.

18  Q   Now, if I feel like I'm Superman, in reality am I

19  Superman?

20  A   No, you're not.

21  Q   Do I know the difference?

22  A   No, you don't.

23  Q   Why?

24  A   Because you are under the influence.  You do not have the

25  ability to be able to -- to distinguish between whether you

1  can function or not.  You feel like you can.

2  Q    But you don't know?

3  A    You -- you have a central nervous system depressant,

4  which is basically keeping you from doing that.

5  Q    Now, scientifically, is it possible for opiates to have

6  the effect on someone to give them energy to increase their

7  energy?

8  A    Not -- not that I'm aware of.  It's the opposite.

9  Q    Because it's a depressant?

10 A    Right.

11 Q    Can workers function normally while they're abusing

12 drugs?

13 A    Not if they are not under control, and let me --

14 Q    What does that mean?

15 A    -- let me describe that.

16       There are patients who basically are on methadone

17 maintenance programs --

18 Q    Okay.

19 A    -- for instance, that can have a controlled environment

20 where basically they -- they can function.  I'm not sure that

21 they can function normally, because most of the patients I've

22 seen usually try to -- they will abuse that as well by

23 selling some of the methadone to get something else.  But,

24 overall, the goal of those programs, which is to try to

25 substitute a long-acting drug for the short-acting drugs that

1   basically give you the high and the euphoria.

2          For anybody who basically is using short-acting

3   drugs, I don't think it's possible to basically be normal,

4   because you're always somewhere in the -- either the euphoric

5   or the withdraw state.  Very rarely that you're going to be

6   in that normal state.

7   Q   And that's because they can't regulate --

8   A   That's right.

9   Q   -- the amount of drugs that they're going to need

10  consistently to stay normal?

11  A   That's correct.

12  Q   You indicated -- well, I just have one last question --

13  you indicated that workers who think they're Superman are not

14  really Superman.

15  A   That's correct.

16  Q   Is addiction, drug addiction, something you would call a

17  disease of denial?

18  A   Drug addiction to me is a disease.  It's a disease of

19  denial, because they're the last person usually to determine

20  that they have the problems, they're an addict themselves.

21  And it's also a disease of relapse, in that it's very

22  difficult for people without good care to maintain their

23  sobriety.

24  Q   Now, Dr. Downs, you heard the testimony of Mr. Sullivan

25  and Mr. Haux, and they indicated the levels, the amounts of

1    pills they had to take in order to make it through the day.

2         Do you understand that?

3    A    Yes.

4    Q    Can you compare for Judge Rice the impact that would have

5    on the abuser versus the impact it would have on someone like

6    yourself or myself that is not using those drugs?

7    A    If we were to use the -- the level of drugs that a

8    tolerant person was taking, we would die.

9    Q    And why is that?

10   A    It would be respiratory depression.  It would just go

11   down to our brain stem and shut off our respiratory center.

12   Q    And how is the tolerant -- how is the abuser able to take

13   those drugs and not die?

14   A    That -- that's a great question.  The tolerance develops,

15   the brain will develop tolerance to that where you can

16   continue to increase the dose.  Now, those folks will

17   probably breathe more shallow, okay.  They may not be able to

18   get that, and they're much at higher risk if you add on

19   another drug like a benzodiazopene, Valium or Xanax, that

20   they could overdose and -- and suppress their respiration

21   where they would die.  But the brain has an amazing ability

22   to become tolerant.

23             MS. TAYLOR:  I have nothing further, Dr. Downs.

24             THE COURT:  All right.

25             MR. SCUDERI:  May I, your Honor?

1    THE COURT:  Sure.

2                    CROSS-EXAMINATION

3  BY MR. SCUDERI:

4  Q   Doctor, there are a lot of things that can kill you,

5  right?

6  A   I'm sorry.  I didn't hear your question.

7  Q   Can you be addicted to alcohol?

8  A   You can get addicted to alcohol, yes, you can.

9  Q   Can you use alcohol recreationally and not be addicted?

10 A   Yes, you can.

11 Q   Can you use opiates recreationally and not be addicted?

12 A   Yes, you can.

13 Q   How about marijuana?

14 A   Yes, you can.

15 Q   Benzos?

16 A   Yes.

17 Q   Xanax?

18 A   Yes.

19 Q   Can you take a Xanax at night and be fine the next day?

20 A   It depends on which Xanax you take, whether it's

21 short-acting or long-acting.

22 Q   And would it depend upon your tolerance?

23 A   It could depend on your tolerance as well.

24 Q   So in theory I could take one at oxycodone a day, or then

25 two a day because I've built up a tolerance?

1  A    Correct.

2  Q    And when I take my first oxycodone it's much more

3  powerful than my second oxycodone; isn't that correct?

4  A    So you're talking about tolerance; is that correct?

5  Q    Tolerance.

6  A    Yes.

7  Q    Tolerance.

8          So that to achieve the same effect, the feeling of

9  euphoria or normalcy; is that correct?

10 A    You would need a --

11 Q    You could appear normal --

12 A    -- you would need a higher dose.

13 Q    -- even though -- even though you could be taking ten

14 oxycodones a day; is that correct?

15 A    In order to get the --

16 Q    Could you take --

17 A    -- euphoria --

18 Q    -- could you take ten --

19 A    -- effect --

20 Q    -- could you take --

21 A    -- in order to get the euphoria --

22          THE COURT:  Hold on.

23          MR. SCUDERI:  I'm sorry.

24          MS. TAYLOR:  Objection.

25          MR. SCUDERI:  I'm sorry.

1          MS. TAYLOR:  If he could just let --

2          MR. SCUDERI:  I didn't know he was talking.

3          MS. TAYLOR:  Okay.

4          THE WITNESS:  Okay.  In order to get the euphoric

5   effect, with tolerance you would need a higher dose, that's

6   correct.

7   BY MR. SCUDERI:

8   Q   Okay.  And that could escalate, correct?

9   A   It certainly can.

10  Q   And that's true for somebody who is quote, "taking it for

11  non-medical reasons and for medical reasons"; isn't that

12  correct?

13  A   That's correct.

14  Q   So, for example, if someone has cancer, and has a lot of

15  pain, that person would need to take more and more and more?

16  A   That's correct.

17  Q   And, for example, if a cancer patient took five

18  oxycodones, let's say 30 milligrams, they could appear

19  normal, where if I took one, I could appear -- I might fall

20  asleep; is that correct?

21  A   I'm not sure that they would appear normal.  They may not

22  have as much pain.

23  Q   They may not have as much pain, but would they appear

24  unbalanced?

25  A   It's hard to say.

1    Q   Okay.  So you can't -- you can't say that's so.

2          In theory you could not necessarily ID someone who

3    is abusing opiates?

4    A   Yes, you can.

5    Q   You can.  You can always do that?

6    A   You can -- well, in -- in medical -- in a medical

7    diagnosis, the first thing you look at is their eyes, and you

8    ask questions about their GI tract.  The first two things.

9    Q   Okay.  Well, assume you couldn't ask questions.

10         Could you look at me today and say I'm doing opiates

11   or not doing --

12   A   No.

13   Q   No?  Probably not, correct?

14         And if I were taking -- if I built up a tolerance

15   for opiates, could you tell just from talking to me?

16   A   That's a difficult question to answer.

17   Q   Okay.  Now, withdrawal from alcohol, is that also

18   serious?

19   A   That can be deadly.

20   Q   That's deadly.  It's actually more deadly than opiate --

21   A   That's correct.

22   Q   -- withdraw; isn't that correct?

23   A   That's correct.

24   Q   Now, I saw one of your publications here.  You wrote an

25   article called, "A Non-Medical Use of Prescription Opioids

1   and Stimulants Among Student Pharmacists," correct?

2   A   Correct.

3   Q   And student pharmacists are individuals who want to be

4   pharmacists, correct?

5   A   That's correct.

6   Q   And as a pharmacist, you've got a very potentially

7   dangerous job; isn't that correct?

8   A   That's correct.

9   Q   Because if you prescribe, or if you deliver the improper

10  or the wrong dosage of a drug to a patient, you can kill

11  them; isn't --

12  A   Yes --

13  Q   -- that correct?

14  A   -- that is correct.

15  Q   For as simple who has the hiccups; isn't that correct?

16  A   Okay.

17  Q   So you are basically holding somebody's life in your

18  hands?

19  A   Correct.

20  Q   Now, yet you wrote a paper about the non-medical use

21  among student pharmacists.

22  A   Right.

23  Q   So I assume that begs the question that there were

24  students of pharmacy who were doing drugs?

25  A   We were surveying to see if there were.  That was --

1  Q   Okay.

2  A   -- a survey that was done.

3  Q   And the answer to your survey was yes?

4  A   Yes.

5  Q   Okay.  And were there also practicing pharmacists who

6  were using drugs for non-medical purposes?

7  A   Not in that survey, but, correct, there are.

8  Q   Another thing.

9       In your interventions, did you only intervene with

10 students or did you intervene with pharmacists?

11 A   I intervened with pharmacists as well.

12 Q   Okay.  And you know those people handled dangerous drugs

13 --

14 A   Correct.

15 Q   -- correct?

16      And did those people receive treatment?

17 A   Correct.

18 Q   Did you go to the authorities and say, Hey, these people

19 are using drugs, they might kill somebody?

20 A   Yes.

21 Q   You did that?

22 A   Yes.

23 Q   And did they lose their licenses?

24 A   No, because we have the Impaired Pharmacists Program in

25 Pennsylvania, that the State Board allows those people to go

1   into treatment, into after-care programs, contractual

2   agreement, and then at a time be able to go back and maintain

3   their license.

4   Q   Is that a recognition by you and by others that people

5   with this disease can be cured?

6   A   This disease is not curable.  It is treatable.

7   Q   It is treatable.

8              Is it controllable?

9   A   It's controllable.

10  Q   To the point where you would feel comfortable saying that

11  this person who has received treatment for, whether it's

12  opioids or alcoholism, is competent to be a licensed

13  pharmacist?

14  A   Correct.

15  Q   And handle dangerous drugs?

16  A   Correct.

17  Q   And to treat people?

18  A   Correct.

19  Q   And you feel the same way about people who -- the general

20  public who abuses opioids or alcohol --

21  A   Correct.

22  Q   -- isn't that correct?

23             That your goal really is rehabilitation --

24  A   Correct.

25  Q   -- to help the individual and it can be done -- they can

1  become productive; isn't that correct?

2  A    Correct.

3          MR. SCUDERI:  Thank you very much.

4          Thank you, your Honor.

5                   CROSS-EXAMINATION

6  BY MS. SCOTT:

7  Q    Good afternoon, Dr. Downs.

8  A    Good afternoon.

9  Q    Sir, you indicated upon questioning on direct

10 examination, that you don't believe workers who are taking

11 opiates could function normally --

12 A    That's correct.

13 Q    -- is that right?

14 A    That's correct.

15 Q    You've heard the term "functional addict," right?

16 A    Yes, I have.

17 Q    And it's fair to say that that term is usually used to

18 describe individuals who are able -- who are taking various

19 types of drugs, including opiates, but able to function

20 normally both with their family and in the work place --

21 A    Okay.

22 Q    -- is that right?

23 A    That's correct.

24 Q    So you would agree that there are times, or at a period

25 of time where a person who is taking opiates could, in fact,

1   work in their work place, right?

2   A   I would agree if they're in -- if they have a control

3   over the opiates.  So normally what happens in -- in the case

4   of methadone or give norpine, is that there's somebody who

5   basically is monitoring and controlling the -- the dosing of

6   those drugs.

7   Q   Okay.  Well, there are some opiates, including the

8   Percocet, oxycodone, and fentanyl that are prescribed by

9   physicians --

10  A   Mm-hmm.

11  Q   -- and distributed by pharmacists --

12  A   Correct.

13  Q   -- is that right?

14  A   That's correct.

15  Q   And individuals who are taking those opiates are not

16  precluded from working, right?

17  A   Not necessarily.

18  Q   So, in fact, physicians will often say, Well, you have to

19  take some time off from work, but then you can return after a

20  certain amount of days; is that right?

21  A   Frequently as long as -- and I can't say for sure that

22  whether the dose was decreased as -- when they went back to

23  work, you know, after the pain was gone.

24          Is that what you're implying?

25  Q   Well, no.

1    A    Oh, okay.

2    Q    My question is this:  There are times when an individual

3    can still be in pain, still take opiates, and go back to

4    work; is that right?

5    A    That's right.

6    Q    And they're under a physician's care?

7    A    They're under a physician's care and they may need to

8    modify what they do.

9    Q    Okay.  Then an individual who is not under that

10   physician's care is still on the same dosage would -- is not

11   any different than -- than the person who is still under the

12   physician's care; is that right?

13   A    I -- I have difficulty with that -- that premonition,

14   because I don't think that a person who basically is

15   obtaining the drug legally, first of all, knows what they're

16   getting, and whether they're getting the same dose, or

17   whether they have to change drugs because of access.

18   Q    Well, in this case, it's fair to say that you don't have

19   any idea how long any of the individuals sitting here, the

20   defendants, were using the drug --

21   A    No, I don't.

22   Q    -- is that fair to say?

23   A    That's correct.

24   Q    You don't know whether it was a week, two weeks, or two

25   years?

1    A    That's correct.

2    Q    And, so, you cannot say with certainty that these

3    individuals could not perform their -- their work duties?

4    A    That's correct.

5    Q    You spoke about Mr. Sullivan's testimony about a

6    week-and-a-half ago.  Mr. Sullivan who testified that he felt

7    like Superman.

8    A    Yes.

9    Q    Do you recall that Mr. Sullivan testified that he at

10   times was doing the work of two individuals --

11   A    Yes, I do.

12   Q    -- is that right?

13        And do you also recall Mr. Sullivan's testimony that

14   he was performing those duties with no problems?

15   A    In his -- his -- that was his statement, that's correct.

16   Q    Well, it's fair to say that you're not aware of any of

17   the problems that he may have had, and you're not aware that

18   those duties were not, in fact, performed well?

19   A    I -- I don't have a comment on that.

20   Q    Because you just don't know?

21   A    Well, I can give you my supposition.

22        THE COURT:  No, you can't guess.

23   BY MS. SCOTT:

24   Q    Well, I wouldn't want you to give your supposition.

25        THE COURT:  She just wants you to testify if you

1  know.

2              THE WITNESS:  I do not know.

3  BY MS. SCOTT:

4  Q    Okay.  So you can't rebut that?

5  A    That's correct.

6              MS. SCOTT:  I have no further questions.

7              THE COURT:  I have a question for you.  Thanks, Ms.

8  Scott.

9              If I were to take fentanyl or oxycodone, what type

10  of employment-related restrictions would a doctor or

11  pharmacist recommend?

12             THE WITNESS:  They would probably not have you do

13  anything that included heavy equipment or driving.  It's

14  almost no different than any kind of depressant to your

15  central nervous system.

16             THE COURT:  And why is that?

17             THE WITNESS:  Because basically it changes your

18  perception.

19             THE COURT:  How so?

20             THE WITNESS:  Just like alcohol would do.  So that

21  people who drink alcohol and get tolerant to it, they can

22  drink a substantial amount of alcohol, but still feel like

23  they're normal.  But if you get them in a car, they get in

24  accidents.  So there's a higher incidence of alcohol or

25  marijuana-related accidents, because of the drugs.

1    THE COURT:  I guess this is a bit of a hypothetical,

2    but in the case of people at Boeing, assuming there's no

3    history of work-related accidents, or poor performance --

4    THE WITNESS:  Mm-hmm.

5    THE COURT:  -- how do you explain the use of the

6    drug --

7    THE WITNESS:  I --

8    THE COURT:  -- on the job?

9    THE WITNESS:  -- I pondered that.

10    THE COURT:  Okay.

11    THE WITNESS:  And I kept --

12    THE COURT:  Because I have been, too.

13    THE WITNESS:  I think back to my students.  Most of

14    the students that I intervene on are very bright students,

15    okay.  They're very -- they're very intelligent people, and

16    they can do very well for periods of time, until something

17    happens.  So when we start to see grades drop, and that could

18    be -- and they could have been basically using drugs for

19    several years before that occurs.  Usually you see something

20    happens, whether they quit going to class, they get in fights

21    with their classmates or their girlfriends, they have social

22    problems, that sort of thing affects them.  Something usually

23    causes that to occur.  And some of them go through, we never

24    see it until they go out and start practicing, and they get

25    arrested for stealing drugs.

1          THE COURT:  Now, in this case, I mean there has been

2    testimony that Boeing had -- and Agent Carr described it as

3    an epidemic.

4          THE WITNESS:  Yes.

5          THE COURT:  How would you explain the lack of

6    performance-related issues if there's an epidemic of

7    prescription drug use?

8          THE WITNESS:  You're asking a tough question.

9          THE COURT:  That's why you're the expert.

10          THE WITNESS:  That's why I'm here, right?

11          I would -- I would think that -- and I don't know

12    the circumstances of how the drugs were being done there.

13    I'm assuming what happened, these folks started to get pretty

14    tolerant to their drugs, and so they were able to, quotation

15    mark, "function," okay.

16          I don't know whether there were times when they were

17    euphoric, like the individual that could do the Superman job.

18    I would assume at that time he was high and could do that.

19          But at the other times he had to be sent home,

20    because he couldn't function.  He was in withdraw.  And so

21    that you get those -- there are times that I would assume

22    some of these folks also probably did this sporadically, so

23    that you could do, you know, weekends of abusing, and then

24    function during the week, and then go back to the weekend.

25    It's just like alcoholics do sometimes.

1        It depends on the pattern that you see, and that's a

2   very difficult question.

3        What's impressive is that they said one in four

4   people were using at the plant.  That's substantial.  25

5   percent is higher than the national average.

6        THE COURT:  Okay.

7        MR. SCUDERI:  Your Honor, can I follow-up with what

8   you said?

9        THE COURT:  Sure.

10                  CROSS-EXAMINATION

11  BY MR. SCUDERI:

12  Q   Doctor, what I was -- I mentioned earlier in my cross, I

13  mean there is recreational use of an alcohol, opiates,

14  marijuana --

15  A   Mm-hmm.

16  Q   -- benzos, other -- other Schedule IV drugs; isn't that

17  correct, and these people can function very well in society?

18  A   Well...

19  Q   Well, I know it depends on the definition of the word

20  "function."

21  A   I know.  It's a -- alcohol is a more common one that we

22  see, okay.  If you look at functional alcoholics, and you

23  probably all have them somewhere in your days, they can

24  function pretty normally, okay.  They usually have family

25  problems, they have other things that go on that they can

1   hide from you until they basically crash and something

2   happens to them, or they get a DUI.  There's -- there's

3   usually something that occurs that precipitates that, but you

4   usually can't see it.

5   Q   But can you drink alcohol, or take drugs, and not be

6   addicted?

7   A   Sure.

8   Q   Okay.  So if I --

9   A   I mean we all do --

10  Q   -- have -- there's a week, a week --

11          MS. TAYLOR:  Objection, your Honor.  If he can just

12  let the doctor finish his whole answer and then go to the

13  next question.

14          MR. SCUDERI:  Okay.

15          THE COURT:  I think it was inadvertent.

16          THE WITNESS:  I'm sorry.  I interrupted you, I think

17  on that one.

18  BY MS. SCOTT:

19  Q   That's okay.

20  A   Any of us who drink can have a -- a social drink, and go

21  home, and be fine, okay.  I think you're much more cautious

22  now about having three drinks, and get in your car and drove

23  home after work, because you're more concerned about having a

24  buzz that causes you to get a DUI, okay.  You probably deal

25  with that all the time, so that we're much more cautious.

1        The addicted individual can't do that, because they

2   have that craving, and basically they -- they -- they have

3   the compulsion to do that.  It makes them very different than

4   you and me.

5   Q   And the person who has the addiction, who has the

6   craving, if he stops, he's going to have a horrible

7   withdrawal; is that correct?

8   A   If he's -- if he's -- if he's got substantial drug on

9   board, that's correct.

10  Q   Okay.  But you can use these drugs, including alcohol,

11  and not be addicted, and not have that withdraw; isn't that

12  correct?

13  A   Yes.

14  Q   So, in theory, somebody could be using opioids on a

15  weekend, or just at night, and perform well enough at their

16  job the next day to not make a mistake; isn't that correct?

17  A   It may not be the next day, but --

18  Q   It could be any time.  But I'm just saying theoretically

19  we're talking about -- you don't know these people, you don't

20  know how much they -- they may or may not have done as far as

21  drugs are concerned --

22  A   It's -- you're -- you're --

23  Q   -- but theoretically someone like alcohol can have a

24  drink at night, they can take a drug at night, and get up the

25  next day and go to work without experiencing the withdraw

1  from not taking drugs the next day --

2  A    The non --

3  Q    -- isn't that correct?

4  A    -- the non-tolerant person can do that, that's correct.

5  Q    I understand.  Okay.

6             MR. SCUDERI:  That's all I have.

7             THE COURT:  All right.  I think we're at Mr. Dreyer?

8             MR. DREYER:  No questions, your Honor.

9             THE COURT:  Mr. Laigaie?

10            MR. LAIGAIE:  Just a couple, your Honor.

11                        CROSS-EXAMINATION

12  BY MR. LAIGAIE:

13  Q    Dr. Downs, you would agree that opiates are used by many

14  people to control painful conditions, correct?

15  A    Correct.

16  Q    And you would agree that everybody who uses an opioid

17  does not necessarily move down the X axis on Downs No. 4

18  where they're -- they're taking larger and larger doses, and

19  -- and not getting the same pain relief, correct?

20  A    Almost anybody who uses opiates for a period of time --

21  and I can't tell you what that time is -- will start to

22  develop a tolerance.

23  Q    Okay.  I believe that to be the case --

24  A    Okay.

25  Q    -- sure, but they don't ineluctably move down, all the

1  way down the X axis where your very bold arrows are only

2  bringing them back to baseline, correct?

3  A    That's correct.

4  Q    Some do.  Some don't.

5  A    Some don't.

6  Q    And, in fact, opioids are used for the control of chronic

7  pain in many cases, correct?

8  A    Correct.

9  Q    And chronic pain, if -- if I'm not mistaken, is pain

10  that's just not going to go away, correct?

11  A    Okay.  I agree.

12  Q    Okay.  Now, if someone moves along the X axis on Downs

13  No. 4, and is taking more and more of the drug and getting

14  less and less of a positive effect, do I understand your

15  testimony that at some point that person is going to manifest

16  their drug abuse in some fashion?  For instance, with

17  slurring of words, or nodding out, falling asleep, that type

18  of thing?

19  A    I didn't say it was drug abuse.  I think what you were

20  describing was somebody dosing for chronic pain.

21  Q    Okay.

22  A    They would basically become tolerant, perhaps, to that

23  nodding out.  But by the same token, they would become more

24  tolerant, so -- so they would need larger doses.

25           Is that the question I think you're asking?

1  Q   Okay.  Well, let me try it a different way.  Maybe I can

2  get to this point.

3          You mentioned that some of your best students over

4  the years, some bright students ended up being drug abusers

5  --

6  A   Correct.

7  Q   -- correct?

8  A   Correct.

9  Q   And you mentioned that invariably the students ultimately

10 did something that keyed you in, that clued you in, that,

11 Wait, this student might have a drug problem.

12 A   Correct.

13 Q   But, again, it's possible for somebody to use these --

14 this class of drugs for chronic pain and never get to the

15 point where it's negatively affecting their behavior in a way

16 that would clue somebody in to, Hey, maybe this person's

17 abusing this drug?

18 A   Well, that's -- that's a tough question.

19 Q   I'm sorry.

20 A   I think if -- if you're using it for pain --

21 Q   Mm-hmm.

22 A   -- okay, a person who becomes dependent, they still

23 become dependent upon the drug, you still get the withdraw --

24 Q   Right.

25 A   -- okay.  So those folks are still going to have an

1    effect, and if they're trying to work during that period of

2    time of withdraw, that's going to be difficult for them.

3          I'm not sure that's the question you're asking --

4    Q    Well, I --

5    A    -- though.

6    Q    -- I guess I'm not being very articulate, and I

7    apologize, but -- and with all due deference to your

8    background, you're not a medical doctor.

9    A    No, I'm not.

10   Q    And you don't treat chronic pain patients.

11   A    No, I don't.

12   Q    And, so, you don't have any personal experience in how

13   these drugs may be used over a long term to treat chronic

14   pain.

15   A    Okay.  I -- I have certainly worked with physicians who

16   have done that, but, no, I have no -- I do not prescribe.

17   Q    Okay.  50 nanograms per milliliter, is that a dosage of

18   oxycodone that would be within the therapeutic range?

19   A    Are you talking about blood levels?

20   Q    Yes.

21   A    I have no idea.

22   Q    Okay.

23   A    I'm sorry.

24   Q    Fair enough.  Neither do I.

25          MR. LAIGAIE:  With that, that's it, your Honor.

1       MR. O'MEARA:  Thank you, your Honor.  No questions.

2       THE COURT:  All right.  Anything further, Ms.

3  Taylor?

4       MS. TAYLOR:  One question.

5       THE COURT:  All right.  Sure.

6                   REDIRECT EXAMINATION

7  BY MS. TAYLOR:

8  Q   Dr. Downs, and I don't remember which counsel asked the

9  question, but I want to talk about using drugs during the

10 work day, and withdraw symptoms and performance.

11      If I am addicted to opiates, and I am using it for

12 whatever reason, pain or whatever, at some point I build up

13 tolerance; is that correct?

14 A   Correct.

15 Q   Now, let's suppose I'm going to work.  You indicated you

16 heard the testimony where the witnesses said they had to take

17 it in the morning, so they could get to work.  And then at

18 some point during the day, they had to take it to continue to

19 work.  And I believe Mr. Haux testified he had to take it in

20 the evening, so he could get through the night, so he could

21 start this cycle back over again.

22 A   Right.

23 Q   What happens if they can't get that drug?

24 A   What usually is they will try to find a substitute drug,

25 so the benzodiazapines, the Valiums, are -- are one agents

1    that they'll use in order to try to tied them over until they

2    can get the drug again, or they'll withdraw.

3    Q   And if they suffer the withdraw, because they cannot

4    obtain that drug, would they experiences -- they experience

5    those symptoms if I'm at work, at work?

6    A   Absolutely.

7    Q   And can those symptoms then affect my ability to perform?

8    A   Yes.

9    Q   Now, take the reverse.

10         What happens -- do they -- is the chance of withdraw

11   lesser if there is, as Mr. Haux and Mr. Sullivan testified,

12   ready availability of oxycodone, Percocets, and Fentanyls?

13   A   Correct.

14   Q   And is that because they can get the drug to continue to

15   function until they're next dose?

16   A   Correct.

17         MS. TAYLOR:  I have nothing further.

18         THE COURT:  All right.  Doctor, thank you, and

19   especially thank you for coming down on your own time.

20         THE WITNESS:  My pleasure.

21         THE COURT:  We appreciate the service you've

22   provided to all the parties in the case.  It was very

23   impressive.

24         (Witness excused.)

25         MS. TAYLOR:  Your Honor, the Government has one last

1   witness.

2           THE COURT:  All right.  How long will that be?

3           MS. TAYLOR:  On direct, 15 minutes.

4           THE COURT:  All right.  Well, why don't we take a

5   brief recess.

6           MS. TAYLOR:  Very well.

7           THE COURT:  We'll recess until 4:30.

8           MS. TAYLOR:  Very well, your Honor.

9           THE COURT:  All right.  Thank you.

10          (A recess was taken from 4:16 o'clock p.m. until

11  4:26 o'clock p.m.)

12          BERNARD JONES, after having been first duly sworn as

13  a witness, was examined and testified as follows:

14          MS. TAYLOR:  May I proceed, your Honor?

15          THE COURT:  Of course.

16                      DIRECT EXAMINATION

17  BY MS. TAYLOR:

18  Q   Good afternoon, Mr. Jones.

19  A   Good afternoon.

20  Q   Can you tell the Court your employer?

21  A   Boeing.

22  Q   And how long have you been employed by Boeing?

23  A   27 years.

24  Q   What is your current title?

25  A   BMA, which is Boeing Military Aircraft Director of

1    Operations.

2    Q    Director of Operations?

3    A    Correct.

4    Q    Do me a favor, Mr. Jones, can you pull the mic closer,

5    and speak directly into it --

6    A    Okay.

7    Q    -- so that everyone can hear you.

8              As the Boeing Military Aircraft Director of

9    Operations, what are your duties and responsibilities?

10   A    So we oversee the execution of the -- the build of all of

11   our military aircraft, platforms across five different sites.

12   I specifically have cognizant authority over three of those,

13   which is Philadelphia, Macon, Georgia, and Mesa, Arizona.

14   Q    Now, previously were you site leaders for those three

15   locations?

16   A    I was.

17   Q    And as a site leader for those locations, what were your

18   responsibilities?

19   A    Overall site responsibility, which is overseeing the

20   overall site, and all the operations at -- at the site.

21   Q    So in your current position, you perform that and

22   additional duties at three separate Boeing facilities; is

23   that correct?

24   A    Correct.

25   Q    Are you physically located in Philadelphia?

1    A    I am.

2    Q    Do you continue to oversee the production activities in

3    the Philadelphia facility?

4    A    Not -- not directly, but indirectly, yes.

5    Q    That person reports to you?

6    A    Correct.

7    Q    Okay.  Have you been in Philadelphia since 2008?

8    A    Correct.

9    Q    And when you first came to Philadelphia, were you the

10   actual site leader at that location?

11   A    Site leader and director of operations, correct.

12   Q    And was that from approximately 2008 to 2010?

13   A    Correct.

14   Q    And after 2010, you took on these additional

15   responsibilities?

16   A    That's correct.

17   Q    But you were still physically working out of the

18   Philadelphia area; is that correct?

19   A    Correct.

20   Q    Now, are there types of occurrences at -- let's use

21   Philadelphia -- but at any one of the facilities you oversee,

22   in your experience, that could cause a negative impact in

23   productivity?

24   A    Absolutely, there's a number of them.

25            Overall employee morale, absenteeism, which is

1  tardies, leave earlies, being away from their job, accidents

2  in the work area, and then overall non-compliance to work

3  procedures and rules.

4  Q   What about employees' inabilities to perform their duties

5  due to injury, illness, or other reasons?

6  A   Absolutely, it's an impact.

7  Q   Now, at my request, have you prepared a chart dealing

8  specifically with the attendance issue?

9  A   I have.

10 Q   And, in that chart, did I request that you compare the

11 attendance of the individuals charged in this investigation

12 with the attendance of the general UAW membership?

13 A   Correct.

14 Q   And the UAW is United Auto Workers?

15 A   Correct.

16 Q   And is that the union that -- that is in effect at the

17 Boeing facility in Philadelphia?

18 A   UAW 1069.

19 Q   UAW 1069?

20 A   Correct.

21 Q   Now, in doing this, were there some individuals, I

22 believe two, charged in this investigation that were not

23 members of the UAW?

24 A   Correct.

25 Q   And they were not included in the chart that you're about

1   to present to the Court; is that correct?

2   A    That's correct.

3           MS. TAYLOR:  Your Honor, may I have one moment?

4           (Discussion held off the record.)

5           MS. TAYLOR:  Any objection to 1, 2 and 3?

6           COUNSEL:  I have no objection.

7           MS. TAYLOR:  Your Honor, the Government would ask

8   that we bring up on the screen Exhibit Jones, I think, 1.

9           (Pause.)

10  BY MS. TAYLOR:

11  Q    And, Mr. Jones, you prepared a series of exhibits for the

12  Government; is that correct?

13  A    Correct.

14  Q    Is what's been marked as Jones 1, one of the pages of

15  that exhibit?

16  A    It is.

17  Q    Can you -- and I think you can do it from your seat --

18  A    Okay.

19  Q    -- can you explain to the Court what Government's Exhibit

20  Jones 1 first compares and what it demonstrates?

21  A    Okay.  So this was data from January 1st, 2009, through

22  September 29th, 2011, and if you look at the -- the first pie

23  chart, it shows the overall absences for the touch labor work

24  force, or UAW 1069 work force, minus the 33 defendants, and

25  that the average absence occurrence during that period of

1    time frame was 17 percent.

2    Q    And what period of time did you cover?

3    A    January 1, '09, through September 29, '11.

4    Q    Okay.

5    A    Okay.  If you look at the second pie chart having to do

6    with the 33 charged employees, it shows that their absence

7    rate was 26 percent, so a significant difference.

8            If you look at the -- the bottom bar graph you can

9    see how the attendance rate again, the -- the blue bars are

10   the overall population minus the 33 defendants, and the red

11   bar is those defendants.  You can see how it really started

12   escalating from 2009 through 2011, whereas the general

13   overall population remained relatively flat, around 17

14   percent.  There was somewhat of a spike in -- in '10, but

15   going back and looking at the fluctuation from 16 to -- to

16   18, you know, in '10, we had a significant number of

17   inclement weather days with ice and snow in '010, and that's

18   reflected.

19   Q    Now, in your two -- I guess they're the pies -- that's an

20   average of all three years; is that correct?

21   A    Which one?  I'm sorry.  Yes.

22   Q    It's the pie chart that shows the workers --

23   A    Correct.

24   Q    -- at 17 percent, charged employees at 26 percent.

25   A    That's correct.

1  Q   And then you break it down by year on your numbers

2  showing how you reach your average?

3  A   Correct.

4  Q   And in arriving at this chart, did you examine the same

5  categories for the work force that you examined for the

6  charged defendants?

7  A   All the -- all the data is an apples-to-apples

8  comparison.

9  Q   And does that mean that you also included for -- for the

10 work force, and the charged defendants, any time that they

11 took for vacation?

12 A   That's correct.

13 Q   And any time that they took for sick leave?

14 A   Correct.

15 Q   So that this chart represents their time away from the

16 company?

17 A   Correct.

18 Q   And that would be the entire work force and all of the

19 defendants?

20 A   Both groups.

21         MS. TAYLOR:  If we can turn to Page 2, please?

22         (Pause.)

23 BY MS. TAYLOR:

24 Q   And do you have Page 2 in front of you, sir?

25 A   I do.

1  Q   Now, this Page 2 is entitled, "Work Force Absence

2  Trends"; is that correct?

3  A   That's correct.

4  Q   And what do you see to indicate in this chart?

5  A   So the trend really starts to worsen with -- with the

6  more involvement, so the -- the three bars are -- again, the

7  first bar is representative of the overall UAW work force.

8  That's 17 percent.  The Government did supply a list of

9  others that are the POI group.

10 Q   And POI, is that persons of interest?

11 A   Persons of interest group.

12 Q   And are those individuals who are currently under

13 investigation by the Government?

14 A   I do not know that.

15 Q   Did the Government supply those names to you as

16 individuals that we had an investigative interest in?

17 A   Yes.

18 Q   And then the other group is the actual charged

19 defendants; is that correct?

20 A   Correct.

21 Q   Now --

22 A   So the 26 percent matches the pie chart on the first

23 slide, but you can see the POI group really steps up from the

24 average population, and, again to the 26 percent.

25 Q   And that's why you indicate trend worsens with more

1   involvement?

2   A    Correct.

3   Q    Now, does the -- just so we're clear -- when you averaged

4   out the UAW workers, you did not include the POIs, or the

5   defendants, or did you?

6   A    Could you ask that one more time?

7   Q    Sure.  In your analysis, did you take the POIs, as well

8   as the charged defendants, out of the equation before you

9   averaged in the numbers that you represent as UAW?

10  A    On -- on the first chart they -- they are in there.

11  Q    They are in there?

12  A    They are in there.

13  Q    So you understand --

14  A    In -- in the overall --

15  Q    -- what I'm saying?

16  A    -- in the overall UAW population.

17  Q    So when you use -- let's go back to the first chart.

18          So in your first chart -- let's use 2009 -- the blue

19  are the charged defendants, correct?

20  A    The red.

21  Q    Oh, I'm sorry.  The red is the charged defendants.

22  A    Correct.

23  Q    The blue are all UAW defend -- workers including the

24  charged defendants?

25  A    That's correct.

1    Q    So their numbers are included in the overall UAW number?

2    A    That's correct.

3    Q    So when we turn to Page 2, to the persons of interest to

4    the Government, are also included in the overall number for

5    the UAW?

6    A    That's correct.  If I were to subtract that out, the UAW,

7    the overall represented would be lower.

8    Q    Would be lower?

9    A    Correct.

10             MS. TAYLOR:  If we could turn to Page 3?

11             (Pause.)

12   BY MS. TAYLOR:

13   Q    Now, Page 3 is entitled "Work Force Absence Data for

14   Defendants," again, January 2009, through September 28, 2011;

15   is that correct?

16   A    Correct.

17   Q    And there are four individuals who are highlighted on

18   that chart; is that correct?

19   A    Correct.

20   Q    And are those the individuals -- well, I'll just ask you

21   who they are.

22             Are they Andrew Stanley Duris, Jr.?

23   A    Correct.

24   Q    Michael Thomas Patterson?

25   A    Correct.

1  Q   Victor Quinto Phillip?

2  A   Correct.

3  Q   And James Swan?

4  A   Correct.

5  Q   And on this chart you show the categories you use in

6  order to achieve the percentages that are shown in the

7  earlier charts; is that correct?

8  A   Correct.

9  Q   One of the categories is "Percent of Days Late," or

10 "ABS"; is that absent?

11 A   Correct.

12         MS. TAYLOR:  And if you could just focus on that,

13 please?

14         SPEAKER:  (Inaudible).

15         MS. TAYLOR:  Yes.  A little bigger.  That didn't

16 help me.  It may be as good as it's going to get, I don't

17 know.

18         SPEAKER:  Yes.

19 BY MS. TAYLOR:

20 Q   Can you see those numbers clearly on your --

21 A   I can on -- on my paper copy.

22 Q   Okay.  What's Mr. Duris's percentage of days late or

23 absent?

24 A   24.4 percent.

25 Q   What was Mr. Patterson's?

1    A    21 percent.

2    Q    Mr. Phillip?

3    A    38.7.

4    Q    And Mr. Swan?

5    A    31.2.

6    Q    Do you know or are you familiar with something called a

7    corrective action?

8    A    I am.

9    Q    And tell the Court what a corrective action is.

10   A    A corrective action is formal documentation that any

11   employee may receive documenting non-compliance with company

12   rules or company procedures.

13   Q    And I want to show you what we're marking as Swan 1 and

14   2, which is (inaudible).

15            (Pause.)

16            I want to show you what's been marked as Government

17   Exhibit Swan 1, and Government Exhibit Swan 2.

18            (Pause.)

19            Are those examples of a corrective action memos?

20   A    They -- they are.

21   Q    And are those corrective action memos against James Swan?

22   A    They are.

23   Q    Can you tell the Court the date of the memo and the

24   corrective action?

25   A    The date of action on Exhibit 1 is 10/25/10, and this is

1   failure -- it's a violation of company rule failure to

2   comply.

3   Q   And what specifically -- why specifically is he given a

4   corrective action?

5   A   A corrective indicates that he failed to buy off

6   operations on a specific job that he was doing, a specific

7   part number.  By failing to buy off the job, he prevented

8   quality from buying off the job, which caused a delay in the

9   process.

10  Q   And what does that mean in layman's terms?

11  A   In layman's terms it means every time a -- a job is

12  completed, the person that completes that job stamps it off

13  with their stamp, signifying that they performed that -- that

14  job, and that -- but quality cannot come in and inspect the

15  job until that -- that's completed.

16  Q   And, so, what delay did Mr. Swan's actions cause?

17  A   I don't know the specific delay, but it -- it's evident

18  here from the corrective action that it caused delays in --

19  in the process.  It could have been --

20  Q   I don't want you to speculate.

21  A   Okay.

22  Q   I'm not asking you to speculate.

23        Whatever he did not do to cause the delays he

24  received a corrective action?

25  A   Correct.

1  Q    What is the second one?  Was that Swan 1, sir?

2  A    That was Swan 1.

3  Q    What is Swan 2?

4  A    Swan 2 is dated 2/14/11, and this one is for demonstrated

5  unsatisfactory attendance by failing to comply with the site

6  practices.  He received a written warning for attendance.

7  Previously, on 7/26/10, since that time, it indicates he had

8  the following absences; partial days on 9/2/10, 9/21/10,

9  11/5/10, 11/19/10, and 2/7/11, and full day absences of

10 11/8/10, 2/6/11, and 2/8/11, which is a violation of pro

11 5097, attendance standards.

12 Q    Have you had an opportunity, at my request, to compare

13 the corrective actions issued against the 33 UAW member

14 defendants in this case versus the overall UAW population?

15 A    I have.

16          (Discussion held off the record.)

17          MS. TAYLOR:  I'm sorry, your Honor.  May I have a

18 moment?

19          THE COURT:  Yes, sure.

20          (Discussion held off the record.)

21          MS. TAYLOR:  If we could turn -- oh, you're already

22 there.  Impressive.

23 BY MS. TAYLOR:

24 Q    What have we placed on the monitor, sir?

25 A    So this is the number of corrective actions, again, for

1   the total UAW work force minus the defendants, and the second

2   bar there is just for the defendants.  So, in summary, 17 of

3   the 33 defendants were issued one or more corrective actions

4   in that same time period of 1 January '10, through 9/20/11,

5   which is 52 percent of the population.

6        We also looked at the data all up across the -- the

7   UAW work group and the comparison is 15 percent at the all

8   up, so a significant increase there.  So 47 corrective

9   actions against the 33 defendants, so on average 1.4

10  corrective actions per employee.

11  Q   And, so, some of the total of 33, 17 got corrective

12  actions?

13  A   Correct.

14  Q   And just so we're clear, as to the four defendants in

15  this courtroom, only Mr. Swan had a corrective action?

16  A   I would have to go back and look at the data.

17  Q   Well, that's the only one that I've -- I've demonstrated

18  --

19  A   Okay.

20  Q   -- to you; is that correct?

21  A   Yes.

22  Q   Now, could an employee have more than one corrective

23  action?

24  A   Absolutely.

25  Q   And that accounts for the fact that you have 47 over 17

1   employees; is that correct?

2   A    Correct.

3   Q    And I want you to turn to the next page.

4            THE COURT:  What exhibit was that?  The one we just

5   --

6            MS. TAYLOR:  That's Jones 1 -- I'm sorry.

7            THE COURT:  No.

8            MS. TAYLOR:  I thought I was answering your

9   question.

10           THE COURT:  4?

11           MS. LUNKENHEIMER:  It's all been marked as 1.  Your

12  Honor, it's all been --

13           MS. TAYLOR:  It's all Jones 1 collectively.  There

14  are eight pages.

15           THE COURT:  Okay.

16           THE WITNESS:  So the next chart we looked at,

17  "Recordables", which in our definition is any entry that

18  results in medical treatment that goes beyond first aid and

19  meets the general recording criteria of time off the -- the

20  job, and this one is pretty alarming, too.  It shows for the

21  general or total UAW work force, minus the defendants, a 21

22  percent recordable occurrence rate, and 46 percent for the --

23  the defendant population, again, over that same time period

24  of January 1, '09, through September 29, 2011.

25  BY MS. TAYLOR:

1  Q   And the recordables would be as little as one incident

2  per person; is that correct?

3  A   Correct.

4  Q   Now, in this number, could it also mean that one person

5  had more than one recordable?

6  A   It could.

7  Q   So it is the number of incidents, not the number of

8  individuals?

9  A   Yes.

10 Q   Right?

11         And you compared that percentage to the total number

12 of the 33 --

13 A   That's correct.

14 Q   -- charged defendants; is that correct?

15 A   That's correct.

16 Q   Now, when you have a recordable safety occurrence, they

17 had to have been referred to medical in order to make your

18 chart; is that correct?

19 A   Correct.

20 Q   In order to be considered, there was a referral to

21 medical?

22 A   Right.

23 Q   Would the employee file indicate whether, on that

24 referral to medical, it was for a drug test?

25 A   Not -- not in the records that I see, no, but if -- if

1   somebody -- if somebody was -- if a manager had cause in a --

2   in an accident, and it met the -- the guidelines, they --

3   they would request that the -- the person be tested.  But

4   just because it was a recordable, does not mean that the

5   person was tested.

6   Q   And do you have access to any records that would show

7   whether or not that employee, on any of these occurrences,

8   whether it's UAW, or the separate defendants, that recordable

9   resulted in a referral to medical for a drug test?

10  A   I --

11  Q   Do your files show that?  Do the employee files show

12  that?

13  A   Yes.

14  Q   They do show that?

15  A   If -- if -- if a manager request that an employee be

16  tested?

17  Q   Yes.

18  A   So I -- what's in the file?  I guess I'd have to refer to

19  HR, because I -- I'm --

20  Q   Okay.

21  A   -- not --

22  Q   Okay.  So you don't know what's in the -- the employee

23  file?

24  A   Correct.

25  Q   But certainly if a manager requested that an employee be

1   tested, that is recorded somewhere?

2   A    Right.

3   Q    Okay.  As the person responsible for the production at --

4   I guess you'd call it BMA, the Boeing Military Aircraft -- do

5   you believe that drug-impaired employees negatively impact

6   the goals of that facility?

7   A    Absolutely.

8   Q    Why?

9   A    The data here shows specifically that they're much more

10  likely to be involved in an accident, which could mean --

11        MR. SCUDERI:  Your Honor, I'm going to object, as

12  lack of foundation, or it can go to the weight.

13        I don't know.  The fact that these people are

14  charged with drugs, does not mean that other people are not

15  using drugs, so I don't know if he's using a statistical

16  base, which is flawed.  I --

17        THE COURT:  Well, it goes to weight, doesn't it?

18        MR. SCUDERI:  Okay.

19  BY MS. TAYLOR:

20  Q    I'm not asking you just to rely on the -- let me reask my

21  question, because I'm not limiting my question to your chart.

22  A    Okay.

23  Q    As the person responsible for production at that

24  facility, do you believe that drug-impaired employees,

25  charged or not, negatively impact the goals of that facility?

1    A    Yes, I do.

2    Q    And tell the Court why.

3    A    Because we -- we rely on all of our -- we rely on

4    first-time quality on all of our -- our products, be it --

5    it's been mentioned several times today, design engineers, be

6    it production workers.  We rely on first-time quality in

7    every one of those jobs, and I heard it stated before that

8    drug-impaired employees are not capable of doing the same job

9    as those that -- that are not impaired.

10   Q    Do they increase, in your experience, the risk of

11   accidents?

12   A    Absolutely.

13   Q    Does that slow down productivity?

14   A    It slows down productivity a lot.

15   Q    You're familiar with the different jobs on the

16   manufacturing side that go into servicing an aircraft at

17   Boeing, servicing and manufacturing the aircrafts that Boeing

18   produces.

19   Q    Correct.

20   Q    Is there a position, in your opinion, in that

21   manufacturing process that is not critical to production?

22   A    All of our jobs are critical.  They require

23   certification, they require quality buy offs, there are some

24   jobs that are more critical than -- than others, but they are

25   all critical to the safety of our -- our war fighters and the

1   -- the platforms that we -- we build for them.

2   Q   Now, are there ramifications -- well, let me step back

3   for a second.

4           As director of operations, does Boeing have quality

5   assurance policies and procedures in effect?

6   A   Absolutely.

7   Q   And, first of all, what is the purpose of your quality

8   assurance policies and procedures?

9   A   To assure that our products meet the design

10  specifications that we deliver -- that we need to deliver to

11  the customer.

12  Q   And do your quality assurance policies and procedures,

13  are they in place in order to make sure that what is shipped

14  out is what the customer ordered?

15  A   Correct.

16  Q   How, if at all, do your quality assurance policies and

17  procedures account for error?

18  A   Well, there's a lot of redundancy in the inspection

19  process.  There's --

20  Q   Explain to the Court what that means.

21  A   So there's redundancy in it from the standpoint that most

22  of our jobs have a -- a -- the mechanic that does the job,

23  stamps it off, and a quality inspector stamps it off, and

24  then the customer actually has inspectors on site that stamp

25  off a portion of the jobs, not all of the jobs, but a portion

1    of them.  So that's the -- the redundancy in the system.  We

2    do a lot of functional tests on -- on the airplanes that are

3    also designed to test for non-conformances in the system.

4    Q    And what happens if something isn't right?

5    A    It has to be reworked.  It's very costly.  It impacts the

6    schedule on -- on the line, and ultimately could impact

7    delivery of the platforms that the war fighters need.

8    Q    And have there been occasions where you've had to do

9    rework?

10   A    All the time.

11   Q    And when you have to do rework, do you -- are you able to

12   -- that's just not the right...

13          Do you have the ability, at your plant, to trace a

14   specific issue to a specific worker generally?

15   A    We -- we do not track non-conformances down to the

16   employee level.

17   Q    You --

18   A    We do it --

19   Q    Go ahead.

20   A    -- at some sites, but at this particular site, our

21   systems are not that -- that robust --

22   Q    Okay.

23   A    -- to be able to track it down to the individual employee

24   level.

25   Q    So when you find a problem, you fix a problem?

1    A    Yeah, we try to do --

2    Q    But you can't --

3    A    -- what we call a root cause, a corrective action.  We --

4    we -- look for the root cause of it and try to drive it back

5    to the area, but not necessarily to the specific employee.

6    Q    Okay.  And then you use the redundancy to make sure that

7    the quality or the product is shipped to the customer?

8    A    Correct.

9    Q    Now --

10            THE COURT:  Why is -- excuse me.

11            MS. TAYLOR:  Okay.

12            THE COURT:  Why can you do it at other places and

13   not at Ridley?

14            THE WITNESS:  It just has to do with the different

15   electronic IT systems that -- that we have.  This particular

16   site, for example, we're introducing a new suite of systems,

17   common systems that will be in place in October of this year,

18   but we just don't have that common suite systems in place.

19   Once --

20            THE COURT:  So you will have it?

21            THE WITNESS:  We will have it, yes, sir.

22            THE COURT:  Just on this thing that's on the screen

23   here, there's four gentleman that we're focusing on

24   particularly today, Mr. Duris, Mr. Swan, Mr. Patterson, Mr.

25   Phillip, are their or do they have any instances of safety

1  record problems that are included in that 40 -- I can't read

2  it -- what is it, 40 percent?

3           THE WITNESS:  Sir, I -- I don't specifically have

4  that backup data with me.

5           THE COURT:  Do you know, Ms. Taylor?

6           MS. TAYLOR:  I do not, you Honor.  I will supply

7  that to the Court, though.

8           THE COURT:  Okay.

9           MS. TAYLOR:  The absence of presence.

10          THE WITNESS:  I have it, I just -- we had to have it

11 --

12          THE COURT:  Okay.

13          THE WITNESS:  -- build the chart by it --

14          THE COURT:  I just wanted it.  I understand.

15          THE WITNESS:  -- but I don't have it with me.

16 BY MS. TAYLOR:

17 Q   Mr. Jones, should that -- when you get back to your

18 office if you could forward that to me, I'll forward it to

19 the Court --

20 A   Will do.

21 Q   -- and counsel.

22          THE COURT:  You know, and also for any of the 13

23 that are going to be coming up --

24          THE WITNESS:  Okay.

25          THE COURT:  -- if there's --

1          MS. TAYLOR:  We'll do it for the entire --

2          THE COURT:  Yes, if there's people who --

3          MS. TAYLOR:  -- yes, we'll do it --

4          THE COURT:  -- were involved --

5          MS. TAYLOR:  -- for that entire population.

6          THE COURT:  -- in any of these, I'd like to know

7    that.

8          MS. TAYLOR:  Very well, your Honor.

9    BY MS. TAYLOR:

10   Q    What are the ramifications --

11         MS. TAYLOR:  And this is my last question, your

12   Honor.

13   BY MS. TAYLOR:

14   Q    -- what are the ramifications to Boeing, and its

15   customers, if your product is not quality?

16   A    So it impacts our reputation, it impacts the -- the

17   Boeing brand.  Right now we're going through significant

18   issues with Department of Defense budgets, and it's all about

19   delivery of -- meeting your -- your contractual commitments,

20   it's about the reputation that you have, and these type of

21   things impact the reputation that -- that we have with --

22   with our customers.

23   Q    Do they impact your ability to meet your production

24   deadlines?

25   A    If we have a lot of absenteeism, a lot of non-

1 conformances, a lot of safety, absolutely, it impacts.

2 Q   What about if you just discover more issues that you have

3 to correct --

4 A   The --

5 Q   -- does that impact production?

6 Q   Those are the non-conformances that are described,

7 absolutely.

8 Q   What about the impact to your customer?

9 A   Well, you know, a Chinook -- the products that we build,

10 it's not -- not to make light of stocking shelves at Walmart

11 -- but -- but these are platforms that take soldiers into

12 harm's way and bring them home every day.  They -- they rely

13 on these products.  You can't stop a Chinook at 10,000 feet,

14 pull it over on the side of the road, because there's a -- a

15 defect and -- and fix it. Airplanes -- when airplanes crash,

16 airplanes kill people.

17         And, no, to answer the question, can I significantly

18 tie any defect back to any of these 33 today?  No, I can't.

19 Q   What has been the military range of response when there

20 are issues with the aircrafts you deliver?

21 A   So there's been aircraft -- entire fleets that have been

22 grounded, because of safety issues.  Every time there's an

23 occurrence of a -- of a defect, the customer has a Safety

24 Board that reviews it, and determines the level of safety up

25 to and including grounding the -- the fleet.  It could be

1    that it has flight restrictions from -- from the base that

2    its operating on, until that non-conformance can -- can be

3    fixed or until we can found what aircraft the -- the problems

4    are on, and a lot of the times we, the Boeing Company, has

5    to, at our expense, send people out into the field to make

6    the -- these repair on these aircrafts.

7           MS. TAYLOR:  Your Honor, I have nothing further of

8    this witness.

9           MR. SCUDERI:  May I, your Honor?

10          THE COURT:  Yes, I have a question first, if you

11   don't mind; is that all right?

12          MR. SCUDERI:  Okay.

13          THE COURT:  I'll try not to steal yours.

14          (Laughter.)

15          This rework after there's a problem, can you

16   identify whether that increased or decreased after the

17   arrests were made here in 2011?

18          THE WITNESS:  Well, sir, that's what I was referring

19   to.  Because our non-conformance system at this site, it's --

20   it's not as robust as it is at some of the others, so we do

21   not track non-conformances down to the employee level.

22          THE COURT:  Okay.  But how about generally?  After

23   the arrests, did you notice any improvement or change in the

24   number of quality issues?

25          THE WITNESS:  I -- I can't say that I've looked at

1    that data.  I mean all and all, our trends for performance

2    and quality have been getting better throughout this year.

3              THE COURT:  Let me get back to the drug testing

4    question that I've asked a couple people, and maybe you're

5    the person, I don't know.

6              Way is it, if prescription drug abuse is such a

7    problem at the Boeing plant, the company -- you're the

8    Director of Military Operations or I've forgotten --

9              THE WITNESS:  Operations.

10             THE COURT:  -- Director of Operations for Military

11   Aircraft, why wasn't there an aggressive move made with the

12   UAW to renegotiate that contract provision to address that

13   and allow for more randomized testing?

14             THE WITNESS:  So part of the answer is we -- we were

15   not aware how big the problem was --

16             THE COURT:  Well, Mr. Fasold was.

17             THE WITNESS:  -- and, secondly, as we did find it,

18   we have been working with their corporate headquarters on --

19   on this particular issue --

20             THE COURT:  But that's --

21             THE WITNESS:  -- until we got the -- got the panel

22   expanded.

23             THE COURT:  I mean that was four or five years.

24             THE WITNESS:  I haven't -- I haven't been in

25   Philadelphia that long, but we -- we've been working it with

1  the corporation, and like Dave Bouse testified, it's -- it's

2  enterprise-wide and we have to work it at -- at the

3  individual sites with the individual represented contracts

4  that we have.

5          THE COURT:  Okay.

6          THE WITNESS:  But it is a concern to us.

7          THE COURT:  Okay.  Thank you.

8          MS. TAYLOR:  I have no further questions.  I was

9  just standing here in case --

10          THE COURT:  How did I do?

11          MS. TAYLOR:  -- I had questions --

12          THE COURT:  Did I steal any of your questions?

13          MS. TAYLOR:  -- based on yours.

14          MR. SCUDERI:  Yes, just one.  Actually, two.

15          THE COURT:  Well, I hope I didn't mess them up.

16                  CROSS-EXAMINATION

17  BY MR. SCUDERI:

18  Q   Sir, is this problem with substance abuse, just

19  restricted to Boeing Ridley Park?

20  A   I'm sure we have -- we have substance abuse at the other

21  sites.

22  Q   Well, are there investigations at other sites?

23  A   Not that I'm aware of.

24  Q   Okay.  This redundancy --

25  A   Are you talking external investigations?

1   Q   Criminal, yes, criminal?

2   A   Not that I'm aware of.

3   Q   Okay.  This redundancy of inspection of parts, is that

4   just performed at Boeing Ridley Park or is that all over the

5   country?

6   A   It's in every aircraft facility.

7   Q   Okay.  If everybody at Boeing Ridley Park were sober, and

8   had never done drugs, would you still have that redundancy

9   checking?

10  A   It might eliminate some of it, yes.  We -- we do process

11  surveillance where if a -- if a job is performed

12  successfully, without non-conformances over a period of time,

13  we back some of the inspection requirements out of it, and so

14  does the Government.

15  Q   Okay.  Can you relate non-conforming parts to alcohol or

16  drug abuse?

17  A   Not directly.  I -- I think it's obvious that people that

18  are impaired don't have the same hand-eye coordination, or --

19  or adherence to policy and procedure, which I think is

20  evident from the -- the chart that I showed earlier.

21  Q   Isn't there a way of backtracking where a certain part

22  was manufactured within the plant at Boeing?

23  A   Where it was, yes.

24  Q   Where it was manufactured; is that correct?

25  A   The -- the work area?  Yeah.

1    Q    In which shop the work area?

2    A    Mm-hmm.

3    Q    And within that work area, can't they tell which employee

4    worked on the part?

5    A    Yeah, you can go back and look at the -- the individual

6    jobs, but a lot of times non-conformances is -- aren't --

7    aren't that easy to -- to track.

8    Q    But, in theory, you could go back and say, Here's a piece

9    of composite, and it was manufactured by Victor Phillip, or

10   it was inspected by Victor Phillip; isn't that correct?

11   A    Correct.

12   Q    Do you have any evidence with you today that any part

13   that any of these people worked on was non-conforming?

14   A    No, I do not.

15   Q    Okay.  Now, can you take half a vacation day?

16   A    You can.

17   Q    Can you?

18   A    Yes.

19   Q    Can you take an hour of vacation day?

20   A    It depends on what it's for.

21   Q    Okay.  Are there -- so can I take -- can I use an hour

22   for vacation, let's say, if I had a family emergency?

23   A    If it's preapproved, yes.

24   Q    Preapproved?

25   A    Yes.

1  Q   Preapproved.  Okay.  So the longer you stay at Boeing, do

2  you get more vacation?

3  A   Correct.

4  Q   And if you're there for over 20 years, you get four weeks

5  vacation?

6  A   That's correct.

7  Q   Now, to your understanding, Victor Phillip was never

8  written up for absences?

9  A   That's correct.

10 Q   Okay.  Now, and that would be in his permanent record

11 somewhere, correct?

12 A   As Dave Bouse testified, it gets pulled out of the

13 records after ten months.

14 Q   At some point?

15 A   Ten months.

16      MS. TAYLOR:  Ten months.

17 BY MR. SCUDERI:

18 Q   Oh, ten months.  So you don't really know if he was -- he

19 might have a million corrective action reports.

20      You're telling me that Boeing does not keep records

21 more than ten months?

22 A   For the -- per the UAW 1069 contract, that's correct.

23 Q   Well, in theory, you have Victor Phillip, that he was --

24 when you are talking about late, or misses work, or absences,

25 you're including vacation time; is that correct?

1   A    In -- in -- it was an apples-to-apples comparison across

2   the entire work force, yes.

3   Q    Okay.  So, in theory, if I have four weeks vacation, and

4   I take an hour for 60 days in a row, I'm just using up 60

5   hours, but it shows up as a day absent, 60 days absent; isn't

6   that correct?

7   A    A partial.

8   Q    A partial.

9   A    Yeah.

10  Q    And on your chart here you have partial, it says "Number

11  of Full, Partial Day Absences."

12          I'll show you this.

13          (Pause.)

14  A    Correct.

15  Q    Is that your chart?

16  A    Yes.

17  Q    So it would mean that Victor Phillip was absent for 80

18  days, correct?

19  A    It means that those 60 hours that you talked about, 60

20  days --

21  Q    Right.

22  A    -- that he took an hour --

23  Q    Right.

24  A    -- that impacted the production line.

25  Q    Okay.

1   A   Because there's --

2   Q   I'm not asking you that question.

3   A   -- not a manager --

4   Q   I'm not asking that question.

5   A   Okay.

6   Q   I'm just asking you whether that shows up as a day absent

7   or late --

8   A   It --

9   Q   -- on your chart?

10  A   Any -- I said earlier -- any tardies, and any leave

11  earlies, or any full day absences.

12  Q   And vacation day absences?

13  A   Any.

14  Q   Any.  Okay.  Any.

15  A   Any.

16  Q   So you're agreeing with me?

17  A   Right.

18  Q   In theory, he could have gotten approval for 60 one-hour

19  days and it shows up as 60 days out?

20  A   Correct.

21  Q   And for that, at least for the ten months, there has been

22  no corrective action taken against Victor Phillip; is that

23  correct?

24  A   Per the documents, that's correct.

25  Q   Now, did the Government ask you to look at the rest of

1  the work force, the non-union work force, and see about their

2  absences?

3  A   The rest of the non -- the salaried-exempt employees?

4  Q   All right.  At Ridley Park there are 6,000 employees.

5  A   Correct.

6  Q   They're 1900 in the union.

7  A   Right.

8  Q   You know about the EAP Program, correct?

9  A   I do.

10 Q   And you know that also non-union people are in the EAP

11 Program.

12        Did you examine their work habits, whether they were

13 absent a lot?

14 A   We -- we do look at that, yes.

15 Q   But it's not in this chart?

16 A   It's not -- it's not in that chart, because we don't

17 track attendance for salaried-exempt people, the same way

18 that we do for non-exempt employees.

19 Q   And were any of those people arrested?

20 A   Two.

21 Q   Were any non-union people arrest?

22 A   Two.

23 Q   Two.  Okay.  Now, about the CARs, the corrective action

24 reports.

25 A   Mm-hmm.

1  Q   Did you break down who received the reports as far as

2  seller versus buyers or narcotics?

3  A   No, I do not have that information.

4  Q   Okay.

5          MR. SCUDERI:  No further questions.

6                    CROSS-EXAMINATION

7  BY MS. SCOTT:

8  Q   Good afternoon, Mr. Jones.

9  A   Hello.

10 Q   Sir, you indicated that you actually oversee three

11 individual sites for Boeing; is that right?

12 A   Correct, cognizant authority on those.

13 Q   Did you bring any charts that compared the absences of

14 employees for Ridley Park, as it relates to those other two

15 sites?

16 A   I did not.

17 Q   And do you have any charts, or any information, as to the

18 inability to meet contractual deadlines comparing Ridley Park

19 to the other two sites that you oversee?

20 A   Are you asking if I have information on it or -- or can

21 --

22 Q   Did you bring any charts or documentations --

23 A   I do not have --

24 Q   -- with you here today?

25 A   -- I do not have charts for that.

1  Q   You spoke about corrective action reports that were given

2  to Mr. Swan.

3        Do you still have those in front of you, sir?

4  A   I do.

5  Q   And the first one was actually given on October 25th,

6  2010, where Mr. Swan failed to comply with a company rule

7  related to a buy off operations process; is that right?

8  A   Correct.

9  Q   And you testified that you were not sure exactly what had

10 been done at that time, but that he, in some way, failed to -

11 - to conform with the company policy; is that right?

12 A   Correct.

13 Q   It's fair to say that there are a number of employees who

14 receive the CARs, right?

15 A   Correct.

16 Q   Many of whom are not the subject of Government

17 investigations, right?

18 A   Mm-hmm.

19 Q   Many of those who are not the subject of Government --

20 Government investigations who receive repeated CARs; is that

21 right?

22 A   Correct.

23 Q   So you certainly can't testify today that that CAR back

24 on October 25th, 2010, was somehow related to Mr. Swan's use

25 of opiates; is that right?

1   A   I cannot.

2   Q   And, in fact, you don't even know whether he was using

3   opiates back on October 2010?

4   A   I do not.

5   Q   Ms. Taylor showed you the -- what's been marked as Jones

6   1.  I think it was Page 3.

7           Do you have that still in front of you?  That's the

8   list of defendants with four highlighted areas for the four

9   defendants that are related to this case.

10  A   Correct.

11  Q   And one of those individuals is my client, James Swan.

12  A   Correct.

13  Q   You highlighted Mr. Swan because he had 31 percent

14  absentee -- absenteeism; is that right?

15  A   Correct.

16  Q   Going back to 2011, the notation is that there were 107

17  absences in 2011; is that right?

18  A   Correct.

19  Q   Does that also include the days that Mr. Swan was

20  suspended without pay after his arrest in this case?

21  A   I don't -- I do not believe so.

22  Q   Okay.  Back in 2010 -- or you said you don't believe so.

23          Do you --

24  A   Well, it's through September, the end of September 2011.

25  Q   Okay.

1   A    So it would not include those if it was after that.

2   Q    Okay.  2010, you indicated that there were 62 either

3   partial or full day absences.

4   A    Correct.

5   Q    Are you aware that Mr. Swan suffered from carpal tunnel

6   syndrome?

7   A    I -- I am not.

8   Q    Then you also are not aware that he was using many FLMA

9   and sick days related to that carpal tunnel?

10  A    I am not.

11  Q    So certainly, in your calculations, there is no --

12  there's no breakdown as to what the sickness, or what the

13  illness, or what the absence was for?

14  A    Correct.

15  Q    So then you're also not aware that in 2009, Mr. Swan was

16  out of work for six weeks after a bike accident?

17  A    I am not.

18  Q    So all you have are the numbers, not anything behind the

19  numbers?

20  A    Correct.

21  Q    You spoke about the quality control at the Ridley plant

22  being affected by perhaps the number of absences or perhaps

23  drug use.

24          Do you have anything that compares what the level of

25  quality control was at Ridley Park versus the other two

1  plants that you oversee?

2  A    I do.  I don't have the data in front of me, but, yes, I

3  have that data.

4  Q    But not here today with you?

5  A    Correct.

6            MS. SCOTT:  I have no further questions.

7            THE COURT:  Do you know it off the top of your head?

8            THE WITNESS:  The -- what we call the cost of rework

9  repair and scrap is higher in Philadelphia than it is at the

10 other two sites that she was asking about.

11 BY MS. SCOTT:

12 Q    Do the other two sites also produce the Chinook and

13 Osprey Helicopters?

14 A    One -- one site, Mesa, produces the Apache -- attack

15 helicopter, the H-6I, and a number of proprietary programs.

16 Q    So they are not necessarily the same products?

17 A    It's not the same product.

18 Q    At least for that one?

19 A    It's not the same product.

20           MS. SCOTT:  I have no further questions.

21           MR. DRYER:  No questions, your Honor.

22           THE COURT:  All right.

23           MR. LAIGAIE:  Just a couple, your Honor.

24                      CROSS-EXAMINATION

25 BY MR. LAIGAIE:

1  Q   Since it's on the screen, I'm going to ask you some

2  questions about Page 3 of Jones 1, the spreadsheet.

3  A   Okay.

4  Q   Boeing employees who have worked for more than 20 years

5  get 20 days a year of vacation, correct?

6  A   Correct.

7  Q   And employees who have worked from one to nine years get

8  ten days vacation?

9  A   Correct.

10 Q   And employees who have worked ten to 19 years get 15 days

11 vacation, correct?

12 A   Correct.

13 Q   Okay.  And what you've done here is tabulated the total

14 number of vacation days and sick days taken by this group,

15 and compared it to the total vacation and sick days taken by

16 the entire union population, correct?

17 A   Partial and full day absences, correct.

18 Q   Okay.  And, so, I note that 22 of the 33 people listed on

19 this chart have 20 plus years of service.

20        Do you agree with me on that?

21 A   I haven't made the calculation, but I assume you're

22 right.

23 Q   Okay.  Did you adjust the entire population for the fact

24 that this population, two-thirds of these people get 20 days

25 of vacation a year allotted to them?  Did you adjust that

1   with the rest of the population --

2   A   I have not.

3   Q   -- to normalize it?

4   A   I have not.

5   Q   And if the entire population had fewer people with 20

6   years of experience, it would have -- these would be skewed,

7   the number of days taken would be skewed higher.

8           Would you agree with me?

9   A   Yup, we have a very senior work force across the board.

10  Q   Well, is it -- is it your understanding it's consistent

11  with your overall work force that 60, nearly 70 percent of

12  the workers have 20 years of service?

13  A   That's a -- a little higher, but --

14  Q   It seems high --

15  A   Yes --

16  Q   -- yes.

17  A   -- but we have senior, a very senior work force on

18  average.

19  Q   Okay.  Now, let me make sure I understand what you're not

20  testifying to.

21          You're not testifying that the V-22 has quality

22  problems, are you?

23  A   Nope.

24  Q   It's a good aircraft, right?

25  A   Yup.

1  Q   And the Chinook, it's been in service for 50-plus years,

2  correct?

3  A   Correct.

4  Q   It's a good quality aircraft.

5  A   It's only as good as -- as the way it's built.

6  Q   I hear you, but it's built well, correct?

7  A   Yes.

8  Q   You agree with Secretary of State Clinton, when she says

9  that the V-22 Osprey has an excellent safety record, don't

10 you?

11 A   I do.

12 Q   Now, I know that you can't track every piece of work done

13 by every production employee.  We've talked about that some.

14         My client, Mike Homer, is an inspector of final

15 assembly.  In fact, Boeing can, at the Ridley Park, track

16 every piece of work that my client, Mike Homer, signs off on,

17 can it?

18 A   It can go back to -- as an inspector, he can go back and

19 look at all of his inspection records, correct.

20 Q   And if there were a problem with something that Mike

21 Homer did, Boeing could track back to, Wait a minute, Homer,

22 we had a problem with this failure in the field, and you

23 signed off on it, correct?

24 A   If we did the manual due diligence on each and every --

25 each and every non-conformance across the board, yes.

1   Q   Well, okay.  And certainly you're aware that when there's

2   a field failure, be it combat, or be it testing, there's an

3   extreme amount of scrutiny placed on what happened and why?

4   A   Correct.

5   Q   And no problem with the Chinook, no problem with the

6   V-22, has ever come back to something that Mike Homer did

7   incorrectly, correct?

8   A   I cannot answer that.

9               MR. LAIGAIE:  No further questions, your Honor.

10              THE COURT:  All right.  Mr. O'Meara?

11              MR. O'MEARA:  Thank you, your Honor.  I have no

12  questions.

13              THE COURT:  All right.  Sir, thank you very much for

14  your time.

15              THE WITNESS:  Thank you.

16              (Witness excused.)

17              THE COURT:  All right.  We're done with the

18  evidence.

19              Any evidence from the defense?

20              MS. SCOTT:  Nothing, your Honor.

21              COUNSEL:  No, your Honor.

22              THE COURT:  All right.  So I'll take all this

23  evidence, and consider it, and issue a ruling on Mr. Swan,

24  Patterson, Phillip, and Duris.

25              Was that the plan?

1          MS. TAYLOR:  Yes, sir.

2          THE COURT:  All right.  And then we'll address any

3     individual issues after that opinion, after that ruling comes

4     out with respect to the defendants as their sentencing dates

5     approach.

6          MS. TAYLOR:  Yes.

7          THE COURT:  If somebody needs a hearing before the

8     sentencing date, if you think we're going to need more than a

9     half hour or 45 minutes, we'll do that.

10          MS. TAYLOR:  Okay.

11          THE COURT:  Does anyone want to submit any more

12     briefs about anything?

13          MR. DREYER:  Your Honor, I have character evidence

14     letters on behalf of Mr. Patterson, and  obviously I would

15     like to submit those and make them available to the

16     Government.

17          THE COURT:  Okay.  Have they been docketed or do you

18     want me to docket them?

19          MR. DREYER:  No, they don't need to be docketed.

20          THE COURT:  Okay.

21          MR. DREYER:  They can just be reviewed by your

22     Honor.

23          THE COURT:  Okay.

24          MR. LAIGAIE:  Your Honor, I would intend to file a

25     sentencing memorandum --

1        THE COURT:  Oh, sure.

2        MR. LAIGAIE:  -- prior to sentencing.

3        COUNSEL:  So would I.

4        THE COURT:  I'm talking about any more briefing on

5   the 3607 issue --

6        COUNSEL:  I don't believe so, your Honor.

7        THE COURT:  -- on the applicability.  I mean you'll

8   have a chance to -- they'll be more evidence, apparently,

9   coming out.

10       MR. LAIGAIE:  And I may have something I wish to

11  respond if and when I see that evidence.

12       THE COURT:  Right, I understand.  But as of today,

13  based on the evidence that the Government's offered?

14       MR. LAIGAIE:  No, your Honor.

15       I might submit Hillary Clinton's statement about the

16  V-22.

17       COUNSEL:  Or bring her in live.

18       MR. LAIGAIE:  Yes.

19       MS. TAYLOR:  I don't stipulate to that report.  I

20  want you to present the Secretary.

21       THE COURT:  Excellent.

22       MS. TAYLOR:  It would be a crowning moment.

23       THE COURT:  All right.  So we can close the record

24  on this other than the things you're going to follow-up on,

25  Ms. Taylor, if anything?

1          MS. TAYLOR:  Yes.  Yes, your Honor.

2          MS. LUNKENHEIMER:  Yes, your Honor, and we'll seek

3    to provide chambers with a copy of our exhibits, so --

4          THE COURT:  Okay.  Any other thoughts, words of

5    wisdom from anyone?

6          (No response.)

7          THE COURT:  All right.  It's been a long day.  Thank

8    you.  Have a good night and I'll -- I'll get your ruling out

9    promptly.

10          Thank you.

11          MS. TAYLOR:  Thank you, your Honor.

12          ALL COUNSEL:  Thank you, your Honor.

13          (Court adjourned at 5:18 o'clock p.m.)

14                              *  *  *

I N D E X

| WITNESSES: | DIR | CR | REDIR | RECR |
|---|---|---|---|---|
| David Bouse | | | | |
|     By Ms. Lunkenheimer | 10 | | | |
|     By Mr. Scuderi | | 55 | | |
|     By Ms. Scott | | 68 | | |
|     By Mr. Laigaie | | 76 | | |
| Raymond Carr | | | | |
|     By Ms. Lunkenheimer | 85 | | 93 | |
|     By Mr. Scuderi | | 89 | | 94 |
|     By Mr. Laigaie | | 91 | | |
| Dr. George Downs-Voir Dire | | | | |
|     By Ms. Taylor | 97 | | 144 | |
| Dr. George Downs | | | | |
|     By Ms. Taylor | 106 | | | |
|     By Mr. Scuderi | | 123, 137 | | |
|     By Ms. Scott | | 130 | | |
|     By Mr. Laigaie | | 140 | | |
| Bernard Jones | | | | |
|     By Ms. Taylor | 146 | | | |
|     By Mr. Scuderi | | 175 | | |
|     By Ms. Scott | | 181 | | |
|     By Mr. Laigaie | | 186 | | |

* * *

<u>E X H I B I T S</u>

| NUMBER | <u>ADMITTED INTO EVIDENCE</u> |
|---|---|
| Jones 1 | 97 |
| HR-15, 8, 9, 5, 7, 6, 11, 1, 2, 4, 14, 14 | 97 |
| Carr 1 through 8, 10 through 13, 14 | 97 |
| Downs 3 | 99 |

* * *

CERTIFICATION


    I hereby certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter.


S:/Geraldine C. Laws, CET          Date 8/1/12
Laws Transcription Service